**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

MELVIN THOMAS
c/o
Nathans & Ripke, LLP
120 E. Baltimore Street, Suite 1800
Baltimore, Maryland 21202

      Plaintiff,

v.                                                        Case No. _____

BALTIMORE POLICE DEPARTMENT
   Serve on: Commissioner Richard Worley
   601 E. Fayette Street
   Baltimore, MD 21201,

GEORGE VIGUE,
80 Rosalia Circle
York, Pennsylvania 17402,

SCOTT DANIELCZYK,
76 N. Forest Drive
Forest Hill, Maryland 21050,

RONALD M. COPELAND,
4349 Cooper Road
Whiteford, Maryland 21160,

      Defendants.

\*     \*     \*    ooo0ooo    \*     \*     \*

**COMPLAINT AND REQUEST FOR JURY TRIAL**

Plaintiff Melvin Thomas, by his undersigned attorneys, sues Defendants

Baltimore Police Department (BPD) and employees of the BPD, including George

Vigue, Scott Danielczyk, and Ronald M. Copeland ("Officer Defendants" or "BPD

Employees") and states the following:

## <u>INTRODUCTION</u>

1.      Melvin Thomas spent over 19 years in Maryland prisons for an attempted murder he did not commit.  He was convicted on December 6, 2001, and exonerated on December 15, 2020.

2.      On the night of February 26, 2001, Myron Brockington was shot outside a rowhouse bar called "My Sally's Place," in the 100 block of North Glover Street in Baltimore (101 North Glover Street).  He had been inside the bar playing Keno and watching TV.  Mr. Brockington survived, and later explained that the shooting happened outside in the 100 block of North Glover Street after he walked out of the bar to use his cell phone.

3.      Mr. Brockington saw two individuals outside together just before he was confronted with a gun.  He knew one of two; the person he believed handed the shooter a gun.  The very next day, on February 27, 2001, from the hospital, Mr. Brockington identified Donte Lyle ("Lyle") as the person who handed the shooter the gun.  Unlike Lyle, Mr. Brockington did not recognize the shooter or know him.

4.      Lyle was arrested, talked to police, and described the shooter as African American, 22-23 years old, short, dark-skinned, close-cut hair, thick build.  Lyle denied knowing the person's real name.

5.      Nina Wilson, who was working in the bar when the crime happened, did not witness the shooting, but she had been sitting inside the bar with Mr. Brockington,

Lyle and the unidentified individual that Mr. Brockington accused of the shooting. Ms. Wilson said that before the shooting happened, she spoke with the unidentified individual inside the bar. Ms. Wilson provided her description to the police. A police report noted the description was a black male, dark skin, 5'10", Asian shaped eyes, 22-23 years old, 175-180 lbs.

6.      Dewey Morgan witnessed Mr. Brockington talking or arguing with the man who shot him right before the shooting. Mr. Morgan told investigating officers from the Baltimore Police Department the nick-name of the person who shot Mr. Brockington and told police the shooter was known to him as a drug dealer.

7.      After Lyle's arrest, about five weeks passed during which police did not arrest anyone else for the shooting.

8.      Eventually Baltimore Police Department ("BPD") officers came to Mr. Brockington with a set of photographs (a "photospread") that contained Plaintiff Melvin Thomas' picture. Mr. Brockington reviewed the photospread and did not identify Mr. Thomas as being involved in the incident. The Officer Defendants then, and in subsequent meetings with Mr. Brockington, showed Mr. Brockington additional photospreads that again contained Mr. Thomas' picture. In the subsequent showings, Officer Defendants physically pointed to the picture of Melvin Thomas in those photospreads when they were shown to Mr. Brockington. They directed Mr. Brockington to Mr. Thomas' photograph in the subsequent photospreads, not any others. While pointing to Mr. Thomas' photograph in the photospreads, the Officer Defendants became aggressive with Mr. Brockington. The Officer Defendants told Mr.

Brockington that Mr. Thomas was the person that shot you and insisted that Mr. Brockington needed to sign his name and identify the picture of Mr. Thomas as being his shooter.

9.      Mr. Brockington initially refused to pick Mr. Thomas' picture out of the photospread when police instructed him to do so.  The police officers insisted.  Mr. Brockington feared the officers and believed they would do something to harm him or his family if he did not just do what they insisted.  Eventually, at the insistence of the Officer Defendants, Mr. Brockington signed Mr. Thomas's photograph.

10.     The Officer Defendants fabricated the false identification of Mr. Thomas by coercing Mr. Brockington into identifying him as the shooter.

11.     After Mr. Brockington's succumbed to the police pressure and he signed the photograph where the police told him to, the Officer Defendants then covered-up their unconstitutional misconduct during the photospreads and never disclosed that they only obtained a signature on that picture by coercing Mr. Brockington into signing Mr. Thomas' photograph.  The Officer Defendants falsely presented this form of identification as if it had been obtained through a proper constitutional legal process when they knew it had only been obtained through deliberate violation of that process.

12.     As the result of the Officer Defendants misconduct, Mr. Thomas was arrested and charged with Attempted Murder and other offenses.  At trial, the only evidence linking Mr. Thomas to the crime was the lone identification from Mr. Brockington. The Officer Defendants made certain Mr. Brockington showed up for Mr. Thomas' trial and that he testified consistently with the fabricated identification.

13.     Mr. Thomas said he had nothing to do with the crime. It made no difference. After a jury wrongly convicted Mr. Thomas based on Mr. Brockington's falsely manipulated identification, Mr. Thomas was sentenced to 65 years in prison.

14.      During more than 19 years of incarceration, Mr. Thomas maintained his innocence. From his prison cell, Mr. Thomas continued to seek justice and eventually obtained access to police records that the police claimed had been unavailable and could not be found.

15.     Eventually, the State's Attorney's Office for Baltimore City ("SAO"), which had prosecuted Mr. Thomas, launched a re-investigation in which it confirmed Mr. Thomas' actual innocence.

16.     The SAO, then caused to be filed a Petition with the Circuit Court for Baltimore City, which it jointly filed with Mr. Thomas, affirming the results of the SAO's investigation and the SAO's conclusion that the Court should grant Mr. Thomas' Writ of Actual Innocence.

17.     On December 15, 2020, a judge granted Mr. Thomas' Writ of Actual Innocence (which was jointly filed by Mr. Thomas and the State of Maryland) and ordered his immediate release.

18.     On January 20, 2021, the SAO issued a Certification of Conviction in Error, confirming the State's conclusion that Mr. Thomas is factually innocent of all the charges upon which he was convicted, and for which he served 19 years in prison.

19.     Mr. Thomas was not wrongfully convicted by accident. He spent over 19 years in prison as a result of misconduct at the hands of Officer Defendants and

detectives acting in the BPD.

20.     In sum, the Officer Defendants coerced Mr. Brockington into falsely implicating Melvin Thomas.

21.     To seal Plaintiff's fate and conceal their earlier actions, the Officer Defendants concealed their coercive conduct that had extracted the false identification and did not accurately report that Mr. Brockington viewed numerous photospreads with Mr. Thomas' picture and Mr. Brockington did not pick his picture, or that in turn that the Officer Defendants had pointed to the picture that they wanted Mr. Brockington to identify and then used coercive pressure on Mr. Brockington to get him to eventually identify Mr. Thomas' picture after he refused to do so when presented with photospreads containing Mr. Thomas' picture.

22.     In the face of this campaign by law enforcement to secure a conviction, Mr. Thomas was wrongfully convicted at trial because of, and as a result of, the identification the Officer Defendants fabricated against Mr. Thomas.

23.     This lawsuit seeks redress for the injuries Mr. Thomas sustained as the result of Defendants' abuse of power and unconstitutional misconduct.

## JURISDICTION AND VENUE

24.     This action is brought under 42 U.S.C. § 1983.

25.     This Court has both federal question and supplemental jurisdiction under 28 U.S.C. §§ 1331 and 1367.

26.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events leading to this Complaint occurred in this judicial district.

27.     On December 9, 2021, undersigned counsel sent the Chief of the Office of Legal Affairs for the City of Baltimore notice of Plaintiff's claims per the Maryland Local Government Tort Claims Act, to include claims against the employees and agents of the Baltimore City Police Department. The Mayor and City of Baltimore are given notice of any potential claims against the employees and agents of the Baltimore City Police Department per the Local Government Tort Claims Act and then required to provide legal defense for employees in any action resulting from tortious conduct or omissions committed within the scope of employment.

28.     Undersigned counsel did not receive a response from the City of Baltimore.

## PARTIES

29.     Plaintiff Melvin Thomas was born in Baltimore, Maryland.  At all times relevant to this Complaint, he was a citizen and resident of the State of Maryland. Mr. Thomas is currently still a resident of the State of Maryland.  On April 24, 2001, he was wrongfully arrested and incarcerated. On December 6, 2001, he was wrongfully convicted by a jury of attempted murder.  Mr. Thomas was continuously incarcerated from December 2001 through December 15, 2020.  As a result, Mr. Thomas spent over 19 years in prison until his exoneration.

30.     At all times relevant to this Complaint, the Officer Defendants were employees of the BPD, acting under the color of state law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and usage of the BPD. Plaintiff sues the Officer Defendants in their individual capacities.

31.     Defendant Baltimore Police Department employed each of the Officer Defendants at all times relevant to this suit. BPD is a "person" within the meaning of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

32.     In February 2001, Mr. Brockington was a resident of Baltimore City and frequented a Bar called Ms. Sally's Place located at 101 North Glover Street, in Baltimore, Maryland.

33.     On February 26, 2001, Mr. Brockington was at Ms. Sally's Place.

34.     On that date, Mr. Brockington walked outside Ms. Sally's Place and was confronted by an individual with a gun.

35.     The individual with the gun fired and shot Mr. Brockington.

36.     Mr. Brockington survived the shooting, escaped the scene, and was subsequently interviewed by the police on multiple occasions.

37.     Mr. Thomas had nothing to do with the shooting of Mr. Brockington, a person he did not even know.

38.     Mr. Thomas was not anywhere on the scene of the shooting or at Ms. Sally's Bar at any time on the night in question.

39.     BPD Officers responded to the scene of the shooting and started an investigation of the incident.

40.     BPD employees involved in this investigation included, but are not limited to, Detective George Vigue, Detective Scott Danielczyk, and Detective Ronald Copeland (referred to as BPD Employees and/or Officer Defendants).

41.     On February 27, 2001, Mr. Brockington identified Donte Lyle as one of two individuals he saw just prior to being robbed and shot.

42.     On that same date, Mr. Brockington stated that he believed Lyle handed the gun to the shooter just before he was shot.

43.     Nina Wilson was in the Bar with Mr. Brockington prior to the shooting. She noticed another person she had never seen before, who she described as a Black Male, 22-23 years old, with dark skin, "Asian" shaped eyes, round face, flat/wide nose, close cut hair 5'9" to 5'11," medium build.

44.     Mr. Brockington informed police he did not know this other person either, but that this was the man who shot him.

45.     BPD employees arrested Lyle who made a statement.

46.     Lyle described the shooter as a Black Male, approximately 22 years old, close-cut hair, thick build, and short, dark skinned.

47.     Mr. Thomas is not short or dark-skinned.

48.     BPD employees subsequently met with Mr. Brockington on multiple occasions.

49.     BPD employees showed Mr. Brockington photographs, including photographs arranged in groups of six ("photo-spreads").

50.     BPD employees also showed photographs to Nina Wilson, on or about April 3, 2001, including Mr. Thomas' photograph.

51.     Ms. Wilson did not pick Mr. Thomas' photograph or any photograph on April 3, 2001, as being involved in Mr. Brockington's shooting or even being present

that night in the Bar.

52.     In response to her not picking any photograph, BPD employees told Ms. Wilson that she needed to pick a picture anyway.

53.     Ms. Wilson informed the BPD employees that she refused to just pick a picture when it was not the person she saw.

54.     Ms. Wilson told BPD employees why she knew the picture of Mr. Thomas was not the person she saw, and she explained why his picture was wrong.

55.     Mr. Brockington was shown photospreads by BPD employees that included Mr. Thomas' photograph but did not select his photograph.

56.     In response, BPD employees presented other photospreads with Mr. Thomas' photograph in them.  During the presentation of the subsequent photospreads to Mr. Brockington the police became aggressive with Mr. Brockington, banging their finger on the table, while pointing at the picture of Mr. Thomas and insisting Mr. Brockington pick a photograph falsely identifying Mr. Thomas as being his shooter.

57.     Mr. Brockington refused to pick the pictures of Mr. Thomas that BPD employees identified and pointed at, or any photograph on more than one occasion.

58.     Rather than report to the SAO that Mr. Brockington repeatedly failed to identify Mr. Thomas as the shooter when he was shown the photo arrays containing Mr. Thomas' photograph BPD kept that information secret and continued to try to get an identification of Mr. Thomas out of Mr. Brockington.

59.     BPD employees would meet Mr. Brockington by showing up at his house, or by picking Mr. Brockington up and taking him to the police station and putting him

in a room.

60.     In a subsequent encounters, Mr. Brockington was again shown photographs including Mr. Thomas and BPD employees again insisted that Mr. Brockington needed him to pick Mr. Thomas' photograph.

61.     Mr. Brockington was in fear that the police were going to continue to harass him or his family and violate his rights.  The Officer Defendants told Mr. Brockington they finished their investigation, they knew Mr. Thomas was the man that shot him, and that they just needed Mr. Brockington to sign his name next to the photograph.

62.     After BPD employees unconstitutionally obtained Mr. Brockington's signature on the picture of Mr. Thomas, they went to try to get Ms. Wilson to also make an identification of Mr. Thomas, but she refused to make any identification from the photospread and told BPD Employees why Mr. Thomas' picture was not the person who shot Mr. Brockington.

63.     After Ms. Wilson told the Officer Defendants that the person who shot Mr. Brockington was not in the photospread that had Mr. Thomas' picture, BPD Employees decided not to take a recorded statement from Ms. Wilson.

64.     Detective Vigue was the lead investigator of this attempted murder case, Ronald Copeland was a member of the investigative team, and Scott Danielczyk was also a member of the investigative team (collectively the "Officer Defendants").

65.     The Officer Defendants worked collaboratively during the investigation and shared information with one another as it was gathered. They also selectively

summarized their progress in investigative notes and reports that were provided to, among others, their Commanding Officer, and the BPD.

66.     On information and belief, the Officer Defendants failed to memorialize meetings with Mr. Brockington when Mr. Brockington was presented with photospreads containing Mr. Thomas' photograph and Mr. Brockington did not select Mr. Thomas' photograph and the Officer Defendants did not disclose these events to the prosecution or the defense because they contradicted the Officer Defendants' narrative of the case.

67.     Detectives Vigue, Copeland and Danielczyk coerced and intimidated Mr. Brockington into adopting their false version of the events, that Mr. Thomas was the shooter.

68.     Given Mr. Brockington's refusal to pick Mr. Thomas's photograph, and Nina Wilson's refusal to pick Mr. Thomas' photograph, the Officer Defendants knew or had reason to know that these witnesses could not make a truthful, accurate, or reliable eyewitness identification of Mr. Thomas.

69.     Dets. Vigue, Copeland and Danielczyk told Mr. Brockington that Mr. Thomas had shot him, and they fed him details implicating Mr. Thomas in order to convince him to sign his name to say that Mr. Thomas did shoot him.

70.     The Officer Defendants intimidated Mr. Brockington, supplied him with the police's version of the facts and used suggestive tactics during the photo arrays, including pointing to Mr. Thomas' photograph, becoming angry with him, and telling Mr. Brockington that the police knew this was the man that shot him and they needed

him to sign Mr. Thomas' picture.

71.     The Officer Defendants coerced, suggested, and/or fabricated a false statement and identification from Mr. Brockington. They ignored Mr. Brockington's prior statements and told Mr. Brockington that they knew Mr. Thomas had committed the crime. Under intense pressure from the interrogating Defendants, Mr. Brockington falsely signed Mr. Thomas' photograph and otherwise stated that Mr. Thomas shot him because of the unconstitutional coercion committed by the Officer Defendants during their meetings with Mr. Brockington and all the way through his testimony at trial.

72.     On information and belief, the Officer Defendants did not take notes of, or videotape or audio record, other prior meetings with Mr. Brockington when he refused to follow their direction to select Mr. Thomas' photograph in order to cover up their misconduct.

73.     The Officer Defendants knew or had reason to know that Mr. Brockington's subsequent identification of Mr. Thomas was false and not voluntary.

74.     The Officer Defendants never disclosed to the prosecution or Plaintiff's defense counsel (before, during, or after trial) that they had coerced and fabricated Mr. Brockington's statements and identification. The Officer Defendants failed to disclose, among other things, their intimidation, suggestive photo array tactics, and pre-statement and pre-identification statements to Mr. Brockington trying to convince him of Mr. Thomas' guilt. The Officer Defendants conspired with one another to conceal their coercion, suggestion, and fabrication of the statements and the identification.

75.     On the basis of the fabricated witness statement and identification, the

Officer Defendants sought and obtained a warrant for the arrest of Mr. Thomas.

76.     Police officers have an obligation to disclose all material information, including information harmful to their investigations, in applications for a search and/or seizure warrant so that a neutral judge can make a probable cause determination.

77.     In the application and supporting affidavit for Mr. Thomas' arrest, the Officer Defendants did not disclose Mr. Brockington telling them that pictures they showed him of Mr. Thomas was not the person who shot him, the prior negative identifications and witness statements, or their coercion of Mr. Brockington.

78.     The Officer Defendants presented the Baltimore City State's Attorney's Office with false and incomplete information to secure indictments.

79.     In doing the above, regarding Mr. Thomas and his civil rights, the Defendants acted with actual malice and/or gross negligence.

80.     Because the SAO did not know that the Officer Defendants had fabricated and/or coerced Mr. Brockington's identification and testimony, prosecutors charged Mr. Thomas with all the charges placed against him, including attempted first-degree murder.

81.     The prosecution case at trial relied on the coerced and/or fabricated identification and witness testimony of Mr. Brockington.

82.     On December 6, 2001, the jury convicted Mr. Thomas of, *inter alia*, attempted first degree murder and robbery.

83.     Mr. Thomas' arrest, his conviction at trial, and his subsequent seizure and

incarceration resulting in the depravation of his liberty was caused by the Officer Defendants' fabrication of evidence against him, to include their described conduct in fabricating Mr. Brockington's alleged and coerced identification from the phot-spread and then subsequently covering up their misconduct by not reporting how the Officer Defendant's coerced and fabricated the alleged identification.

84.     Absent the Officer Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and he would not have been convicted.

85.     The court sentenced Mr. Thomas to a total of 65 years in prison for the attempted first-degree murder of Myron Brockington.

86.     Mr. Thomas never wavered in protesting his innocence.

87.     The Maryland Court of Special Appeals upheld his conviction on direct appeal.

88.     Plaintiff repeatedly challenged his convictions. For almost two decades, courts rejected these efforts.

89.     Mr. Thomas sought records from the police department including all records concerning his arrest and prosecution, but the police department informed both Mr. Thomas and the Circuit Court for Baltimore City that their file was lost and nothing was available.

90.     Mr. Thomas did not cease and eventually received documents in response to a public records request. In those documents, Mr. Thomas discovered police reports that had not been disclosed to the defense before trial.

91.     Mr. Thomas relied on this and other information to seek to establish his

absolute factual innocence through exoneration.

92.     Given the overwhelming evidence of Plaintiff's innocence, the State took

the rare step of joining Mr. Thomas in filing a Joint Petition for Writ of Actual

Innocence.

93.     On December 15, 2020, the Circuit Court for Baltimore City held a hearing,

granted the petition, and vacated the convictions.

94.     The State then dismissed every one of the counts against Mr. Thomas.

95.     The criminal proceedings against Mr. Thomas that were based on the

conduct alleged here finally terminated favorably to Mr. Thomas on December 15, 2020,

with his exoneration, the termination of his case and his release from prison.

96.     That day, for the first time in over 19 years, Mr. Thomas was free.

## DAMAGES

97.     Defendants' misconduct robbed Mr. Thomas of the best years of his life.

98.     Mr. Thomas spent over 19 years caged in Maryland prisons.

99.     Mr. Thomas suffered immense physical and emotional pain throughout

his imprisonment.

100.     He encountered and experienced the violence and degradation inherent to

prison life.

101.     Mr. Thomas witnessed murders in prison, he witnessed inmates killing

other inmates, and he himself was attacked and stabbed with a knife while he slept,

sustaining a serious cut across his face that is still visible on this face to this day.

102.     While incarcerated in State facilities, Mr. Thomas missed meaningful life

events: the ability to share holidays, birthdays, and weddings with loved ones; the

opportunity to find meaningful work; the chance to care for and raise children; the

opportunity to be present with friends and family in moments; the occasion to develop

cherished memories; and the fundamental freedom to lead his own life in freedom.

103.    Plaintiff suffered tremendous damage, including physical injuries and

severe emotional trauma, and he continues to suffer emotional trauma, all of which was

caused by Officer Defendants' misconduct.

104.    Plaintiff's injuries and damages were foreseeable to Defendants at the time

of their acts and omissions.

105.    All the acts and omissions committed by Defendants were done

intentionally, unlawfully, wantonly, recklessly, negligently, with malice and/or in bad

faith.

## <u>FEDERAL CLAIMS</u>

### Count I – 42 U.S.C. § 1983
### Malicious Prosecution (Fourth and Fourteenth Amendments)
### (Against Officer Defendants)

106.    Each foregoing paragraph is incorporated as if restated fully herein.

107.    In the manner described above, by their conduct and under the color of

state law, the Officer Defendants caused Plaintiff to be arrested, charged, and

prosecuted for the attempted murder of Myron Brockington pursuant to legal process

that was unsupported by probable cause, thereby violating Plaintiff's clearly established

rights, under the Fourth and Fourteenth Amendments of the United States Constitution,

to be free of unreasonable searches and seizures.  No reasonable officer in 2001 would

have believed this conduct was lawful.

108.    The misconduct described in this Count was objectively unreasonable, and the Officer Defendants acting individually and in concert, intentionally, knowingly, and deliberately misrepresented the truth and withheld exculpatory facts from the prosecutor.

109.    The proceedings terminated in Plaintiff's favor on December 15, 2020.

110.    As a direct and proximate result of the Officer Defendants' malicious prosecution, Plaintiff suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and he continues to suffer emotional distress.

### Count II – 42 U.S.C. § 1983
### Violation of Due Process (Fourteenth Amendment)
### Fabrication of Evidence
### (Against Officer Defendants)

111.    Each foregoing paragraph is incorporated as if restated fully herein.

112.    In the manner described above, by their conduct and under the color of state law, the Officer Defendants fabricated evidence against Plaintiff.

113.    The Officer Defendants performed the above-described acts under color of state law, deliberately, and recklessly for Plaintiff's clearly established constitutional rights and innocence.  No reasonable officer in 2001 would have believed this conduct was lawful.

114.    As a direct and proximate result of the Officers Defendants' fabrication of evidence, including fabrication of an identification and witness testimony, Plaintiff suffered injuries, including but not limited to loss of liberty, physical injury, and

emotional distress, and he continues to suffer emotional distress.

**Count III – 42 U.S.C. § 1983**
**Violation of Due Process (Fourteenth Amendment)**
**Failure to Adequately Investigate and Disclose Exculpatory and Impeachment Evidence**
**(Against Officer Defendants)**

115.    Each foregoing paragraph is incorporated as if restated fully herein.

116.    In the manner described above, by their conduct and under color of state law, the Officer Defendants deprived Plaintiff of his constitutional rights to be free from deprivation of liberty without due process of law. The Officer Defendants, individually, jointly, and in conspiracy with one another and others, deliberately withheld exculpatory and impeachment evidence. The Officer Defendants also in bad faith failed to adequately investigate the crime in order to shield their wrongful acts. In doing so, the Officer Defendants violated their clearly established duty to report to prosecutors all exculpatory and impeachment materials. No reasonable officer in 2001 would have believed this conduct was lawful.

117.    Absent the Officer Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and he would not have been convicted. The Officer Defendants' misconduct directly led to the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment. The Officer Defendants thus denied Plaintiff his constitutional rights to be free from deprivation of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

118.    As a direct and proximate result of this violation of his constitutional

rights to be free from deprivation of liberty without due process of law, Plaintiff

suffered injuries, including but not limited to the loss of liberty, physical injury, and

emotional distress, and he continues to suffer emotional distress.

**Count IV – 42 U.S.C. § 1983**
**Failure to Intervene**
**(Against Officer Defendants)**

119.     Each foregoing paragraph is incorporated as if restated fully herein.

120.     In the manner described above, by their conduct and under color of law,

during the constitutional violations described herein, each of the Officer Defendants

stood by without intervening to prevent the violation of Plaintiff's constitutional rights,

although each of the Officer Defendants had the opportunity to do so.

121.     The misconduct described in this Count was objectively unreasonable and

was undertaken intentionally, recklessly, and with willful indifference to Plaintiff's

clearly established constitutional rights.

122.     As a direct and proximate result of the Officer Defendants' failure to

intervene to prevent the violation of Plaintiff's clearly established constitutional rights,

Plaintiff suffered injuries, including but not limited to loss of liberty, physical injury,

and emotional distress, and he continues to suffer emotional distress.

**STATE LAW CLAIMS**

**Count V**
**Malicious Prosecution**
**(Against Officer Defendants)**

123.     Each foregoing paragraph is incorporated as if restated fully herein.

124.     The Officer Defendants accused Plaintiff of criminal activity knowing

those accusations to be without genuine probable cause, and they made statements to the prosecutor and other officials to exert influence and to institute and continue the judicial proceedings.

125.    The Officer Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

126.    The Officer Defendants fabricated evidence and withheld exculpatory evidence that would have established Plaintiff's innocence. The Officer Defendants knew that, as described more fully above, no true or reliable evidence implicated Plaintiff in the attempted murder of Myron Brockington.

127.    The Officer Defendants intentionally failed to investigate evidence that would have confirmed Plaintiff's innocence.

128.    The misconduct described in this Count was undertaken intentionally, willfully, and with reckless indifference to the rights of others.

129.    The proceedings terminated in Plaintiff's favor on December 15, 2020.

130.    As a direct and proximate result of this misconduct, Plaintiff suffered and continues to suffer injuries as set forth above, including physical injury and emotional distress.

**Count VI**
**Intentional Infliction of Emotional Distress**
**(Against Officer Defendants)**

131.    Each foregoing paragraph is incorporated as if restated fully herein.

132.    The acts and conduct of the Officer Defendants as set forth above were extreme and outrageous. The Officer Defendants' actions were rooted in an abuse of

power or authority, and they were undertaken with intent to cause, or were in reckless

disregard of the probability that their conduct would cause, severe emotional distress to

Plaintiff.

133.    As a direct and proximate result of the Officer Defendants' actions,

Plaintiff suffered and continues to suffer physical injury and severe emotional distress.

**Count VII**
**Indemnification**
**(Against the Baltimore Police Department)**

134.    Each foregoing paragraph is incorporated as if restated fully herein.

135.    Maryland law provides that public entities are directed to pay any tort

judgment for compensatory damages for which employees are liable for acts or

omissions within the scope of their employment activities.

136.    The Officer Defendants are or were employees of the BPD who acted

within the scope of their employment in committing the misconduct described in this

Complaint.

137.    Accordingly, the BPD should be ordered to indemnify the Officer

Defendants for any judgment entered against them in this matter and to pay such

judgment to the Plaintiffs.

**<u>Demand for Damages</u>**

Plaintiff Melvin Thomas requests that this Court enter judgment in favor of

himself, and against Defendants, including the Baltimore Police Department and award

him:

1.    Compensatory damages, attorneys' fees, costs, and pre-judgment and

post-judgment interest against all Defendants, jointly and severally;

    2.    Punitive damages against each Defendant;

    3.    Any and all other relief this Court deems appropriate.

## **JURY DEMAND**

    Plaintiff Melvin Thomas demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all triable issues of fact.

Dated:    December 13, 2023    Respectfully submitted,


/s/ *Booth M. Ripke*
_____
Booth M. Ripke
Bar # 25764
Bripke@nathanslaw.com
Larry Allen Nathans
Bar # 03023
Nathans@nathanslaw.com
Nathans & Ripke, LLP
Truist Bank Building
120 E. Baltimore Street
Suite 1800
Baltimore, Maryland 21202
(phone) 410-783-0272
(fax) 410-783-0518