IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MELVIN THOMAS,** | * | |
| **Plaintiff,** | * | Case No. 23-CV-003379-BAH |
| v. | * | |
| **GEORGE VIGUE, et al.,** | * | |
| **Defendants.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**OFFICER DEFENDANTS' MOTION TO STAY DISCOVERY PENDING FILING OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT AS A LITIGATION SANCTION BASED ON PLAINTIFF'S EFFORTS TO TAMPER WITH AND PAY WITNESS**

Defendants George Vigue, Scott Danielczyk, and Ronald M. Copeland ("Officer Defendants"), by and through their undersigned attorneys, move this Honorable Court to stay discovery until this Court can resolve Officer Defendants' forthcoming motion to dismiss Plaintiff's Complaint as a litigation sanction based on Plaintiff's efforts to tamper with and pay recanting victim-witness Myron Brockington. In support of this instant motion to stay discovery, Officer Defendants state as follows:

**OVERVIEW**

Recent discovery has revealed that Plaintiff sought to pay the central witness in this case, Myron Brockington, and then tried to hide his misconduct by lying in his answers to interrogatories and deposition testimony. Recorded prison calls show Plaintiff discussing payments to Brockington—the same witness whose recantation forms the backbone of Plaintiff's claims against Officer Defendants—while also having at least four direct phone conversations with Brockington himself during which the two discussed Brockington's testimony. Plaintiff's conduct strikes at the

1

heart of the truth-seeking function of discovery and risks impugning the integrity of the judicial process.

Given the nature and scope of Plaintiff's misconduct, it is unjust and inefficient to force Officer Defendants to continue defending themselves against the entirety of Plaintiff's wide-ranging claims. The case is now on the brink of a dispositive sanctions motion that could end this litigation altogether. To expend resources on additional depositions and expert discovery before the Court determines whether Plaintiff's own misconduct warrants dismissal would be a needless waste of time and money for the parties and a waste of the Court's resources.

A stay of discovery is, therefore, the only fair and practical solution at this stage of litigation. Officer Defendants seek a stay so that they may file and brief a motion to dismiss as a litigation sanction and present the Court with the facts that have been uncovered to date and the controlling case law so that the Court can take appropriate action.[1] See *Johnson v. Baltimore Police Dep't*, No. 22-2095, 2024 WL 1209744 (4th Cir. Mar. 21, 2024) (affirming dismissal as a litigation sanction where the plaintiff knowingly used false and fabricated evidence to secure his exoneration and intentionally tampered with potential witnesses); *Dewitt v. Ritz*, No. CV DKC 18-3202, 2021 WL 915146 (D. Md. Mar. 10, 2021) (granting the defendants' motion to dismiss as a litigation sanction based on witness tampering and the fabrication of evidence and the defendants' motion for award of attorneys' fees). Resolving these issues serves the interests of judicial economy, spares Defendants the inequitable burden of defending a case tainted by fraud, and prevents saddling the parties with substantial costs of continued discovery that may ultimately prove unnecessary.

---

[1] To be clear, Officer Defendants are not alleging any wrongdoing on the part of Plaintiff's counsel. Officer Defendants' instant Motion to Stay and forthcoming Motion to Dismiss as a litigation sanction are based on Plaintiff's own misconduct.

2

**FACTUAL BACKGROUND**

On December 6, 2001, Plaintiff was convicted by a jury of attempted first-degree murder and related charges for the February 26, 2001, shooting of Myron Brockington outside a bar on North Glover Street in the Patterson Park area of Baltimore. *See* ECF 1 at ¶ 2. Plaintiff's conviction was based largely on identification testimony from Brockington himself, who testified two times as a State's witness—first at Plaintiff's motion to suppress hearing and then at Plaintiff's criminal trial—that Plaintiff shot him in the face.[2] Following trial, Plaintiff was sentenced to 65 years of incarceration.

Seventeen years after his conviction, on December 4, 2018, Plaintiff alleges Brockington signed a recantation affidavit stating that he misidentified Plaintiff as the shooter. *See* Ex. 1, Joint Writ of Actual Innocence Petition at p. 6. In this affidavit, Brockington claimed that Plaintiff was not the man who shot him and that he saw the actual shooter at a flea market not long after Plaintiff's criminal trial. *Id.* On April 28, 2020, Brockington participated in a virtual interview with the Conviction Integrity Unit of the Baltimore City State's Attorney's Office, in which the State's Attorney's Office maintains Brockington provided a statement "consistent with the statement he provided to the defense [in December 2018]. He first determined he made a mistake in identifying Defendant Thomas upon seeing the person who shot him at the Flea Market. Prior to this sighting (pre-trial and at trial), the documents reflect no indication the Victim should not have been believed in his identification of Defendant Thomas." *Id*.

On December 14, 2020, Plaintiff and the State's Attorney's Office jointly filed a motion for writ of actual innocence, pursuant to Maryland Criminal Procedure, § 8-301, in the Circuit

---

[2] At trial, Brockington testified he was outside the bar using his cellphone when Plaintiff and Donte Lyle, an individual Brockington knew and who was later arrested and prosecuted alongside Plaintiff, came up behind him. Brockington testified that Lyle gave Plaintiff a gun and Plaintiff then attempted to rob Brockington. Brockington said he was shot twice in the face, and he testified there was "no doubt in my mind" Plaintiff was the shooter.

3

Court for Baltimore City. *See* Ex. 1. This joint motion was based on Brockington's recantation to Plaintiff's criminal defense attorney and the State's Attorney's Office. *Id*. The day after this joint motion was filed, on December 15, 2020, the Honorable Charles Peters held a hearing and granted the joint motion, vacating Plaintiff's conviction. ECF 1 at ¶ 17. The State's Attorney's Office then dismissed all charges against Plaintiff. *Id*. On January 20, 2021, the State's Attorney's Office issued to Plaintiff a Certification of Conviction in Error. *See* Ex. 2, Letter from State's Attorney's Office to Plaintiff. After receiving this certification, Plaintiff filed for relief with the Office of Administrative Hearings, pursuant to the Walter Lomax Act, and was awarded more than $1.6 million in compensation. *See* Ex. 3, Board of Public Works Settlement Agreement.[3] Plaintiff is scheduled to receive a final payment of nearly $250,000 from the State next year. *Id*.

On December 13, 2023, two days before his statute of limitations ran, Plaintiff filed the instant lawsuit against Officer Defendants and the Baltimore Police Department, alleging claims of malicious prosecution, fabrication of evidence, failing to adequately investigate and disclose exculpatory and impeachment evidence, failing to intervene, and related state law claims.[4] *See* ECF 1 at ¶¶ 106-137.

As part of discovery in this case, Officer Defendants asked Plaintiff in an interrogatory whether he paid or offered to pay any witness in this case. *See* Ex. 4, Excerpt of Plaintiff's Answers to Defendants' Interrogatories. Plaintiff responded to this interrogatory with a single word: "No." *Id*. Defendants thereafter subpoenaed Plaintiff's recorded prison calls from the Maryland

---

[3] This exhibit was produced to Officer Defendants by Plaintiff.

[4] Officer Defendants filed a motion to dismiss (ECF 20), which resulted in the Court dismissing Plaintiff's failure to intervene claim but allowing all other claims against Officer Defendants to proceed. Defendant Baltimore Police Department filed a motion to dismiss Plaintiff's indemnification claim (ECF 21), which the Court granted without prejudice.

4

Department of Public Safety and Correctional Services.[5] Upon review of these calls, Officer Defendants identified four recorded calls that contain conversations between Plaintiff and Brockington in which the two discuss various aspects of Plaintiff's case, including Brockington's prior testimony and anticipated testimony. Additional prison calls show Plaintiff and various individuals on his behalf offered to financially compensate Brockington for his involvement in Plaintiff's post-conviction relief and civil case against Officer Defendants and the Baltimore Police Department. Officer Defendants also identified numerous calls between Plaintiff and various family members in which Plaintiff coordinates efforts to influence and pay Brockington.[6]

Fact discovery is scheduled to close on October 16, 2025, and expert discovery will proceed through January. *See* ECF 52. Given what Officer Defendants have uncovered to date regarding Plaintiff's efforts to tamper with and pay Brockington, Officer Defendants intend to brief and file a Motion to Dismiss as a litigation sanction that could be dispositive of this case. In the interests of justice, therefore, Officer Defendants seek a Court Order that stays discovery until after the critical issue of witness tampering is brought fully before this Court.

## LEGAL STANDARD

District courts are afforded "substantial discretion in managing discovery." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995). Courts are also afforded discretion to stay discovery when necessary. See *Landis v. N. Am. Co.*, 299 U.S. 248,

---

[5] Officer Defendants initially subpoenaed records from Maryland Department of Public Safey and Correctional Services, which included nearly 5,000 audio recordings of Plaintiff's prison calls from 2013 to 2020. During Plaintiff's deposition, he admitted to using identification numbers of other inmates to make additional phone calls (*see* Ex. 5, Tr. of Melvin Thomas Deposition, 181:12-14), and Officer Defendants then subpoenaed these calls, which resulted in 65 additional audio recordings, including 15 calls made by Plaintiff, two of which were with Brockington. Given the large number of recordings, Officer Defendants continue to review these calls.

[6] Throughout this motion, Officer Defendants include excerpts from several of these recorded prison calls, along with the corresponding time codes. Officer Defendants have also filed a Motion for Leave to File Electronic Media in the event the Court wishes to listen to the calls cited herein.

5

254 (1936) ("[T]he power to stay proceedings is incidental to the power in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); see also *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 379 (4th Cir. 2013).

Under Rule 26, a district court has the discretion to stay discovery pending the outcome of a dispositive motion. See *Thigpen v. United States*, 800 F.2d 393, 396-97 (4th Cir. 1986), *overruled on other grounds by Sheridan v. United States*, 487 U.S. 392 (1988) ("Nor did the court err by granting the government's motion under Fed. R. Civ. P. 26(c) to stay discovery pending disposition of the 12(b)(1) motion."). Such a stay "is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." *United States v. Daily Gazette Co.*, No. CIV.A. 2:07-0329, 2007 WL 7575700, at *2 (S.D.W. Va. Oct. 18, 2007) (citation omitted).

"Even with the court's broad discretion, however, '[t]he party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative.'" *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, No. CV 3:1514887, 2018 WL 11412001, at *1 (S.D.W. Va. Apr. 30, 2018) (quoting *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983)). "In determining whether the movant has met this burden, the Court must consider three factors: '(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party.'" *Clark v. Appalachian Power Co.*, No. 2:24-CV-00424, 2025 WL 72165, at *2 (S.D.W. Va. Jan. 10, 2025) (quoting *White v. Ally Fin. Inc.*, 969 F. Supp. 2d 451, 462 (S.D.W. Va. 2013)) (internal quotation and citation omitted); *Blankenship v. Trump*, No. 2:19-CV-00549, 2020 WL 748874, at *2 (S.D.W. Va. Feb. 13, 2020).

**PLAINTIFF'S MISCONDUCT**

I. **Plaintiff Offered to Pay Brockington in Exchange for His Testimony and Lied About it in His Interrogatory Response.**

Plaintiff's entire claim that Officer Defendants allegedly fabricated Brockington's statement and testimony used to convict Plaintiff hinges on Brockington's recantation of his criminal trial testimony. Thus, the question as to why Brockington recanted is key to this case. Officer Defendants asked Plaintiff in an interrogatory whether he directly or indirectly paid or offered to pay Brockington, and Plaintiff unequivocally denied that he did. *See* Ex. 4. In fact, Plaintiff initially denied at his deposition ever speaking to Brockington.[7] Yet, Plaintiff's recorded prison calls (and his deposition testimony about several of those calls) prove, at the very least, that Plaintiff offered to pay Brockington for his testimony.

A. **Call Between Plaintiff and Brockington on May 18, 2016 (Ex. 6)**

On May 18, 2016, Plaintiff called his mother, Angela Campbell, on a recorded prison line. During the call, Ms. Campell conferences in "Wolf," later identified as Anthony Wilson, a self-proclaimed private investigator hired by Plaintiff. Wolf then conferenced in Brockington, who was able to speak directly with Plaintiff, while Ms. Campbell listened in on the call. During the call, Plaintiff and Brockington became acquainted with one another. Later in the call, Plaintiff referenced compensation:

> Plaintiff: And at the end of the day, let me tell you something good, let me tell you something good. **This might work out for me and you on on the compensation bit**, because once you let let it be known that they did wrong then I get to sue them for what they did wrong to me. You understand what I'm saying? Them getting you to pick out my picture-

---

[7] *See* Ex. 5, Tr. of Melvin Thomas Deposition, 83:1-17. (Q: And since you had your trial, have you spoken with Mr. Brockington while you were in jail? A: No.). *See also*, *Id*. at 183: 9-13 (Q: Okay. So – we talked about this briefly but I want to make sure that we're very clear. Did you reach out to – did you reach out to Myron Brockington while you were in jail? A: Absolutely not.)

>   Brockington: Yeah, definitely.

*See* Ex. 6 at time code 21:30-21:47.

After that exchange, Plaintiff's mother said, "Yeah, yeah, the lawyer told us that, we got a good suit case once we get this done. And so that's what we're gonna do. We're gonna sue the shit out of they ass." *Id*. at time code 22:18-22:26. Ms. Campell added, **"Myron, you gonna be compensated then too. You gonna be compensated then too. I'm gonna speak to that."** *Id*. at time code 22:31-22:37. Plaintiff concluded the call by asking for Brockington's phone number, so he "can get in contact, contact with you about . . . about a few things. You understand what I'm saying? Making sure that we on the same page about . . . What's going on. You understand what I'm saying? If you don't mind that." *Id*. at time code 22:56-23:07. Plaintiff also told Brockington, "And I just want to make sure that all your worries is cured as far as me, man. You know what I'm saying?" *Id*. at time code 24:57-25:05.

>   **B.   Call Between Plaintiff and Brockington on June 19, 2016 (Ex. 7)**

On June 19, 2016, Plaintiff had his girlfriend conference call Brockington so that Plaintiff and Brockington could speak directly, which they did for over 20 minutes. During this call, Plaintiff and Brockington appear to discuss an arrangement where Wolf will "bring everything through" once Brockington completes his testimony. The recorded discussion is as follows:

>   Plaintiff:   Yeah, man. I just had a lot of things on my mind. I'm quite sure, right, that, that maybe sooner than later the, the private investigator gonna get back with you, right. I guess he was busy right now.
>
>   Brockington: Yeah.
>
>   Plaintiff:   But I'm quite sure he'll, he'll get back with you sooner or later. I just wanted to get up with you on the up and up before all that happened, right.

8

| | |
|---|---|
| Brockington: | Right, right. |
| Plaintiff: | Just holler at you, you know, see what's up. |
| Brockington: | Yeah. Cause I told him **once everything's said said and done, just, you know, I mean, just bring everything through.** We just meet up somewhere or something. |
| Plaintiff: | **Oh, yeah. No, yeah. I already know.** |
| Brockington: | Of course. |
| Plaintiff: | I'm pretty sure, however he going through this. |
| Brockington: | Hold on. |
| Plaintiff: | I mean, y'all, y'all gonna be doing it, like, I guess, y'all, yeah, I mean, and, and I don't know, I don't know how I go. He a professional. |
| Brockington: | Right. |

*See* Ex. 7 at time code 3:53-4:46.

**C.    Call Between Plaintiff and Brockington on July 26, 2016 (Ex. 8)**

On July 26, 2016, Plaintiff again used his mother, Angela Campbell, to call Brockington on a three-way call. During Plaintiff's conversation with Brockington, Plaintiff mentioned to Brockington that he received a copy of Brockington's affidavit and asked about a video recording of Brockington that he had yet to obtain.[8] As the call progressed, Plaintiff started to coach Brockington on how to answer questions posed to him about the photo array that was part of Plaintiff's criminal trial:

| | |
|---|---|
| Plaintiff: | I guess, I'm – I'm -- everything went --went -- went on the -- on -- on the video when he did the camera part for you right there. Did -- what he asked you, did he -- what -- did he ask you a series of questions or something? |

---

[8] According to prison calls, this affidavit and video recording of Brockington were procured by "Wolf." Plaintiff has not disclosed either record to Officer Defendants in response to their Request for Production of Documents.

9

    Brockington:    Yeah.

    Plaintiff:    Oh, yeah. Because the reason why I say that, right, is because when I read, like, over the affidavit and I'm just trying to -- I know like -- like, you know, when -- when you don't -- like, I understand what you saying, like -- all right.· Like it comes to a point where, let's say, and -- and -- and in a question demonstration is like, all right, you knew it wasn't him. What -- what do you say in a situation where they say, "Well, you knew it wasn't him when you see him in court, why did you do it anyway?" Like what -- like -- but you did it anyway. Like, you know what I'm saying?· What I'm saying?· Like what -- what do you -- what -- what would you -- what would you come back and say to that?· Because they ask – they'll ask a question like that because it's a simple question to ask.· Like, who made you do that?· Like, what -- what made you do that at that time?

*See* Ex. 8 at time code 9:57-10:58.

Plaintiff continued to coach Brockington in the event Brockington is ever required to go to Court:

    Plaintiff:    Huh? Yeah. Yeah, yeah, yeah, yeah, yeah. Yeah, man. Yeah, I'm just glad all was well. And -- and -- and -- and --and my whole thing is -- my whole thing is only reason why I -- I -- I talked, you know, I --I – I'm going over which, because it become a time, like if -- if you get -- like if when you -- when it come time to go to court. When -- one thing I don't – that's why I al – that's why I told – that's why I always told you, listen, just go off what you know, just go off the truth. See?  See? And -- and -- and -- and -- and that'll be --and -- and that'll be good because -- because when you --when you -- when you -- when you speaking the truth, you ain't got to remember it. You understand what I'm saying?

    Brockington:    Exactly.

    Plaintiff:    You to try -- you trying to get the confidence -- the confidence up all the types of – you know, ways to,

10

|  |  |
|---|---|
|  | you know, do things, you know, it's all --my whole thing is sometimes -- sometimes the truth don't make sense. |
| Brockington: | You just have to – it get twisted. |
| Plaintiff: | You understand what I -- exactly. |
| Brockington: | Yeah. |

*Id.* at time code 13:23-14:19.

### II. Plaintiff's Recorded Calls Establish That He Had Various Intermediaries Offer to Pay Brockington on Plaintiff's Behalf.

Also on his recorded prison calls, Plaintiff spoke with numerous individuals, including his mother, cousin, and girlfriend, in which they make detailed plans to locate Brockington and people connected to Brockington and to pay Brockington. For example, as early as May 2015, Plaintiff and his girlfriend, Donna Tabron, discussed how to get Brockington comfortable with working with Plaintiff by offering him financial compensation and having him "blame the police."

|  |  |
|---|---|
| Plaintiff: | And how to get him comfortable and making him work with us now and how and for some reason we got to make it so not only him to know it's the right thing but also **he can benefit from it in some type of way,** that's how you keep him on your line, you understand what I'm saying? Not only do you benefit by by clearing your conscience but **he benefit some other type of way whether it's monetary funds or whatever. If done right, he can blame the police and the prosecutor right to get me off and and he can get paid for it**. |

*See* Ex. 9, Call between Plaintiff and Donna Tabron on May 27, 2015, at time code 27:20-27:54. About a minute later in the call, Plaintiff indicated that Ms. Tabron went to Brockington's mother's house: "I remember you said that when you went to his mother." *Id*. at 28:55.

11

In a 2015 call with his mother, Ms. Campbell, Plaintiff explained his plans to have his girlfriend, Ms. Tabron, "check on that girl," a reference to Brockington's long-time domestic partner, who Plaintiff described as weak:

> Plaintiff: And I'm about to ask Donna to check on that girl and see if she out yet, the girl that he bailed out because she knows where he at, understand what I'm saying? remember her? His girlfriend, his baby mama I mean? Yeah, that's his baby mother, She got a child by him.
>
> Campbell: Is he still with her?
>
> Plaintiff: We don't know that. All we know is that he bailed her out, we don't know if they still with her or not. That's impossible to know, that's impossible to know but we do know that he bailed her out recently that time that she was just locked up so what we going to do is, what we going to do is, um find out where she at and see if we can break her, you know what I mean? cause she's a junkie, so she weak, you know what I'm saying? she's the weaker one, she's the weakest link. You understand what I'm saying?"

*See* Ex. 10, Call between Plaintiff and Angela Campell on May 24, 2015, at time code 21:50-22:47.

In yet another call with his mother, Plaintiff explicitly discussed a schedule of payments to Brockington:

> Campbell: **Get two more hundred dollars then $500 and he get the other five when he go to court. He get five when he do affidavit, five when he go to court.**
>
> Plaintiff: **You gotta realized, I was thinking about it like this. that [N] said that he want to be compensated. He ain't ever really say what.**

*Id.* at 15:50-16:15.

Later in this same call, they continued to discuss paying Brockington:

> Campbell: **He don't get no money until he do the affidavit and stuff, right?**

12

> Plaintiff: Listen, Ma, you don't have to keep going to money and all that, all I'm saying is, all I'm saying is, yeah going to get that, that **I just done told you, he ain't going to do nothing without getting something so yeah. He going to get the five, he going to get that. At the affidavit thing, yeah, he going to get that**.

*See* Ex. 11, Call between Plaintiff and Angela Campell on June 30, 2016, at time code 17:44-18:13.

### III. Plaintiff Lied In His Interrogatory When He Denied Paying or Offering to Pay Brockington, and Plaintiff Continues to Refuse to Disclose These Payments.

As noted above, Officer Defendants asked Plaintiff in an interrogatory whether he paid or offered to pay any witness in this case. *See* Ex. 4. Specifically, on April 4, 2025, each Officer Defendant sent the same interrogatory (Interrogatory no. 3) to Plaintiff:

> Did you ever, either directly or indirectly, pay or offer to pay money, provide anything of value, and/or provide any other consideration to any witness in connection with this civil case, your underlying criminal case, or any proceeding of any kind related to your underlying criminal case? If your answer is anything other than an unqualified "no", state with specificity:
>
> a) The name of the witness;
> b) The nature of the payment or benefit;
> c) The approximate dollar value of the payment or benefit(s) separated by each instance in which it was provided;
> d) The dates each payment or other benefit was offered or requested;
> e) The dates each payment or other benefit was provided;
> f) The means by which the payment or other benefit was conferred;
> g) The reason for each instance in which a payment or other benefit was conferred; and
> h) Any promise or other communication that was made in connection with or concerning the payment or other benefit.

On June 17, 2025, Plaintiff sent verified responses to Officer Defendants, which included this answer to interrogatory no. 3: "No." *Id*. Based on the recorded prison calls referenced above, Plaintiff's answer is demonstrably false.

13

### IV. In His Deposition Testimony, Plaintiff Denied Speaking with Brockington Before Being Confronted with His Recorded Prison Calls.

On August 11, 2025, Officer Defendants deposed Plaintiff. During his deposition, Plaintiff unequivocally denied having any direct contact with Brockington and denied offering Brockington any payments. Plaintiff testified:

> Q. And since you had your trial, have you spoken with Mr. Brockington while you were in jail?
> A. No.
> Q. No?
> A. No.
> Q. And when was – I'm not sure if the question was clear. Did you talk to Myron Brockington at all while you were in jail?
> A. No.
> Q. Okay. So you had no communication with him in any way?
> A. No.
> Q. And when was the last time that you saw Mr. Brockington?
> A. In court.
> Q. And when was that?
> A. 2001.

*See* Ex. 5, Tr. of Melvin Thomas Deposition, 83:1-17.

> Q. Okay. So -- we talked about this briefly but I want to make sure that we're very clear. Did you reach out to -- did you reach out to Myron Brockington while you were in jail?
> A. Absolutely not.

*Id*. at 183:9-13.

Only after Plaintiff was confronted with recorded phone calls during his deposition did he admit that he had spoken with Brockington. After listening to a call between Plaintiff and Brockington from June 19, 2016 (Ex. 6), Plaintiff first conceded that it "sounds like Myron." *Id.* at 241:21. Plaintiff then heard more of the call, and when asked again who he was talking to, he said, "Myron." *Id.* at 244:17-21 - 245:1.

Plaintiff also admitted that, during a conversation with his mother, he intended on paying Brockington:

14

Q. Okay. Did you ever have a discussion with your mother, Ms. Angela Campbell, about paying Mr. Brockington?
A. That -- a discussion -- payment -- payments was initially -- it was a -- it was at a time in the beginning where he ain't feel comfortable and he wanted -- and he asked for payment for his truth. But at the end, that all fell to the waste line and all I had to do was pay my private investigator for it.
Q. But there was initially discussion about payment with Mr. Brockington between either you or a member of your family; is that right?
A. There was.
Q. Okay.
A. Not from my end.
Q. Who made an offer to Mr. Brockington?
A. Nobody made an offer to Brockington.
Q. Who discussed that with him?
A. Like it was said -- like I said in that statement, he said that he wanted to be paid initially for his own truth.
Q. And how did -- who had that conversation with him?
A. The private investigator, I believe.
Q. And was that ever -- did you ever discuss that with him in your phone calls?
A. You say did I discuss what? What he said?
Q. Payment to him. Did you ever discuss payment to him?
A. I don't recall.
Q. To Mr. Brockington?
A. I don't recall.
Q. Would you have done it if he insisted?
MR. BALLENGER: I would object to the speculation of it. But you can answer.
A. I was -- I was always animated against it, like, and -- I don't know.
Q. Okay. So your answer is I don't know?
A. I don't know.
 Q. All right. If we could go to a call dated June 30th, 2016. And it's . . . to phone number (240) 217-8599. And do you recognize – first of all before we start the call, do you recognize whose number that is?
A. 8599.
Q. Yes.
A. That's sounds like my mother's number.

… [Played Exhibit 11 beginning at 15:30]

MS. GOO: Stop there a second.
Q. So is it an accurate representation of the recording that you said "all right, maybe you can tell him the plan. If you can't do it

15

correctly, don't even try." Then she **says "get two more hundred dollars and $500 and he get the five when he go to court. He get five when he do the affidavit, five when he go to court."** Is that an accurate representation –
A. **That's what was said.**
Q. -- of the recording. And this was a discussion about who?
A. That was the discussion about Myron.
Q. Okay. Keep going further, please.

… [Continued playing Exhibit 11]

MS. GOO: Stop there for a second.
Q. So is it accurate that you said "you got to realize I was thinking about it like this, that [N] said that he wanted to be compensated. He never really say what." Is that what was said?
A. **That's what was said.**

… [Continued playing Exhibit 11 at 17:40]

MS. GOO: Stop there.
Q. So is it accurate that you said "listen, am, you don't have to keep going to money and all that, all I'm saying is, yeah, going to get that, I just done told you he ain't going to do nothing without getting something, so, yeah. He going to get the five, he going to get that, at the affidavit thing yeah, he going to get that." Is that accurate?
A. That's accurate.
**Q. So you were saying Myron was going to get paid after doing the affidavit at that point during the phone call, right?**
**A. That's what was said.**
Q. So Mr. Brockington, was he ever paid?
A. No. No. Actually my understanding, my understanding that the private investigator convinced him otherwise and that was his money.
Q. So you said that the private investigator convinced him otherwise.
A. That -- go ahead.
Q. Was Mr. Brockington ever told that he was going to get paid?
A. He asked to be paid.
Q. He asked. And in response was he ever told that he was going to get paid?
MR. BALLENGER: By who?
Q. By anybody on your behalf?
A. I don't recall.
Q. So it's possible that somebody said, "yeah, you will get paid"?
A. What, it's possible that somebody may have agreed to that?
Q. That somebody said to him that? I don't know.

16

> Q. So is it possible that your mother said to him, "yeah, you'll get payment"?
> A. There is a possibility that somebody probably said that to him.

*Id*. at 275:5 – 282:5.

## V. The Interests of Justice and Judicial Economy Weigh Heavily In Favor of Staying Discovery.

Courts routinely stay discovery when a case-dispositive motion is imminent, and in this matter, the three factors—judicial economy, hardship and equity to Officer Defendants, and potential prejudice to Plaintiff—favor granting a stay. *See Clark v. Appalachian Power Co.*, No. 2:24-CV-00424, 2025 WL 72165, at *2 (S.D.W. Va. Jan. 10, 2025) (quoting *White v. Ally Fin. Inc.*, 969 F. Supp. 2d 451, 462 (S.D.W. Va. 2013)) (internal quotation and citation omitted); *Blankenship v. Trump*, No. 2:19-CV-00549, 2020 WL 748874, at *2 (S.D.W. Va. Feb. 13, 2020).

First, the interests of justice favor reducing the burden of discovery on parties when the motion to dismiss raises potentially dispositive legal issues and "the resolution of which may obviate the need for or limit discovery in this case." *See Slone v. State Auto Prop. & Cas. Ins. Co.*, No. 2:19-CV-00408, 2019 WL 4733555, at *1 (S.D.W. Va. Sept. 26, 2019). As previously discussed, a stay to resolve case-dispositive motions is appropriate because "a finding in defendant's favor could completely resolve the case without any need for discovery." *Rowe v. Citibank N.A.*, No. CIV.A. 5:13-21369, 2015 WL 1781559, at *2 (S.D.W. Va. Apr. 17, 2015). This preserves judicial economy by avoiding the fruitless expenditure of resources devoted to a time-consuming and expensive discovery process. *See Bragg v. United States*, No. CIV.A. 2:10-0683, 2010 WL 3835080, at *2 (S.D.W. Va. Sept. 29, 2010).

Second, the potential hardship to Officer Defendants favors granting a stay of discovery. To date, the Officer Defendants have conducted three depositions (*i.e.*, Plaintiff, Brockington, and

17

Brockington's domestic partner) and currently have two other depositions scheduled in September (*i.e.,* the trial prosecutor and the head of the Conviction Integrity Unit). There are also additional witnesses that Officer Defendants will consider deposing if they must continue to defend against Plaintiff's entire Complaint, which contains seven counts and a demand for damages. These witnesses include Plaintiff's criminal defense attorney at trial, Plaintiff's co-defendant's criminal defense attorney, civilian witnesses at the bar at the time of the shooting, and a 30(b)(6) witness. If discovery continues forward with the existing deadlines, the parties will proceed forward to expert discovery in less than six weeks. Officer Defendants will then spend hours preparing and deposing Plaintiff's experts as well as hiring their own experts to defend the case. It is a significant cost that would pose a potential hardship to the Officer Defendants. Officer Defendants should not have to incur additional costs in defending this case when the overwhelming evidence presented above demonstrates that Plaintiff lied about how he procured Brockington's recantation testimony and Officer Defendants have already had to devote significant resources to uncovering collusion between Plaintiff and Brockington, including locating and reviewing thousands of prison calls.

Third, as to potential prejudice to the non-moving party, if there are sanctions in this case because of Plaintiff's conduct, it would affect the trajectory of the case. At this juncture, given what Officer Defendants have already uncovered, Plaintiff should not continue to benefit from his misconduct until the Court has a full opportunity to consider Officer Defendants' motion for sanctions in the case.

## CONCLUSION

For the foregoing reasons, Officer Defendants respectfully request that this Honorable Court stay discovery in this matter until the Court resolves Officer Defendant's forthcoming motion to dismiss Plaintiff's Complaint as a litigation sanction based on Plaintiff's efforts to tamper with and pay recanting victim-witness Myron Brockington, and for any other such relief

this Court deems just and proper.

Dated: September 12, 2025                                          Respectfully Submitted,

*/s/ Perry Wasserman*
Shneur Z. Nathan, Bar No. 20707
Avi T. Kamionski, Bar No. 20703
Christine Goo, Bar No. 30378
Perry Wasserman, Bar No. 31209
Nathan & Kamionski LLP
575 S. Charles Street, Suite 402
Baltimore, Maryland 21201
410-846-0061
pwasserman@nklawllp.com

*Attorneys for Officer Defendants*

## **CERTIFICATE OF SERVICE**

    I, PERRY WASSERMAN, an attorney, hereby certify that on September 12, 2025, I caused the foregoing document to be filed with the Court's CM/ECF system, which provided electronic notice and a copy of the same to all counsel of record.

                                              */s/ Perry Wasserman*
                                              Perry Wasserman, Bar No. 31209