# **EXHIBIT 1**

IN THE CIRCUIT COURT FOR BALTIMORE CITY MARYLAND

| | | |
|---|---|---|
| Melvin Thomas | * | |
| v. | * | Crim. No. 101141007-10 |
| State of Maryland | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## JOINT PETITION FOR WRIT OF ACTUAL INNOCENCE AND MEMORANDUM OF LAW IN SUPPORT OF JOINT PETITION FOR WRIT OF ACTUAL INNOCENCE

**NOW COMES,** Melvin Thomas, through undersigned counsel, and Marilyn J. Mosby, State's Attorney for Baltimore City and the State of Maryland by and through Lauren R. Lipscomb, Assistant State's Attorney for Baltimore City, and hereby petition this Court for a Writ of Actual Innocence, pursuant to Maryland Code of Criminal Procedure § 8-301, to grant a new trial in the instant case and respectfully requests a hearing on this Petition.

December 14, 2020

Respectfully submitted,

By: _____
Marilyn Mosby
State's Attorney for Baltimore City

Lauren R. Lipscomb
Chief, Conviction Integrity Unit
Office of the State's Attorney for
Baltimore City
120 E. Baltimore Street
Baltimore, MD 21202
443-984-6000
CIP@stattorney.org
*State of Maryland*

_____
Booth Ripke
Nathans & Biddle, LLP
120 E. Baltimore Street, Ste 1800
Baltimore, MD 21202
(410)783-0272 ext. 103
bripke@nathanslaw.com

*Counsel for Melvin Thomas*

CC: Judge Fletcher-Hill
CC: Post Conviction Defenders Division

NK DEF 004150

# IN THE CIRCUIT COURT FOR BALTIMORE CITY

MELVIN THOMAS,                              *

    Petitioner,                          *

v.                                          *   Case #101141007-10

STATE OF MARYLAND,                          *

    Respondent.                         *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW
## IN SUPPORT OF JOINTLY FILED UNOPPOSED CONSENT PETITION
## FOR A WRIT OF ACTUAL INNOCENCE

Melvin Thomas ("Mr. Thomas") by and through his attorney, Booth M. Ripke, Nathans & Biddle, LLP, hereby jointly files this Memorandum of Law with Lauren Lipscomb, Chief, Conviction Integrity Unit, Office of the State's Attorney for Baltimore City. This Memorandum of Law is offered in support of the jointly filed unopposed consent Petition to grant Mr. Thomas a Writ of Actual Innocence. The above parties jointly state as follows.

## I. INTRODUCTION

On the night of February 26, 2001, the Victim[1] was shot outside a rowhouse bar called My Sally's Place, just South of Orleans Street in East Baltimore. He had been inside the bar for several hours playing Keno and watching TV. The Victim survived, and explained that the shooting happened after he walked out of the bar to use his cell phone. When the police first arrived about 15 minutes later, the victim was with a woman who worked at the Bar, Witness #1. He told police that the person who shot him had been sitting next to Witness #1 in the bar, prior to the shooting. Later at the hospital, the Victim informed a detective that when the shooter was outside, right before he was shot, the shooter was with another man who he knew to be Donte

---

[1] To ensure the continued safety of individuals involved in this case, the parties have agreed to refer to involved parties anonymously.

Lyle[2] ("Lyle"). They had been inside the bar together with the Victim prior to the shooting. The Victim identified Lyle on February 27, 2001, but did not know the shooter.

Lyle was arrested, spoke to police, and described the shooter as: 22 years old, short, dark-skinned, with close-cut hair, and a thick build. He did not know the person's name. Witness #1 did not witness the shooting, but she had been inside the bar with the Victim, Lyle, and the unidentified shooter. Witness #1 said that she spoke with the shooter, and they were in the bar together for over 15 minutes before the man walked outside. Witness #1's first description was provided to the police when they first arrived. A police report noted the description indicated a black male, dark-skinned, 5'10", with "slanted[3]" eyes, 21-23 years of age, and 175-180 lbs. She said he had a white and black bandana on his head. Police recorded her description as "a BM, 22-23, dark-skinned, 'Asian'[4] shaped-eyes, round face, flat wide nose, close cut hair, 5'9" to 5'11", medium build, white grey sweatshirt, blue jeans, Timberland boots."

Witnesses were able to give a very detailed description. The Victim could not provide a description on the scene, as he was shot in the face, and could not speak. Detectives went back and interviewed the Victim when he was able to speak. In this statement, the Victim described his shooter as a 5'8" or 5'9" dark-skinned black man, wearing a red coat, a white T-shirt and "a duray or bandana on the head."

The Victim was 6'1" tall and reported that the shooter – whom he stood face-to-face with – came up to about his nose. He later stated that the shooter was shorter than himself, and that he (the victim) is noticeably taller than the shooter. He said the shooter was "a little taller" than Donte Lyle. Lyle was noted on his arrest report as 5'4". Through investigation, police interviewed Lyle who provided that he and his friend, Witness #3, were present at the time of the shooting. Based on that information, detectives obtained photographs of known associates of Witness #3, including a picture of Melvin Thomas. The police thereafter constructed a photo array which included Melvin Thomas, approximately five weeks after the shooting. The police took this photo spread to the Victim who picked Mr. Thomas' photograph in the photo array.

---

[2] Donte Lyle subsequently was charged and pled guilty to charges arising from this incident. Mr. Lyle is deceased.
[3] Witness's terminology.
[4] Witness's terminology.

2

No other evidence linked Mr. Thomas to the crime. Contrary to the descriptions of the witnesses, Mr. Thomas was not dark-skinned, but light-skinned. While witnesses described a shooter as short, Mr. Thomas was at least six feet tall, and the arrest report listed him as 6'1", and 200 pounds. Mr. Thomas does not have eyes shaped as described by witnesses. The police tried to obtain a second photo identification of Mr. Thomas, but Witness #1, the other person in the bar, did not make the ID. As to why she did not pick Mr. Thomas' photo, Witness #1 stated specific reasons, including that the shooter's "eyes are more 'chinky', and the cheekbones are higher." Years later, the Victim was at a flea market in Baltimore and he suddenly realized he was staring at the person who actually shot him. The Victim said "I looked at him, and I got this weird feeling. And I was like that's the guy that shot me right there." Mr. Thomas was incarcerated at the time of this identification. The Victim admitted that he was selling drugs out of the bar and that the shooting was over a robbery gone bad.

Following a thorough and independent legal investigation of this entire case over the last 18 months, the State has concluded that Mr. Thomas is factually innocent and he did not commit this crime for which he was convicted.

As explained below, the State has concluded that Mr. Thomas did not commit this crime, and jointly with Mr. Thomas, we respectfully request that the Court Grant this Joint Petition for a Writ of Actual Innocence, and Order Mr. Thomas' release from prison.

## II.   PROCEDURAL HISTORY

This incident occurred on February 26, 2001. Mr. Thomas was arrested, and pled not guilty. He informed the police, at the time, that he was innocent. The case proceeded to trial on December 3, 2001. On December 6, 2001, Mr. Thomas was convicted by a jury sitting in the Baltimore City Circuit Court. In Case No. 101141007, Mr. Thomas was convicted of attempted first degree murder. In Case No. 101141008, he was convicted of conspiracy to commit armed robbery. In Case No. 101141009, he was convicted of robbery with a deadly weapon. On April 8, 2002, Mr. Thomas was sentenced to a total of 65 years.

On May 2, 2002, Mr. Thomas filed a direct appeal to the Court of Special Appeals. On July 24, 2003, Mr. Thomas's conviction was affirmed. Mr. Thomas filed for post-conviction relief on December 31, 2003. On July 19, 2006, the post-conviction hearing was held before the

NK DEF 004153

honorable Judge Carrion. On August 11, 2006, an order was issued granting Mr. Thomas permission to file a belated motion for new trial. All other relief was denied. On August 21, 2006, Mr. Thomas filed a belated motion for new trial. On September 8, 2006, Mr. Thomas filed an application for leave to appeal the post-conviction finding. On April 11, 2008, the same application was denied. On September 30, 2011, Mr. Thomas's belated motion for a new trial was heard before the Honorable Judge Fletcher-Hill. On August 2, 2012, the motion was denied. On August 29, 2012, Mr. Thomas filed an appeal of the denial. On February 4, 2015, the appeal was denied. On May 5, 2015, the Court of Appeals denied Mr. Thomas's writ of certiorari.

### III. STANDARD OF PROOF

The standard for granting a Petition for a Writ of Actual Innocence is twofold. First, newly discovered evidence must "create a substantial or significant possibility that the result may have been different, as that standard has been judicially determined." Md. Code Crim. Pro. § 8-301(a)(1). The "substantial or significant possibility" standard has been judicially determined under Maryland Rule 4-331(c). *Huffington v. State*, No. 10-K-83-6373/4 at 9 (May 1, 2013) (mem. op.) (citing *Yorke v. State*, 315 Md. 578, 556 A.2d at 234-35 (1989)). The standard is satisfied where "[t]he newly discovered evidence *may well have produced a different result*, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Id.* at 588, 556 A.2d at 235 (emphasis added). The Court of Appeals of Maryland articulated that the "significant possibility" standard does not require that the evidence "probably produce acquittal" or even rise to the level of probable cause, just that there be a "significant possibility that the verdict of the trier of fact would have been affected." *Love v. State*, 621 A.2d 910, 916 (1993) (quoting *Yorke*, 315 Md. at 586-87); *see also Yorke*, 315 Md. at 586-87 (explaining that the standard is one "that falls between 'probable,' which is less demanding than 'beyond a reasonable doubt,' and 'might' which is less stringent than probable."). The standard was described as a "judgmental one—weighing the effect of the evidence." *Jackson v. State*, 358 Md. 612, 626 (2000).

Second, the newly discovered evidence "could not have been discovered in time to move for a new trial under Maryland Rule 4-331." Md. Code Crim. Pro. § 8-301(a)(2). As a result, the newly discovered evidence must postdate the deadline set forth in Maryland Rule 4-331 of "one year after the later of (A) the date the court imposed sentence or (B) the date the court

4

NK DEF 004154

received a mandate issued by the final appellate court to consider a direct appeal from the judgment or a belated appeal permitted as post-conviction relief." Md. Rule 4-331(c)(1).

## IV. NEWLY DISCOVERED EVIDENCE IN THIS CASE IS SUFFICIENTLY MATERIAL TO SUPPORT VACATING PETITIONERS' CONVICTIONS AND GRANTING A NEW TRIAL

### A. DEFENSE'S INVESTIGATION

All parties agree that identity was the sole contested issue at trial. The only testimony identifying Mr. Thomas was that of the victim. The newly discovered evidence justifying the granting of this Writ of Actual Innocence is that the Victim's identification was erroneous and he now knows that he identified the wrong man and that Mr. Thomas is not the person who shot him.

Because the victim's identification was the only evidence that ever implicated Mr. Thomas, and that identification has been recanted through this newly discovered evidence, the parties jointly submit that this newly discovered evidence is material and would have led to Mr. Thomas' acquittal if it had been known in time for trial.

The victim's recantation qualifies as newly discovered evidence because it was not known at the time of trial and could not have been known within the Rule 4-331 time for filing for a new trial, even with the due diligence of all concerned. It could not be known at that time because at trial, the victim was unaware that he had picked the wrong person. The victim did not realize he had made a false identification until years after the period of time for filing a Rule 4-331 motion for new trial had run.

### B. STATE'S CONVICTION INTEGRITY PROGRAM INVESTIGATION[5]

Outside of the identification made by the Victim, there are no other witnesses who identified Defendant Thomas and no physical evidence was recovered that inculpated Defendant Thomas. Reviews of the trial transcripts, police records and our file reveal that there were no

---

[5] This section reflects the State's assessment and evaluation of available records, evidence and materials. The State's assessment and evaluation may differ from that which is presented in the Defense's Investigation section. Notwithstanding this, both the State and Defense join in the recommended outcome.

5

NK DEF 004155

additional witnesses or pieces of evidence that inculpated Defendant Thomas but were not used at trial. Given the Victim was the sole individual inculpating Defendant Thomas, our re-investigation centered primarily on assessing the reliability of and determining whether corroboration exists for the recantation. Once we determined the recantation was reliable, the investigation focused on whether the case should be re-tried and, if not, whether the declination to re-try the case is based on a lack of evidence inculpating Defendant Thomas.

1. Victim – Recantation.

The Victim recanted and provided an affidavit to that effect to Defendant Thomas's counsel on December 4, 2018. This affidavit was provided to the State. The Victim provided as follows. At some point following the trial, he was at the Patapsco Flea Market when he ran into a man and immediately recognized him as being the person who shot him. He stated, "I looked at him and I got this weird feeling. And I was like that's the guy that shot me right there." The Victim became scared and fled the area.

On April 28, 2020, the Victim was interviewed via ZOOM[6] by the State, providing as follows. The Victim advised that he first believed he had identified the wrong person when he saw the actual shooter at the Patapsco Flea Market[7]. He advised that he was with Witness #4 at the market. He saw the shooter and "his heart dropped". He did not come forward due to fright.

The Victim's statement is consistent with the statement he provided to the defense. He first determined he made a mistake in identifying Defendant Thomas upon seeing the person who shot him at the Flea Market. Prior to this sighting (pre-trial and at trial), the documents reflect no indication the Victim should not have been believed in his identification of Defendant Thomas.

2. Recantation Reliability.

**Witness #1 Interview**

---

[6] Given the state of emergency and pandemic, all interviews after March 16, 2020, were conducted virtually by video or by phone conference.
[7] This was consistent with the information that he had provided to the Defense in December of 2018.

6

NK DEF 004156

On June 26, 2020, CIP team interviewed Witness #1 on a conference call. Witness #1 provided as follows. She is currently living out of state because she remains extremely fearful of people involved in this incident. At the time of the shooting, she was working and had worked every night because she was the only bartender. While working, she observed two unknown men sitting next to the Victim, who was a friend of hers. At some point, the Victim went outside, then the two men followed. She heard gunshots and ran, ultimately locating the Victim who advised the guy sitting next to him at the bar did the shooting. Witness #1 confirmed her description of the shooter, which did not match Defendant Thomas.

### Witness #5 Interview

On July 30 and November 18, 2020, Witness #5 was interviewed via teleconference by the CIP Team. She is a friend of Defendant Thomas. Regarding the incident, she relayed the following information. Witness #5 stated Defendant did not at any point have gold teeth or gold fronts. She also reiterated, without a posed question, that Defendant Thomas had long hair – not short hair. Multiple witnesses described the shooter as having gold teeth and short hair.

### Witness #4[8] Interview

Witness #4 did not testify at trial and her knowledge of the incident is limited to the following. In November 2020, BPD located Witness #4 who contacted the State. Witness #4 was incoherent[9] when she called. She stated she "was at the flea market" with the Victim and "this is horrible what is happening" before hanging up the line. Subsequent to this call, numerous attempts were made to contact her with no success. In visiting the home of Witness #4, our SAO investigator was informed by a resident that Witness #4 had not been home and is actively using cocaine and heroin.

### Witness #6 Interview

Witness #6 was not called to testify by the State or Defense at trial. Subsequent to trial, one of the allegations raised for consideration during the 2006 post-conviction hearing was the

---

[8] The Victim reported that Witness #4 was with him when he saw the real shooter at the flea market.

[9] Drug use was suspected.

7

defense's failure to call Witness #6 as a witness at trial. Ultimately, the Court denied the petition, stating that the defense had not presented any evidence that showed how Witness #6's testimony might have been helpful at trial[10]. On July 17, 2019, Witness #6 was contacted at her residence by the State. Witness #6 confirmed that she was outside the bar at the time of the shooting. She further confirmed that she would be able to identify the shooter nicknamed "Man"[11][12]. Her description of the shooter matched that of other witnesses and does not match Defendant Thomas.

### Co-Defendant Donte Lyle – Document Review

Co-Defendant Donte Lyle is deceased[13]. On March 21, 2001, Lyle was arrested and interviewed. During his interview with BPD, he advised as follows. He was sitting on steps outside of Sally's Place bar smoking marijuana with his friend, Witness #3. At some point, the Victim emerged outside and was in front of the bar talking to the unknown man, described by Lyle as "dude who shot him[14]". The shooter was described by Lyle as dark skinned, short, two golds in mouth, 22/23 years old, and hangs at Perkins. When asked who else was present, Lyle mentioned that "the white dude[15]" came to the door at some point, Witness #3 was with him, and an old man was in the vicinity[16]. A review of all available investigatory and transcript records reflects that at no point did Co-Defendant Lyle inculpate Defendant Thomas in this incident. In all of the same records, Co-Defendant Lyle remained consistent that he was present during the shooting (though he minimized his role to mere presence) and observed the shooter.

### Witness #2 – Document Review

---

[10] Witness #6 was not called to testify at the post-conviction hearing.
[11] Defendant Thomas's nickname is not Man. Witnesses #2 and #6 were consistent in their identification of someone named "Man" talking to the Victim at the time of the shooting. "Man's" description does not match Defendant Thomas.
[12] BPD has been provided this information and has assisted in this investigation.
[13] Investigator Ellis confirmed with OCME.
[14] This is consistent with Witness #2 and Witness #6's statements – that the Victim was having a conversation with the shooter at first.
[15] This person is Witness #2 and he was interviewed by BPD. Discussed later.
[16] It should be noted that Defendant Thomas was not mentioned by Co-Defendant Lyle as being present.

8

NK DEF 004158

Witness #2 did not testify at trial. The State has made multiple attempts to contact Witness #2 via phone and at multiple addresses throughout this investigation. Most recently, on October 13, 2020, the State made an attempt to contact Witness #2 at his home and was advised Witness #2 had been kicked out for theft of a family member's property. Notwithstanding this, the State has the benefit of Witness #2 having been interviewed by BPD directly following the incident. Additionally, Witness #2 testified in 2011 at the motion for new trial hearing.

On September 30, 2011, Witness #2 was transported to court on a writ and testified during the motion for new trial. Witness #2's testimony and description of the shooter remained consistent with his initial statements to police. That description does not match Defendant Thomas. Witness #2 testified he did not know the Defendant and had never seen Defendant Thomas at any point before the morning of the instant hearing. Notably, Witness #2 testified that the hearing on the morning of the September 30, 2011, was the first and only time he has seen Defendant Thomas.

### State's Conclusion

As described in detail above, this is a one-witness non-fatal shooting case in which the Victim has now recanted. Here, a substantial portion of facts and evidence that exculpate Defendant Thomas were unearthed over the years following his conviction and were raised in post-trial motions. Most recently, on September 30, 2011, the Defendant presented his case for relief during his post-trial motion for a new trial. Defendant Thomas's case on the motion included testimony from Witness #1 and Witness #2. However, neither of those two witnesses testified at trial and, standing alone, their testimony may not have negated the Victim's identification pre-trial and at trial. The pivotal development, not presented to the jury or known previously, is the Victim's December 2018 recantation. Standing alone, this recantation, if unreliable and uncorroborated, would be subject to *Nance-Hardy*. However, the State's investigation ultimately determined the recantation to be reliable based on substantial corroborating evidence.

In summation, the corroboration is as follows. The shooter's description given by Witnesses #1, #2, and Co-Defendant Lyle (back in 2001 and now) is consistent and does not match Defendant Thomas. Further, Witnesses #2 and #6 describe the same man known to them

9

NK DEF 004159

as nicknamed "Man", not Defendant Thomas, as being the shooter. The State has located no apparent connection that Defendant Thomas has to the bar[17] or the individuals at the location.

## V. JOINT CONCLUSION

It is the State and Petitioner's position that the newest development in the case, the Victim's recantation, is newly discovered evidence under Crim. Pro. § 8-301. Further, the State and Petitioner assert that if the aforementioned evidence was presented alongside the evidence presented to the jury, it is substantially likely that the outcome would have been different and this evidence satisfies level of proof needed under Crim. Pro. § 8-301. Accordingly, the parties respectfully request this Court grant a hearing on the instant joint petition for writ of actual innocence at which time we jointly will respectfully request that the Court grant this petition and order a new trial.

December 14, 2020                                    Respectfully submitted,

                                                     Marilyn J. Mosby
                                                     State's Attorney for Baltimore City

                                                 By: _____

Booth Ripke, Esq.                                    Lauren R. Lipscomb
Nathans & Biddle, L.L.P.                             Chief, Conviction Integrity Unit
Baltimore, MD 21202                                  Office of the State's Attorney for Baltimore City
                                                     120 E. Baltimore Street
*Counsel for Melvin Thomas*                          Baltimore, MD 21202

                                                     *State of Maryland*

---

[17] Witnesses and reports uniformly describe Sally's bar as being a local bar frequented by locals only. The night in question introduced two unknown men, including the shooter. The shooter was described consistently by witnesses, notably, as being short. Defendant Thomas is tall. Outside of the Victim's pre-trial identification and in court identification, there is no other evidence suggesting Defendant Thomas was ever in the bar.

NK DEF 004160