# EXHIBIT 5

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MARYLAND

3                    NORTHERN DIVISION

4       MELVIN THOMAS,

5               Plaintiff              Case No.

6          vs.                        1:23-CV-03379-BAH

7       GEORGE VIGUE, ET AL,

8               Defendants

9       _____/

10              Pursuant to Notice, the videotaped

11         deposition of MELVIN THOMAS was taken on

12         Monday, August 11, 2025, commencing at 9:35

13         a.m., at the offices of Ballenger & Roche, LLC,

14         401 E. Pratt Street, Suite 2341, Baltimore,

15         Maryland  21202 before David C. Corbin, a

16         Registered Professional Reporter and Notary

17         Public.

18

19

20

21              REPORTED BY:  David Corbin, RPR

| | | | | |
|---|---|---|---|---|
| | | | | Page 2 |

Page 2

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF:
 3      MATT BALLENGER, ESQUIRE
 4      Ballenger & Roche, LLC
 5      401 E. Pratt Street, Suite 2341
 6      Baltimore, Maryland  21202
 7      mballenger@br-lawyer.com
 8   ON BEHALF OF THE PLAINTIFF:
 9      BOOTH RIPKE, ESQUIRE
10      LARRY NATHANS, ESQUIRE
11      KERRY MULLIN
12      Nathans & Ripke, LLP
13      120 E. Baltimore Street, Suite 1800
14      Baltimore, Maryland  21202
15      Bripke@nathanslaw.com
16
17
18
19
20
21
```

Page 3

```
 1   ON BEHALF OF THE DEFENDANTS:
 2      CHRISTINE GOO, ESQUIRE
 3      PERRY WASSERMAN, ESQUIRE
 4      BEN GRUEN, ESQUIRE
 5      EPHRAIM SIFF, ESQUIRE (via Zoom)
 6      Nathan & Kamionski, LLP
 7      575 S. Charles Street, Suite 402
 8      Baltimore, Maryland  21201
 9      cgoo@nklawllp.com
10
11   VIDEOGRAPHER:  Brian Mackey
12
13
14
15
16
17
18
19
20
21
```

Page 4

```
 1           I N D E X
 2   Name of Witness
 3   Melvin Thomas
 4   Examination:                        Page
 5   By Ms. Goo                       8
 6
 7        E X H I B I T S
 8   Exhibit 1 Complaint                    12
 9   Exhibit 2 Answers to interrogatories      12
10   Exhibit 3 Letter 5/5/25 with Medical records  119
11   Exhibit 4 Inmate hearing record.  Violation  161
12   date 9/26/06
13   Exhibit 5 Hearing decision review, 8/27/08   163
14   Exhibit 6 Information report form, 11/9/11    164
15   Exhibit 7 Notice of inmate rule violation,    166
16   9/4/12
17   Exhibit 8 Notice of inmate rule violation,    167
18   5/26/13
19   Exhibit 9 Notice of inmate rule violation,    167
20   5/29/13
21   Exhibit 10 Notice of inmate rule violation,  168
```

Page 5

```
 1   6/10/18
 2   Exhibit 11 Inmate hearing record, 10/22/19   170
 3   Exhibit 12 Inmate waiver of appearance with a 172
 4   Plea Agreement
 5   Exhibit 13 Motion for new trial              176
 6   Exhibit 14 Brockington Affidavit             295
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

Veritext Legal Solutions
202-803-8830 -- 410-494-8300

1   IT IS HEREBY STIPULATED AND AGREED that

2 the reading and signing of this deposition are not

3 waived.

4   VIDEOGRAPHER: We are going on the record

5 at 9:35 a.m. and August 11, 2025. This is

6 media unit one in the deposition of Melvin

7 Thomas in the matter of Melvin Thomas versus

8 George Vigue, et al. In the United States

9 District Court for the District of Maryland.

10 Case number 1:23-CV-03379-BAH. This deposition

11 is taking place at 401 East Pratt Street,

12 Baltimore, Maryland. My name is Brian Mackey

13 from Veritext and I'm the videographer. The

14 court reporter today is Dave Corbin from

15 Veritext. Would counsel please state their

16 appearances and affiliations for the record.

17   MR. BALLENGER: Yes, good morning. Matt

18 Ballenger or behalf of the plaintiff.

19   MR. RIPKE: Booth Ripke on behalf of the

20 plaintiff.

21   MR. NATHANS: Larry Nathans on behalf of

1 the plaintiff.

2   MS. MULLIN: Kerry Mullin on behalf of

3 plaintiff.

4   MS. GOO: Christine Goo with Nathan

5 Kamionski on behalf of the defendants.

6   MR. WASSERMAN: Good morning. My name is

7 Perry Wasserman with Nathan Kamionski on behalf

8 of defendant officers.

9   MR. GRUEN: Ben Gruen also with Nathan

10 Kamionski on behalf of defendant officers.

11   MR. WASSERMAN: And we have Mr. Ephraim

12 Siff with Nathan Kamionski --

13   THE WITNESS: What did you say again.

14   MR. WASSERMAN: I'm sorry.

15   THE WITNESS: I didn't hear what you said.

16   MR. WASSERMAN: Let me just introduce our

17 counsel on Zoom. His name is Ephraim Siff,

18 S-I-F-F, with Nathan and Kamionski on behalf of

19 officer defendants. My name is Perry

20 Wasserman. I'm an attorney representing the

21 defendant officers.

1   THE WITNESS: Okay.

2   VIDEOGRAPHER: Will the reporter please

3 swear in the witness.

4    MELVIN THOMAS,

5 duly been sworn/affirmed to tell the truth, the

6 whole truth, and nothing but the truth, testifies as

7 follows:

8   E X A M I N A T I O N

9 BY MS. GOO:

10  Q. All right. Good morning, Mr. Thomas. As

11 I just stated, my name is Christine Goo. I

12 represent the officer defendants, and those are

13 Detectives Vigue, Copeland and Danielczyk in this

14 case. I'm just going to go through a couple

15 preliminary questions and ground rules with you

16 before we get started, okay?

17  A. Okay.

18  Q. So the first thing is I just want to make

19 sure that you are in a capacity to take your

20 deposition this morning. So the questions I ask you

21 are not meant to embarrass you in any way, it's just

1 to make sure that you're thinking clear minded and

2 you're able to testify in a capacity that would be

3 acceptable for the court, okay?

4  A. Yes, ma'am.

5  Q. So the first question is have you taken

6 any medications this morning?

7  A. No.

8  Q. Okay. Are there any medications that you

9 typically take that you did not take this morning

10 that would somehow affect your ability to testify

11 this morning?

12  A. No.

13  Q. Okay. And are you thinking clear headed

14 this morning as well?

15  A. Yes.

16  Q. Have you ever had your deposition taken

17 before?

18  A. No.

19  Q. And just to go over some basic ground

20 rules, I obviously have a number of questions

21 related to the lawsuit that you have brought with

1  your attorneys.  There are objections that may come
2  from your attorneys, and I would encourage you to
3  pause if that's the case.  Unless instructed you are
4  not to answer, you may answer the question even if
5  there is an objection.  You are invited to let me
6  know if my question is unclear.  Attorneys often ask
7  questions that are not the easiest to understand, so
8  if you don't understand a question, just say I'm not
9  sure I understand it, could you ask it differently,
10 and I'll try to rephrase my question in a way that
11 you can understand exactly what the question is.
12 Because we have a court reporter here today, and
13 this is probably the most important thing, court
14 reporter seated to your right to my left, it's
15 really important for him to get everything that
16 we're saying today.  So sometimes you may want to
17 talk over me because you're anxious to answer a
18 question.  I will also have to be mindful of letting
19 you finish your answer because we need to have a
20 clear record.  Please wait until I finish asking my
21 questions until you start to answer it, okay?

1       A.  Okay.
2       Q.  In terms of breaks, this is something I
3  mentioned to you before we came on the record,
4  we can take a break at any time.  I just ask if
5  there is a question pending you answer the question
6  first and then we can take a break.
7       A.  Okay.
8       Q.  Understood.  Okay.  So could you please
9  state your full name for the record?
10      A.  Yes.  Melvin William Thomas, Junior.
11      Q.  And I'm sorry, was there a middle name?
12      A.  William.
13      Q.  William, sorry, I didn't hear you.  And do
14 you go by any nick names, Mr. Thomas?
15      A.  No.
16      Q.  Do you -- there was a complaint filed in
17 this case with a number of claims and allegations.
18 Do you adopt everything that was written in the
19 complaint?
20      MR. BALLENGER:  I'm just going to object.
21      There is a lot of legal stuff in there.  You

1  can answer if you can.
2       A.  Can you say that again?
3       Q.  So the complaint -- actually if I could
4  get a copy of that, please.  Showing this to
5  Plaintiff's counsel as Exhibit 1.
6       (Deposition Exhibit 1 marked.)
7       MR. BALLENGER:  Okay.
8       Q.  Mr. Thomas, there is -- this is the
9  complaint that was filed in this case on your
10 behalf.  There are a number of factual allegations
11 and claims against the police officers in this case.
12 My question to you is do you adopt the facts as they
13 are there stated and the claims that were made in
14 the case?
15      A.  Yes.
16      MR. BALLENGER:  Same objection.  Go ahead.
17      A.  Yes.
18      Q.  Okay.  And there were a set of answers to
19 interrogatories that were filed on June the 17th of
20 2025.
21      (Deposition Exhibit 2 marked.)

1       Q.  Showing it to counsel.  Okay.  So I'm just
2  going to show you the first page and then direct
3  your attention to the last page.  Sorry, the second
4  to last page of it on page 18.  So if you could just
5  take a look at this first.  And if I could direct
6  your attention to page 18.  And do you see a
7  signature there on page 18?
8       A.  Yes.
9       Q.  Okay.  And above your signature it says
10 that you swear and affirm under the penalties of
11 perjury that the foregoing is true and correct to
12 the best of my knowledge, information and belief; is
13 that correct?
14      A.  Yes, ma'am.
15      Q.  Okay.  And do you adopt the answers that
16 were provided in those interrogatories in Exhibit 2?
17      MR. BALLENGER:  Objection.  Same thing
18      about legal content, but you can answer.
19      A.  Yes.
20      Q.  Okay.  And do you swear to the truth of
21 the answers provided in that document?

1     MR. BALLENGER: Same objection. You can
2  answer.
3     A. I don't -- I mean I haven't -- you want me
4  to read through all this?
5     Q. If you want to just take a moment to look
6  at it, by all means.
7     A. I don't -- Dewey Morgan, his statement
8  don't seem full. Understand what I'm saying? Dewey
9  Morgan it says everything but -- he actually
10  witnessed the shooting.
11     MR. BALLENGER: Where are you at, page
12  three?
13     A. Page three. Like he watched him shoot
14  that boy.
15     MR. BALLENGER: Okay.
16     A. So that's something may be incomplete.
17     Q. So Mr. Thomas, your correction to
18  interrogatory answer number one is that Dewey Morgan
19  actually observed the shooting?
20     A. Yes.
21     Q. Okay.

1     A. He did. According to him. He watched the
2  argument. Then when he was going into the house,
3  the shooting -- he heard the shots and he said he
4  looked out the door or the window to witness the
5  shooter shooting at Myron. And he seen him put up
6  his hands, seen him run down the alley was his full
7  statement.
8     Q. Mr. Thomas, I see that you put the
9  document down. Have you had a sufficient chance to
10  review Exhibit 2, the answers to the
11  interrogatories?
12     A. Yes.
13     Q. And had you had an opportunity to review
14  this previously?
15     A. Yes.
16     Q. Okay. And you signed the statement below
17  on page 18 because you are swearing under and
18  affirming under the penalties of perjury that it is
19  true and correct to the best of your knowledge?
20     A. Yes.
21     Q. Okay. So Mr. Thomas, we are here because

1  of the complaint that was again filed on your behalf
2  because of your claim that you were not the
3  perpetrator in Myron Brockington's shooting back in
4  2001; is that right?
5     A. Yes.
6     Q. And you got to speak up.
7     A. Yes.
8     Q. Okay. Who is the real shooter?
9     A. I don't know.
10     Q. You don't know?
11     A. No.
12     Q. So you have no information about who --
13  any identifying information for this person?
14     A. I mean information.
15     Q. Okay. And what is the information that
16  you have about that person?
17     A. I mean according to my so-called
18  co-defendant, he said the person that was with him
19  was a guy named Namey.
20     Q. Namey?
21     A. Yes.

1     Q. I just wanted to make sure I have that
2  right. Do you know Namey's true identity?
3     A. Well, according to an investigation that
4  my lawyer done after trial, he said his name was, I
5  mean, Charles Floyd.
6     Q. And which attorney was that?
7     A. Lyle Jones.
8     Q. Lyle Jones?
9     A. Yes.
10     Q. Okay. Have you ever met Charles Floyd?
11     A. I didn't know him as Charles Floyd.
12     Q. You knew him as Namey?
13     A. Yes.
14     Q. How did you encounter him?
15     A. I mean we was -- he was around the same
16  neighborhood that I grew up in.
17     Q. Okay. Do you know where he lived?
18     A. No.
19     Q. What neighborhood was that?
20     A. Perkins Projects.
21     Q. Where in Perkins. Where in Perkins?

1     A.  I don't understand the question.

2     Q.  So you said in Perkins Projects.  Perkins

3  Projects is a pretty big area in East Baltimore.  Is

4  there a particular street, block that you're

5  referring to when you say Perkins Projects?

6     A.  No.

7     Q.  Do you know exactly where he lived, which

8  block?

9     A.  I didn't -- I never said he lived down

10  there.  I said he was hanging out there.

11     Q.  He was hanging around there?

12     A.  Yeah.

13     Q.  So you saw him in the area?

14     A.  Sometimes.

15     Q.  But is that what you're saying, you saw

16  him in Perkins Projects on occasion?

17     A.  On occasion.

18     Q.  And what period of time was it that you

19  saw him in Perkins Projects?

20     A.  Probably from some years, from my teenage

21  years.

1     Q.  Your teenage years?

2     A.  Yeah.

3     Q.  And just to get a frame of reference, in

4  terms of the time period, what year were you born?

5     A.  In '80.

6     Q.  1980?

7     A.  Yes, ma'am.

8     Q.  So that would have been in the 90's that

9  you saw him in Perkins Projects?

10     A.  Yeah, in the 90's.

11     Q.  Did you -- when you saw him, what was he

12  doing.  Was he just hanging out with people, was he

13  visiting relatives, or was he engaging in any type

14  of illegal conduct?

15     A.  I don't know.  I mean when I used to see

16  him it was basically just -- I seen him, like I

17  don't know what he was doing.

18     Q.  Was he, you know, dealing drugs on the

19  corner, anything like that?

20     A.  I wouldn't know.

21     Q.  Okay.  And Mr. -- Mr. Thomas, do you

1  recall what your SID number was when you were in

2  jail?

3     A.  My SID number?

4     Q.  Yes.

5     A.  No.

6     Q.  You don't remember what it was?

7     A.  No.

8     Q.  And how did you find out about the

9  identity of Namey.  Because I mean you said that you

10  heard it from some folks.  How did you learn that?

11     A.  That's what they called him.

12     Q.  How did you find out that Namey was the

13  person that did the shooting of Myron Brockington?

14     A.  I can't say that -- that he did the

15  shooting.  I mean that's what allegedly was said.  I

16  wasn't there.

17     Q.  I understand that.  How did you learn that

18  rumor, that information, that he's the one who

19  supposedly did it?

20     A.  Word on the street.

21     Q.  Okay.  So word on the street.  Who did you

1  hear it from?

2     A.  People.

3     Q.  Who are the people you heard it from?

4     A.  I don't recall.

5     Q.  You don't recall who you heard it from?

6     A.  I mean there was people I guess.

7     Q.  Can you recall the name of one person who

8  shared this information with you?

9     A.  My so-called co-defendant.

10     Q.  And who is that?

11     A.  Donte Lyle.

12     Q.  So Namey is somebody who -- actually,

13  strike that.  Have you ever had a conversation with

14  Namey?

15     A.  Like ever?

16     Q.  Yes, ever.

17     A.  Yeah, I had a conversation with him

18  before.

19     Q.  When did the two of you have a

20  conversation?

21     A.  I don't know.

Page 22

1    Q.   Was it while you were on the street or in
2    jail?
3    A.   Oh, it was definitely on the street.
4    Q.   Was it before or after you served time for
5    Mr. Brockington's shooting?
6    A.   Before.
7    Q.   Okay.  So possibly during the 90's, during
8    that period of time?
9    A.   Yes.
10   Q.   Do you have -- are any of your friends,
11   associates, do you know if any of them had a
12   relationship with Namey?
13   A.   Yes.
14   Q.   Okay.  And who of them are friends or
15   associates with Namey?
16   A.   Cousins that I seen hanging -- him hanging
17   with.
18   Q.   What are the names of those cousins?
19   A.   Specifically Larnell Ellis.
20   Q.   Larnell Ellis?
21   A.   Yeah.

Page 23

1    Q.   Does he go by any other name other than
2    Larnell Ellis?
3    A.   Yes.
4    Q.   And what is that name?
5    A.   Tyreke.
6    Q.   And how does Tyreke, Tyreke Ellis, Larnell
7    Ellis, know Namey?
8    A.   Well, they are cousins.
9    Q.   They are blood relatives?
10   A.   I believe so.  On his other side of the
11   family.  At least that's what he says.
12   Q.   That's what who said?
13   A.   They said.  Them two.
14   Q.   So did you hear that from Namey?
15   A.   I mean they was calling each other
16   cousins.
17   Q.   You heard Namey call Ellis cousins,
18   cousin?
19   A.   They both used to say that.
20   Q.   And you heard Tyreke call Namey cousin as
21   well?

Page 24

1    A.   Yes.
2    Q.   And did you hear -- did you call him
3    Larnell or Tyreke?
4    A.   Tyreke.
5    Q.   Do you call -- did Tyreke ever say to you
6    that Namey is the one who shot Brockington?
7    A.   No.
8    Q.   Did you ever pass this information along
9    to law enforcement about the rumor of this being --
10   the information that this was Namey who did the
11   shooting?
12   A.   I didn't even know about the -- a lot of
13   the information before the case until after trial.
14   Q.   When did you learn of this information to
15   the best of your recollection?
16   A.   When my lawyer did an investigation after
17   I was convicted.
18   Q.   And this was Lyle Jones?
19   A.   Yes.
20   Q.   So your trial occurred in early
21   December 2001, does that sound right?

Page 25

1    A.   Sound right.
2    Q.   Okay.  You were convicted on December 6 of
3    2001?
4    A.   Yes.
5    Q.   And you were sentenced on April 8th of
6    2002; is that right?
7    A.   That sounds correct.
8    Q.   And in a motion for new trial on April the
9    8th, 2002, your attorney at that point had filed a
10   motion and raised some issues related to Namey at
11   that point; is that right?
12   A.   That sounds about correct.
13   Q.   Okay.  So is that the investigation that
14   you're talking about then, you didn't learn about it
15   until after trial?
16   A.   Right.
17   Q.   Now, do you know whether or not Lyle Jones
18   brought this information to again law enforcement
19   letting them know that they had the wrong person?
20   A.   To my recollection, in the motion to the
21   new trial, I believe he took it to the States

Page 26

1  Attorney.
2      Q.  So Mr. Thomas, I'm going to direct you to
3  interrogatory number 21 in your answer.  So it's the
4  document right in front of you.  Number 21 is on
5  page 17.  Let me know when you're at interrogatory
6  21?
7      A.  Seventeen?
8      Q.  Page 17, yes.  Okay.  So interrogatory 21
9  it says "state the name of the individual and that
10  person's address or last known address whom you
11  contend shot Myron Brockington on February 26,
12  2001."  The answer says "other than the nick name
13  Namey, plaintiff does not have this information."
14  But your testimony this morning is that you did know
15  that this person -- person's name is Charles Floyd?
16      A.  No.  I said that -- yeah, I know him as
17  Namey.  I didn't know about Charles Floyd until my
18  lawyer brought that to my attention.
19      Q.  And that was Lyle Jones?
20      A.  Yes.
21      Q.  And that was back in 2002?

Page 27

1      A.  Yes.
2      Q.  Okay.  And this was signed on June the
3  17th of 2025, which you would agree with me is well
4  after April of 2002, correct?
5      A.  Correct.
6      Q.  Okay.  And is there any reason why you
7  didn't provide that information in response to
8  interrogatory number 21 about Charles Floyd?
9      A.  Because I know him as Namey.
10      Q.  But you also know that his name is Charles
11  Floyd; isn't that right?
12      A.  I mean that ain't what I know him as.
13      Q.  And you also knew that he was at least
14  around the area of Perkins Homes back in the 90's,
15  correct?
16      A.  Yes.
17      Q.  All right.  Mr. Thomas, in preparation for
18  this deposition today did you review any documents,
19  case filings, transcripts, anything like that prior
20  to your testimony today?
21      A.  You mean today did I do that?

Page 28

1      Q.  Did you do that in the weeks leading up to
2  the deposition today?
3      A.  Some.  Not really.  I got it in my brain.
4      Q.  So what did you review to prepare for
5  today?
6      A.  Nothing.
7      Q.  We're going to go document by document.
8      A.  Nothing really.
9      Q.  You say nothing really but you said there
10  was a couple of things that you have reviewed?
11      A.  Yeah, things that me and my lawyers went
12  over.
13          MR. BALLENGER:  I'm going to object.  You
14      don't need to tell her about anything you spoke
15      with or anything with your lawyers, that's
16      attorney client privilege.  In fact even asking
17      him which specifics is probably attorney
18      client.  I'm giving you some leeway here on
19      that.
20          MS. GOO:  All right.  In terms of
21      documents that he reviewed?

Page 29

1          MR. BALLENGER:  Uh-huh.
2      Q.  Were there any trial transcripts that you
3  looked at?
4      A.  Trial transcripts?
5      Q.  Uh-huh.
6          MR. BALLENGER:  Just for clarification,
7      I'm not making an objection, but I'm a little
8      concerned because he's been reviewing documents
9      since he was in jail.  So can you give a little
10      bit of a timeframe in terms of what your...
11      Q.  So since your deposition was noted for
12  today, so for the last -- we'll call it for the last
13  month, have you reviewed any of the trial
14  transcripts in your case?
15      A.  Some.
16      Q.  Some.  Okay.  Were there particular dates
17  or witness's testimonies that you reviewed?
18      A.  I don't recall.
19      Q.  Okay.  Did you review any of the police
20  reports in your case -- in preparing for your
21  deposition today?

Page 30

1    A.  Police reports?  Maybe.

2    Q.  Maybe.  Okay.  And if I ask you what

3  reports those are, do you recall what they are?

4    A.  Not by you asking me, no.

5    Q.  Okay.  While you were -- I'll ask this

6  question differently.  So have you kept your own

7  files related to this -- to your case?

8    A.  Yes.

9    Q.  So you have an existing set of files now?

10    A.  Yes.

11    Q.  Okay.  And is that something that you keep

12  at home?

13    A.  Yes.

14    Q.  Okay.  And when you were in jail, did you

15  also keep files related to this case?

16    A.  Yes.

17    Q.  How long had you been keeping files for

18  related to this case?

19    A.  Since I've been collecting them since my

20  incarceration.

21    Q.  So since, we will call it, 2001?

Page 31

1    A.  Yes.

2    Q.  Mr. Thomas, where do you currently live?

3    A.  719 North Carrollton Avenue.

4    Q.  How long have you been living there for?

5    A.  Almost going on four years.

6    Q.  Is that where you have resided since you

7  got out?

8    A.  No.

9    Q.  Where did you first reside when you got

10  out of jail?

11    A.  Dundalk.

12    Q.  Dundalk?

13    A.  Yes.

14    Q.  Do you recall the address?

15    A.  I know it's Kelmore Road.  I don't recall

16  the address.

17    Q.  How do you spell Kelmore?

18    A.  K-E-L-M-O-R-E.

19    Q.  And how long did you stay there for?

20    A.  Almost a year.

21    Q.  And after that where did you go to?

Page 32

1    A.  Where I reside at.

2    Q.  Okay.  And with whom did you reside there

3  with?

4    A.  Myself.

5    Q.  Okay.  Do you have any siblings?

6    A.  Yes.

7    Q.  And what are the names and ages of your

8  siblings?

9    A.  Blake and Mildred Thomas.

10    Q.  Are those your only two siblings?

11    A.  Yes.

12    Q.  Okay.  And how old is Blake?

13    A.  He a year younger than me.  So he will be

14  going on 44, I believe.

15    Q.  And how old is Mildred?

16    A.  A year younger than him, so she may be

17  going on 43.

18    Q.  Do you have children?

19    A.  Yes, one.

20    Q.  One.  And how old is your child?

21    A.  Twenty-three.

Page 33

1    Q.  And what is her name?

2    A.  Melajah Thomas.

3    Q.  Melajah Thomas?

4    A.  M-E-L-J-A -- I mean M-E-L-A-J-A-H.

5    Q.  And do you have any grandchildren?

6    A.  No.

7    Q.  Are you currently employed?

8    A.  Yes.

9    Q.  Where are you employed?

10    A.  Well, I have a food truck and I have a

11  clothing company.

12    Q.  You said it was a food truck?

13    A.  Yes.

14    Q.  What kind of food?

15    A.  Halal.

16    Q.  Halal?

17    A.  Yeah.

18    Q.  And how often do you operate the truck?

19    A.  I don't operate it never.

20    Q.  Sorry.

21    A.  I don't operate it never.  I have

1  employees for that.
2      Q.  You have employees for that.  How many
3  food trucks do you have?
4      A.  One.
5      Q.  And how often does the food truck do
6  business?
7      A.  Daily.
8      Q.  Daily.  Sunday through Saturday?
9      A.  Sunday through Saturday.
10     Q.  Sunday through Saturday.  How many hours?
11     A.  Unless -- unless there is an event on a
12  Sunday.
13     Q.  So Sundays they have the days off.  Is it
14  six days a week they operate?
15     A.  Yeah, unless there is an event.
16     Q.  And when did you -- so do you own the food
17  truck?
18     A.  Yes.
19     Q.  When did you buy the food truck?
20     A.  About three years ago.
21     Q.  How did that opportunity present itself to

1  you?
2      A.  I have a -- my partner, he owns
3  restaurants and food trucks, and he gave me the
4  opportunity to buy into it.
5      Q.  And how much did the food truck cost?
6      A.  I think I paid 70 grand for that food
7  truck.
8      Q.  And how much do you pay your one employee
9  to run the truck.  Like on -- does he get paid a
10  salary or is it like daily --
11     A.  Yeah, he gets paid a salary.
12     Q.  And how much is he paid?
13     A.  Thousand dollars a week.
14     Q.  And how many hours during the day does he
15  work?
16     A.  I don't know.
17     Q.  So does -- I mean is it like an eight hour
18  job, is it like a three hour job.  I mean just to
19  get some idea?
20     A.  It's around -- they go out around 9:30,
21  10:00 and they return around 4:00, something like

1  that.
2      Q.  And presumably there is some type of
3  cooking prep that needs to be done in advance?
4      A.  Yes.
5      Q.  Okay.  And is he getting paid for that or
6  is that part of the whole?
7      A.  No, different employees get paid for
8  different things.
9      Q.  So it just -- you said -- sorry, how many
10  employees do you have?
11     A.  I don't -- I can't say how many employees
12  I have because he rotates them.  I don't do none of
13  that.  I'm just owner, investor.
14     Q.  Okay.  So he has -- he's the one who is
15  running the truck?
16     A.  Right.
17     Q.  Okay.  And then he employs other people?
18     A.  To work the truck.
19     Q.  Work the truck?
20     A.  Right.
21     Q.  Is he responsible for paying them?

1      A.  Yeah.  The company is responsible for
2  paying them.
3      Q.  There's a company that's responsible?
4      A.  Yes.
5      Q.  So do you pay them to manage the food
6  truck for you?
7      A.  Right.
8      Q.  Okay.  And how much -- so you give him
9  $1,000 a week?
10     A.  Or them.
11     Q.  Them?
12     A.  Yes.
13     Q.  And then they deal with payroll for other
14  employees and all of that?
15     A.  No, we got an accountant that deals with
16  payroll and all that.
17     Q.  Okay.  So I guess how much are you
18  spending on that company per week for like running
19  it, accountant, whoever the employees are.  How much
20  is that per week?
21         MR. BALLENGER:  I'm going to object at

Page 38

1  this time.  Where is the relevance.
2      A.  Right.
3          MR. BALLENGER:  You're asking about the
4  details of the business that --
5          MS. GOO:  We're just trying to
6  understand -- we're just trying to understand
7  damages and what his earning is at this point
8  in time.
9          MR. BALLENGER:  I understand that.  But
10  asking him the details about how -- details of
11  the business being run doesn't get you there.
12          MS. GOO:  I'm just trying to understand
13  how the business is run --
14          MR. BALLENGER:  I'm going to let you go a
15  little bit longer but that's getting a little
16  bit in the weeds.  Go ahead, answer to the best
17  you can.
18      Q.  So just on a monthly basis how much money
19  are you spending on the food truck business.  I
20  think that's the best way I can ask that question.
21      A.  I don't know.  I got to look at my books.

Page 39

1      Q.  You don't know?
2      A.  No.
3      Q.  Okay.  What is the name of the company?
4      A.  Shareef's.
5      Q.  And the last question I have related to
6  this is that this -- do you own a franchise as a
7  part of Shareef's or Shareef's your company?
8      A.  No, I own 50 percent of the actual
9  business of the truck.
10      Q.  Okay.  Now, you mentioned that you also
11  run a clothing company?
12      A.  I do.
13      Q.  And could you just talk to us briefly
14  about what your involvement is with the clothing
15  company?
16      A.  Well, me and my cousin, we founded a
17  clothing brand name and we embroider, we do
18  embroidery.
19      Q.  You do embroidery?
20      A.  Yes.
21      Q.  So, again, I'm just trying to get some

Page 40

1  idea.  Do you work with other companies with
2  embroidering?
3      A.  No.  I mean --
4      Q.  How does it work?
5      A.  What do you mean work with other
6  companies?  Like we can do something, like if say
7  you had a -- you started a company and you needed
8  shirts made with names or something like that,
9  we can do that for you.
10      Q.  So people will come to you and say we need
11  X, Y, Z things embroidered; is that right?
12      A.  Yes, yes.
13      Q.  How much do you get paid on a monthly
14  basis from that company?
15      A.  That's up and down.  I don't -- I would
16  have to check my books.
17      Q.  Okay.  What is the name of that company?
18      A.  Divine Minds, LLC.
19      Q.  Divine Minds, LLC?
20      A.  Yes.
21      Q.  Do you have any idea of what you grossed

Page 41

1  last year?
2      A.  No.
3      Q.  This year to date?
4      A.  I would have to check my books.
5      Q.  And all of the -- actually, strike that.
6  So when you report your taxes, are you reporting
7  1099's, K-1's.  How are you reporting this.  I'm
8  just trying to figure out how you're paid between
9  your two businesses?
10      A.  Well, my cousin and my other partner, they
11  take care of taxes and all that.  But I file -- I
12  don't -- I don't know the exact what you -- that
13  1019 or that what you are talking about, I just know
14  that when I get my forms I get them dealt with
15  through the people who do -- people to do my taxes,
16  that's that.
17      Q.  Do you get paid on a monthly basis, weekly
18  basis, quarterly?
19      A.  Depends.  I mean, you know, money go
20  directly into an account.  You know, I may take it
21  out monthly, it's up to me.

11 (Pages 38 - 41)

1    Q.  And do you know how much money you made
2  last year?
3    A.  No.  I have to look at my books.
4    Q.  And are you in a relationship now?
5    A.  No.
6    Q.  The next set of questions are going to be
7  related to your mental and physical health.  Again,
8  because of some of the claims that you've made in
9  this case, I'm asking these questions just to assess
10  like your current mental and physical health.  For
11  that purpose, and I'm saying that right now because
12  I'm asking these questions not to embarrass you in
13  any way but just because it's relevant to your
14  claims.  So the first set of questions have to do
15  with your mental health.  Have you ever had, in your
16  entire life, have you ever had any type of
17  psychological or psychiatric testing?
18    A.  Yes.
19    Q.  And when was that for.  Or when was that?
20    A.  They do it when you're in prison.  And I
21  had it done when I was home.

1    Q.  When you were at home?
2    A.  When I first came home, yeah.
3    Q.  Prior to your time at the DOC from 2001
4  until you got out in, I believe it was about 2020,
5  prior to that, did you go to any type of
6  psychological or psychiatric testing?
7    A.  Prior to prison?
8    Q.  Yes.
9    A.  I can't recall.
10    Q.  Okay.  And you said in the Department of
11  Corrections you would receive testing on some type
12  of routine basis.  How often did that occur?
13    MR. BALLENGER:  I object.  I'm not sure he
14  used that term.
15    A.  I did not say that.
16    Q.  Okay.  What was it you said in terms of
17  how often you received psychiatric testing?
18    A.  I didn't say.  I said I received
19  psychiatric testing.
20    Q.  How often did you receive it?
21    A.  I don't recall.

1    Q.  You don't recall if it was like an
2  as-needed thing or if it was just --
3    A.  Like I know they do it when you first come
4  in.  And then, you know, any time after that you
5  have to request it or something like that.
6    Q.  So you know that you received it at least
7  once when --
8    A.  At least.
9    Q.  When you were first admitted?
10    A.  At least.
11    Q.  And were you ever diagnosed with any type
12  of psychiatric or psychological disorder?
13    A.  Yes.
14    Q.  And what was that for?
15    A.  PTSD.  ADHD.
16    Q.  Anything else?
17    A.  No.
18    Q.  For the PTSD, do you recall what year it
19  was that you received that diagnosis?
20    A.  Approximately like three years ago.
21  Maybe.  When I first came home, yeah.

1    Q.  Was that a diagnosis that you received
2  after you had left the DOC?
3    A.  Yes.
4    Q.  Okay.  And as a result of that diagnosis,
5  did you receive any treatment from either a
6  psychologist or psychiatrist?
7    A.  Yes.
8    Q.  And who was the psychologist or
9  psychiatrist that treated you?
10    A.  I know his last name is Fabian.  I can't
11  recall his first name.
12    Q.  Do you recall if he was a psychologist or
13  psychiatrist?
14    A.  Psychologist.
15    Q.  Did you receive any type of medication as
16  a result of the treatment?
17    A.  I refused the medications.  I mean it
18  wasn't no medication prescribed for PTSD.  I mean...
19    Q.  Was it Stephen Fabius.
20    A.  Stephen Fabius, yes.
21    Q.  You mentioned that you refused some type

12 (Pages 42 - 45)

1  of medication?

2      A.  I didn't mean to say that.  I meant to say

3  I don't recall even medication being recommended for

4  my PTSD.

5      Q.  For the ADHD, when did you receive that

6  diagnosis?

7      A.  I received that young.

8      Q.  Young?

9      A.  Yes.

10     Q.  Okay.  So was that a diagnosis where you

11  received before going into the DOC in 2001?

12     A.  Yes.

13     Q.  Were you -- did you receive any treatment

14  for the ADHD?

15     A.  No.

16     Q.  Were you prescribed medication or told to

17  take medication as a result of that diagnosis?

18     A.  I don't recall was I -- I don't recall

19  whether or not medication was recommended, but I

20  don't -- my mother didn't allow me to take no

21  medication.

1      Q.  So you didn't take any medication if it

2  was prescribed to you for the ADHD?

3      A.  Right.

4      Q.  And since that period of time did you

5  ever -- were you ever again subsequently diagnosed

6  with ADHD?

7      A.  What you mean subsequently?

8      Q.  So when you were diagnosed with PTSD and a

9  psychiatrist visited with you, I guess Doctor

10  Fabius --

11         MR. BALLENGER:  I think he said a

12  psychologist.

13     Q.  Sorry, psychologist.  When you were

14  diagnosed with that after you got into the DOC, did

15  the ADHD come back -- come up again?

16     A.  I brought it up.

17     Q.  You brought it up?

18     A.  Correct.

19     Q.  Did he diagnose it with you in the 2020 to

20  2025 period of time?

21     A.  I don't recall if he re-diagnosed me, but

1  I know that he diagnosed me with PTSD.

2      Q.  Okay.  Did you receive any -- did he

3  prescribe for you any medication related to ADHD?

4      A.  No.  No.  Yes, he did.  Vyvanse, now I can

5  recall.  Yes.

6         MR. BALLENGER:  Sorry, what was that?

7      A.  Vyvanse, a focus -- supposedly keep you

8  focused.

9      Q.  Are you taking that medication?

10     A.  No.

11     Q.  Had you ever taken it?

12     A.  Yes.

13     Q.  And how long did you take that for?

14     A.  Not too long.  I didn't like the side

15  effects.

16     Q.  So other than the PTSD and ADHD, have you

17  been diagnosed with any other type of psychological

18  or psychiatric disorder?

19     A.  No.

20     Q.  And to the best of your knowledge is

21  Stephen Fabius the only person you've seen since

1  leaving DOC that's a mental health professional?

2      A.  Yes.

3      Q.  And have you been to a -- like a primary

4  care provider since you have left the Department of

5  Corrections?

6      A.  Yes.

7      Q.  Have you been diagnosed with any physical

8  conditions, ailments, that type of thing since

9  leaving DOC?

10     A.  Physical ailments.  Briefly high blood

11  pressure, but then I got that in order.

12     Q.  How did you get that in order?

13     A.  According to them, my high blood pressure

14  was self-induced.

15     Q.  Did you -- how did you treat it?

16     A.  I started not stressing, staying calm.

17     Q.  Did you take any medication for it?

18     A.  Initially.  But then they said the

19  medication was -- I didn't need it basically.

20  That's how they came up with the diagnosis that I

21  was self, that I used to raise my own blood

1 pressure.

2      Q.  Are you currently being treated for

3 anything?

4      A.  No.

5      Q.  Mr. Thomas, do you have any criminal

6 convictions?

7      A.  No.

8      Q.  At the time of your trial in two --

9 December of 2001, did you have convictions at that

10 point?

11      A.  At that point.

12      Q.  Okay.  And what were those convictions

13 for?

14      A.  CDS.

15      Q.  Felony CDS?

16      A.  Yes.

17      Q.  Okay.  And that was for possession with

18 intent to distribute?

19      A.  Yes.

20      Q.  And do you recall when you were arrested

21 for those events -- those offenses that led to those

1 convictions at that point in time?

2      A.  Don't recall.

3      MR. BALLENGER:  Just real quick.  I'm

4 going to step out.  Booth will take over.

5      MS. GOO:  Okay.

6      Q.  Do you recall being arrested by the police

7 for those drug convictions?

8      A.  Yes.

9      Q.  Do you recall where you were arrested for

10 the first one?

11      A.  Yes.

12      Q.  Where was it?

13      A.  In Perkins Projects.

14      Q.  Do you remember where specifically in

15 Perkins?

16      A.  No.

17      Q.  And for the second conviction, do you

18 recall where you were arrested?

19      A.  Yes.

20      Q.  And where was that?

21      A.  Perkins Projects.

1      Q.  You have to keep your voice up, sir?

2      A.  Perkins Projects.

3      Q.  And were you arrested in the same place or

4 a different place within Perkins Projects?

5      A.  Different place.

6      Q.  Okay.  You don't recall what block it was?

7      A.  No.

8      Q.  At the period of time in which you were

9 arrested for those two drug offenses, where were you

10 living?

11      A.  Don't remember.

12      Q.  You don't remember where you were living

13 at the time?

14      A.  I'm thinking one of two places but I don't

15 recall which place at the top of my head.

16      Q.  Okay.  So were you born in Baltimore?

17      A.  Yes.

18      Q.  And what was your first residence within

19 Baltimore?

20      A.  You mean when I was born?

21      Q.  When you were born.

1      A.  I don't know.

2      Q.  You don't remember your childhood home?

3      A.  No.

4      Q.  What's the first residence that you can

5 recall that you lived in?

6      A.  I know it was in South Baltimore.  I don't

7 recall the street.  Then my mother -- at my youngest

8 age that I can recall.  I don't -- she moved a lot.

9      Q.  So you first were in South Baltimore?

10      A.  At my earliest childhood --

11      Q.  At your earliest?

12      A.  Childhood memory, yeah.

13      Q.  And where after that?

14      A.  East Baltimore mostly.

15      Q.  Okay.  So what's the first East Baltimore

16 address that you can remember?

17      A.  North Avenue.

18      Q.  Where along North Avenue, east side or

19 west side?

20      A.  All east side I'm talking about right now.

21      Q.  Do you recall what the cross street was

14 (Pages 50 - 53)

1  and North Avenue?
2      A.  Collington.
3      Q.  Collington?
4      A.  Yes.
5      Q.  And how long did you live at that North
6  and Collington address?
7      A.  Maybe six years, something like that.
8      Q.  Do you recall what level of school you
9  were in when you were living there?
10     A.  From middle to my first year of high
11  school.
12     Q.  Okay.  So after your first year of high
13  school where did you live?
14     A.  Lakewood.
15     Q.  Okay.  And do you recall what block that
16  was?
17     A.  400 block.
18     Q.  Okay.  And how long did you -- sorry, is
19  that north or south?
20     A.  North.
21     Q.  And how long did you live at that address

1  for?
2      A.  Can't recall.  It was some years.
3      Q.  Okay.  Did you graduate from high school?
4      A.  No.
5      Q.  What year did you leave?
6      A.  I don't recall what year I left.  I recall
7  what grade I left.
8      Q.  What grade did you leave?
9      A.  Ninth.  Ninth.
10     Q.  Okay.  So 400 North Lakewood, is that --
11  that's above Fayette Street?
12     A.  Yes.
13     Q.  Below Orleans?
14     A.  No.
15     Q.  Is it right at Orleans?
16     A.  In between Orleans and Jefferson.
17     Q.  Okay.  And are you familiar with the area
18  around the 100 north block of Clover Street?
19     A.  What you mean familiar?
20     Q.  Like had you been in that area before, had
21  you walked through there?

1      A.  I'm sure I walked through there before or
2  drove through there.
3      Q.  Did you ever have friends and associates
4  that lived anywhere near there?
5      A.  No.
6      Q.  So you recall living in the 400 block of
7  North Lakewood Street, and that was -- sorry, I just
8  want to make sure I understand this.  That was your
9  first -- around your first year of high school or
10  did you leave around then?
11     A.  No, I was still going to high school when
12  I first moved there.
13     Q.  And then you lived there for a couple of
14  years after that?
15     A.  Right.
16     Q.  Okay.  So would it be fair to say that you
17  were in your teen years when you were living at 400
18  North Lakewood?
19     A.  Yes.
20     Q.  So at that point in time after you left
21  high school, what if anything did you do for work?

1      A.  I used to -- I used to -- there was this
2  guy who used to evict people and I used to work with
3  him sometimes when he had the space for me.
4      Q.  When he had the space for you?
5      A.  Yeah, because he used to let us kids help
6  him evict people.
7      Q.  So what would you actually do to help him
8  out?
9      A.  Put the stuff out.
10     Q.  Go into the house, take the stuff out?
11     A.  Yeah, take the stuff out.
12     Q.  How much would he pay you?
13     A.  I don't recall.  I remember it being
14  decent.
15     Q.  So this was back in the 90's?
16     A.  Yes.
17     Q.  What was decent, like 20 bucks, 50 bucks?
18     A.  Maybe like 50.
19     Q.  Per house, per day?
20     A.  Yeah, like if we -- during that day of
21  work, yeah, at the end of the day he would give me

Page 58

1  50 bucks, something like that.

2  Q. So you could have done a couple houses in

3  a day and then he'd give you 50 bucks at the end of

4  the day?

5  A. Probably no more than two.

6  Q. And do you recall how many evictions you

7  helped him with?

8  A. I don't recall. A lot.

9  Q. Did he come to you consistently or was it

10  just kind of like an as-needed he would call you up?

11  A. No, he -- I mean it wasn't that he came to

12  me. I went to him early in the morning. If I was

13  there early in the morning and -- yeah.

14  Q. So if you were there early in the morning

15  where?

16  A. He lived on -- so that's the 500 block.

17  Q. The 500 block of what?

18  A. Lakewood.

19  Q. So you would go to him and ask if he had

20  any work for you that day?

21  A. Yeah.

Page 59

1  Q. Approximately how many times did you do

2  this work for him?

3  A. About -- he -- Monday through Friday. It

4  was -- he didn't do it on weekends.

5  Q. Did you do this for a couple weeks, couple

6  months?

7  A. Maybe -- maybe around a year. Maybe.

8  Q. And how -- how did you get paid?

9  A. Cash.

10  Q. Cash. Now, back in February of 2001, what

11  was your -- what was the normal day for you back

12  then?

13  MR. BALLENGER: Sorry, what time?

14  Q. February of 2001.

15  A. Hanging out with my friends.

16  Q. Were you working then?

17  A. No.

18  Q. What did you do for money?

19  A. Sold drugs.

20  Q. What kind of drugs were you selling?

21  A. Cocaine.

Page 60

1  Q. Where did you sell?

2  A. Perkins Projects.

3  Q. Where?

4  A. In different courts.

5  Q. Which courts?

6  A. Heron, Dallas.

7  Q. Heron, Dallas, any others?

8  A. No.

9  Q. How much did you make on a weekly basis?

10  A. I don't recall.

11  Q. Did you sell during the night time or

12  daytime or was it -- did it vary?

13  A. It varied.

14  Q. Did you have a shop set up or did people

15  call up and ask for you to sell to them at requested

16  specific times?

17  A. I stood there and they came to me.

18  Q. And in February of 2001 were you on

19  probation?

20  A. February 2001. Yes.

21  Q. And were you using drugs at this period of

Page 61

1  time as well?

2  A. No.

3  Q. Okay. So you were not using cocaine?

4  A. No.

5  Q. Okay. No marijuana?

6  A. No.

7  Q. Drinking alcohol?

8  A. Sometimes.

9  Q. Okay. I'm going to go through a list of

10  different people and then I'm going to ask you a

11  series of questions depending on whether or not you

12  know who the person is. So the first person is

13  Octavia Barnes. Do you know this person?

14  A. Yes.

15  Q. And how do you know Ms. Barnes?

16  A. That's my daughter's mother.

17  Q. Does Ms. Barnes have any nick names?

18  A. Tay.

19  Q. Tay?

20  MR. BALLENGER: Can you spell that?

21  A. T-A-Y. Octavia. Tay is for short.

16 (Pages 58 - 61)

1    Q.   And so back in 2001 had your daughter been
2    born at that point?
3        A.   At what point?
4    Q.   Sorry, in 2001.
5        A.   At what point?
6    Q.   In February of 2001.
7        A.   No.
8    Q.   Okay.  What was your relationship with Ms.
9    Barnes back in February of 2001?
10       A.   That was my girlfriend.
11   Q.   Did you speak with Ms. Barnes while you
12   were in the DOC?
13       A.   Yes.
14   Q.   Okay.  And how did the two of you
15   communicate?
16       A.   Letters mostly.  Sometimes phone calls.
17   Q.   And I assume -- I'm not going to assume.
18   Did the two of you speak regularly?
19       A.   Pretty regular.
20   Q.   Alease Turner, do you know this person?
21       A.   No.

1    Q.   Have you heard of Alease Turner's name
2    before?
3        A.   Yes.
4    Q.   And how do you know of Alease Turner?
5        A.   From the case.
6    Q.   Okay.  And tell me what you know about
7    Alease Turner?
8        A.   Nothing.
9    Q.   You know nothing about Alease Turner.
10   What does Alease Turner know about your case that
11   you know of?
12       A.   If I can recall, I think she -- I believe
13   that she said that she talked to the shooter that
14   night, alleged shooter that night.
15   Q.   And how did you learn this information
16   about Alease Turner having that information?
17       A.   From a report.
18   Q.   What kind of report?
19       A.   Discovery report, I believe.
20   Q.   Was it a police report?
21       A.   Yes, police report.

1    Q.   Have you ever spoken to Ms. Turner?
2        A.   No.
3    Q.   Have you seen her before?
4        A.   No.
5    Q.   Okay.  So you've had no communications
6    with her whatsoever?
7        A.   No.
8    Q.   Dewey Morgan.  We had some conversation
9    about Mr. Morgan at the beginning of the deposition.
10   Do you recall that?
11       A.   Yes.
12   Q.   And you said that you had some information
13   about what Dewey Morgan had observed.  And I think
14   you said that he had actually observed the shooting.
15   Is that correct?
16       A.   That is correct.
17   Q.   Okay.  How did you learn about that?
18       A.   In 2011 or ten I believe I took the
19   Baltimore Police Department to court for Maryland
20   Public Information Act and they actually gave me
21   that information.

1    Q.   Who gave that information?
2        A.   The Baltimore Police Department.
3    Q.   They gave you the information about Dewey
4    Morgan?
5        A.   Yes.
6    Q.   How did they give that information to you?
7        A.   The judge made them give me my full
8    discovery packet.
9    Q.   So was that a -- something that was
10   contained within the information that was turned
11   over as a result of the MPIA --
12       A.   Yes.
13   Q.   -- request?
14       A.   Yes.
15   Q.   Have you ever spoken to Dewey Morgan?
16       A.   I mean he was -- he came to court and
17   that's the first time I ever seen him.
18   Q.   And have you ever attempted to communicate
19   with him at all?
20       A.   No.
21   Q.   Okay.  Have you ever had anybody on your

Page 66

1  behalf try and reach out to him?
2      A.  Investigators.
3      Q.  Investigators?
4      A.  Yes.
5      Q.  Okay.  For what purpose?
6      A.  For court purpose.
7      Q.  Which court?
8      A.  So that's 2010.  Motion for new trial.
9      Q.  So when you say the motion for a new
10  trial, what did you mean.  What did you need from
11  him for the motion for the new trial?
12      A.  His testimony.
13      Q.  And who were the investigators at that
14  point?
15      A.  I don't remember his name.  I know that
16  Andy Alperstein said he was pretty good though,
17  because he did find him.
18      Q.  So it was an investigator that
19  Mr. Alperstein had?
20      A.  Yes.
21      Q.  Nina Wilson, do you know her?

Page 67

1      A.  No.
2      Q.  Are you familiar with who Nina Wilson is?
3      A.  Yes.
4      Q.  And what do you know about Nina Wilson as
5  it relates to this specific case?
6      A.  That she was another person who allegedly
7  talked to the shooter that night.
8      Q.  Okay.  And have you ever communicated with
9  Ms. Wilson?
10      A.  Never.
11      Q.  Have you had anyone on your behalf reach
12  out to Ms. Wilson?
13      A.  Yes.
14      Q.  And who was that?
15      A.  Investigator.
16      Q.  Okay.  And which investigator was that?
17      A.  Same investigator.
18      Q.  Okay.  So that's the same one from Andy
19  Alperstein?
20      A.  Yeah.
21      Q.  And why did you ask that person to reach

Page 68

1  out to Ms. Wilson?
2      A.  I didn't ask him to do nothing.  Andy did.
3      Q.  And you've never communicated with -- have
4  you ever communicated with Ms. Wilson?
5      A.  Never.
6      Q.  Anthony Wilson, do you know this person?
7      A.  Yes.
8      Q.  Okay.  And who is he?
9      A.  A private investigator.
10      Q.  Does he go by any nick names or business
11  names?
12      A.  Huh?
13      Q.  How do you refer to him, is it Anthony
14  Wilson, Mr. Wilson, or do you call him something
15  different?
16      A.  He has a nick name, Wolfe.
17      Q.  When did you -- who hired him?
18      A.  I hired him.
19      Q.  Okay.  And when did you hire him, if you
20  can recall?
21      A.  I don't recall.

Page 69

1      Q.  Was it, if you know, before or after the
2  private investigator for Andy Alperstein helped with
3  your case?
4      A.  After.
5      Q.  And why did you hire Mr. Wilson?
6      A.  How many people did I get him to talk to?
7  I hired him to talk to -- to find again Dewey Morgan
8  and to try to find Myron Brockington.
9      Q.  Any -- so Dewey Morgan, Myron Brockington,
10  anyone else?
11      A.  No, that was it.
12      Q.  Okay.  Why was it important for you for
13  him to find Dewey Morgan?
14      A.  For court purposes.
15      Q.  What court?
16      A.  I believe I was going to use that for my
17  actual innocence petition.
18      Q.  And why was it important for him to find
19  Myron Brockington?
20      A.  For the same reason, I mean I believe
21  that -- that after all these years, he might have

18 (Pages 66 - 69)

1  been helpful.

2      Q.  Why did you believe that?

3      A.  I had to believe it.  That's all I had.

4      Q.  Why?

5      A.  I mean because -- I know I didn't do it,

6  so who -- I shot my shot.

7      Q.  So was there any reason -- did you have

8  any particular reason that you wanted to have

9  Mr. Brockington approached that you thought that

10  somehow something was going to be different?

11      A.  I don't understand the question.

12      Q.  Sure.  Did you learn anything about

13  Mr. Brockington while you were in jail that made you

14  think that he might say something different?

15      A.  I did actually.  I heard that he

16  supposedly seen the person that shot him.

17      Q.  So you had heard that?

18      A.  Yeah, I heard it.

19      Q.  Okay.  Because up to I guess the point in

20  which Mr. Brockington eventually does come in, he

21  had testified twice against you, right?

1      A.  Twice?

2      Q.  Yes.  Do you recall that there was a

3  motion to suppress a photographic array in which he

4  testified?

5      A.  No.

6      Q.  In your case.  You don't remember that?

7      A.  No, I don't.

8      Q.  But you recall at your trial itself he did

9  testify against you?

10      A.  Yes, he did.

11      Q.  Okay.  Donte Lyle.  Do you know this

12  person?

13      A.  Yes.

14      Q.  Okay.  And how do you know Donte Lyle?

15      A.  He lived on my block on Lakewood.

16      Q.  Do you remember if he went by any nick

17  names?

18      A.  Yes.

19      Q.  What was that?

20      A.  Junky Veins.

21      Q.  What was your relationship with Mr. Lyle

1  back in 2001?

2      A.  Somebody that lived on my block.  Hung

3  with my brother.

4      Q.  And that was Mr. Blake Thomas?

5      A.  Yes.

6      Q.  Did your brother and Mr. Lyle know each

7  other, were they close friends?

8      A.  They were friendly enough.  They used to

9  be with each other.

10      Q.  Repeat that.

11      A.  They were friendly enough.  I used to see

12  them with each other sometimes.

13      Q.  While you were in -- actually, so other

14  than your relationship, other than knowing him

15  through your brother, did you ever -- did you have

16  any relationship with Mr. Lyle.  Like were the two

17  of you friends, did you ever serve him drugs?

18      A.  No.

19      Q.  When was -- did you ever speak with

20  Mr. Lyle while you were in jail?

21      A.  No.

1      Q.  And what was the last time that you spoke

2  with Mr. Lyle?

3      A.  When we were sitting next to each other at

4  the trial table.

5      Q.  So that was back in 2001?

6      A.  Yes.

7      Q.  And Mr. Lyle has since passed?

8      A.  Yes.

9      Q.  And how did you learn about his death?

10      A.  I don't recall.

11      Q.  Were you in jail at the time?

12      A.  Yes.

13      Q.  The next name on the list is Blake Thomas.

14  So you already said that he is your brother?

15      A.  Yes.

16      Q.  How often do the two of you talk

17  currently?

18      A.  I don't know, I visit him a lot.

19      Q.  Where is he now?

20      A.  Patuxent.

21      Q.  For what?

Page 74

1    A.   Murder.

2    Q.   And do you know what year he went away?

3    A.   I don't.  Maybe -- I know it was before

4  me.  Before I got incarcerated.

5    Q.   So sometime in the 90's?

6    A.   It wasn't that long, but it was around the

7  same time.

8    Q.   And was your brother, Blake Thomas, did he

9  know Namey at all?

10    A.   Yeah.  I'm sure that anybody who was

11  around the projects knew of him.

12    Q.   Knew of who?

13    A.   Some type of way.  Namey.

14    Q.   Why would they know of Namey?

15    A.   Because he was around there.

16    Q.   So, you know, Perkins Projects, there is a

17  lot of apartments, buildings.  A lot of people.

18    A.   There is no buildings --

19    Q.   I mean there is a lot of people in a small

20  area, is that fair to say?

21    A.   It depends on what you consider large.  I

Page 75

1  don't consider Perkins large.

2    Q.   Okay.  Approximately how many people do

3  you think lived in Perkins Projects back in 2001?

4    A.   I don't know.

5    Q.   Like a couple hundred?

6    A.   Yeah.

7    Q.   Okay.  So there is a couple hundred people

8  that were living in Perkins Projects at that time?

9    A.   Right.

10    Q.   And Namey is one of a couple hundred

11  people that lived in Perkins Projects, correct?

12    A.   True.

13    Q.   So why would anybody -- why would people

14  know who Namey was?

15    A.   Everybody don't hang outside, right, on

16  corners and things like that.  Everybody doesn't do

17  that.  That's a very small amount of people.

18    Q.   Okay.  So was Namey one of the people that

19  was hanging around other corners?

20    A.   Yes.

21    Q.   And when you're talking about the small

Page 76

1  amount of people that are hanging on the corners,

2  what are they doing on the corners?

3    A.   Whatever they do.

4    Q.   What does that mean?

5    A.   I don't know.

6    Q.   So you don't know what type of activities

7  they are partaking in, they are just hanging out on

8  the corners?

9    A.   They are doing something I'm sure.

10    Q.   What's the something that they could be

11  doing?

12    A.   I don't know.

13    Q.   You don't know?

14    A.   Whatever they do.

15    Q.   Tyreke Ellis.  You stated that he is a

16  cousins of yours?

17    A.   Yes.

18    Q.   How are the two of you related?

19    A.   Through marriage.

20    Q.   So is he a cousin through marriage?

21    A.   Yes.

Page 77

1    Q.   Okay.  And who married who for the two of

2  you to be related?

3    A.   His mother and my cousin.  Yeah.  That's

4  my cousin.

5    Q.   Okay.  How often when you were within

6  prison did you speak with Tyreke?

7    A.   Not often.

8    Q.   Once a month, once a year?

9    A.   Sometimes it had been like once a year.

10    Q.   Were there times it was more frequent,

11  like once a month or a couple times a month?

12    A.   It depends.  I mean 20 years, I call

13  people -- I don't know.  I just check up on them

14  sometime.  Yeah, cause could have been -- he wasn't

15  my -- on my normal call list or people that I was

16  interested in talking to on a daily basis.

17    Q.   Okay.  Who did you talk to on a daily

18  basis?

19    A.   My girlfriends.

20    Q.   Who were the girlfriends that you had

21  while you were in?

Page 78

1    A.  Donna.  And Dina.

2    Q.  You said Dana or Dina?

3    A.  Dina.  D-I-N-A.

4    Q.  Let's start with Donna Tabron?

5    A.  Tabron.

6    Q.  Tabron.  When -- how did you meet

7  Ms. Tabron?

8    A.  Through a friend.

9    Q.  And you met her before you went into jail?

10   A.  No.

11   Q.  You met her there?

12   A.  Yes.

13   Q.  Okay.  And when did you meet her?

14   A.  Early 2000's.

15   Q.  Any nick names for Donna that you used?

16   A.  No.

17   Q.  How long were you the two of you together?

18   A.  About 17 years.

19   Q.  Do the two of you still communicate now?

20   A.  No.

21   Q.  When was the last time you communicated

Page 79

1  with Ms. Tabron?

2    A.  Few years back.

3    Q.  And when did she get out?

4    A.  When did she get out?

5    Q.  Yes.

6    A.  Get out --

7       MR. BALLENGER:  What --

8    Q.  Did she leave the jail at some point?

9    A.  She was never locked up.

10   Q.  I thought you said you met her when you

11  were in jail?

12   A.  I was in jail, she wasn't.

13   Q.  Then that's -- I should have corrected

14  that.  She was never in jail with you?

15   A.  No.

16   Q.  But you met her somehow while you were in?

17   A.  Yes.

18   Q.  Okay.  And the two of you talked on a

19  daily basis?

20   A.  Pretty much, yes.

21   Q.  One -- up until what you describe as a few

Page 80

1  years ago when you last communicated with her, was

2  that in 2020, 2021, around that period of time?

3    A.  Like 2023.

4    Q.  Okay.  So you communicated with her since

5  you got out of jail?

6    A.  Yeah.

7    Q.  Dina Thomas, when did the two of you start

8  dating?

9    A.  I was about 16, maybe 17.

10   Q.  And how long did the two of you date for?

11   A.  I mean she was there the whole time I was

12  locked up.

13   Q.  Okay.  And how often did the two of you

14  talk while you were in?

15   A.  It depends on what years it was.

16   Q.  So what years did you speak with her more

17  regularly than the others?

18   A.  In the earlier years was more frequent

19  than the later years.  But it was still constant.

20   Q.  So I would say in the decade leading up to

21  you getting out, so the 2010 to 2020 period of time,

Page 81

1  how often were you the two of you talking then?

2    A.  A lot until about the halfway point.

3    Q.  And how would the two of you communicate

4  while you were in?

5    A.  Letters and phone.  Only two ways you can

6  communicate with somebody.  Or visits.

7    Q.  I forgot to ask that question about Ms.

8  Tabron.  How did the two of you communicate?

9    A.  Same.

10   Q.  Angela Campbell, who is this person?

11   A.  My mother.

12   Q.  When you were in -- how often did the two

13  of you talk?

14   A.  Often, a couple times a week.

15   Q.  And do you and your mother still see each

16  other on a regular basis?

17   A.  Yes.

18   Q.  Lisa Gallaham.  Do you know this person?

19   A.  No.

20   Q.  Do you know that name, Lisa Gallaham at

21  all?

21 (Pages 78 - 81)

Page 82

1    A. No.

2    Q. Do you know a Lisa that is a girlfriend or

3  a baby momma of Myron Brockington?

4    A. How would I know that?

5    Q. Do you know this person?

6    A. I don't. Never heard of her.

7    Q. All right. Myron Brockington, do you know

8  this person?

9    A. Yes.

10    Q. Okay. Now, did you know Mr. Brockington

11  prior to this specific case. Like so prior to 2001

12  did you know Myron Brockington?

13    A. No.

14    Q. Do you know -- had you heard of him, seen

15  him around?

16    A. No.

17    Q. Do you know if any of your friends,

18  associates, ever knew Mr. Brockington?

19    A. No.

20    Q. Before 2001?

21    A. No.

Page 83

1    Q. And since you had your trial, have you

2  spoken with Mr. Brockington while you were in jail?

3    A. No.

4    Q. No?

5    A. No.

6    Q. And when was -- I'm not sure if the

7  question was clear. Did you talk to Myron

8  Brockington at all while you were in jail?

9    A. No.

10    Q. Okay. So you had no communication with

11  him in any way?

12    A. No.

13    Q. And when was the last time that you saw

14  Mr. Brockington?

15    A. In court.

16    Q. And when was that?

17    A. 2001.

18    Q. Other than Mr. Wilson, the private

19  investigator, is there anyone else that you

20  instructed or directed to contact Mr. Brockington on

21  your behalf?

Page 84

1    A. No.

2    MS. GOO: Okay. I think at this point it

3  would be appropriate for us to take a five

4  minute break.

5    MR. BALLENGER: Okay.

6    VIDEOGRAPHER: We are going off the

7  record. The time is 11:04 a.m.

8    (Off the record colloquy.)

9    VIDEOGRAPHER: We are back on the record.

10  The time is 11:18 a.m. This is media number

11  two.

12    Q. Mr. Thomas, we were going through a list

13  of names and follow-up questions depending on

14  whether you know the person. So the next name is do

15  you know Charles Floyd who you also stated his nick

16  name is Namey. How do you know Mr. Floyd?

17    A. From being around the neighborhood.

18    Q. Do you know if Mr. Floyd goes by any other

19  nick names?

20    A. I don't even know him his name.

21    Q. Have you heard any other individuals

Page 85

1  with -- that described him having another nick name?

2    A. No.

3    Q. Or mentioning any other nick names?

4    A. No.

5    Q. And you -- have you ever been in the same

6  DOC facility as Mr. Floyd?

7    A. Never.

8    Q. Were the two of you ever in lock-up

9  together at Circuit Court for Baltimore City?

10    A. No.

11    Q. Have you ever -- have you ever seen him in

12  person while you were in incarcerated?

13    A. No.

14    Q. And are you in any way afraid of him or

15  fearful of him?

16    A. Afraid of him?

17    Q. Yes.

18    A. No.

19    Q. So going back to February of 2001. I had

20  a number of questions for you about what a normal

21  day for you was back in February of 2001. Do you

22 (Pages 82 - 85)

Page 86

1 recall that line of questions?

2    A.   Yes.

3    Q.   And do you have any recollection of what

4 you were doing on either February the two -- sorry,

5 February 25th, 2001?

6    A.   Not at all.

7    Q.   And do you have any recollection about

8 what you were doing on February 26, 2001?

9    A.   No.

10   Q.   You have to speak up for the record?

11   A.   No.

12   Q.   Okay.  All right.  But at some point you

13 were arrested for the shooting of Myron Brockington,

14 correct?

15   A.   Correct.

16   Q.   Okay.  And could you just describe what

17 you recall of that occurring.  Your arrest

18 specifically?

19   A.   I was arrested by the Housing Authority

20 and taken to one of them police stations.

21   Q.   Okay.  And where were you arrested?

Page 87

1    A.   In -- at my home at the time.

2    Q.   Where were you living at the time?

3    A.   Hillman Court.

4    Q.   Was that 823 Hillman Court?

5    A.   Yes.

6    Q.   And were you arrested by just Housing

7 Authority or was Baltimore Police Department there

8 as well?

9    A.   Just Housing Authority.

10   Q.   Did they give you your Miranda warnings?

11   A.   No.

12   Q.   Housing Authority never did?

13   A.   No, they just arrested me.

14   Q.   And when was the first time you

15 encountered somebody from the Baltimore Police

16 Department?

17   A.   When they took me to the station and I

18 encountered detectives after that.

19   Q.   Do you recall which detectives you first

20 met with?

21   A.   Vigue.

Page 88

1    Q.   Is Vigue the only one that you remember or

2 is Vigue the only one that met with you?

3    A.   He wasn't -- he wasn't the only one that I

4 remember, but he was like the guy.

5    Q.   What do you mean by the guy?

6    A.   He was the guy doing all the questioning,

7 most of the questions.  He was the guy who seemed

8 like everybody else was following.  Yeah.

9    Q.   Did it seem like he was giving direction

10 to the other officers?

11   A.   Yeah, he definitely seemed like he was

12 above them.

13   Q.   Could you tell who was a police officer

14 and who was a detective that you interacted with?

15   A.   I assume they all was detectives.  They

16 didn't dress -- they all dressed in other -- they

17 didn't have police uniforms.

18   Q.   Was Vigue dressed in a police uniform?

19   A.   Never.

20   Q.   What was he dressed in?

21   A.   Like -- just regular clothes is some type

Page 89

1 of way I can recall, but it wasn't like a uniform.

2 It was basically some type of something with a badge

3 hanging from him type of situation.

4    Q.   Would it be fair to describe it as him

5 wearing plain clothes?

6    A.   Plain clothes, yeah.

7    Q.   Not the BP blue that --

8    A.   Right, exactly.

9    Q.   Was there anyone else there that was

10 dressed like that?

11   A.   Yes.

12   Q.   And do you recall the names of those

13 persons?

14   A.   Copeland.

15   Q.   Anyone else?

16   A.   Chinese looking guy.  I think his name was

17 Don Lee.  That's what I can recall.

18   Q.   And who gave you your -- did you

19 eventually receive your Miranda warnings?

20   A.   I don't recall getting no Miranda

21 warnings.

23 (Pages 86 - 89)

1      Q.   Now, you mentioned that there were a
2   number of questions that you received from Vigue.
3   Did you agree to speak with police?
4      A.   Excuse me.
5      Q.   When were you finally at the police
6   station and you were with Vigue and other
7   detectives, did you agree to give a statement?
8      A.   No.
9      Q.   You did not agree to give a statement?
10      A.   No.
11      Q.   So you did not tell them that you don't
12   recall anything about that day?
13      A.   I did tell them that.
14      Q.   So what did you tell the police that day
15   after you were arrested?
16      A.   That I don't know nothing about what they
17   are talking about.
18      Q.   Do you remember what they asked you?
19      A.   I remember what he said.
20      Q.   What did he say?
21      A.   Vigue hisself was saying -- it was one

1   thing that stood out to me the most about his
2   questioning.  He literally said that "so you -- you
3   going to take this."  I thought that was weird for
4   him to say when I kept on saying I wasn't there, had
5   nothing to do with this.  He said "so you going to
6   take this, huh."  And I said -- I asked him to
7   repeat it.  He said "so you're going to go down for
8   this."  And my response was "go down, I don't know
9   about that."
10      Q.   Do you recall any other questions that
11   Vigue asked you?
12      A.   No.  That stood out to me because it was
13   like, you know, he almost -- like he knew that --
14   almost like to say that if you don't -- like he know
15   that I didn't do it but at the same time saying that
16   he was going to -- look like I'm going down for it
17   if I don't, you know, help him in some type of way.
18      Q.   Okay.  Let's back up a little bit.  So
19   Vigue did ask you questions at the police station,
20   is that fair to say?
21      A.   He tried.

1      Q.   Okay.  So there were questions posed to
2   you by Vigue?
3      A.   Yeah.
4      Q.   Whether or not you answered them is a
5   separate question?
6      A.   Yeah, I don't recall, yeah.
7      Q.   When you first got to the station, do you
8   recall them asking for things like biographical
9   information, your name, where you live, your phone
10   number.  Did they go through those questions with
11   you at the beginning?
12      A.   I don't recall, but I'm sure they did.
13      Q.   And did they go through an advice of
14   rights with you, where you have to initial form and
15   they read you --
16      A.   No.
17      Q.   -- about whether or not you want to talk?
18      A.   No, I don't recall.
19      Q.   You just don't recall?
20      A.   No.
21      Q.   Is it possible that they read that form to

1   you?
2      A.   I don't recall that, no.
3      Q.   Okay.  You just have no memory?
4      A.   Not of them -- not -- I don't recall them
5   ever saying I had the right to remain silent or
6   nothing like that.
7      Q.   Is it possible they did and you just don't
8   remember it?
9           MR. BALLENGER:  Objection.  You can
10      answer.
11      A.   I think I would remember something like
12   that.
13      Q.   Then did they ask you questions about what
14   you were doing on February the 25th of 2001?
15      A.   I'm sure he did.
16      Q.   Okay.  You just don't remember what those
17   specific questions were?
18      A.   No, because I had short answers for it.
19      Q.   Do you recall whether or not they
20   mentioned whether you were at Sally's bar that
21   night?

1     A.  It's a possibility that he asked me that.

2     Q.  And they mention any of the injuries of

3  the victim to you at that point?

4     A.  I'm sure he did say stuff about that too.

5     Q.  You just don't have a specific

6  recollection of it?

7     A.  No.

8     Q.  So when the questions that you do

9  remember, do you remember what kind of questions

10  they were asking you around the -- so there is

11  specific things that you are remember about --

12     A.  Like I know he was asking me about names.

13  And, you know, like he mentioned my brother, I

14  believe.  And of course my so-called co-defendant

15  and whether I was there and what do I know about

16  that night.

17     Q.  Just so the record is clear, when you say

18  you're so-called co-defendant, who is that?

19     A.  Donte Lyle.

20     Q.  And your brother being Blake Thomas?

21     A.  Yes.

1     Q.  And your interview with the police was not

2  on tape?

3     A.  No.

4     Q.  Is that right?

5     A.  No.

6     Q.  Okay.  Now, the lawsuit brought in this

7  case is against Detective Vigue, Detective Copeland,

8  and Detective Danielczyk.  Those are the specific

9  ones the case is brought against, right.  Can you

10  just tell me what Detective Vigue did wrong in terms

11  of his wrongdoing in this case?

12        MR. BALLENGER:  I'm going to object to the

13     broadness of that.  Calls for a lot of legal

14     speculation on his part.  With that in mind,

15     you can answer the question.

16     A.  Repeat the question?

17     Q.  I'll ask the question a little bit

18  differently.  What has your interaction been with

19  Detective Vigue?

20     A.  He was aggressive in tone and in body

21  language.  He was very, I don't know, trying to be

1  manipulative.  And it seemed like whatever mode he

2  set, Copeland followed.  Like trying to intimidate

3  me, trying to get me to say like -- I don't know

4  what they wanted from me.  Because I told them I

5  wasn't there.  I don't...

6     Q.  So you're describing Detective Vigue as

7  being aggressive in tone and in body language?

8     A.  And manipulative.

9     Q.  And manipulative.  And this is what

10  occurred in your interaction for when they were

11  trying to get a statement from you?

12     A.  Yes.

13     Q.  Other than that statement, what other

14  interactions did you have with Detective Vigue?

15     A.  None.

16     Q.  So that was -- other than court, is that

17  the only time that you saw him in relation to this

18  case?

19     A.  Yes, I believe so.

20     Q.  What about Detective Copeland?

21     A.  Same.

1     Q.  So just this statement that they took from

2  you?

3     A.  Yes.

4     Q.  And what about Detective Danielczyk, was

5  he present for the statement?

6     A.  Him and Don Lee, I don't -- they didn't

7  pretty much say much.  I don't -- you know.

8     Q.  As to your specific -- as to this specific

9  case, did you have any other interactions with

10  Detective Danielczyk?

11     A.  No.

12     Q.  Okay.  Now you mentioned that you believe

13  that Detective Vigue was being manipulative.  In

14  what way was he being manipulative?

15     A.  If you tell me that "are you going to go

16  down for this" and you frame it in a different way

17  and say -- he said "are you going down for this."

18  And he said "so you going" -- when he repeated it,

19  he pretty much said the same thing.  So I'm like

20  that's strange language for a person that you saying

21  did it.  Like why would I be going down for

1  something -- why would you say "so you going down
2  for this" if you're saying at the same time that I
3  did it. That's manipulative. I don't know what
4  that was about, but it was like I took it as a
5  threat on my life.
6      Q. You understood that to be a threat on your
7  life.
8      A. Yes.
9      Q. That one question or those two questions?
10     A. Absolutely. Absolutely.
11     Q. So I didn't ask these questions. But --
12  so where -- this happened at the police station?
13     A. Yes.
14     Q. One of the police stations?
15     A. Yes.
16     Q. Could you describe what the room looked
17  like that you were in?
18     A. Small room. Small table. Three guys
19  aggressively grilling me.
20     Q. Okay. So it was -- who were the three
21  detectives in the room?

1      A. I know it was him and Copeland.
2      Q. Who is him?
3      A. Vigue and Copeland at all times. And then
4  different times, you know, if that's his name, Don
5  Lee or Danielczyk would come in and just stare at me
6  and grill me. But it was Copeland and Vigue, mostly
7  Vigue, that was opening up their mouth.
8      Q. And how long did -- how long were you in
9  that room for?
10     A. I was -- without meeting with the lawyer,
11  I said they kept on trying to spin their questions
12  around for a long time, just to get the same answers
13  from me.
14     Q. More than a half hour?
15     A. Yes.
16     Q. More than an hour?
17     A. I believe so, yes.
18     Q. More than two hours?
19     A. I don't know. I can't -- but I know it
20  was lengthy enough to say it was longer than a half
21  hour or hour.

1      Q. Did you ever ask to use the rest room
2  while you were there?
3      A. I don't recall.
4      Q. Okay. Do you recall them denying your
5  ability to use the rest room if you needed it?
6      A. I don't recall at all.
7      Q. Now, I know you said the questioning was
8  threatening. That's your testimony today, right?
9  That line of questioning about, you know, you're
10  going to go down for this, those questions. Those
11  are threatening to you, correct?
12     A. Yes.
13     Q. Did they ever physically threaten you in
14  the room?
15     A. No.
16     Q. Nobody brought their guns out and put them
17  on the table or anything like that?
18     A. No. Unless you want to take, "are you
19  going down for this" as a physical threat. I did.
20     Q. Okay. And ultimately you stuck to what
21  you said through -- so what did you tell them in

1  response to "are you going to go down for this"?
2      A. I asked him to repeat it. And he said the
3  same thing in a different way. I don't know if it
4  was the first time he said "are you going to go down
5  for this", and I said, "huh, say that again." And
6  he said "so you going to take this charge." That's
7  what he said. He said it two different ways. "So
8  you going to take this charge."
9      Q. And what did you say in response to that?
10     A. He might have said that one first and then
11  when I asked him to repeat it he said "so you going
12  to go down for this." But he definitely said those
13  two things. I can't recall -- it's more than likely
14  that he said "so you going to take this charge"
15  first. And then when I asked him to repeat it, and
16  he said "oh, so you going to go down for this."
17     Q. So when you -- did you say anything in
18  response to the second time that he made that
19  statement?
20     A. I said "I don't know about going down."
21     Q. That's what you said?

Page 102

1    A.  Yeah.

2    Q.  Is there anything more that you said after

3  that?

4    A.  No.

5    Q.  Did you conclude -- did you try to

6  conclude the statement at that point?

7    A.  Yeah, I was -- I shut down after that

8  pretty much because I understood what was going on.

9    Q.  Now, when he said you're going to go down

10  for this, was that a question or was that a

11  statement?

12    A.  No, it was a question.

13    Q.  It was a question.  So he asked in a

14  way -- he said it in a way that was a question to

15  you?

16    A.  He said "so you are going to go down for

17  this."  That's a question.  And I asked him to

18  repeat it.  And he said "so you going to take this",

19  to that form.  I don't know.  I was like "okay, I

20  see what's going on here."

21    Q.  After you were done with your statement

Page 103

1  where did you go after that?

2    A.  I believe Central Booking.

3    Q.  And then you selected to take this case to

4  trial; is that right?

5    A.  Yes.

6    Q.  And who was your attorney for the trial?

7    A.  Lyle Jones.

8    Q.  You were present in the courtroom for all

9  of your trial testimony?

10    A.  I believe so.

11    Q.  So you were not -- to the best of your

12  recollection you didn't miss any of the witness

13  testimony for any reason?

14    A.  I don't think so.

15    Q.  And you were present for the testimony of

16  Mr. Brockington?

17    A.  Yes.

18    Q.  Okay.  And in your opinion who was the key

19  witness in your trial?

20    A.  Myron Brockington.

21    Q.  And --

Page 104

1    A.  Only because, when I say that, only

2  because my co-defendant was -- couldn't be a witness

3  because of his deal.  So he was more important than

4  Myron Brockington, but in his deal to not testify on

5  my behalf hindered me.

6    Q.  So let's talk about Mr. Lyle and his case.

7  What did you learn while your case was pending about

8  Mr. Lyle's case?

9    A.  Could you reframe the question.

10    Q.  What happened to Mr. Lyle's case, your

11  co-defendant?

12    A.  He took a plea.

13    Q.  Were you present in the courtroom for that

14  plea?

15    A.  I was present when his lawyer said that --

16  the part where, you know, he is taking a plea and he

17  will no longer be, you know, part of this process

18  pretty much, how I remembered it.

19    Q.  So you were present for that?

20    A.  Yes.

21    Q.  And who was his attorney at that time?

Page 105

1    A.  William Purpura.

2    Q.  Were you present when Mr. Lyle had to

3  actually go through a list of questions with the

4  judge and said that he was pleading guilty?

5    A.  I don't recall.

6    Q.  And what did you learn about Mr. Lyle's

7  deal?

8    A.  Just that I learned that -- well, I

9  learned that at first it seemed like a simple plea

10  agreement, but I learned the specifics behind it a

11  little after that.

12    Q.  What were the specifics -- what were the

13  specifics?

14    A.  You can not testify on Melvin Thomas's

15  behalf.

16    Q.  How did you learn about that?

17    A.  Through my lawyer.  And through his

18  lawyer.

19    Q.  Did you see any written agreement to that

20  effect?

21    A.  I did not.

Veritext Legal Solutions
202-803-8830 -- 410-494-8300

1     Q. So this is just information you got?

2     A. Through lawyers, yeah.

3     Q. Okay. How did you feel when you found out

4 that he had pled guilty?

5     A. I didn't feel no way about it. I was

6 indifferent about him pleading guilty.

7     Q. And how did you feel about the specific

8 terms about his plea?

9     A. I was crushed about that. I was crushed

10 about that. Because it just -- it sounds -- like a

11 weight just keep on going against me.

12     Q. Did you know what Mr. Purpura told your

13 attorney about the specifics?

14     A. That's -- that's exactly what he told him.

15 He said that he did what was in his client's best

16 interest, even though his client told him that he

17 wasn't there and all this and all that and he had

18 nothing to do with that. He said that deal would

19 have been off the table if he would have tried to

20 testify on my behalf. Because my lawyer asked him

21 can he testify on his behalf. And he said

1 absolutely not.

2     Q. And did you ever speak with Mr. Purpura?

3     A. I did.

4     Q. And what did Mr. Purpura say to you?

5     A. Just that.

6     Q. When did you speak to Mr. Purpura?

7     A. When I was incarcerated.

8     Q. Do you remember approximately when that

9 was?

10     A. It was -- it was not too long in, and

11 he -- and he informed me that I can -- my attorneys

12 can actually subpoena him and he will testify to any

13 demonstrations, just that, that that's what

14 happened.

15     Q. Just the bit about how he was not --

16 Mr. Lyle could not testify for you?

17     A. Yeah, not --

18     Q. Let me ask my question.

19     A. Not just that, he said from the beginning

20 that I wasn't there, I didn't have anything to do

21 with it, he don't know why I'm here. This is -- he

1 said all that.

2     Q. Okay. So let's go over that a little bit

3 more. So what did Mr. Purpura, when he talked to

4 you, what did he say that he could do on your

5 behalf?

6     A. Say just that, that his client did say

7 that I wasn't there, that I did not have anything to

8 do with -- I wasn't nowhere around, I wasn't a

9 thought in his mind, that Myron Brockington is

10 lying. That -- and that -- yeah, just that.

11     Q. Okay. And did you ever review any

12 transcripts or were you aware of the statement of

13 facts supporting Donte Lyle's guilty plea?

14     A. No, I told you that already.

15     Q. So you don't know?

16     A. Yeah, I never seen paperwork on his plea,

17 no.

18     Q. Would it surprise you that you're named as

19 the shooter in that plea --

20     A. That would surprise he. Yeah, that would

21 surprise me a lot actually.

1     Q. Okay. So to the best of your

2 recollection, and you may not have everything

3 although you seem to have a pretty good memory of a

4 lot of the post conviction proceedings, can you

5 describe what efforts you took to try and get out,

6 new trial, those types of thing?

7     A. What you mean?

8     Q. So what if any motions for new trial did

9 you file?

10     A. Post conviction. Appeal from post

11 conviction. Appeal from the appeal. Federal habeas

12 corpus.

13     Q. And you recall the motion for new trial

14 back in April of 2002, around your sentencing?

15     A. I don't.

16     Q. Do you recall that a motion for new trial

17 was filed on your behalf and moved by Lyle Jones?

18     A. I found that out after it was already

19 done. Like he came to prison and told me of his

20 idea of it. And from there on he had his own legs.

21 He said he did an investigation, yeah.

Page 110

1    Q.  Did you ever read the motion that he filed
2  on your behalf?
3    A.  After.
4    Q.  Afterwards?
5    A.  Afterwards.
6    Q.  Okay.  And you said that you were not
7  afraid of Namey, right?
8    A.  I don't know, there wasn't anything for me
9  to be afraid of.
10   Q.  Would it surprise you to know that in that
11 motion for new trial it says that you were afraid
12 of -- that you knew Charles Floyd was the shooter
13 but withheld this information for fear of bodily
14 harm?
15   A.  I was surprised to read that when I read
16 it.
17   Q.  Okay.  And then that motion for new trial
18 was ultimately denied by the court, do you recall
19 that?
20   A.  Don't know.
21   Q.  You didn't get a new trial?

Page 111

1    A.  Yeah, right, no trial.
2    Q.  And there was -- I believe this was also
3  reviewed by the Court of Special Appeals and they
4  denied it as well at some point later; is that
5  right?
6    A.  I don't know nothing about that.
7    Q.  But you remember that there were appeals
8  filed on your behalf in the case?
9    A.  I don't recall no appeals from that motion
10 for new trial.  I don't.
11   Q.  Did you file a petition for post
12 conviction relief at some point?
13   A.  I did.
14   Q.  And were you represented by counsel or is
15 that something that you wrote yourself?
16   A.  No, counsel did that.
17   Q.  Okay.  And you were alleging that Mr. Lyle
18 Jones was ineffective?
19   A.  Yes.
20   Q.  And I mean without going through the
21 specific claims, do you recall what you said -- why

Page 112

1  was he ineffective?
2        MR. BALLENGER:  I'm just going to object.
3  To the best of your ability as a lay person not
4  as a lawyer.  Go ahead and answer.
5    A.  I can't.  I mean my lawyer put that
6  together.
7    Q.  You have no recollection of it?
8    A.  I mean my lawyer filed my post conviction.
9    Q.  But do you believe that he was
10 ineffective?
11   A.  Absolutely.
12   Q.  Okay.  So can you tell me in your own
13 words why you thought he was ineffective?
14   A.  I mean when you come to trial and you
15 don't have simple things as my co-defendant's taped
16 statement.  Like I never seen that.  I didn't see
17 that until ten years later.  Never seen it.  And
18 that information in there would have been definitely
19 helpful at that time.  When you come to court and
20 your most important witness that you call is a lady
21 who claimed to talk to the guy prior to the shooting

Page 113

1  but you somehow don't got the eyewitness who said he
2  seen the shooting, it's nowhere.  He wasn't even
3  mentioned in trial.  That is ineffective.
4    Q.  Okay.  What if anything else?
5    A.  I mean does there have to be anything
6  else.  Off the top of my mind.  I can go deeper but
7  that's the facts --
8    Q.  I'm asking, what if anything else did you
9  believe was ineffective?
10   A.  He asked for -- he tried to subpoena a
11 witness in the middle of trial, got denied.  Like he
12 absolutely wasn't prepared to take that trial.
13   Q.  What witness did he try to subpoena in the
14 middle of trial?
15   A.  Dina Wilson.
16   Q.  Anything else that you can think of right
17 now while you're sitting here as to why he was
18 ineffective?
19   A.  I mean, you know, that's my answer.
20   Q.  And did you file another petition for post
21 conviction relief after the first one?

29 (Pages 110 - 113)

Page 114

1    A.  No, I don't believe so.  Not to my
2  recollection.
3    Q.  Okay.
4    A.  But I had an attorney the whole time.
5    Q.  It's possible one was filed on your
6  behalf?
7    A.  A double post conviction.
8    Q.  A supplemental petition?
9    A.  I guess it's possible.
10    Q.  And in September of 2011 there eventually
11  was a motion for a new trial hearing in your case;
12  is that right?
13    A.  There was.
14    Q.  And do you recall which witnesses
15  testified on your behalf?
16    A.  Yes.
17    Q.  And who were they?
18    A.  Dina Wilson.  Dewey Morgan.  Darnel Earl.
19  I can't recall if there was any more witnesses.
20    Q.  Are do you remember Dina Thomas testifying
21  very briefly?

Page 115

1    A.  Oh, yes, Dina Thomas.
2    Q.  And who represented you at that hearing?
3    A.  Andrew Robinson.
4    Q.  And that was denied by a judge in 2012?
5    A.  It was denied for sure.  I don't know what
6  year it was.
7    Q.  And you made mention of the -- the MPIA
8  request and you obtaining subsequent statements from
9  Dewey Morgan.  Do you recall testifying about that?
10    A.  Yes.
11    Q.  Okay.  And was a claim made on your behalf
12  arguing a Brady violation.  If you know this, I'm
13  asking.  Do you know whether or not you know of a
14  Brady violation?
15    A.  For sure.
16    Q.  And that was filed in 2015 on your behalf?
17    A.  On my behalf.
18    Q.  In your case?
19    A.  In my case, I'm sure.
20    Q.  And that was denied by the court?
21    A.  Yeah.

Page 116

1    Q.  And December 14th of 2020 was your joint
2  petition for writ of actual innocence; is that
3  correct?
4    A.  If that's the year.
5    Q.  Okay.  As a part of the answer to
6  interrogatories that I showed you, Exhibit 2, there
7  are -- there were some questions about physical,
8  mental, emotional distress while you were
9  imprisoned.  And that's why you're seeking damages
10  in this case.  I'm going to ask you a couple
11  questions relating to.  So as to the physical
12  distress, so first of all you were at -- you were
13  housed in different places while you were in the
14  DOC?
15    A.  Yes.
16    Q.  Can you tell me what you recall where you
17  were?
18    A.  At what time?
19    Q.  During the entire time.  So where did you
20  start and where did you go?
21    A.  I went from Maryland House of Corrections,

Page 117

1  maximum security facility, to the Maryland House of
2  Corrections Annex, maximum security facility, to
3  North Branch Correctional Institution, ultra maximum
4  security, to finally making it the last year of my
5  incarceration to MCIJ medium which I was
6  subsequently released from.
7    Q.  I believe you said the first one was
8  Maryland House of Corrections?
9    A.  Yes.
10    Q.  And where is that physically located?
11    A.  It don't have a location no more, they
12  knocked it down, but it was in Jessup.
13    Q.  That was at Jessup?
14    A.  Yes.
15    Q.  And your family at that time lived in
16  Baltimore?
17    A.  Yes.
18    Q.  Okay.  So that's about a 25 minute drive?
19    A.  Yeah, something like that.
20    Q.  Now, I'll just -- start with Jessup.  What
21  violence did you observe while you were at Jessup?

30 (Pages 114 - 117)

Page 118

1      A.  I was a victim of violence in Jessup.  I
2   got this nice scar right here from the Maryland
3   House of Corrections Annex.  I mean Maryland House
4   of Corrections.  In my sleep too.
5      Q.  So tell me about that incident, what do
6   you recall?
7      A.  I recall sleeping and waking up to a big
8   wide gaping -- gaping scar on my face.
9      Q.  So obviously -- did somebody contact you
10  to take you to receive medical treatment?
11     A.  Yes.
12     Q.  Did you see who did it?
13     A.  No, I didn't.
14     Q.  Were you -- so while you were asleep, and
15  I don't know the logistics of this, who was in that
16  cell with you?
17     A.  Eighty-nine other people.
18     Q.  Eighty-nine other people?
19     A.  Yes.
20        MR. BALLENGER:  Just for clarification,
21     that wasn't a cell, it was a dorm.

Page 119

1      A.  Yeah, it was an open dorm.
2      Q.  It was an open dorm.  Where were you taken
3   for medical treatment?
4      A.  I believe to the University of Maryland.
5      Q.  University of Maryland Medical Center?
6      A.  Yes.
7      Q.  And how long were you there when you
8   received treatment?
9      A.  Few hours.  A plastic surgeon came through
10  and stitched me up pretty good.
11     Q.  Were you admitted to the hospital for
12  treatment or were you just treated in the -- like in
13  the -- were you just treated in and out within a
14  couple hours?
15     A.  Yeah, treated in and out within a couple
16  of hours.
17        (Deposition Exhibit 3 marked.)
18     Q.  Showing to counsel Exhibit 3.  Mr. Thomas,
19  if you could take a quick moment to look at
20  Exhibit 3.  I'm not sure, have you seen this
21  document before?

Page 120

1      A.  No.
2      Q.  Could you take a moment to look at it.  So
3   this is a little difficult to read at times.  I'm
4   just going to ask you to turn to the last page.
5      A.  Yeah.
6      Q.  So at the very -- at the bottom, the last
7   paragraph it says, it looks like, AIP, colon.  Do
8   you see that?
9      A.  Last page.
10     Q.  Yes.  On the very back last page, sorry.
11  If you could turn to the back because these are two
12  sided pages.
13     A.  All right.
14     Q.  So the last paragraph there, do you see
15  where it says facial laceration?
16     A.  Yes.
17     Q.  Okay.  It says "will close."  There is
18  some medical jargon, but the last sentence it says
19  "F/U five days for suture removal."  Is that an
20  accurate description of what treatment you had to
21  receive after leaving the system?

Page 121

1      A.  Yes.
2      Q.  Okay.  Did you have to go back to receive
3   any further medical treatment for that laceration,
4   other than just the suture removal?
5      A.  No.  Pain medications.
6      Q.  And what type of pain medications did you
7   take?
8      A.  I don't recall.
9      Q.  Do you recall if it was opiates or
10  anything that had to be prescribed?
11     A.  I believe that it was a prescribed dose.
12  It wasn't like an Ibuprofen or nothing.
13     Q.  Okay.  And, again, this is while you were
14  at MHC?
15     A.  Yes.
16     Q.  Jessup.  Okay.  And how many stitches did
17  you receive?
18     A.  Twenty in, 20 out.  So 40 altogether to my
19  recollection.
20     Q.  When you say 20 in, 20 out, what do you
21  mean by that?

31 (Pages 118 - 121)

Page 122

1    A.  I didn't understand the language either,
2 but he said he had to stitch 20 inside my jaw and
3 then close it with 20 more.
4        MR. BALLENGER:  For the record, that's
5    typical subdural stitching followed by them,
6    just to let you know.
7    Q.  So that's -- obviously you were a victim
8 of violence there.  Were there any other incidences
9 in which you were a victim of violence while you
10 were there?
11   A.  In that prison?
12   Q.  In that one, yes.
13   A.  No.
14   Q.  Okay.  And did they ever -- they didn't
15 apprehend whoever did it?
16   A.  No, they just moved me.
17   Q.  They just moved you.  Where did you get
18 moved to after that?
19   A.  Next door.
20   Q.  To another dorm?
21   A.  No, to the Maryland House the Corrections

Page 123

1 Annex.
2    Q.  That's the Annex.  How long were you at
3 the Annex for?
4    A.  For approximately about four years.
5    Q.  Were you a victim of violence while you
6 were there?
7    A.  Physically or mentally?
8    Q.  Physically.
9    A.  No.
10   Q.  Okay.  After the annex, where did you go
11 after that?
12   A.  North Branch Correctional Institution.
13   Q.  While you were at North Branch
14 Correctional Institution were you physically the
15 victim of any violence?
16   A.  Yes.
17   Q.  Could you describe that?
18   A.  Yes.  My -- tried to attack me and I tore
19 my LCL but they didn't go give me no medical
20 treatment for.  It took me about four years to get
21 my knee back right.

Page 124

1    Q.  Do you remember what year that was?
2    A.  I don't.
3    Q.  Okay.  Was it in the beginning of your
4 time there or was it middle?
5    A.  Pretty much in the beginning.
6    Q.  The beginning?
7    A.  Yeah, the first year or so there.
8    Q.  Okay.  So -- I'm sorry, what happened that
9 caused the injury?
10   A.  A guy ran up on me and started trying to
11 punch me, and we got into an altercation.  And him
12 rushing me, it made me -- it tore my lateral
13 collateral ligament.  My knee blew up.  And it was
14 crazy.  And they -- and their subpar medical
15 treatment allowed my knee to heal weird and it just
16 took a long time for me to be able to actually like
17 do things just normal with my leg.
18   Q.  Who was it that you got into this
19 altercation with that ran up to punch you?
20   A.  I don't know.  Some guy that had a problem
21 with one of my friends.

Page 125

1    Q.  And do you know if he was disciplined as a
2 result of this?
3    A.  Yeah, I never seen him again in there.
4    Q.  Any other injury, physical injuries while
5 you were at Northern Branch?
6    A.  Yes.
7    Q.  Okay.  Tell me about the next one?
8    A.  They starved me for days.  The
9 correctional officers did.  Which automatically led
10 into a big investigation that ultimately led to the
11 Warden being escorted out of there.  Just because of
12 that.
13   Q.  When was that?
14   A.  The year was -- I don't recall the year.
15 Actually I don't.
16   Q.  Was that in the last decade?
17   A.  No, it was -- it was -- I was in there for
18 11 and a half years, and things in that jail was
19 constant what they were doing.  So everything is bad
20 about my experience there.  So I don't -- so I can't
21 point out a specific year.  They was always doing

Page 126

1 something.
2    Q.  Do you remember who the Warden was that
3 was escorted out?
4    A.  Bobby Sheridan.
5    Q.  Bobby Sheridan?
6    A.  Yes, Bobby Sheridan.  And the same reasons
7 that they escorted him was the exact reasons that I
8 put in my complaint.
9    Q.  Okay.  And then after Northern Branch,
10 then you went to MCIJ; is that right?
11   A.  Yes.
12   Q.  And did you receive any physical violence
13 at MCIJ?
14   A.  No.  Covid.  Covid attacked me in MCIJ.
15 Almost felt like I was going to die.
16   Q.  Did you receive the vaccine while you were
17 there?
18   A.  No.  The vaccine wasn't even out then at
19 that time.
20   Q.  So what year did you get Covid?
21   A.  When was I released, in 2020, right.  So

Page 127

1 earlier 2020 I believe.  In the beginning of Covid.
2    Q.  And you were treated within the facility?
3    A.  I was isolated in the facility, if you
4 want to call that treatment.  I was quarantined.
5    Q.  Okay.  Now, you also mentioned that -- I'm
6 sorry, I forgot to ask a follow-up question related
7 to this.  You mentioned that you were starved for
8 days while you were at I believe it was Northern
9 Branch?
10   A.  North Branch.
11   Q.  North Branch.  How many days was it
12 that --
13   A.  Five.
14   Q.  -- you didn't receive -- five days?
15   A.  Five days.
16   Q.  Had you received any infractions around
17 that period of time?
18   A.  Absolutely not.
19   Q.  Who else other than you was starved?
20   A.  My cell mate.
21   Q.  I'm sorry.

Page 128

1    A.  My cell buddy, the person that was in the
2 cell with me.
3    Q.  Anybody else?
4    A.  No, just us.
5    Q.  Do you know why that happened?
6    A.  Because they said my cell buddy threw
7 trash on the tier, so they decided the penalty
8 should be starving us for five days.
9    Q.  Did your cell buddy receive an infraction
10 as a result of that?
11   A.  No.  Yeah, not being fed was the
12 infraction.
13   Q.  There was no hearing or official notice
14 that you know of?
15   A.  No, no.
16   Q.  Okay.  Now, you also mentioned that you
17 observed violence within the facilities.  And we're
18 going to go in chronological order again.  Starting
19 with what I'm going to call Jessup, the first
20 facility you were in, what violence did you observe,
21 did you personally observe?

Page 129

1    A.  I mean when I first got there, off the
2 top, I was in my cell and I heard screaming.  And I
3 later seen the guy running past my cell with -- and
4 every time he touched his skin the skin would just
5 peel off.  Come to find out later that they threw
6 hot baby oil -- boiling hot baby oil on him.  And
7 any placed that he touched just peeled, like butter,
8 just removed.  That was crazy.  And -- yeah, that
9 was insane to see.
10   Q.  And was that when you were early on at
11 Jessup?
12   A.  Early on.  That's my introduction to the
13 Maryland House of Corrections.
14   Q.  Anything else while you were there?
15   A.  Yeah.  Multiple stabbings.  Hear people --
16 well, I heard that once in the Maryland House of
17 Corrections, somebody get raped.
18   Q.  You heard that somebody got raped, but did
19 you witness it?
20   A.  No, I said I heard it.
21   Q.  You actually heard?

33 (Pages 126 - 129)

Page 130

1    A.   I heard it, I listened to somebody getting
2   raped.  And these instances happened when I was in
3   the cells.  So the dorm was a different experience.
4    Q.   Did you personally observe any murders
5   while you were at Jessup?
6    A.   Two personally.
7    Q.   So what did you --
8    A.   No, not in Jessup.
9    Q.   Okay.  Let's move now -- any other
10   instance --
11    A.   No, but I seen stabbings and stuff.
12    Q.   Approximately how many stabbings did you
13   see?
14    A.   Numerous.  Numerous.  That was constant.
15   That was all the time.  I seen full out knife fights
16   with groups versus groups.  Yeah.  Violence was
17   constant in the Maryland House of Corrections.
18    Q.   Daily, weekly, monthly, what are we
19   talking about?
20    A.   Definitely weekly at least.  Got something
21   new for you every week.

Page 131

1    Q.   Now, at the Annex, same set of questions.
2   What if any violence did you observe while you were
3   there?
4    A.   Besides just regular stabbings and seeing
5   numerous helicopters come get people.  That jail was
6   my first time I ever seen a murder.  And that was in
7   the yard.  And that was done like -- no, two.  Two
8   in the Annex.  One I didn't see the murder but I
9   seen the results.  I seen them carry -- I seen the
10   dude go to -- go to his destination, come out with
11   handcuffs, and them come out with a real knife, like
12   a knife that flip out that they got from somehow.
13   Uptown, like from -- had to be in the streets.
14   Can't make that in prison.  It was a real flip out
15   knife.  Them walking up there with that in a bag and
16   them walking with the victim and strolling him up
17   the compound with a sheet over him.
18    Q.   That's what you saw of one of the murders?
19    A.   Yeah.  And another one -- the first one
20   was when a guy was in the yard and another guy just
21   rolled -- he was standing on the fence.  And it was

Page 132

1   done fast.  You wouldn't even notice that it was a
2   stabbing, because it looked like he was just running
3   in the yard.  Then he ran towards the guy, it was
4   close proximity, then he just ran off and the guy
5   just dropped.
6    Q.   How far were you away from the stabbing
7   happening?
8    A.   About 20, 30 feet.
9    Q.   And how did you feel after you realized
10   what had happened?
11    A.   Like wow.  Because that guy didn't get
12   caught.  Never got caught.  Like I seen him every
13   day after that on the compound.  So that's how
14   smooth that was.
15    Q.   So you saw who did the murder?
16    A.   Yeah.
17    Q.   Okay.  And obviously you saw the victim
18   afterwards?
19    A.   Yeah.
20    Q.   Were you scared of the person who did the
21   murder?

Page 133

1    A.   No.
2    Q.   Did you have any safety concerns?
3    A.   There wasn't need.  We slept in two
4   different housing buildings.  So only time I seen
5   him is outside of my unit so I had no -- and we had
6   no interaction so wasn't no real reason for me to be
7   like overwhelmingly afraid of him.
8    Q.   But the two of you were in the yard
9   together?
10    A.   Yeah, we was in the yard together that
11   day, yeah.  They actually shut that big yard down
12   for a long time after that though.  So we was only
13   out in the individual yards that was connected to
14   our building so that made it difficult for me to see
15   him anyway.
16    Q.   Was there a point in time in which the
17   yard was opened up again and the two of you saw each
18   other?
19    A.   I don't recall.
20    Q.   But you weren't frightened of him?
21    A.   I mean I was -- I was -- I was frightened

Page 134

1  of the situation because that guy was about to go
2  home. And this is all documented proof. Like you
3  can go back into their records and show a guy got
4  killed in that timeframe in the yard. I'm not
5  making this up. I was there to see it. This is
6  stuff I can prove. Not making it up in my mind.
7      Q.  And approximately when did this happen?
8      A.  This approximately happened around
9  2005ish, sixish. Both of them. Both of the
10  murders.
11     Q.  So you mentioned that I can go up and look
12  this up myself?
13     A.  Absolutely.
14     Q.  Request the records. My question to you
15  is can you give me as much information as possible
16  about this so if I decide to go look this up I can?
17     A.  I just gave it to you. A guy died in the
18  yard. Ain't too many happening that year. That's
19  the only one that happened.
20     Q.  In 2005?
21     A.  2005 or 2006. Then a guy got killed on

Page 135

1  lock-up. He was in cuffs. The guy was in cuffs
2  that got killed. And one guy walked down there to
3  kill him. And what happened, that's how he died,
4  because the police ran while he murdered that boy.
5      Q.  Is this the -- other murder that you
6  described as seeing the --
7      A.  The knife.
8      Q.  With the folding knife?
9      A.  Right, yeah.
10     Q.  And that was in that 2005 to 2006 period
11  of time as well?
12     A.  Yup. Yup. Yup.
13     Q.  And how did you feel after witnessing
14  that?
15     A.  Coincidentally both of them guys was about
16  to go home.
17     Q.  Which guys?
18     A.  The victims.
19     Q.  Victims?
20     A.  So that alone just messes with your head.
21  Like damn, they died in prison when they was about

Page 136

1  to go home. Insane. Insane. So the environment
2  was scary and unpredictable, daily. It's a mental
3  institution.
4      Q.  So let's talk about Northern Branch. What
5  violence did you observe while you were there?
6      A.  Man, now, North Branch had the highest
7  rate of cell buddy murders I ever seen in my life.
8      Q.  Cell body murders?
9      A.  Cell buddies, two people in the cell.
10     Q.  Cell buddy murders.
11     A.  And one come out alive and the other one
12  is dead. Like on the regular. I know one guy, one
13  guy specifically, that killed three of his cell
14  buddies before they finally decided that they can't
15  put nobody in the cell with him. It took three of
16  them.
17     Q.  Did you witness any of the murders?
18     A.  No, I wasn't in the cell with him, but I
19  knew the guys.
20     Q.  So how did you learn about the murders?
21     A.  Because it's well known. Like it's in our

Page 137

1  community. He killed his cell buddy, went to
2  lock-up, came off, they gave him another cell buddy,
3  he killed him too. Then he killed another one.
4      Q.  I just want to make sure I understand this
5  correctly. Were you in when these three murders
6  happened --
7      A.  I was in prison, yeah, it happened during
8  my time. I was on the tier with the guy at some
9  point in time.
10     Q.  Were you on the tier with any of these
11  folks while these murders happened?
12     A.  I said I was on the tier with the guy who
13  committed the murders.
14     Q.  So my question is were you on the same
15  tier with him when he committed these murders?
16     A.  No, I wasn't on the same tier with him
17  when he committed the murders.
18     Q.  What was his name?
19     A.  I don't know his real name. I just know
20  his nick name.
21     Q.  What is his name?

35 (Pages 134 - 137)

Page 138

1    A.  Antmo.

2    Q.  Antmo?

3    A.  Yeah.

4    Q.  And what was Antmo in for if you know?

5    A.  Murder.

6    Q.  Murder?

7    A.  Yeah, he was from the District of

8    Columbia.  So I believe that he had to get locked up

9    in like Prince George's County or something.

10   Q.  Why.  Why?

11   A.  Because that's the only way -- that's

12   where they go at.  When D.C. boys, when they get

13   locked up in Maryland, they are usually coming from

14   Prince George's County.

15   Q.  Now, you mentioned obviously these -- I

16   think you said it was three that he was responsible

17   for.  What other ones?

18   A.  Just them three.

19   Q.  Okay.  Did you actually witness any

20   murders while you were at Northern Branch?

21   A.  Yes.

Page 139

1    Q.  Let's talk about that.  What did you

2    observe?

3    A.  I observed two Mexicans in the big yard,

4    in our big yard on three and four side, because, you

5    know, you got four buildings in North Branch.  One

6    and two and three and four.  Rec time, three and

7    four side, broad daylight, two Mexicans beat another

8    Mexican to death.  Stomped him until their white

9    shoes were red.  Until they're tired.  Until they

10   were -- that's how long it took for the police to

11   get to the yard and finally stop that.

12   Q.  Okay.  And where were you -- how far were

13   you from it happening?

14   A.  Not far at all.

15   Q.  How far?

16   A.  Not many feet.  I mean, you know, it was

17   shocking to see.  I stood there about, I don't know,

18   20 feet away, something like that.  I don't know.

19   Not far.

20   Q.  Okay.

21   A.  Far enough to clearly see it, the detail

Page 140

1    of the tennis shoes, to see them breathing hard, to

2    see everything.  Yeah.  And another one was -- there

3    were two laundry men on the tier, I don't know if

4    the other made one mad, but that ended up with him

5    being knocked out and stomped to death right on the

6    walkway to the chow.

7    Q.  To the where?

8    A.  To go to eat.

9    Q.  To -- okay, to the meal hall?

10   A.  Right.  Like I said, these are things

11   that, you know, that's documented.  Like these

12   things -- because I know his name that died.  His

13   name was Michael Armistead.  He got stomped to

14   death.

15   Q.  This is the laundry men working?

16   A.  Yeah.

17   Q.  Michael Armistead was the victim?

18   A.  Yeah, he was the victim.

19   Q.  And who stopped him to death?

20   A.  The other laundry man.

21   Q.  Who was it?

Page 141

1    A.  I don't know his name.

2    Q.  Do you know the nick name?

3    A.  I don't.  He was quiet, he was like

4    well -- it was shocking to see him out of character.

5    Q.  Going back to the one that you saw in the

6    yard with the two Mexican guys.  When was that?

7    A.  Must have been within the first four years

8    I was there.  The first five years I was there.  I

9    know that it was in the first half.  Yeah.  And I

10   got there in 2008, so we saw anywhere from like 2008

11   to 2013.  Approximately.

12   Q.  And what about the one with the laundry

13   man, when did that occur?

14   A.  That actually was within the same

15   timeframe too.

16   Q.  But you don't know when it was?

17   A.  It was within the same timeframe though.

18   Q.  I'm just asking you don't know a specific

19   year though?

20   A.  I don't.  I guess you can Google Michael

21   Armistead in North Branch and it will tell you a

Page 142

1  specific day.
2      Q.  Okay.  Any other murders at Northern
3  Branch other than these two?
4      A.  The ones I didn't see that cell buddies
5  killed each other.  Numerous stabbings.  I seen one
6  time a dude get hit with a fan motor and almost
7  knocked his eye ball out of his head in the kitchen.
8      Q.  Some guy got hit with a fan motor in the
9  kitchen?
10     A.  Yeah, a fan motor in the kitchen.  And it
11 took the guy's eye almost out of socket.  I mean
12 people paranoid to sit down and eat every day after
13 that for a long time because it was so sneakingly
14 done.  It just was like -- and the boy ain't never
15 seen it coming.  Got cracked in the back of his head
16 with a fan motor that weigh about four or
17 five pounds.  It was nasty.  It was bad.
18     Q.  Were you eating at the time?
19     A.  Yes.
20     Q.  And how many people were in the hall at
21 that point?

Page 143

1      A.  I don't know because they was like -- I
2  was still in the line and there was still peopling
3  sitting down.  So it was constantly still moving.  I
4  didn't even get to sit down yet.
5      Q.  So you had gotten your food but you hadn't
6  sat down to eat it yet?
7      A.  I didn't get my food yet.  I was in line
8  to get my food.
9      Q.  Where did the fan come from?
10     A.  From the fans that they sell on
11 commissary.
12     Q.  Like a ceiling fan?
13     A.  No, your personal fan that got the blade
14 hooked to it.  He just took it out of the frame, I'm
15 assuming, took the blade off of it, and it already
16 has a cord to it, now he just got a heavy motor and
17 the cord wrapped around his hand.
18     Q.  I see.
19     A.  And concealed into a sock.
20     Q.  How big was the fan motor?
21     A.  Like this big.

Page 144

1      Q.  In a sock?
2      A.  That's what it looked like was around it.
3  Something white.  I assume it's -- I don't know.  It
4  was covered though.  It wasn't shiny metal.  He had
5  something covering it.  But he had the cord wrapped
6  around his hand.  So yeah.
7      Q.  All right.  So he was using it like a
8  blunt force object?
9      A.  Right, yeah.
10     Q.  Okay.  Any other murders that you
11 observed?
12     A.  Not that I can recall.
13     Q.  Okay.  Then at MCIJ, did you observe any
14 violence while you were there?
15     A.  Yeah.  During Covid specifically one
16 extreme gang knife fight that seemed like it lasted
17 forever in the dorm.  That wasn't a dorm, they --
18 because of Covid, they had to turn our building into
19 a quarantine building where I slept.  So they
20 converted the whole gym into a dormitory.  And in
21 that time, in that dormitory, two gangs got into it

Page 145

1  and it was an extremely long bloody knife fight that
2  seemingly lasts forever.
3      Q.  How long did it take for the guards to get
4  there?
5      A.  There was guards that was there
6  immediately.  They just couldn't do nothing.  They
7  waited for other guards to come.  There was at least
8  one guard that's in there, but he ain't moving until
9  more back up came.  And then they was hesitant to
10 really do anything because it was all scattered
11 around.  And they basically yelled stop before they
12 get involved, stop, stop, stop, stop.  And then they
13 start spraying mace.  So, yeah.
14     Q.  Did mace disperse the fight or stop it?
15     A.  It did.  It did.
16     Q.  How long did it take until the mace was
17 deployed?
18     A.  I would say from the time that they got
19 there, they might have yelled stop for about a good
20 minute, 60 seconds, maybe a little longer, stop,
21 stop, stop, before they start deploying the mace.

37 (Pages 142 - 145)

1     Q.  How long had the fight been going on
2  before that happened?
3     A.  A good four minutes.  And that seemed like
4  forever just watching people stabbing each other.
5  Good four, five minutes.
6     Q.  To your knowledge did anybody die?
7     A.  Nobody died.  Nobody died.
8     Q.  Were you -- were you a physical victim of
9  that fight?
10    A.  No, I wasn't.  But once again I got cut in
11 my sleep.  So just stuff like that.  Just made it
12 mentally hard for me to be around, especially in
13 open areas like that.  So it just -- the mental
14 effect of all that just was a lot.  Still affected
15 to the day.
16    Q.  So let's -- okay.  So that's going to be
17 my next set of questions has to do with your mental
18 and emotional distress.  For the first facility, so
19 Jessup, could you describe the -- your emotional and
20 mental distress that you experienced while you were
21 there?

1     A.  I came in with mental distress, came in
2  with it the day that they said guilty.  So I was
3  already a little off from that, from guilty to
4  walking in there.  And then seeing how prison is.  I
5  never been in prison before.  Seeing how it was and
6  how people are in maximum security prison at least.
7  Because it was different in medium I noticed when I
8  finally got there 19 years later, that they two
9  different leagues of being incarcerated.
10    Q.  Just a follow-up question.  You're talking
11 about the difference between max and medium
12 security?
13    A.  Yeah, there is a big difference.
14    Q.  Sorry, I didn't mean to interrupt you.
15 So, again, you're at the initial facility, your
16 mental and emotional distress there.  So after --
17 you talked about I guess the initial distressed you
18 experienced while you were entering?
19    A.  Right.
20    Q.  So if you could describe what the stress
21 was once you were physically there?

1     A.  It was heightened by the -- by the
2  constant aggressive nature of the environment.  How
3  anything can happen for any small reason.  How it
4  seems like a lot of these guys shouldn't even be in
5  prison but put away in mental institutions.  What I
6  realized is that that's not happening.  The mental
7  institution is prison.  So you got full fledged
8  psychos walking around that don't -- that seemingly
9  shouldn't be walking around.  You know, people
10 trying to rehabilitate and things, because they
11 can't be rehabilitated.  They are mentally messed
12 up, running around prison savagely.
13    Q.  So you were around a number of individuals
14 who needed mental health treatment, is that fair to
15 say?
16    A.  Absolutely.  Then I realize -- that too, I
17 learned that, that that's what was happening.  There
18 is no -- it's once they label you criminal, there
19 ain't no psychological evaluations for your mental
20 state, you're going to prison, regardless of what
21 you do.  So them people that needs mental health

1  treatment are right there around you.  They putting
2  them in the cell with you because you don't choose
3  cell buddies.  We can talk about that, the many
4  deranged cell buddies I had that was forced upon me.
5     Q.  Mr. Thomas, it's important you listen to
6  the question that I ask you.
7          MR. BALLENGER:  I object.  I think he was
8  answering it very well.  You asked him what
9  psychological -- excuse me, you asked him what
10 psychological experiences he had.  You gave him
11 a wide open question and he's giving you a wide
12 open answer.
13         MS. GOO:  And I didn't interrupt him, I'm
14 just trying to ask follow-up questions.
15         MR. BALLENGER:  You did.  That's what I'm
16 saying.
17    Q.  Mr. Thomas, you started talking about your
18 deranged roommates.  So my question to you in terms
19 of your experience, this is the follow-up question
20 to that, how did being around persons who needed
21 mental health treatment affect you emotionally and

1 psychologically?

2    A.  It made me have to work overtime on my

3 survival skills.  It make me have to adapt, have to

4 find different methodologies and not to piss

5 somebody off or not.  Or to be some type of

6 psychiatrist to their issues or anything to survive

7 the moments.  Constantly, constantly.  You got to

8 keep going changing your way of being to be around

9 certain people.  You can't be one way, you got to be

10 adaptive to survive.  I was constantly for 20 years

11 in survival mode because I wanted to come home.  I

12 didn't want to end up getting killed or having to

13 hurt somebody.  And to be able to do that, I had to

14 keep on changing the way I think and the way I got

15 to be around certain people, all the time.

16    Q.  Okay.  Now, I asked you that question as

17 it related to the first facility you were at.  Is

18 that the same experience that you had with all four

19 institutions you were in?

20    A.  Through all four institutions.  At best

21 was toned down slightly at medium security.

1    Q.  Okay.  So it wasn't as bad but it was

2 still there?

3    A.  Yeah, it was still there.

4    Q.  Okay.  Now, is there anything else that

5 you want to add to your answer about mental or

6 emotional distress as to just Jessup first?

7    A.  I mean I gave you a -- that -- that answer

8 I gave you is for my experience in its totality.  I

9 never -- that was constant.  That was -- I had to be

10 like that.  And it's hard to do that and focus on --

11 I had to learn law.  I have to -- I had to -- it was

12 too much, it was a mental overload.  And I'm not --

13 I still suffer from the things to today because of

14 how much I had to stretch my brain around survival

15 mode in prison.

16    Q.  Now, at the Annex, is there anything that

17 you want to add to that answer about emotional or

18 mental distress?

19    A.  I think I did.

20    Q.  Based off of what you just said?

21    A.  Yes.

1    Q.  What about Northern Branch?

2    A.  Northern Branch was crack me.  That did

3 it.  That was the worst experience by a landslide in

4 my life.  Like I never experienced -- I experienced

5 systemic racism like with what George Vigue did to

6 me in a system where they take people like me and

7 victimize them and give them charges that they know

8 that they didn't do.  And that's -- that's systemic,

9 it's just the system picking on a nobody.  But when

10 you talking about outright racism that I felt and I

11 experienced out in North Branch, that was a whole

12 different experience.

13    Q.  Okay.  So if you could describe that for

14 me?

15    A.  Like I said, they broke every rule.  Like

16 they not only do things like not feed you, there was

17 times they took my showers for a month.  There was

18 times when they called me nigger.  Like that was a

19 regular word to say.  There was times when I watched

20 them, even though the police did kill people in

21 North Branch, I never witnessed that, but I

1 witnessed them try.

2    Q.  How?

3    A.  All right.  A guy -- I watched them going

4 into -- because at North Branch, they had toys.  I

5 call them toys because that's how they played with

6 them.  Like shock shields.  I never seen a shock

7 shield before I went to North Branch.  I seen them

8 use every weapon that I never seen before on people.

9    Q.  What is a shock shield?

10    A.  It's a shield that they will run down on

11 you with and as soon as it touch you you shocked.

12    Q.  So it has an electrical shock to it?

13    A.  Yeah, it's an electric shock shield.  I

14 seen them bean bag, look like a grenade launcher.  I

15 have seen them use that on people.  I seen them use

16 every weapon I never seen in no other prison I seen

17 them use on us, in one way or another.  And it seems

18 like their mace was on steroids.  Like they could

19 spray that thing a half -- over another ten and it

20 swings through your cell and choke you out.  Like

21 what the hell, that is that.  Insane, make you throw

Page 154

1  up and all that. It was different there. And there
2  was -- and there was -- it wasn't no rank. Meaning
3  that if a CO1 say something, the Sergeant went with
4  it, the Lieutenant went with it, all the way up.
5  And it was like DOC didn't even exist, like because
6  Reisterstown wasn't -- you wasn't ARP's, they never
7  made it there. In order to write them up, you had
8  to send the ARP home. You had to do this in a
9  timely fashion.
10  Q. So let me ask a quick question before you
11  keep going. What is an ARP?
12  A. A write-up. Like you want to report
13  something that they are doing, it's called -- what's
14  the abbreviation for the ARP, you all know? I
15  forgot.
16  MR. NATHANS: I believe he's talking about
17  when an inmate is reporting violence by a guard
18  or something.
19  A. Or anything. Anything. Any mistreatment.
20  Q. It doesn't matter what ARP is, I just want
21  to make sure I understand what an ARP is?

Page 155

1  A. Yeah, yeah. So that -- you know that
2  process was stolen from you because you give it to
3  them because they got to sign it. Some CO got to
4  sign it and take it and go through the process. It
5  never happens. Never.
6  Q. So you faced difficulty with trying to
7  complain about any of the correctional officers?
8  A. Absolutely. Absolutely.
9  Q. Officers, sorry.
10  A. Absolutely. And they did things like --
11  there was one time it was an Arian nation guy and
12  they were somehow beefing with the BGF some type of
13  way on lock-up. And how does this happen on
14  lock-up. The guy -- the black guy comes out in
15  handcuffs, in three pieces, how you got to go to the
16  shower. The white guy comes out with no handcuffs
17  and a knife and stabs him. How does that happen on
18  lock-up. This is a real incident.
19  Q. Is that something that you saw?
20  A. Yeah, this is something I saw. How does
21  that happen on lock-up. That's crazy. But it's

Page 156

1  just -- I could just go story after story. The more
2  I think about it the more stories just keep on
3  popping up to me. Real incidents, documented
4  incidents that happened. They had to move a lot of
5  people out of jail for that incident alone just to
6  stop a war from happening. This is what I
7  experienced at North Branch, outright blatant racism
8  on ten. Them putting their boots on our necks, not
9  giving us our rights, like not feeding us, using
10  food as disciplinary. The only thing they do, they
11  used to make a big thing they called sag food where
12  they used food as a punishment when that's -- that's
13  a violation of -- you can't use food as punishment.
14  That's a Constitutional right for prison, you can't
15  do it. But they did.
16  Q. So what was the sag food?
17  A. It was called a sag loaf.
18  Q. What was it?
19  A. It was some type of -- I don't know if it
20  was a potato at its base, but they put like greens
21  and maybe mac and cheese or some type of meat, some

Page 157

1  type of slop all together and say there you go.
2  Like that's nutritious enough for you and say that
3  was like legal for them to do. When come to find
4  out, no, you can not at no point use food as
5  punishment in prison. But they did it regularly
6  though for anything they didn't like that you did.
7  Q. So this punishment with food, was that
8  something you only experienced at Jessup?
9  A. That's only North Branch Correctional.
10  Q. Sorry, North Branch.
11  A. I never seen nothing like that at Jessup.
12  Q. Anything else that you want to mention
13  about Northern Branch before I move to the next one.
14  A. That's it.
15  Q. And the last one is MCIJ. Is there
16  anything else that you want to add in terms of your
17  mental and emotional stress that you haven't already
18  mentioned?
19  A. MCIJ I wasn't there for too long because
20  Covid hit and we were pretty much locked down and
21  movement was restricted. And that -- one of the

Page 158

1 biggest things I seen was that whole thing in the
2 dorm.
3    Q.  The knife fight?
4    A.  Yeah.  Then I went home.
5    Q.  Did you ever witness any hangings while
6 you were there?
7    A.  No, I didn't witness.
8    Q.  Any of the facilities?
9    A.  No.
10    Q.  While you were -- I'll go facility by
11 facility.  My question has to do with what if any
12 educational vocational courses did you take.  What
13 if anything did you take while you were at the first
14 facility, Jessup?
15    A.  I got my GED in the first facility.
16    Q.  What about at the Annex?
17    A.  They didn't -- that prison didn't provide
18 you with further.  They gave out a math and a
19 psychology class which gave you some type of
20 credits.  I took the psychology but, you know it
21 wasn't like furthering your education, it was more

Page 159

1 like a program than anything else.
2    Q.  What about at Northern Branch, did you
3 have any programs?
4    A.  The programming -- their racism on my
5 black -- on me.  That's the program that I had.
6    Q.  And what about at MCIJ?
7    A.  No.
8    Q.  Okay.
9       MS. GOO:  We okay to go for another half
10 hour?
11       MR. BALLENGER:  I could probably take a
12 break if you're going to go that much longer.
13       MS. GOO:  Can we go for about like maybe
14 ten minutes and see where we are.
15       MR. BALLENGER:  Yeah, I can probably last
16 ten minutes.
17       MS. GOO:  I mean we can take a break now
18 if that's easier.
19       MR. BALLENGER:  I would prefer.
20       VIDEOGRAPHER:  We're going off the record.
21 The time is 12:38 p.m.

Page 160

1       (Off the record colloquy.)
2       VIDEOGRAPHER:  We're back on the record.
3 The time is 12:50 p.m.  This is media number
4 three.
5 BY MS. GOO:
6    Q.  Mr. Thomas, what if any infractions did
7 you receive while you were within the DOC?
8    A.  Well, I know throughout my whole
9 incarceration I had three infractions so it ain't
10 hard to remember.
11    Q.  What were they?
12    A.  The time when the guy attacked me, they
13 don't consider that an attack, they consider that a
14 fight.  That one.  They charged with me a weapon
15 that was in my cell.  And one other infraction, I
16 know -- Oh, North Branch.  They lied and said a
17 lollipop that they sold off commissary had drugs in
18 it.  Oh, my God.  I forgot.  How did I forget that.
19    Q.  Do you remember the years of these
20 infractions?
21    A.  I don't.

Page 161

1    Q.  And you think it's -- and your
2 recollection is it's just those three?
3    A.  I know it's just them three.
4    Q.  So do you recall receiving some discipline
5 or infraction for possession of a cell phone in
6 October of 2006?
7    A.  No.
8       (Deposition Exhibit 4 marked.)
9    Q.  So at the very -- if I could just direct
10 your attention to the first page?
11       MR. BALLENGER:  She is directing your
12 attention to the first page.
13    A.  Yeah.
14    Q.  Okay.  So at the top it says name, Melvin
15 Thomas.  Do you see that?
16    A.  I see that.
17    Q.  And it says the date of violation there is
18 September 26, 2006?
19    A.  Uh-huh.
20    Q.  And at the section below there is like a
21 chart there with rule numbers and it says not

41 (Pages 158 - 161)

Page 162

1  guilty, no plea guilty.  Do you see that on the
2  first page?
3      A.  I see it.
4      Q.  You see that the Rule 110, the check is
5  next to guilty?
6      A.  I see it.
7      Q.  And the one next to the 406 is also
8  guilty?
9      A.  Yeah, I see it.
10     Q.  And next to 120 it says not guilty.  Do
11 you see that?
12     A.  I do.
13     Q.  And the Rule 102 is an admission of
14 possession of contraband; is that right?
15     A.  According to the paper, yeah.
16     Q.  I'm sorry.
17     A.  According to the paper.
18     Q.  Was that -- do you recall that being
19 admission to contraband?
20     A.  What's the question again?  Rule 10 what?
21         MR. BALLENGER:  Do you know what Rule 102

Page 163

1  is?
2      A.  No.
3      Q.  Were you in possession of contraband.
4  Were you found guilty of possession of contraband?
5      A.  Yeah, I was found guilty of possession.
6      Q.  All right.  Now, in August -- you
7  mentioned a fight that you were involved in?
8      A.  Yes.
9      Q.  Okay.  And you said you just didn't
10 remember the date of that?
11     A.  I did.
12     Q.  And do you remember who you were in the
13 fight with?
14     A.  I don't remember his name, no.
15     Q.  Do you recall it being Damon Atkinson?
16     A.  Damon, that sounds familiar to me.
17     Q.  And there was an admission to -- actually
18 showing you Exhibit 5.
19         (Deposition Exhibit 5 marked.)
20     Q.  And you would agree that you were found
21 guilty of committing assault and interfering with a

Page 164

1  search of a person, area or location.  So were you
2  found guilty of committing an assault?
3      A.  Yeah.  We both was found guilty.
4      Q.  All right.  And also Rule 312 which was
5  interfering with the search of a person, area or
6  location?
7      A.  I don't know what that rule is.  I don't
8  know.  I don't even know how a search of something
9  is even -- I don't know how --
10         MR. BALLENGER:  You answered.  You
11     answered.
12     Q.  And you received a 60 day penalty for
13 that?
14     A.  Yeah, if that's what they say.
15     Q.  All right.  Now, November 9th, 2011, this
16 was the lollipop infraction.  This is at Northern
17 Brach?
18     A.  Yes.
19     Q.  Showing you Exhibit 6.
20         (Deposition Exhibit 6 marked.)
21     Q.  If I could direct your attention just to

Page 165

1  the first page.  It says incident description, do
2  you see that?
3      A.  Yeah.
4      Q.  And would you agree that the record says
5  that "on November 9, 2011 Officer A. Platter $CO_2$
6  brought me, Lieutenant Jake Coleman, one homemade
7  lollipop that was red and white in color with a
8  plastic spoon for a handle, to have tested for
9  suboxone.  Using the DTX's instant Buprenorphine
10 test strip, the lollipop tested positive for
11 suboxone."  The report reads that, correct?
12     A.  That was a lie.
13     Q.  How do you know it was a lie?
14     A.  Because what was that, two years later,
15 the officer -- I knew it was a lie.  There was no
16 drugs in the lollipop, one.  And the officer who
17 said that she found it, she apologized to me for it.
18 There was no test done.  Wasn't no -- she apologized
19 for that.  It took her years to do it but she did
20 it.  That's her name there.  Yeah.
21     Q.  You would agree that the report reads that

42 (Pages 162 - 165)

Page 166

1 an instant test was done, correct?
2     A.  That's what the report says.  But you
3 heard what I said though, right.
4         (Deposition Exhibit 7 marked.)
5     Q.  And do you recall on September the 4th,
6 2012 receiving an informal resolution, ten day cell
7 restriction, for entering a location without
8 authorization and/or leaving an assigned location
9 without authorization?
10     A.  I don't recall.
11     Q.  Showing you Exhibit 7.  Okay.  So in
12 Exhibit 7 do you recall essentially being outside of
13 your cell when you weren't supposed to be and
14 receiving an informal resolution for that?
15     A.  I don't recall.
16     Q.  Okay.  You would agree with me that's what
17 this exhibit says?
18     A.  That's what it says.
19     Q.  And you received two more of those
20 entering locations without authorization in 2013 on
21 May 26th and May 29th?

Page 167

1     A.  Where was I in 2013?  North Branch.  I'm
2 sure.
3     Q.  So on May 26, 2013 you were at Northern
4 Branch and you were outside of an area you weren't
5 supposed to be?
6     A.  If they said it.  You know how that goes.
7     Q.  Showing you Exhibit 8.
8         (Deposition Exhibit 8 marked.)
9     Q.  So you would agree that the report says
10 that on May 26th you were entering a location
11 without authorization, correct?
12     A.  That's what the report says.
13     Q.  And the same thing three days later on
14 May 29th?
15     A.  What is this, a formal deposition again?
16     Q.  So on May 29th of 2013 you accepted --
17 thereabouts you accepted an informal resolution?
18         (Deposition Exhibit 9 marked.)
19     A.  What they used to do is like we animals,
20 try to close doors fast, we might be coming out the
21 shower or the day room, and expect me to haul -- do

Page 168

1 a --
2         MR. BALLENGER:  Sprint.
3     A.  A sprint, full out sprint and catch up.
4 I'm not doing that.  You going to keep on
5 humiliating and demeaning me.
6     Q.  You had other additional infractions; is
7 that correct, after that?
8         MR. BALLENGER:  At North Branch?
9     A.  At North Branch?
10     Q.  At North Branch, yes.
11     A.  I'm sure.
12     Q.  Do you recall on June 10th, 2018 receiving
13 discipline for possessing alcohol.  I'm sorry, hold
14 on, let me make sure I get this right.  Yes,
15 possession or use of alcohol without authorization?
16     A.  I don't.  But, you know, they say I did.
17         (Deposition Exhibit 10 marked.)
18     Q.  Showing you Exhibit 10.
19     A.  What happened with that?  Another informal
20 deposition.  No lock up time, no nothing.  That -- I
21 went on no segregation for none of this stuff you're

Page 169

1 bringing up.
2     Q.  Mr. Thomas, I'm going to ask that you turn
3 to page three of this document.  It's titled
4 Admission of Substance Use, in Exhibit 10?
5     A.  In this.
6     Q.  Do you see in the upper left-hand corner,
7 it says inmate name, Melvin Thomas.  Do you see
8 that?
9     A.  I see it.
10     Q.  And at the bottom there is a signature
11 that says inmate's signature.  That's your
12 signature?
13     A.  Look like it.
14     Q.  And the paragraph above it says "I admit
15 that I used a substance for which I had tested
16 positive as reflected above.  I understand that
17 because I admitted to using the substance, a GCMS
18 confirmation test will not be conducted.  I will
19 accept the sanction to be imposed by the Division of
20 Correction as a result of my truthful admission of
21 substance abuse."  And you signed that on June 10,

1  2018; is that correct?

2      A.  That's what it look like.

3      Q.  And you admitted to possessing, I believe

4  you said it was a weapon, in October of -- but you

5  didn't remember the date; is that right?

6      A.  That's right.

7      Q.  Showing you Exhibit 11.

8          (Deposition Exhibit 11 marked.)

9      Q.  And if you could turn to the third page,

10  which is titled Inmate Waiver of Appearance with a

11  Plea Agreement?

12      A.  What is this?  For what?

13      Q.  So do you see that page, Inmate Waiver of

14  Appearance with a Plea Agreement?

15      A.  What, the knife?

16      Q.  I'm asking you, are you on that page?

17      A.  What page?

18      Q.  The third page that says Inmate Waiver of

19  Appearance with a Plea Agreement?

20      A.  Okay.  What you want me to see?

21      Q.  I'm asking you to turn to that page, it's

1  this third page?

2      A.  Okay.

3      Q.  Okay.  So it says here inmate, Melvin

4  Thomas.  Do you see that at the top?

5      A.  I do.

6      Q.  And it says "the subject inmate informed

7  me that they wished to waive an appearance before

8  the hearing officer and accept a plea agreement in

9  the case pleading guilty."  Do you see that?

10      A.  I do.

11      Q.  Okay.  And this is for -- the date of this

12  report was October 22nd, 2019.  Do you see that?

13      A.  Okay.  I see.

14      Q.  Okay.  So if you could turn to the

15  fifth page, which is the next page after that.  And

16  you see a description of the notice of the rule

17  violation which occurred on October 22nd, 2019.  Do

18  you see that?

19      A.  I see it.

20      Q.  Okay.  So you pled guilty to the

21  possession of the weapon offense?

1      A.  I did.

2      Q.  And you also pled guilty to using

3  Buprenorphine while you were in jail?

4      A.  You said they said I pled guilty to that?

5      Q.  Yes.  Did you.

6      A.  I don't recall.

7      Q.  Showing you Exhibit 12.

8          (Deposition Exhibit 12 marked.)

9      A.  What page did you want me to look at.

10      Q.  If you could turn to page -- page four,

11  keeping in mind it's double sided.  It's titled

12  Affidavit for Admission of Substance Abuse.  It's

13  this page here?

14      A.  Okay.

15      Q.  Okay.  So at the top you see it says

16  Melvin Thomas?

17      A.  Yes.

18      Q.  And date collected, November 11, 2019.

19  And the screening test results say Buprenorphine?

20      A.  I see it.

21      Q.  So you admitted to the positive result of

1  Buprenorphine on November 11th, 2019; is that

2  correct?

3      A.  It said what?  It said I admitted?

4      Q.  It says -- well, first of all let me

5  direct your attention to the offender signature.  Is

6  that your signature at the bottom?

7      A.  That's my signature.

8      Q.  Above that it says that you "solemnly,

9  under the penalties of perjury, and upon personal

10  knowledge that the contents of the foregoing

11  affidavit are true".  Do you see that?  So you're

12  agreeing that by signing you're testifying that this

13  is truthful?

14      A.  I don't see it as that.

15      Q.  I'm sorry.

16      A.  I don't see it as that.

17      Q.  Then why did you sign it?

18      A.  Because he asked me to sign it.

19      Q.  Okay.  And it says, the paragraph above

20  that, it says "I understand that I'm entitled to

21  have the sample I submitted for testing sent to a

1  laboratory for a second test to confirm the presence
2  of the substance for which I have tested positive.
3  I waive or give up my right to have a confirmation
4  test conducted. I acknowledge that the positive
5  result generated by the initial onsite testing
6  device is accurate and I admit that I used the above
7  substance while under the custody of DPSCS."
8      A.  I don't remember this.
9      Q.  And that is your signature below though,
10  correct?
11     A.  It is.
12     Q.  Okay. And did you distribute
13  Buprenorphine or suboxone while you were in jail?
14     A.  No.
15     Q.  Never discussed selling it at all?
16     A.  No.
17         MS. GOO: I think now would be an
18  appropriate time for a lunch break.
19         MR. BALLENGER: Sure.
20         VIDEOGRAPHER: We are going off the
21  record. The time is 1:11 p.m.

1          (Off the record colloquy.)
2          VIDEOGRAPHER: We are back on the record.
3  The time is 1:54 p.m. This is media number
4  four.
5  BY MS. GOO:
6      Q.  Good afternoon, Mr. Thomas.
7      A.  Good afternoon.
8      Q.  Mr. Thomas, I just wanted to get some
9  clarification on one -- one fact that -- I don't
10  think I got on the record earlier. Now, your
11  brother, Blake Thomas, you mentioned that he was
12  incarcerated for something about -- prior to your
13  incarceration; is that right?
14     A.  That's right.
15     Q.  Okay. At the time of the Myron
16  Brockington's shooting, was he in jail or on the
17  street at that point?
18     A.  He was on the street at that point.
19     Q.  He was on the street at that point. Okay.
20  Now, we had discussed the motion for new trial that
21  was filed on your behalf by Lyle Jones. Do you

1  recall that?
2      A.  I recall that.
3      Q.  And, again, you have to keep your voice up
4  just a little bit. Thank you. And you said you had
5  not reviewed this motion prior to it being filed
6  with the court; is that right?
7      A.  That's correct.
8      Q.  I'm showing you Exhibit 13.
9          (Deposition Exhibit 13 marked.)
10     Q.  If you could just take a look at that
11  document for a moment. I'm going to direct your
12  attention to the second page, the last paragraph.
13  And it says -- the paragraph starts with "defendant
14  is familiar." Do you see that?
15     A.  I do.
16     Q.  So it says "defendant is familiar with the
17  individual who shot Mr. Brockington. His name is
18  Charles Floyd. Prior to trial, Mr. Floyd admitted
19  to defendant that he was the shooter." So I'm going
20  to stop there and ask this question. Is that
21  information true?

1      A.  That is not true.
2      Q.  That is not true?
3      A.  No.
4      Q.  Okay. And then going forward it says,
5  "defendant, knowing Mr. Floyd's violent nature,
6  believed that disclosure of the information would
7  bring retribution for himself and possibly his loved
8  ones in the form of serious bodily harm or death."
9  Is that sentence true or false?
10     A.  That's false also.
11     Q.  Now, you mentioned that you used the jail
12  call system to contact loved ones while you were in
13  jail; is that correct?
14     A.  That's correct.
15     Q.  And could you just talk about how the call
16  system works. Like walk us logistically what
17  happens if you needed to make a phone call?
18     A.  You get the phone. You -- I believe that
19  you punch in your I.D. number or something like
20  that, and you dial the person's number that's on
21  your phone list.

1    Q.  But you have to put an I.D. number in
2  first?
3    A.  I believe so, yes.
4    Q.  Okay.  Now, was the I.D. number that you
5  put in your own I.D. number or could you use any
6  I.D. number?
7    A.  I don't understand the question.
8    Q.  I'm sorry.
9    A.  I don't understand your question.
10    Q.  So you have to put in an I.D. number to
11  make a call?
12    A.  Right.
13    Q.  And the number that you use to make a
14  phone call that you put in, is that supposed to be
15  your I.D. number or could you use anybody else's
16  I.D. numbers?
17    A.  What you mean by use anybody else's.  Only
18  way you're able to use somebody else's is if you
19  have their information.  And then on top of that
20  then you have like phone lists, meaning that you can
21  only -- you only required to make phone calls on the

1  list of people that's on your list.
2    Q.  Okay.  So you could use somebody else's --
3  I just want to make sure I understand it.  So if you
4  use somebody else's I.D. number to call, you can
5  only call a set amount of people with that number
6  because it's got to be on a pre-approved list; is
7  that right?
8    A.  That's correct.
9    Q.  Okay.  So you had a certain number of
10  people that you were allowed to call?
11    A.  Yes.
12    Q.  And if you used somebody else's I.D.
13  number then you would have to know again who
14  specifically is on their list to make that phone
15  call?
16    A.  Meaning that who is on their list?
17    Q.  So that's my question to you.  Could you
18  use somebody else's I.D. number to make a phone
19  call?
20    A.  It's possible.  You would have to go
21  through knowing their information and having your

1  numbers on their list.
2    Q.  What do you mean by your numbers on their
3  list?
4    A.  Like if he got a specific -- I think the
5  limit is like eight numbers that you can call or
6  something like that.  I'm not sure.  But if you got
7  eight numbers on his list, am I calling his family
8  members or his friends?  I don't understand the
9  question.
10    Q.  But it's possible if you have that
11  information?
12    A.  It's possible, yes.
13    Q.  While you were in, did you ever use
14  anybody else's I.D. numbers?
15    A.  Yes.
16    Q.  You did?
17    A.  Yes.
18    Q.  Okay.  And how often would you use other
19  people's I.D. numbers to make phone calls?
20    A.  I don't recall.
21    Q.  But you had used it?

1    A.  I had done it before.
2    Q.  And why did you use someone else's I.D.
3  number to make phone calls?
4    A.  Because let's say I called somebody and I
5  want to call them back.  And I can't call back to
6  back with my number.  But if you didn't use the
7  phone, then I can call them back to back off his
8  number, if you allow me to, and you may have -- a
9  person, that same person that I wanted to call on
10  your list.  So that's -- that's the only way
11  possible that that can happen, that I can see.
12    Q.  Are those the occasions in which you might
13  have called somebody back to back using another
14  persons I.D. number?
15    A.  Those occasions, yeah.
16    Q.  Do you recall how many other SID numbers
17  you did use.
18    A.  I don't.
19    Q.  And do you remember what those numbers
20  were?
21    A.  I don't.

Page 182

1    Q.  Do you recall how many other different
2  numbers you used, two, more than five?
3    A.  I don't.
4    Q.  Was it a big number, was it a small
5  number?
6    A.  Small number.
7    Q.  Less than ten?
8    A.  Yeah, less than ten I'm sure.  You saying
9  through the span of 20 years?
10    Q.  Over the span of 20 years.
11    A.  Yeah, I don't know.  I would still
12  probably say less than ten.
13    Q.  So would you ever do it so that you --
14  your phone call wouldn't be recorded under your
15  name.  So a conversation, would you try to avoid
16  having a conversation with somebody recorded under
17  your name?
18    A.  No, because there is no -- all phone calls
19  are recorded.  You can't hide a phone call.  They
20  say that, regardless whose name you use, all calls
21  are being recorded.  So there ain't no way to hide a

Page 183

1  phone call.
2    Q.  But they would have to know what SID
3  number to look for, right, if they were looking for
4  your calls?
5    A.  I guess so.
6    Q.  And it could -- I mean it could be any
7  number that you're using, right?
8    A.  Yes, actually.
9    Q.  Okay.  So -- we talked about this briefly
10  but I want to make sure that we're very clear.  Did
11  you reach out to -- did you reach out to Myron
12  Brockington while you were in jail?
13    A.  Absolutely not.
14    Q.  Okay.  But I think your private
15  investigator did reach out to him on your behalf; is
16  that right?
17    A.  He did, yes.
18    Q.  And why was it so important for you to get
19  in touch with Myron Brockington?
20    A.  Like I said, if after what I heard was
21  true that he actually saw the person that shot him,

Page 184

1  that seems like a perfect opportunity -- this is
2  what I believe.  I believe that it is -- that Myron
3  Brockington was actually sitting next to me in
4  court.  Like I was free.  I wasn't incarcerated, I
5  was out on bail.  He came and sat next to me with
6  his daughter.  I didn't know it was him, he did not
7  know it was me.  The State's Attorney made him --
8  got him from stop sitting next to me.  He had a
9  whole conversation with my daughter's mother.  Our
10  daughters was the same age.  How do I know that,
11  because I was listening to the conversation that he
12  was having with my -- with my daughter's mother.
13  This happened in real-time.  So I was looking at
14  him.  I never seen him before, he never seen me
15  before.  But to then to go on the stand and point to
16  me and say it like he -- like he knew me was strange
17  to me.  It was always strange.  So I'm thinking that
18  wherever -- whatever he did, I have to think that he
19  was made to do it.  I had to think that.  Because I
20  didn't ever see him before and he didn't ever see me
21  before.  So why wouldn't I, even -- even after --

Page 185

1  even if I never found out that he seen the shooter,
2  I got to believe, I'm trying to be free, that he's
3  willing to one day tell the truth.
4    Q.  And you mentioned that you had heard some
5  story about Myron Brockington?
6    A.  Yeah.
7    Q.  What was that?
8    A.  Having interaction with people -- one of
9  the people was the guy that shot him in the flea
10  market.
11    Q.  So what did you hear about the situation
12  with the flea market?
13    A.  That one of the guys went to him and said
14  like why did you -- why did you do that to Myron,
15  like those are good guys, so forth and so on.  I
16  heard it was a very peaceful conversation.  But then
17  the guy who allegedly shot, he not going to say
18  nothing.  To my understanding he did walk up and
19  listen to the conversation.  So -- and that's the
20  extent to the story that I got.
21    Q.  And who did you hear this from?

Page 186

1    A.   One of my cousins.
2    Q.   Which cousin was that?
3    A.   Tyreke.
4    Q.   And was Tyreke present when this happened?
5    A.   Yes.
6    Q.   So is it the guy that went up to Myron?
7    A.   Yes.
8    Q.   Okay.  Do you know why Tyreke went up to
9  Myron that day?
10    A.   Because I believe that he knew Myron, like
11  in some type of way.  Seen him before at least.  And
12  they just happened -- freak coincidence that they
13  was in the same place at the same time.  And he
14  talked to him.  And Myron explained to him, to my
15  understanding, that that pressure came from the
16  police department.  And something about his mother
17  supposedly, if I got the story right, was telling
18  him just go ahead and do what they tell you to do
19  type of situation going on there.
20    Q.   And the person who was allegedly the real
21  shooter was also present?

Page 187

1    A.   Yes.
2    Q.   And was he there -- and this was -- and
3  who was that?
4    A.   Allegedly, Namey.
5    Q.   Allegedly Namey as in allegedly Namey was
6  there or --
7    A.   Allegedly Namey was there.  Allegedly
8  Namey was there and he's saying he was the shooter.
9    Q.   And who is saying that he is the shooter?
10    A.   I guess Myron.
11    Q.   And do you recall when that happened?
12    A.   I don't.
13    Q.   This thing at the flea market?
14    A.   I don't even think I heard about it until
15  a while after, until somebody came and told me.
16    Q.   So was it shortly after -- I'm sure you
17  don't know the specific day, but do you recall like
18  was it when you were -- shortly after you had been
19  found guilty, was it --
20    A.   It was a long time after that.
21    Q.   Like ten years after that, decades after

Page 188

1  that?
2    A.   It could have been.  Not decades, but it
3  could have been within the frame of the first ten
4  days.  Could have been.
5    Q.   All right.
6    A.   But I know it was a long time before that
7  alleged incident and when I hired a private
8  investigator to go talk to him because it was --
9  that was -- I just put that on back burner, because
10  I already had stuff in court.  And I just didn't pay
11  it any thought that I could possibly get out without
12  even worrying about that.
13    Q.   When did you decide that you wanted to go
14  and look for Mr. Brockington to see if there was any
15  truth to this?
16    A.   After the motion for new trial failed me
17  and appeals of that, and I felt as though I don't --
18  I don't have too many more options or bites at the
19  apple left, I got to try for -- I got to try.  I got
20  to try to see if he willing to finally give me some
21  justice.

Page 189

1    Q.   How did you meet Mr. Wolfe.  Like how --
2  did you find him or did he find you?
3    A.   Well, actually he was previously
4  incarcerated in -- I think it was exonerated -- an
5  individual who started his own private investigating
6  and paralegal firm called The Great Injustice.  And
7  he helped quite a few people get home actually.  And
8  that's how I got turned on to him by other people
9  who could attest to his reliability and his
10  professionalism and his investigating tactics.
11    Q.   So you learned about if from some other
12  people?
13    A.   Yes.
14    Q.   And how did you hire him.  Like did you
15  have to have an agreement with him.  Like did you --
16  how did that go about?
17    A.   Yeah.  Donna actually -- crazy how dots
18  connect.  She actually did his taxes before or
19  something, so she knew him.  So that was when --
20  when I finally got his number to -- and I gave it to
21  her, I told her to reach out to him to see if he

1  willing to take the case.  When she put the number
2  in her phone, she see she already had him, had the
3  number and knew him.  So that was an easy transition
4  to getting him hired, because they already had a
5  working relationship.
6       Q.  And did you have to pay a retainer fee for
7  him?
8       A.  Yes.
9       Q.  And was the agreement for him to find
10  specific people or was it just to see if he could
11  help you out for whatever period of time that you
12  needed him?
13       A.  The agreement was to help find specific
14  people.
15       Q.  So who were the specific people you asked
16  him to find?
17       A.  I know for sure it was Dewey Morgan and
18  Myron Brockington.  And -- no, and my -- whoever the
19  owner of My Sally's Place because he did interview
20  her.  And then that's how I found out that there was
21  actually footage of that night, that he found that

1  out, because he talked to her.  And we found out
2  that there was footage that night that the police
3  took.  And actually I found that out too, that that
4  was another thing I found out in my Maryland Public
5  Information Act, that there was tapes.  And I
6  don't -- and I never seen no tapes.  I never heard
7  of them before that.  So My Sally -- he got that
8  interview.  I got that somewhere.  I got that in my
9  paperwork, that she said that the police came in
10  there, they took her tapes, they -- and -- and her
11  niece was Nina Wilson.  Her niece was Nina Wilson,
12  and -- and she said that it's crazy because the
13  police tried to meet her also to pick my picture.
14  And I found out that her and Myron was actually
15  like -- I found a lot through his investigation,
16  that they was actually dealing with each other.
17       Q.  Who was dealing with each other?
18       A.  Myron and Nina.
19       Q.  What do you mean by dealing with each
20  other?
21       A.  Like they had a relationship, a personal

1  intimate relationship.
2       Q.  So Myron and Nina were in a relationship
3  together?
4       A.  Yes.  I guess it wasn't like that was his
5  girlfriend, but they had a thing.  And so they
6  talked about that type of stuff.  And Sally was --
7  but Nina was, according to Sally, was scared, like
8  very afraid of the whole situation.  The fact that
9  they trying -- they got not only Myron to do it but
10  try to get her to do it and the real guy is out
11  there somewhere.  That just -- she was totally
12  frightened.  She didn't even really want to come to
13  court or nothing.  So there was a lot that I found
14  out through his investigations.
15       Q.  And what is Nina Wilson's aunt's name, the
16  owner of Sally's?
17       A.  Sally.
18       Q.  Her name is Sally.  What is her last name?
19       A.  I don't know.  I don't know.
20       Q.  And I'm sorry, to be the clear, the
21  interview that you received a copy of, was that with

1  Sally that you obtained through the MPIA request?
2       A.  No.
3       Q.  It was an interview of who, of Nina?
4       A.  Repeat that question.
5       Q.  So you mentioned that there was an
6  interview that you obtained through the MPIA request
7  for the first time talking about the tapes.  Who was
8  that interview of?
9       A.  It wasn't an interview, it was an evidence
10  log.
11       Q.  An evidence log?
12       A.  Yeah, evidence log.
13       Q.  Okay.  And that's what showed the tapes?
14       A.  Yes, that's what showed.  The evidence log
15  showed the tapes.
16       Q.  Okay.  Now, did Wolfe speak with Sally as
17  well?
18       A.  Yes.
19       Q.  Okay.  And did he write a report for that?
20       A.  Yes.
21       Q.  Okay.  And you have that?

1    A.  Yes.

2    Q.  Okay.  And did he also speak with Nina

3  Wilson as well?

4    A.  No.  No, she was not -- never available to

5  him.

6    Q.  And he spoke to Dewey Morgan?

7    A.  He wasn't able to catch up with him.

8    Q.  And what about Myron Brockington?

9    A.  Yeah, he did.

10    Q.  Did he write a report for -- of his

11  conversation with Myron Brockington?

12    A.  Yes.

13    Q.  And do you have that.  Not physically here

14  but do you have that in your possession somewhere?

15    A.  Yeah, I have it in my possession.

16    Q.  Are there any other witness statements

17  that Wolfe obtained for you?

18    A.  Sally.  Myron.  I don't recall off the top

19  of my head.

20    Q.  Okay.  Do you know -- did you ever contact

21  members of your family or either of your girlfriends

1  and have them reach out to someone who was a

2  girlfriend or baby momma of Myron Brockington?

3    A.  No.

4    Q.  Did you ask anybody to do anything like

5  that?

6    A.  I didn't never know about Myron -- until

7  the day I never knew about the existence of her name

8  to any -- no significant other.  No significance to

9  my case.

10    Q.  Did you know that he had a baby momma or a

11  girlfriend?

12    A.  Of course.  I mean he was sitting next to

13  me in court with his daughter.  And his, I'm

14  assuming, baby mother was sitting next to him.

15    Q.  And when was that court hearing?

16    A.  Trial.

17    Q.  That was for the trial in December of

18  2001?

19    A.  For the trial, yes.  And I know his

20  daughter was two months because he said it.  My

21  daughter was two months at that time.  So that's

1  something I never forgot.

2    Q.  Okay.  So at this point in time we're

3  going to be preparing to play a phone call.  This is

4  dated -- actually, let me make sure, October 24th,

5  2015.  It's called D3C218.  It is to telephone

6  number (240)979-9124?

7    MR. BALLENGER:  Can you repeat the number

8  again.

9    MS. GOO:  Yes, it's (240)979-9124.

10    MR. BALLENGER:  And the date.

11    MS. GOO:  Is October 24th, 2015.  And

12  we can produce these to you in digital format

13  once we're done with this.  And we will

14  obviously provide plaintiff's counsel with a

15  copy as well.  But these were previously

16  produced in discovery.  And Mr. Gruen, if we

17  could just play the first minute of the phone

18  call.

19    AUDIO:  Hello.  You have a prepaid call.

20  You will not be charged for this call.  This

21  call is from Melvin, an inmate at the Maryland

1  Correctional Facility.  This call will be

2  recorded and monitored.  If you wish to block

3  any future calls of this nature, dial seven

4  now.  To accept it.  Hey.  Hey love.  Hey, I

5  was talking earlier, right, (inaudible) the guy

6  apologized.  You hear me --

7    Q.  Can you pause there for a second.  Just

8  pausing there a second.  So there was a male voice

9  in the call.  Mr. Thomas, do you recognize that

10  voice?

11    A.  I don't.  I'm trying to catch on to the

12  voice.

13    Q.  Maybe play a little bit further.

14    AUDIO:  (inaudible) somebody knew

15  (inaudible) messed that up, right, gave you

16  (inaudible).  Other day he apologized

17  (inaudible) I'm good like February but he good

18  until April.  He said he apologized deeply.  He

19  was (inaudible) the other day, he (inaudible)

20  apologize himself, right.  Yeah, Blake tried

21  the number today, (inaudible).

Page 198

1    Q.  Pause it for a second.  Do you recognize
2  the voice?
3    A.  That's my mother.  That sounds like my
4  mother.
5    Q.  And do you recognize the male voice?
6    A.  I don't.
7    Q.  Okay.  At the beginning of the call, when
8  we first began the call and it said "this is a call
9  from Melvin"?
10    A.  Right.
11    Q.  Is that you?
12    A.  That's me, yes.
13    Q.  So that's you speaking on the call?
14    A.  Yes.
15        MR. BALLENGER:  Well, just be careful
16    here.  I thought you were asking him did he
17    recognize the male voice that was talking.  The
18    first part is just a recording.  I've been
19    listening to a lot of these phone calls.  Just
20    Melvin.  So I'm not sure what your question is
21    asking.  Are you talking about the Melvin or

Page 199

1    are you talking about the subsequent colloquy.
2        MS. GOO:  The Melvin and then the
3    subsequent colloquy.
4    Q.  So the Melvin is you, correct?
5    A.  Yes.
6    Q.  Okay.  Now, in the phone call, the male
7  voice that's speaking, that is you speaking, right?
8    A.  Yes.
9        MR. BALLENGER:  .  Okay.
10    Q.  And there is a reference to a Blake on the
11  call as well, did you hear that?
12    A.  Yes.
13    Q.  So that's talking about your brother,
14  correct?
15    A.  Yes.
16    Q.  Can we advance this to starting at 21:50
17  of the phone call, please?
18        MR. GRUEN:  Close as I can get is 21:36.
19        MS. GOO:  21:36 that's fine.  Thank you.
20        AUDIO:  Ain't no (inaudible).  Bring some
21    tape.  Understand what I'm saying.  That's what

Page 200

1  I (inaudible)see what happens.  (inaudible)
2  check back on that girl, see if she out yet.
3  The girl that he bailed out, you know she know
4  where he at.  You understand what I'm saying.
5  Remember her.  (inaudible) Yeah, his
6  girlfriend.  His baby mother I mean.  That's
7  the baby mother.  He got (inaudible)
8  (inaudible).  We don't know that.  All we
9  know --
10    Q.  Okay.  So in the first part of that call,
11  again, the male voice which you recognize as your
12  voice?
13    A.  Yeah.
14    Q.  It says "I'm about to ask Donna to check
15  back on that girl and see if she out yet.  The girl
16  that he bailed out because she knows where he at.
17  Understand what I'm saying.  Remember her, his
18  girlfriend, his baby mother.  I mean, yeah, that's
19  his baby mother, she got a child by him."  And then
20  I believe it's your mother says, "is he still with
21  her."  Is that an accurate representation of the

Page 201

1  audio that was played?
2    A.  That's what it sounded like, yes.
3        MS. GOO:  Okay.  Keep going, please.
4        AUDIO:  He bailed out, (inaudible) with
5    her or not.  That's impossible to know.  That's
6    impossible to know.  We do know he bailed out
7    recently (inaudible) locked up.  So what we
8    going to do is -- what we going to do is find
9    out where she at (inaudible) see if we can
10    break her.  Because she is a junky.
11    (inaudible) She is weak.  You know what I'm
12    saying, she is the weaker one, she is the
13    weakest link, you understand what I'm saying.
14    Q.  Pause there.  Thank you, Mr. Gruen.  In
15  that portion of the call we played is "all we know
16  is that she bailed her out.  We don't know if they
17  still with her or not.  That's impossible to know,
18  that's impossible to know but we do know that he
19  bailed her out recently that time she was just
20  looked up.  So what we're going to do is -- what we
21  going to do is find out where she at and see if we

Page 202

1  can break her. You know what I mean. Because she
2  is a junky so she weak. You know what I'm saying,
3  she is the weaker one, she's the weakest link. You
4  understand what I'm saying." Is that an accurate
5  representation of the audio that was played?
6      A. That's exactly what was played.
7      Q. So what were you describing in your
8  conversation with your mother?
9      A. It sounds like I was talking to somebody
10 else, not my mother. But what I was describing in
11 that conversation is, for one, I knew about the
12 court dates and everything else only because that's
13 what -- what came out through the investigation that
14 private investigator was investigating, he said I
15 could see that he bailed somebody out.
16     Q. And who is --
17     A. And he told -- I believe that he was the
18 one who told me that it was his baby mother. Now, I
19 talked to -- I have to talk to Donna because I can't
20 always talk to Wolfe. And when I'm talking about
21 her being like the weakest link is my lingo is like

Page 203

1  from -- now, all these years later, anything that
2  she may remember she might be willing to
3  corroborate. That's what I meant by all that.
4      Q. So the first question is he said he bailed
5  her out. Who is the he?
6      A. Myron, I believe.
7      Q. Okay. So Myron bailed this woman out?
8      A. This woman out. Because it was records to
9  show that. That was the -- that was the beginning
10 of the, yeah, investigation. That's one of the
11 first things he came up with.
12     Q. So you were aware generally of this baby
13 mother, correct?
14     A. That's a tricky question because I wasn't
15 aware of her and to -- now you jogging my memory.
16 That's making me think of that now, because she was
17 never used -- I think she was never even talked to.
18 So that didn't even jog my memory. You want to ask
19 the question, I forgot all about her.
20     Q. Okay. Now, why -- I'm sorry, why did
21 Donna -- why did you have to call Donna, involve

Page 204

1  her?
2      A. Because she -- because she can convey --
3  if I can't talk to Wolfe directly, he was a hard guy
4  to catch up with, sometimes I can say listen, ask
5  him -- if she -- or he update me through her because
6  I can't always call him directly so he will update
7  me through her sometimes. Like this is all I could
8  come up with, you can tell him. And I use that
9  information to sync or respond. And that's just how
10 the correspondence went.
11     Q. Did you ever have anybody reach out to
12 Myron Brockington's mother?
13     A. That's a possibility.
14     Q. You did?
15     A. I said that sounds like that could have
16 been a possibility.
17     Q. Okay. And I'm sorry, when did you hire
18 Wolfe?
19     A. I don't recall exactly what year or
20 timeframe I hired him. I just know I did hire him.
21     Q. And why did you ask someone to get in

Page 205

1  touch with Myron Brockington's mother?
2      MR. BALLENGER: I'm going to object. He
3  said he thought it was a possibility. But do
4  your best.
5      A. Yeah.
6      Q. Yeah. If you did.
7      MR. BALLENGER: In other words why would
8  you have, if you did?
9      A. Why would I? Because when -- just through
10 conversations and thoughts, they did the interview
11 in their house. So if any -- any -- the police
12 actually interviewed Myron at his house. So any --
13 if anything went wrong, it went wrong right there in
14 front of his -- in front of his family. So I can
15 throw shots -- I know I'm innocent, so I looked at
16 it as I don't have nothing to lose by questioning
17 anybody.
18     Q. So is it fair to say that you were -- if
19 somebody did go to Myron Brockington's mother's
20 house it was for the purpose of seeing if she
21 witnessed anything?

Page 206

1    A.  Yeah.

2    Q.  Is that your testimony?

3    A.  Yes.

4    Q.  If we could cue up, it's called D3C528.

5  This is dated May 27th, 2015, to phone number

6  (240)979-9009.

7         MR. BALLENGER:  May 15th you said?

8         MS. GOO:  May 27, 2015.

9         MR. BALLENGER:  2015.

10        MS. GOO:  Yes.  Just play the first

11  introductory portion.

12        AUDIO:  You have a prepaid call

13  (inaudible) not be (inaudible) this call is

14  from Melvin an inmate.

15    Q.  Pause.  So -- and is that you saying

16  Melvin?

17    A.  That's my -- that's my --

18        MR. BALLENGER:  Is that a recorded --

19  prerecorded statement?

20    A.  Yeah, it's prerecorded.  That's my I.D.

21  number for sure so far.

Page 207

1    Q.  Okay.  And if we could advance it to 25:54

2  please.  Or as best we can.

3         MR. GRUEN:  I got it 25:46.

4         MS. GOO:  If we can start there.

5         AUDIO:  This mother fucker down the

6  middle, huh.  (inaudible) while working hard

7  (inaudible) how about make him do the right

8  thing.  He's a stupid mother fucker.  He do the

9  right thing we both get us money.  Man, you

10  don't let the police trick you into getting a

11  dude (inaudible) see what I'm saying, nigger,

12  (inaudible).  This need to be explained to this

13  punk.

14        MS. GOO:  Can you pause for a second.

15    Q.  In the beginning portion of that audio, is

16  this an accurate representation of the recording.

17  "I'm about to make him do the right thing.  He's a

18  stupid mother fucker.  If he do the right thing we

19  can both get some money, huh."  Is that an accurate

20  representation of the audio recording of a portion

21  of what we just played?

Page 208

1    A.  Yeah.

2    Q.  And who were you talking to.  Talking

3  about?

4    A.  I don't know.  I don't know who I'm

5  talking about.

6    Q.  Okay.  If we --

7    A.  Could you finish playing it?

8    Q.  You want to hear more of that portion?

9    A.  Finish the conversation.

10    Q.  Sure.  You want to keep it rolling for a

11  minute.

12        AUDIO:  Yeah, (inaudible).  You understand

13  what I'm saying.  I mean (inaudible) this man,

14  that never would have happened, (inaudible)

15  conducted themselves around me like that.  You

16  understand what I'm saying.  (inaudible)

17  getting caught (inaudible) happening like that.

18  I see these (inaudible), just like that.

19  (inaudible) around me good time.  You

20  understand what I'm saying.  We don't

21  (inaudible) a reason. (inaudible) brain storm

Page 209

1  and get it.  (inaudible) Yeah.  And get out --

2  get out (inaudible) situation.  There is no

3  matter how much they try and look at it

4  (inaudible) I don't ever, ever.  That's how

5  (inaudible) all in the approach and how to get

6  them comfortable and making them work with us

7  and how -- and for some reason we got to

8  (inaudible) not only doing the right thing

9  (inaudible) type of way.  That's how you keep

10  them on your line.  You understand what I'm

11  saying.  Not only (inaudible) by clean

12  conscious but you benefited some other type of

13  way, (inaudible) or whatever.  If it's done

14  right.  He blames the police and the prosecutor

15  right he get me off, and he can get paid for

16  it.

17        MS. GOO:  We can pause there, please.

18    Q.  In that last portion of the phone call, is

19  it an accurate representation of the recording that

20  you said, "and how to get him comfortable and making

21  him work with us now and how and for some reason we

1   got to make it so not only him to know it's the
2   right thing but also he can benefit from it in some
3   type of way. That's how you keep him underlying.
4   You understand what I'm saying. Not only do you
5   benefit by clearing your conscious but he benefits
6   some other type way whether it's monetary funds or
7   whatever. If done right, he can blame the police
8   and the prosecutor right to get me off and he can
9   get paid for it." Is that accurate?
10     A. Did I say that? Did I say get paid for
11   it.
12     Q. We can replay the statement if that's
13   helpful?
14       MR. GRUEN: Back up ten seconds. This is
15     from 27:44.
16       AUDIO: (inaudible) what happened. If
17     done right, he blames the police and the
18     prosecutor right to get me off, he can get paid
19     for it. You understand what I'm saying.
20     Q. Okay. Is it an accurate representation of
21   the audio recording?

1     A. Yeah. Yes.
2     Q. Is that yes?
3     A. Yes.
4     Q. And who were you talking to in this phone
5   call?
6     A. I can't even tell who I'm talking to
7   because they ain't saying much. But it sounded like
8   Donna.
9       MS. GOO: We can play a little bit more of
10     the call just to get her voice.
11       AUDIO: (inaudible) learning experience.
12     He can (inaudible) on how what not to do and
13     how the police, let the police (inaudible)
14     killing your own (inaudible). They tried to
15     kill me with 65 years. You understand what I'm
16     saying. (inaudible) You understand what I'm
17     saying him (inaudible). Ain't no way he should
18     feel proud of that. You let him (inaudible)
19     something wrong, nigger. You understand what
20     I'm saying, that don't make me no sense. You
21     understand what I'm saying. (inaudible) for

1   the police anyway. But then for damn sure you
2   going to let them patsy you (inaudible) don't
3   have nothing, good nigger (inaudible) wasn't
4   nothing. See what I'm saying. Come on, dude.
5   But then, (inaudible), because before, you
6   (inaudible) where this angle -- some the angle
7   (inaudible) but fucking bumped you, you know
8   what I mean. (inaudible) to his mother house,
9   I know you said.
10     MS. GOO: Pause.
11     Q. Do you recognize the female voice?
12     A. Yeah.
13     Q. Who is that?
14     A. That's Donna.
15     Q. That's Donna. Okay. So is it an
16   accurate -- so I'm going to -- "before I was too
17   emotional, I felt like the anger -- I felt like the
18   anger was like what the fuck is wrong if you like,
19   you know what I mean." Is that an accurate
20   representation of what Donna just said?
21     A. Yeah.

1     Q. And the next line, "I remember you said
2   that when you went to his mother." Was that an
3   accurate representation of what you said?
4     A. Yes.
5     Q. And that -- you're referring to Myron
6   Brockington's mother?
7     A. I don't -- I don't ever recall her going
8   to his mother. But if so, I never recall her having
9   no conversation with her or anything like that.
10     Q. Do you recall whether or not anybody on
11   your behalf at least attempted to stop by his
12   mother's house. Even if they weren't successful in
13   talking to her?
14     A. I guess her. I mean if I said her. I
15   don't -- it wouldn't, nah.
16     Q. And just to be clear, this is Donna
17   Tabron?
18     A. Tabron.
19     Q. Tabron, sorry. And you were eventually
20   successful in getting in touch with Mr. Brockington,
21   do you recall that?

Page 214

1    A. I do at some point.

2    Q. And you spoke with him on the phone; is

3  that right?

4    A. I spoke with him?

5    Q. Yes.

6    A. I never spoke with him.

7    Q. Okay. But somebody eventually did go and

8  talk to Mr. Brockington, correct, on your behalf?

9    A. Yes.

10    Q. Okay. And do you recall having a

11  conversation with Dina Thomas about Myron

12  Brockington agreeing to do a video deposition for

13  you?

14    A. Dina. Probably.

15    Q. Yes. Okay. If we could -- this is a

16  phone call, it's dated May 19, 2016. It's called

17  D4C147 to phone number (410)812-7500.

18    MS. GOO: We're going to go off the record

19  for a minute.

20    VIDEOGRAPHER: We're going off the record.

21  The time is 2:38 p.m.

Page 215

1    (Off the record.)

2    VIDEOGRAPHER: We're back on the record.

3  The time is 2:39 p.m.

4    Q. So, again, for the record, this is call

5  May 19, 2016. D4C147. Actually, sorry, one second.

6  This is going to be phone number (410)812-7500.

7  Before we play the call, Mr. Thomas, do you

8  recognize that phone number.

9    A. I do.

10    Q. And whose number is that?

11    A. That is Dina Thomas.

12    Q. All right. So we're going to play the

13  first ten seconds of the recording, please.

14    AUDIO: (inaudible) recorded and

15  monitored. If you wish to block any future

16  calls of this nature dial (inaudible). What's

17  up.

18    Q. Pause for a second. And do you recognize

19  those voices?

20    A. Yes.

21    Q. And whose voices were those?

Page 216

1    A. Mine and it seemed like Dina so far.

2    Q. Okay. If we could move to as close as

3  possible minute marker 15:24.

4    AUDIO: (inaudible) shit about this nigger

5  want to get paid. He basically want to charge

6  me for the truth. (inaudible) agree to some

7  type of ransom or something, I don't know what.

8    Q. Okay. So in that portion whose voice was

9  that?

10    A. That was my voice.

11    Q. Okay. And is it an accurate

12  representation of the audio that says "him and

13  Tyreke agree to some shit because this nigger want

14  to get paid. He basically want to charge me for the

15  truth. Yeah, they agree to some type of ransom or

16  something." Is that accurate?

17    A. No. I mean that's -- that's what was said

18  but it's not accurate.

19    Q. Okay. If we could move to minute marker

20  16:07, please.

21    MR. GRUEN: Got it to 16:01.

Page 217

1    MS. GOO: That's good.

2    AUDIO: And that's where we at. That's

3  where we at. And I mean do a video

4  confirmation without (inaudible) after

5  everything is handled. I don't know what's

6  happening. You're the first person I called

7  since I talked to mom last night. I just had

8  to give you this news. I'm coming home. Yeah

9  (inaudible).

10    A. I said talk to mom.

11    MS. GOO: If we would pause there for a

12  second.

13    Q. So is it an accurate representation that

14  you said on the call, "I mean he'll do a video

15  confirmation, whatever I want him to do, after

16  everything is handled. I don't know what's

17  happening. You're the first person I called since I

18  talked to Myron last night. I just had to give you

19  this news. I'm coming home. Yeah, it's about to go

20  down."

21    A. I never talked to Myron. But I don't know

Page 218

1  if I misspoke but -- or said his name, but I never
2  talked to him.
3      Q.  But was that an accurate recording of what
4  was on the call?
5      A.  That's an accurate recording.
6      Q.  And I think if we could just keep going a
7  little bit further.
8          AUDIO:  I'm going to get paid.  Everything
9      that I thought was going to happen, they tried
10     to (inaudible) while business.  I stuck to my
11     guns, I didn't let off the foot until I found
12     that nigger.  I banked on him.  And now it
13     seems like -- like my debt is paid off so many
14     years later.  But I (inaudible) find this
15     nigger.  (inaudible) give a fuck, nobody
16     (inaudible) tell me no different.
17     Q.  We can stop there.  Is it an accurate
18 representation of the recording that you said, "oh,
19 I'm going to get paid.  Everything that I thought
20 was going to happen, they tried to push me to
21 ineffective counsel and all that whole while

Page 219

1  business.  I stuck to my guns, I didn't let up off
2  the foot until I found that nigger.  I banked on him
3  and now it seeming like it's just like my bet was
4  paid off so many years later but I still wanted to
5  find this nigger.  I wasn't going to stop until I
6  did.  I didn't give a fuck.  Couldn't nobody deter
7  me, couldn't nobody tell me no different."  Is that
8  an accurate representation of the recording?
9      A.  That is an accurate representation of the
10 recording.
11     Q.  So after you learned that Mr. Brockington
12 would help you out in exchange for money, did you
13 try to start to crowd source to get him paid?
14     A.  No, he never was given no money.
15     Q.  Were there attempts by your family to try
16 and collect money to pay him?
17     A.  No, it was -- no.  No.
18     Q.  Okay.  If we could go to call D4C162.
19 This is dated May 30th, 2016.  And it is to phone
20 number (240)217-8599.  Before we play the call,
21 Mr. Thomas, do you recognize this phone number

Page 220

1  (240)217-8599?
2      A.  240.
3      Q.  217-8599?
4      A.  217-8599.  Yeah, that's my mother.
5      Q.  Okay.
6          MS. GOO:  If we could play the first part
7  of the call, first ten seconds.
8          AUDIO:  Hello.  You have a prepaid call.
9      You are not being charged for this call.  This
10     call is from Melvin.  Hello.  An inmate in the
11     Maryland Correctional facility.  This call will
12     be recorded and monitored.  If you wish to
13     block any future calls of this nature, dial
14     seven now.  To accept this call, press zero
15     now.  Hello.  Hey baby.  What's up.
16     (inaudible).
17     Q.  Do you recognize the voices on that call?
18     A.  That sounds like my mother.
19     Q.  Okay.  And she said she was at a cookout?
20     A.  I don't -- it sounded like that might have
21 been what she said.

Page 221

1      Q.  All right.  If we could move it as close
2  as possible to 2:24.
3          MR. GRUEN:  2:23.
4          AUDIO:  (inaudible).  I don't think --
5      you're (inaudible) I think you the only one
6      that can move that mountain.  I mean I'm not
7      going to tell you nothing that I don't feel
8      about (inaudible), okay.
9          MS. GOO:  If we could keep going.
10         AUDIO:  What makes you think she going to
11     do something for (inaudible) I don't feel like
12     being lied to right now.  Listen to me.  She
13     can (inaudible) I swear to God I will
14     (inaudible).  All right.  So you said you
15     weren't able to get in contact with Tyreke
16     though.  Hello.  Hello.  Hello.  What's up.
17     What's going on.  Who is it that you be talking
18     to, who you communicate with, who (inaudible)
19     you communicate with that I know.  I was
20     talking (inaudible).  I was (inaudible).
21         MS. GOO:  Pause there for a second.

Page 222

1    Q. So is there another female voice that came
2 on the line?
3    A. I'm trying to figure that out.
4    Q. Play it for another few seconds.
5    AUDIO: That's it. (inaudible). You want
6 to talk to Darnel at all. Yeah, I talk to
7 Darnel. I called Darnel. Darnel. Because it
8 seem like -- it seem like (inaudible) --
9 struggling to get people who said they was
10 going to do something to do something.
11    MS. GOO: Pause for a second.
12    Q. So is it an accurate representation that
13 you said "mommy is having a hard time getting people
14 to do what they said they would do."
15    A. That's what was said.
16    Q. Okay.
17    MS. GOO: Keep going.
18    AUDIO: I don't understand that really and
19 (inaudible). Somebody told her -- that
20 somebody told (inaudible). What is it that I
21 need.

Page 223

1    MS. GOO: Pause there for a second.
2    Q. Do you recognize the voice now, female
3 voice?
4    A. I'm still trying to catch on to it.
5    AUDIO: Is that what you said. Yes. You
6 don't know what's going on, I thought you were
7 the first to know, one of the first people to
8 know. But I mean. (inaudible)
9    Q. Stop there for a second. Do you recognize
10 the voice now?
11    A. I don't.
12    Q. Okay. The female voice said "you need
13 $300". Is an accurate representation of the
14 recording?
15    A. Yes.
16    Q. Okay. Keep going.
17    AUDIO: You need $300. I mean, no, why
18 are you asking me that. I mean now we
19 getting -- (inaudible) no, the package said is
20 dead now. That's (inaudible). I can't -- I
21 can't think about a package now. That package

Page 224

1 is dead. It ain't even about that no more.
2 It's about -- it's about the dude, what the
3 dude wants. What (inaudible). I don't know
4 nothing about that, I never heard what he
5 wanted.
6    Q. Stop there for a second. So is it an
7 accurate representation of the recording that you
8 said "no, the package thing is dead now, that's
9 over. I can't think about a package now. That
10 package shit is dead. If ain't even about that no
11 more, it's about what the dude wants. You didn't
12 hear nothing about." The female voice says "I ain't
13 know nothing about that. I never heard what he
14 wanted." Is that accurate?
15    A. That's accurate.
16    MS. GOO: Keep playing.
17    AUDIO: Well, there ain't -- yeah, it's
18 basically around about number that (inaudible).
19 What do he want. Well, well, last time I
20 checked, last time I checked (inaudible) trying
21 to get a whole stack, you understand what I'm

Page 225

1 saying. And he (inaudible) to people.
2    Q. Pause there, please. So the female voice
3 says "what do he want, what do he want." Is that an
4 accurate representation of what the recording
5 reflects?
6    A. Yes.
7    Q. And you said, "we -- well, we -- well,
8 last time I checked Tyreke trying to get him a whole
9 stack. You understand what I'm saying. And he the
10 one that round up most of the people." Is that an
11 accurate reflection of the audio that was played?
12    A. Yes.
13    Q. What is a whole stack?
14    A. A whole stack?
15    Q. Yes.
16    A. A stock is considered a thousand dollars.
17    Q. Advance to 6:15.
18    AUDIO: And (inaudible). Well --
19    MS. GOO: Actually start that again, a
20 little bit before.
21    MR. GRUEN: I'm going to start from 6:01.

57 (Pages 222 - 225)

1     AUDIO:  (inaudible) can use it for this.
2     (inaudible) the money that package (inaudible)
3     still haven't come home so we can get this
4     thing done with.  When the dude get that, he
5     going to do what he got to do.  (inaudible)
6     okay, so the boy saying he will take $1,000.
7     Well, (inaudible), that ain't no way to talk.
8     But, yeah, basically that's what's going to
9     happen.  That's what's going to happen, yeah.
10    And he going to do -- just to do the right
11    thing, yeah basically.
12         MS. GOO:  Pause there for a second.
13         Q.  Okay.  So as a part of that audio
14    recording is it accurate the female voice said,
15    "okay, so the boy said he'll take $1,000."  And then
16    you said, "well, well, that ain't the way to talk,
17    but, yeah, basically that's what's going to happen.
18    That's what's going to happen, yeah, and he going to
19    do -- just do the right thing, yeah, basically."  Is
20    that an accurate representation of the recording?
21         A.  That's an accurate description of the

1     call, yes.
2         Q.  If we could play a little bit further.
3         AUDIO:  (inaudible) dude take a thousand
4     dollars and (inaudible) take thousand
5     (inaudible)
6         MS. GOO:  Stop there a second.
7         Q.  So the female voice said "so if you dude
8     is going to take a thousand dollars, then you can
9     get the $1,000."  Is that an accurate representation
10    of the audio just played?
11        A.  I didn't -- I didn't hear that.
12        MS. GOO:  Just go back again.
13        MR. GRUEN:  Starting at 6:36.
14        AUDIO:  Dude take a thousand dollars
15    (inaudible) take a thousand dollars,
16    (inaudible) thousand dollars.
17        A.  Did you hear that?
18        MR. BALLENGER:  I can't understand it.
19        A.  I couldn't understand it either.
20        Q.  All right.  Can we go to 6:50?
21        MR. GRUEN:  6:41.

1         AUDIO:  Thousand dollars.
2         MR. GRUEN:  Let me increase the volume.
3         AUDIO:  (inaudible) thousand dollars, you
4     can get a thousand dollars.
5         MR. GRUEN:  That's 6:50.
6         Q.  Did you hear that last part, it says "you
7     can get a thousand dollars."
8         A.  That's what it sounded like, I can get a
9     thousand dollars.  I think I heard that, yeah.
10        MS. GOO:  All right.  You can go.
11        MR. GRUEN:  6:51.
12        AUDIO:  What did you say.  (inaudible)
13    dude will take a thousand dollars, you can get
14    the thousand dollars.  That's what I'm saying.
15    (inaudible) it should be that hard either.  The
16    only thing is getting people that go ahead and
17    get it.  Like Tyreke said I'm going to go
18    around and collect it from the people he knows.
19    He told me to gather up more people so we can
20    hurry up and get this thing done.  Because we
21    all agree that the fact that (inaudible)

1     quicker is the better.
2         MS. GOO:  Stop there.
3         Q.  And so is it an accurate representation of
4     the recording that you say "that's what I'm saying.
5     I don't believe it should be that hard either.  The
6     only thing is is to get people to go ahead and get
7     it.  Like Tyreke said I'm gone go around and he
8     going to collect it from the people he know.  He
9     told me to gather up some more people so we can
10    hurry up and get this thing done.  Because we all
11    agree that the faster it gets done the better."  Is
12    that the accurate representation of that recording?
13        A.  Yes.
14        Q.  All right.  And lastly if we could go to
15    8:52, please.
16        MR. GRUEN:  8:49.
17        MS. GOO:  Great.  Thank you.
18        AUDIO:  Okay.  Well, I could give you -- I
19    know for sure I can give you -- I know for sure
20    I can give you $200.  But if you give
21    (inaudible) four, I might get you $300

58 (Pages 226 - 229)

Page 230

1     (inaudible).  Right now, but (inaudible).
2          MS. GOO:  Stop there.
3     Q.  And is it an accurate representation that
4  the female voice said, "okay, well, I can give you,
5  I know for sure I can give you $200, but if you give
6  me until the fourth I might could give you $300.  I
7  for sure got two right now.  But if you give me
8  until the fourth I might got three."  Is that an
9  accurate representation of that recording?
10    A.  Yes.
11    Q.  So what were you -- what was the thousand
12 dollars about?
13    A.  Pay my investigator.
14    Q.  To pay your investigator?
15    A.  Yup.  Can I use the bathroom real fast.
16         MR. BALLENGER:  Yeah, take a break.
17         MS. GOO:  That's fine.  Take a break.
18         VIDEOGRAPHER:  We are going off the
19    record.  The time is 2:56 p.m.
20         (Off the record colloquy.)
21         VIDEOGRAPHER:  We are back on the record.

Page 231

1     The time is 3:07 p.m.  This is media number
2  five.
3     Q.  I'm going to go back to -- it's a phone
4  call dated May 27, 2015, call number D3C528 to phone
5  number (240)979-9009.  We did previously play this
6  call.  I just wanted to ask a few follow-up
7  questions related to that.  So before I play the
8  call, Mr. Thomas, do you recognize call 240 -- phone
9  number (240)979-9009?
10    A.  No, not off the top of my head.
11    Q.  Okay.  And do you recall whether that was
12 a phone number for Donna Tabron?
13    A.  I don't recall that.
14    Q.  Okay.  If we could just go a little bit
15 before 25:44, please?
16         MR. GRUEN:  25:46.
17         AUDIO:  This mother fucker down the
18    middle, huh.  While I'm working hard.  I'm
19    about to make him do the right thing.  He a
20    stupid mother fucker.  He do the right thing,
21    we both get some money, huh.

Page 232

1     Q.  Stop there.  Do you remember us playing
2  this call before where you said "I'm about to make
3  him do the right thing.  He's a stupid mother
4  fucker.  He do the right thing we can both get some
5  money, huh."
6     A.  That's what was said.
7     Q.  Okay.  So my question is when you were
8  talking about somebody saying we can both get some
9  money, were you talking about the private
10 investigator there and you?
11    A.  We can both get some money?  I don't know
12 what I was talking about right there.
13    Q.  If we can play the call at minute marker,
14 about -- a little before 27:20.
15         MR. GRUEN:  27:19.
16         AUDIO:  And get him comfortable and making
17    him work (inaudible).  And how we -- and if for
18    some reason we got to make it that not only is
19    he doing the right thing but he can benefit
20    from it some type of way.  That's how you
21    keep -- keep him on your line.  You understand

Page 233

1  what I'm saying.  Not only do you benefit by
2  cleaning your conscious but you benefit in some
3  other type of way, monetary funds or whatever,
4  like.  If done right, he play the police and
5  the prosecutor right and get me off, he can get
6  paid for it.
7          MS. GOO:  Stop, please.
8     Q.  So that call was about Myron Brockington,
9  right?
10    A.  Yes.
11    Q.  Okay.  Did you ever ask people that were
12 on your call list, people that you called from the
13 jail, did you ever ask them to do three-way calls
14 for you?
15    A.  Yes.
16    Q.  Okay.  And do you recall having someone do
17 this for you to contact talk to Myron Brockington?
18    A.  No.
19    Q.  In June of 2016?
20    A.  No.
21    Q.  If we could have call -- it's dated

1  June 19, 2016. Call D4C181, phone number
2  (410)982-3324. If we could just play the
3  introductory portion of the call, first?
4      MR. GRUEN: Starting at 5:46.
5      AUDIO: If you (inaudible) block
6  (inaudible) any nature of this, dial seven now.
7  To accept this call, press zero now. Hello.
8  Yeah. Yeah. (inaudible) you said you didn't
9  want (inaudible) that what you're saying.
10 Actually I don't (inaudible). I got you. I
11 get it. I get it. Got you. I got to make
12 sure he understand. I got some more
13 clarification to get done (inaudible) somebody
14 sent me his charge sheet. I just need some
15 (inaudible) few more questions, (inaudible) --
16     MS. GOO: Stop there for a second.
17 Q. Okay. Do you recognize the female voice?
18 A. I do.
19 Q. And who is that?
20 A. That is Donna.
21 Q. And that was you as the male on the phone?

1  A. It was.
2  Q. Okay. And you heard the audio said "I've
3  got to butter my bread"; is that right?
4  A. That sounds like biscuit.
5  Q. Butter my biscuit, sorry. What did you
6  mean by that?
7  A. I don't know.
8  Q. Okay. If we could go to just a little bit
9  before 3:03.
10     MR. GRUEN: 3:01.
11     AUDIO: Hello. Yeah. Yeah. I have
12 (inaudible). I don't know what. I was
13 (inaudible) it wasn't allowed -- (inaudible)
14 crazy sometimes like that. (inaudible) allow
15 the three way to go through or wouldn't -- when
16 you was calling. Like I said, usually it
17 worked that way if it don't work the other way,
18 right. Right, right. Yeah (inaudible) when I
19 was over. Right. Yeah, no, I've been meaning
20 to get up with you for a while. (inaudible)
21 jail type (inaudible) one and two. I was -- I

1  was fast to this stuff, so (inaudible), it's
2  night time calls is just (inaudible). Yeah,
3  man. I just had thing -- (inaudible) I'm quite
4  sure, right, that -- that maybe sooner than
5  later that the (inaudible) investigator going
6  to get back you, right. I guess he was busy
7  right now (inaudible) get back with you sooner
8  or later. I just wanted to get up with you on
9  the up and up before all that happened, right.
10     MS. GOO: Pause there for a second.
11 Q. Do you recognize the other male voice?
12 A. I'm trying get tuned to the voice right
13 now.
14 Q. But as part of the recording, I know there
15 was a bunch that was played right before we stopped,
16 is it an accurate representation that you said,
17 "yeah, man, I just had a lot things on my mind. I'm
18 quite sure, right, that maybe sooner or later the
19 private investigator going to get back to you,
20 right. I guess he's busy right now." And the other
21 male voice says "yeah."

1  A. Yeah.
2      MS. GOO: Keep going.
3      AUDIO: Let you know (inaudible) she was.
4  I told him I said everything is done and
5  (inaudible) or something. Yeah, no, I already
6  know, I'm quite sure I have (inaudible) you all
7  going to be doing it (inaudible) I got you all.
8  And I don't know (inaudible) he a professional,
9  (inaudible). You know, I'm just saying that
10 I'm just letting you know basically only got 20
11 minutes (inaudible) ahead but I'm just letting
12 you know basically, you know, you know how
13 (inaudible) thing works, like, you know, just
14 letting you know that basically for
15 conversations like if what you were saying
16 basically -- I mean there ain't nothing for you
17 to be nervous about -- how did you feel about
18 the whole situation (inaudible) like now.
19 Like. No, I'm (inaudible) still everything
20 cool, make it right. Basically I already got
21 my guys and what's going on. Okay, okay. All

Page 238

1    right. (inaudible) we talked last time, you
2    know what I mean. They talk (inaudible) you
3    know what I mean and I wasn't looking at the
4    wrong thing. And what? The conversation we
5    had last time. Yeah, yeah. When I was asking
6    you about that (inaudible) figured you know me
7    but I want to be sure. Oh, you talking about.
8    Yeah. Yeah. Yeah. (inaudible). Right.
9    Right. Right.
10        MS. GOO: Okay. Stop there for a second.
11    Q.   Is that giving you any help in terms
12    knowing who that person is that you were speaking
13    with?
14    A.   I'm still listening.
15    Q.   Okay. One second. If we could actually
16    go up to a little bit before 7:01.
17        MR. GRUEN: 6:56.
18        MS. GOO: Thank you.
19        AUDIO: Let me ask some questions so I can
20    clear my mind. So you (inaudible) did right,
21    yeah, yeah. Yeah. Yeah. (inaudible) Because,

Page 239

1    Oh, all right, that's the only thing that makes
2    sense. Because when he was with them, I don't
3    know, I don't know. I don't know. I don't
4    know. Yeah, that's a strange thing
5    (inaudible). Yeah, I don't know, I don't know.
6    Do you know what Junky Green at right now.
7    Yeah, six feet. All right. I ain't know that
8    you knew that. (inaudible) trust me, I know
9    everything that goes on. All right. All
10    right. Because the reason why you see -- the
11    reason why that the whole situation --
12    partially the reason why he even gave you a
13    photograph to raise it, I'm just going off of
14    me getting his case statement from years ago
15    was because he tried to get -- he tried to tell
16    on somebody, I mean who he say was his rat
17    buddy, some (inaudible)
18        MS. GOO: Stop there for a second.
19    Q.   Okay. Do you know who you're talking to?
20    A.   I'm still listening.
21    Q.   And there were -- did you hear you say

Page 240

1    "why -- you see the reason why that -- the whole
2    situation, I partially -- partially reason why I'm
3    here, why did he even give you photograph to,
4    something inaudible, and I'm just going off, going
5    off to me getting his -- his tape statements some
6    years ago is because he tried to tell. He tried to
7    tell on somebody. I mean who do you say was his rat
8    buddy." And the other male voice says "right." Is
9    this somebody who was involved or knew about your
10    case that you were speaking with you on the phone?
11    A.   I'm trying to figure that out if you could
12    finish playing.
13        MS. GOO: Okay. Keep it going, please.
14        AUDIO: (inaudible) and so wanted
15    (inaudible) being this and that. I'm assuming
16    that's why you got pictures of people from down
17    in the projects or whatever, whatever. You
18    understand what I'm saying. No. But I still
19    don't -- I still don't understand why he gave
20    you a picture. The picture -- my picture being
21    put in the picture involve (inaudible) to this

Page 241

1    day I don't -- I don't even know, right. But.
2    Right. But -- just one more question. You
3    told me in our last conversation, you say when
4    they -- you say they had some type of
5    investigation on you or something. Yeah, yeah,
6    DEA. Oh, okay. I just -- the dude, the
7    homicide investigator -- I mean, yeah, homicide
8    George Vigue, what did he -- what was his role
9    thing in the situation with my case. Like what
10    did -- because (inaudible) he wanted me to give
11    him detail about it. He was just saying -- he
12    wanted me to give him detail about it, because
13    I guess (inaudible) but he was like, he showed
14    me a picture of (inaudible) and four other
15    dudes.
16        MS. GOO: Stop for a second.
17    Q.   Okay. Do you know who the person is that
18    you're speaking with. Having, you know, asking him
19    about this meeting with George Vigue and
20    investigation with the DEA?
21    A.   Sounds like Myron.

61 (Pages 238 - 241)

Page 242

1    Q.  Sounds like Myron?

2    A.  Yeah.

3    Q.  If we could just keep going a little bit

4  further?

5        AUDIO:  And you know (inaudible) big book.

6  He was showing me (inaudible) you know what I

7  mean, blow him off.  Right.

8        MS. GOO:  Could you pause there.

9    Q.  Okay.  So is it an accurate representation

10  of the recording that the other male voice who you

11  said might be Myron, "he wasn't -- he didn't get

12  into detail about it, he was just saying he wasn't

13  going to get into detail about it.  You know, I mean

14  because I guess that's a different situation so he

15  was like so he showed me a picture of, you know, me,

16  you, your brother, Vain and then like four other

17  dudes."  Is that an accurate representation of --

18    A.  That's what it sounded like he said.

19    Q.  Okay.  So a photographic array or some

20  type of photographic identification was shown to

21  this other person that you're talking to?

Page 243

1    A.  Yeah.

2    Q.  Mr. Thomas, as a part of the criminal

3  discovery that you received in your criminal case

4  for the shooting of Mr. Brockington, were you aware

5  of a photographic array being presented to any of

6  the witnesses?  So a series of pictures that were

7  shown to a witness to identify you?

8    A.  Yeah.

9    Q.  Okay.  And who was that shown to?

10    A.  Nina Wilson.

11    Q.  Okay.

12    A.  And Myron Brockington as far as I know.

13    Q.  As far as you know?

14    A.  As far as I know.

15    Q.  But you know about a photo array involving

16  Myron Brockington?

17    A.  Huh?

18    Q.  I said you are aware a photo array was

19  shown to Myron Brockington?

20    A.  Yeah, I know, at some point.

21    Q.  Okay.  If we could go to minute marker 12

Page 244

1  minutes.

2        MR. GRUEN:  We're at 11:57.

3        MS. GOO:  Thank you.

4        AUDIO:  Yeah, I mean I seen him every now

5  and then in passing through.  Have you ever

6  came down to the projects (inaudible) brother

7  but other than that I ain't seen him.  I ain't

8  seen him or -- you don't understand,

9  (inaudible) you don't understand (inaudible)

10  you making me making some of this stuff make

11  sense (inaudible), I don't understand nothing

12  about this (inaudible).  You understand what

13  I'm saying.  (inaudible).  I don't know how you

14  got in the middle.  You (inaudible) except for

15  (inaudible)

16        MS. GOO:  Stop there for a second.

17    Q.  And so does that give you any better

18  recollection as to who you were talking to on the

19  phone?

20    A.  Yes.

21    Q.  And who is it?

Page 245

1    A.  Myron.

2    Q.  It's Myron.  Okay.  So is it an accurate

3  representation of the recording that Myron said,

4  "yeah, because I don't even know how you got in the

5  middle."  You replied "huh" and then Myron stated "I

6  don't even know how you got in the middle because

7  you don't even look anything alike except for the

8  something chinky dude."  Is that an accurate

9  representation of the recording?

10    A.  That's what it sounded like he said.

11    Q.  If we could go to minute marker 16:38 or

12  thereabouts?

13        MR. GRUEN:  16:35.

14        MS. GOO:  Thank you.

15        AUDIO:  (inaudible) anything like

16  (inaudible).  Yeah, yeah, so yeah.  So he

17  was -- the only thing was I knew that something

18  had to have been wrong with you -- with what

19  you did (inaudible) because I'm like how the

20  fuck, man, I don't look nothing (inaudible)

21  nothing, nothing.

62 (Pages 242 - 245)

Page 246

1    Q.  Can we pause there for a second.  So you
2  are discussing with Myron the photo array and you
3  said that you don't look anything like the -- what
4  was being described; is that correct?
5    A.  Right.
6    Q.  And why were you talking to Myron about
7  this?
8    A.  Seemed like I was trying to get some
9  understanding in that conversation.
10   Q.  Okay.  Do you recall talking to
11  Mr. Brockington about the flea market in that phone
12  call?
13   A.  I don't.
14   Q.  Okay.  Keep going, please.
15      AUDIO:  Is this thing about all that is --
16  is you know -- you know you this (inaudible)
17  got me and all (inaudible) that nigger when I
18  was up at the flea market.  And (inaudible) and
19  I looked down and I was like there's that
20  mother fucker right there, I should stab him in
21  the fucking (inaudible).  You know what's crazy

Page 247

1  about that is, I mean at that point I mean how
2  did you feel -- I mean me being that you're
3  seeing the dude that did it but -- but you know
4  that I was here all this time.  I knew a phone
5  call would come around.  That's when it came
6  around I answered it.  Okay.  All right.  Do
7  you know (inaudible)
8      MS. GOO:  Stop there for a second.
9    Q.  Okay.  So in your -- so there was a lot of
10  conversation that we have gone through so far.  And
11  there is a mention of another phone call that you
12  have with Mr. Brockington prior to this call.  Do
13  you recall the first phone call that you had with
14  Mr. Brockington before this one?
15   A.  I swear I didn't recall any phone calls by
16  him.  But I don't know -- no.
17   Q.  Okay.  And do you recall talking to him
18  about the whole flea market situation prior to this?
19   A.  Prior to just now?
20   Q.  Prior to this phone call.  So before you
21  were on the phone with him on this day, which was in

Page 248

1  June of 2016, do you recall a phone call with --
2  having a call with Mr. Brockington in June of 2016
3  which you discussed the flea market?
4    A.  I don't recall.
5    Q.  You talked to Mr. Brockington about the
6  case in this phone call, right?
7    A.  Yeah.
8    Q.  And the phone call lasted about 30
9  minutes?
10   A.  I don't know.
11   Q.  And you had another phone call with
12  Mr. Brockington after this one in June of 2016, do
13  you recall that?
14   A.  No.
15   Q.  Okay.  So you don't recall the duration of
16  that phone call?
17   A.  I don't.
18   Q.  Okay.  And you don't remember coaching him
19  about what to say to the private investigator?
20   A.  I don't.
21   Q.  Okay.  If we could go to a call dated

Page 249

1  July 26, 2016.  It is call D4C201.  The phone number
2  is (240)217-8599.  And before we play the call,
3  Mr. Thomas, do you know what phone number -- whose
4  phone number that is?
5    A.  Did you say 8599?
6    Q.  Yes.
7    A.  That's my mother's number.
8    Q.  Okay.  If we could play the introductory
9  portion of the call.
10      MR. BALLENGER:  Do you have -- can I get a
11  copy of the transcript you're reading from?
12      MS. GOO:  This is my outline right now.
13      MR. BALLENGER:  Do you have a copy of the
14  actual transcripts?
15      MS. GOO:  We have some limited portions of
16  transcripts but we don't have a full transcript
17  of the phone calls.
18      MR. BALLENGER:  Do you have transcripts
19  that you're reading from?
20      MS. GOO:  Again, right now this is what I
21  have in my outline.

63 (Pages 246 - 249)

Page 250

1    MR. BALLENGER: Can I get a copy?
2    MS. GOO: We can get you a copy.
3    MR. BALLENGER: I can have it copied right
4  now and it will save some time on redirect I'm
5  sure. And I can follow along while you're
6  doing it.
7    MS. GOO: Let me see.
8    MR. BALLENGER: I can have my secretary do
9  it.
10    MS. GOO: I'm just looking right now
11  through what we have. No, unfortunately we
12  don't have full transcripts. I have just very
13  small portions which are our work product.
14    MR. BALLENGER: But they are the portions
15  you're reading from.
16    MS. GOO: Sure.
17    MR. BALLENGER: I just want a copy of
18  that, that's all. If it's just a portion that
19  you took, you can send me the full one when you
20  get a chance but I'll just take what you have
21  now.

Page 251

1    MS. GOO: I have what we are using just
2  very limited. But I don't have a copy to
3  produce right now.
4    MR. BALLENGER: Can you download one from
5  your computer?
6    MS. GOO: No, I don't believe we have
7  that.
8    MR. GRUEN: We don't have it in that form
9  and anything we have produced for ourselves is
10  work product.
11    MR. BALLENGER: I don't think it's work
12  product when these are transcripts you're
13  reading from to the witness that are supposed
14  transcripts from these recordings. I mean it's
15  going to speed things up. I mean otherwise I'm
16  going to have -- we'll have to break on a
17  deposition. Obviously I'll let you keep going
18  with what you got, but you could certainly
19  speed things along --
20    MR. GRUEN: They are not transcripts.
21  That's why -- Ms --

Page 252

1    MR. WASSERMAN: It's an attorney
2  transcribing. This is attorney work product,
3  sir.
4    MR. BALLENGER: So you're not going to
5  produce it?
6    MS. GOO: Because it's not a transcript.
7  Again, like we're going through -- can we just
8  go off the record. Actually I want this on
9  record. We're going through and making sure,
10  because we have certain things that we've typed
11  up that we think are what the recordings, but
12  that's what we're going through with your
13  client, if it is accurate or not. So we don't
14  want to produce these as any type of transcript
15  at this point?
16    MR. BALLENGER: So you're refusing to
17  produce it?
18    MS. GOO: Yes.
19    MR. BALLENGER: Okay.
20    MS. GOO: So I believe that we're now on
21  July 26, 2016, D4C201. Call to 240-217-8599.

Page 253

1  If we could just play the introductory portion
2  of that call.
3    MR. GRUEN: Fifty-five seconds.
4    AUDIO: You will not be charged for this
5  call. This call is from Melvin, an inmate at a
6  Maryland correctional facility. This call will
7  be recorded and monitored. If you wish to
8  block any future calls of this nature, dial
9  seven now. To accept this call, press zero
10  now. To decline. Hey, what's up, baby.
11  Nothing (inaudible). Huh? (Inaudible). Oh,
12  you all back home.
13    MS. GOO: Pause there for a second.
14  Q.  And who is on this phone call?
15  A.  My mother.
16  Q.  Okay. And she said she is back at Kara's
17  house?
18  A.  Yes.
19  Q.  And who is Kara?
20  A.  My sister.
21  Q.  Okay. All right. If we could fast

64 (Pages 250 - 253)

1 forward to 3:37.
2      MR. GRUEN: 3:37.
3      MS. GOO: Yes, please.
4      MR. GRUEN: 3:35.
5      AUDIO: Bought (inaudible) said
6 (inaudible). You do. (inaudible) I got it
7 brought it out too. (inaudible), need to ask
8 him a few questions.
9      MS. GOO: Stop there for a second.
10     Q. Is it an accurate representation that you
11 told your mom, "look, I brought Myron's number out
12 here." She responded "I have Myron's number." You
13 said "you do." She said "yeah." And you responded,
14 "all right, I brought it too. I need to ask him a
15 few questions." Is that an accurate representation
16 of the recording?
17     A. That's what it sounded like.
18     Q. And how did you get Myron Brockington's
19 phone number?
20     A. Probably through my investigator.
21     Q. I'm sorry.

1      A. More than likely through my investigator I
2 can see my boy.
3      MS. GOO: If we could go to minute marker
4      around 5:46.
5      MR. GRUEN: 5:46.
6      AUDIO: Phone down. (inaudible). Ain't
7 nothing. I been trying to get up with you
8 since after you met up with the private
9 investigator but I was -- I did (inaudible) top
10 the affidavit and I read over it and it's stuff
11 like that.
12     MS. GOO: Pause there for a second.
13     Q. Is it an accurate representation of the
14 recording that you said "ain't nothing. I've been
15 trying to get up with you since after you met with
16 the private investigator, but I just not too long
17 ago got a copy of the affidavit and I read over it
18 and just stuff like that." Is that accurate?
19     A. That's what it sounded like.
20     Q. And who was the other male voice that
21 you're speaking with?

1      A. Sounded like Myron.
2      MS. GOO: Play a little bit further.
3      AUDIO: Hello. Yeah, I'm here. And I
4 ain't get the -- the -- the video part. Was
5 that (inaudible).
6      MS. GOO: Pause for a second, please.
7      Q. And as a portion of that, because there
8 was a little bit of back and forth, is it an
9 accurate representation of the recording that you
10 said "and I ain't got the -- I ain't got video part
11 yet." And Mr. Brockington responded "he's supposed
12 to be working on that one." Is that correct?
13     A. That's what it sounded like.
14     Q. What video were the two of you discussing.
15     A. I don't know.
16     Q. You don't know what video?
17     A. I don't know.
18     Q. Did Myron Brockington owe you some type of
19 video?
20     A. Did he owe me a video? What you mean?
21     Q. Well, you're asking about a video of

1 Mr. Brockington. What video would he have for you?
2      A. Finish playing it. I'm trying to hear it
3 out.
4      Q. I'm sorry.
5      A. I was trying to hear what the conversation
6 is about.
7      MS. GOO: Understood. Keep playing.
8      AUDIO: What did you say (inaudible).
9 Yeah, you said what about it. (inaudible). He
10 want -- what happened on that. I said sold
11 (inaudible), he (inaudible) all that. So want
12 (inaudible) how to get a hold of it.
13 (inaudible). When he get a hold of it. What
14 you mean. (inaudible). I'm talking about
15 whatever you all did that day. Yeah.
16 (inaudible). You know what I'm talking about.
17 Yeah. Yeah. That goes. Right, right, right.
18 He get something done, get (inaudible) or
19 something. But I got -- I said -- I sent
20 (inaudible) to check up on what you did about
21 that tape right.

Page 258

1    MS. GOO: We can stop there.

2    Q. So you and Mr. Brockington appear to be

3  talking about something about a chip and obtaining

4  the video and prior --

5    A. I know what we're talking about now.

6    Q. What were you talking about?

7    A. The actual video that he said existed in

8  the bar. He said, yeah, that he basically confirmed

9  that Sally was telling the truth that the police --

10  like there is cameras in My Sally's Place bar, it

11  was there at that time, he frequented the bar and

12  the tapes was there. And the police took the tapes.

13  So. But I never able was retrieve them.

14    Q. So this is tapes from Sally's?

15    A. Yes.

16    Q. Why would Mr. Brockington have to do with

17  something involving the tapes at Sally's?

18    A. He said -- because that's evidence. And

19  he was telling me about it.

20    Q. He didn't work for Sally's, did he?

21    A. No.

Page 259

1    Q. So why would he have that video?

2    A. Who said he had it.

3    Q. Well, you're saying that two of you were

4  talking about this video and he was trying -- you

5  guys were having a conversation about it. So why

6  would you be asking him about that video?

7    A. Do you hear the conversation? If you

8  listen to the conversation, it pretty much explains

9  the part I'm saying. If you listen to the whole

10  conversation.

11    Q. I have. I'm asking you the question. So

12  the two of you -- why are you asking Mr. Brockington

13  about this specific tape and this video?

14    A. Because it's more evidence that the police

15  did things that they wasn't supposed to have been

16  doing.

17    Q. Prior to you asking questions about the

18  video part, right before that, "ain't nothing, I've

19  been trying to get up with you since after -- with

20  the private investigator, but I just not too long

21  got a copy of the affidavit and read over it and

Page 260

1  just stuff like that." So there was an affidavit

2  that Mr. Brockington prepared for Wolfe. That's how

3  I'm reading that. Is that correct?

4    A. That's correct.

5    Q. Okay. Then you follow up with, "I ain't

6  get the video part yet."

7    A. Is that what I said?

8    Q. Yes. We can play it back for you if you

9  need to.

10    A. You can.

11    MS. GOO: Okay. Go back to 6:12, please.

12    MR. GRUEN: 601.

13    AUDIO: (inaudible) got a copy of the

14  affidavit and I read over it and (inaudible).

15  Hello. Yeah, I'm here. And I ain't get -- I

16  ain't get the -- the -- the video part yet.

17  Was that (inaudible). Working on that. Huh,

18  what did you say (inaudible). Yeah, you say

19  what about it. (inaudible). He want -- what

20  happened on that. I said (inaudible). He told

21  them (inaudible). Oh, he going to let you know

Page 261

1  how to get a hold of it. (inaudible).

2    MS. GOO: Stop there.

3    Q. So Mr. Thomas, again, so you were talking

4  about the affidavit and then you said "I didn't get

5  the video part yet."

6    A. And then he said that he -- he was talking

7  about the private investigator said that he ain't

8  get a hold of it yet. A hold of it yet.

9    Q. So that video, again, you were first

10  talking about the affidavit and then you said the

11  video part; isn't that correct?

12    MR. BALLENGER: What's the question?

13    A. I don't know.

14    MR. BALLENGER: He answered it like three

15  times. First of all I can't even understand

16  what's being said. So if you have like a

17  transcript that you're saying is an accurate

18  transcript, I would like to hear it English.

19  But he said -- I thought he said before the

20  tapes or whatever videos he's referencing to

21  those missing videos from My Sally's bar. And

66 (Pages 258 - 261)

Page 262

1    there is a connection between Myron Brockington
2    and Nina Wilson.  So I don't know if that's
3    what they are talking about, or if they are
4    talking about some other video.
5        Q.  So you don't -- you're saying again that
6    the video has to do with Sally's bar; is that right?
7        A.  Yeah, that's my recollection of that
8    conversation.  Because he's saying that he said he
9    couldn't get a hold of it yet.
10       Q.  Did you ask Wolfe to get the affidavit of
11   Myron Brockington?
12       A.  Yes.
13       Q.  Did you also ask him to do a video tape
14   interview or affidavit of Myron Brockington?
15       A.  Yes.
16       Q.  You did?
17       MR. BALLENGER:  Wait a minute.  That was
18       two questions.  You threw the affidavit in and
19       then you thew the affidavit in with the video.
20       MS. GOO:  I can ask the question
21       separately.

Page 263

1        MR. BALLENGER:  Would you do that.
2        Q.  Did you ask for an affidavit of Myron
3    Brockington from Wolfe?
4        A.  I did.
5        Q.  Did you also ask for a videotaped
6    affidavit and/or interview of Myron Brockington?
7        A.  I did.
8        Q.  Okay.  And do you have a copy of the
9    affidavit that Wolfe got, the signed affidavit, the
10   written one of Myron Brockington?
11       A.  Somewhere, yeah.
12       Q.  And what about the video statement of
13   Myron Brockington?
14       A.  No.
15       Q.  Were you ever able to obtain that?
16       A.  No.
17       Q.  Do you know whether or not -- even though
18   you haven't seen it, do you know whether or not
19   anybody -- any of your people, so mom, Dina, Donna,
20   do you know if any of them saw the recording or the
21   video of Myron Brockington?

Page 264

1        A.  I don't recall.
2        MR. BALLENGER:  Do you know if a video was
3    ever done?
4        A.  I think it's -- I believe so.
5        Q.  And, again, do you know where that
6    affidavit is, the written one?
7        A.  I don't -- like -- I got plenty of
8    paperwork.  I'm assuming it's in there somewhere.
9        Q.  Is that paperwork you keep at home?
10       A.  Yes.
11       Q.  And did you give advisements to
12   Mr. Brockington about what to say when he spoke with
13   the private investigator?
14       A.  I don't recall.  Like give advice?
15       Q.  Yeah, tell him what to say?
16       A.  Oh, no.
17       Q.  I'm sorry.
18       A.  I don't recall.
19       MS. GOO:  If we could go to about ten
20       minutes into the call.
21       MR. GRUEN:  I'm at 9:55.

Page 265

1        AUDIO:  Everything went -- on the video,
2        when he did the camera part (inaudible) what he
3        asked you -- what did he ask you, a series of
4        questions or something.  Yeah.
5        MS. GOO:  Pause for a second.
6        Q.  So is it an accurate representation that
7    you said on the video "where he did the camera part
8    for you, he asked you a series of questions or
9    something."  Is that correct?
10       A.  That's what it sounded like he said.
11       Q.  Okay.  And Myron said yeah.  You heard
12   that part?
13       A.  That's what it sounded.
14       Q.  And is that the video statement that we
15   have been talking about?
16       A.  Yes, I would say.
17       MS. GOO:  Go on, please.
18       AUDIO:  Oh, yeah.  Because the reason why
19       I say that, right, is because (inaudible) read
20       over the affidavit, I know that like -- you
21       know when you don't like -- I understand what

Page 266

1    you're saying like, all right, like it comes to
2    a point where let's say in a question
3    demonstration, it's like, you know it wasn't
4    him.  What do you say in a situation where they
5    say, well, you knew it wasn't him when you see
6    him in court, why did you do it anyway.  But
7    you did it anyway like.  You understand what
8    I'm saying.  Like what would you come back and
9    say to that.  Because they are going to ask a
10   question like that because it's a simple
11   question to ask.  Like who made you do that,
12   like what made you (inaudible).  You know what
13   fix that.  What.  Black and white pictures.
14        MS. GOO:  If we can stop there for a
15   second.
16        Q.  Is it an accurate representation you said
17   "because the reason why I say that, right, is
18   because remember it over the affidavit, and I'm just
19   trying to -- and I know like you know where you
20   don't -- like I understand what you're saying, all
21   right, like it comes to a point where let's say and

Page 267

1    the question demonstration is like, all right, you
2    know it wasn't him, what do you say in a situation
3    when you say, well, you know it wasn't him but you
4    say it was in court.  Why do you do it anyway.  Like
5    you did it anyway, like you understand what I'm
6    saying, what would -- what would you say to that.
7    Because they are going to ask the question.  So I
8    guess it's a simple question to ask like what made
9    you do that."  And Mr. Brockington then responded
10   "you know what would fix that", you say "what",  and
11   Mr. Brockington then said "them black and white
12   pictures."  Is that an accurate representation of
13   what you and Mr. Brockington discussed.
14        A.  That's what it sounded like.
15        Q.  What were you trying to tell him about
16   this whole thing with the question demonstration?
17        A.  I was trying to get him to answer a
18   question that seemed obvious, like of the situation.
19   Like he knew it wasn't me, he said he knew it wasn't
20   me, why did you pick me anyway.  What was the reason
21   behind it?

Page 268

1        MS. GOO:  If we could continue playing,
2    please.
3        AUDIO:  Right, all right.  Yeah, I
4    understand.  I understand about the black and
5    white picture part.  This ain't -- this ain't
6    me.  Let's just say -- let's just this is the
7    states attorney (inaudible) saying this.
8    Because this is a serious question, all right,
9    I'm just going over it with you.  Like, all
10   right, there came a time (inaudible) black and
11   picture was one thing.  But when you see him in
12   person, that's a whole another thing.  Either
13   you (inaudible) 100 percent sure or you're 100
14   percent sure it's not.
15        MS. GOO:  Stop for a second.
16        Q.  So were you talking about the presentation
17   of a photographic array versus an in-person
18   identification?
19        A.  That's what it sounded like.
20        Q.  Keep going.
21        AUDIO:  Why would you do it (inaudible)

Page 269

1    talking about (inaudible) talking about
2    (inaudible).  Huh.  (inaudible) about.  About
3    the other stuff.  (inaudible).  Yeah, yeah,
4    talking about flea market dude.  Yeah,
5    (inaudible).  Huh.  That's the confirmation.
6    Oh, okay, okay.  (inaudible)  That's what you
7    were saying is (inaudible) for sure because I
8    see.  (inaudible).  Okay.  Okay.  Okay.
9    (inaudible) come up.  Right, right.  I mean
10   because I don't know -- I know he had a series
11   of questions, Wolfe asked you that about that
12   part.  Did he ever ask you that.  (inaudible)
13   Oh he did.
14        MS. GOO:  Stop for a second.
15        Q.  So there is a back and forth between you
16   and Mr. Brockington about the flea market dude and
17   the confirmation.  What were you discussing at that
18   point?
19        A.  What we were discussing?
20        Q.  Yes.  So what was the confirmation?
21        A.  I don't understand the question.

68 (Pages 266 - 269)

1    Q.  Let me ask the question differently.  So
2  Myron says to you, "remember when we talked about,
3  remember when we talked about the people with yo."
4  You say "huh", Myron says "remember when we were
5  talking about the other dude, about the other
6  stuff." Myron says "the other dude, the other
7  dude."  You respond "Oh, yeah, you talking about
8  flee market dude."  First of all is that an accurate
9  representation about a part of that audio?
10    A.  Yes.
11    Q.  Okay.  Then Myron says "yeah, the
12  confirmation" and that's accurate too, right?
13    A.  I don't know.  I mean I don't know what
14  that means.
15    Q.  So I'm saying the recording says he says
16  "yeah, the confirmation".  You herald that?
17    A.  I guess, yeah.
18    Q.  Okay.  So when -- when the two of you are
19  talking about the flea market dude and Myron says
20  something about the confirmation, Myron then says
21  "that was the confirmation", do you know what the

1  talk of you were talking about?
2    A.  I don't know what that meant.
3    Q.  Okay.
4    A.  Literally, I don't.
5    Q.  And then in the --
6    A.  I guess.
7    Q.  Sorry.
8    A.  Unless the confirmation can be that he for
9  sure seen the guy in the flea market.  I'm
10  assuming -- now I'm replaying that little bit piece
11  of tape.
12    Q.  Did you ever encourage Mr. Brockington to
13  go to the police with this information?
14    A.  No.
15    Q.  Why not?
16    A.  It wasn't on my mind.  I don't -- I
17  don't -- I don't --
18      MR. NATHANS:  It wasn't on your mind.
19    A.  Yeah.
20    Q.  I mean at this point, so this phone call
21  was in 2016, July of 2016.  And Myron Brockington is

1  telling you that there is another guy, there is
2  another dude who shot him, right?
3    A.  That's what's being said.
4    Q.  That's what he said in this phone call?
5    A.  That's what he said.
6    Q.  Correct.  And he said that at the flea
7  market you recall him saying, during -- I can't
8  remember if it was this call or the other one that
9  we played, "when I saw him I would have stabbed
10  him".  Do you recall -- do you remember him saying
11  that?
12    A.  I recall that.
13    Q.  Okay.  So I don't think that you would --
14  you would agree that Myron Brockington was shot that
15  night, right, in 2001?
16    A.  For sure.
17    Q.  So he has knowledge of who you say is the
18  likely shooter here, or the shooter that everybody
19  says is the shooter.  Why would you not encourage
20  him to go to the police?
21    A.  Tricky question.  We talking about the

1  same police who had that same information but said
2  that I did it.  That's tricky.  Like they said I did
3  it.  They said I'm the shooter.  They said that
4  before they even questioned me.  Gave me one
5  question.  A warrant was put out for my arrest
6  before one question was asked.  And a description of
7  a short dark skinned person was the description
8  given by three, four different people.  Why would I
9  trust them?  Why would I even say and point somebody
10  in that direction?  Why would I do that?
11    Q.  You've been using the word tricky.  What
12  do you mean by tricky?
13    A.  Tricky means that there is a situation
14  where you feel as though even what's supposed to be
15  the right thing could be the wrong thing for you.
16  That's what I mean by tricky.
17    Q.  Do you recall trying to also -- did you
18  ask Myron Brockington about Dewey Morgan as well and
19  trying to get in touch with him?
20    A.  I guess that was a possibility.  I mean
21  they all hung around that same bar and I assume that

Page 274

1  they all knew each other.
2      MS. GOO: Go to 16:35, please.
3      MR. GRUEN: 16:25.
4      AUDIO: A lot easier for the truth to be,
5  you know, more amplified, right. But didn't
6  you say that Dewey came home not too long ago
7  or something. Did you see him. Did you see
8  Dewey (inaudible). Who. Dewey Morgan. No, I
9  ain't see him (inaudible). Yeah, okay, because
10  he almost -- (inaudible) him alone almost got
11  me (inaudible) the first time, it's just, you
12  know, different thing. And lucky for me that
13  you and the private investigator (inaudible)
14  and all came well and you get to know what's on
15  my mind and I got to know what's on yours, you
16  understand what I'm saying.
17      Q. Stop there. So was that you asking about
18  Dewey Morgan to Mr. Brockington?
19      A. That was.
20      Q. Okay. So you -- I'll ask a different
21  question. Did you and Mr. Brockington come to an

Page 275

1  agreement about payment to him?
2      A. No.
3      Q. For his statements?
4      A. No.
5      Q. Okay. Did you ever have a discussion with
6  your mother, Ms. Angela Campbell, about paying
7  Mr. Brockington?
8      A. That -- a discussion -- payment --
9  payments was initially -- it was a -- it was at a
10  time in the beginning where he ain't feel
11  comfortable and he wanted -- and he asked for
12  payment for his truth. But at the end, that all
13  fell to the waste line and all I had to do was pay
14  my private investigator for it.
15      Q. But there was initially discussion about
16  payment with Mr. Brockington between either you or a
17  member of your family; is that right?
18      A. There was.
19      Q. Okay.
20      A. Not from my end.
21      Q. Who made an offer to Mr. Brockington?

Page 276

1      A. Nobody made an offer to Brockington.
2      Q. Who discussed that with him?
3      A. Like it was said -- like I said in that
4  statement, he said that he wanted to be paid
5  initially for his own truth.
6      Q. And how did -- who had that conversation
7  with him?
8      A. The private investigator, I believe.
9      Q. And was that ever -- did you ever discuss
10  that with him in your phone calls?
11      A. You say did I discuss what? What he said?
12      Q. Payment to him. Did you ever discuss
13  payment to him?
14      A. I don't recall.
15      Q. To Mr. Brockington?
16      A. I don't recall.
17      Q. Would you have done it if he insisted?
18      MR. BALLENGER: I would object to the
19      speculation of it. But you can answer.
20      A. I was -- I was always animated against it,
21  like, and -- I don't know.

Page 277

1      Q. Okay. So your answer is I don't know?
2      A. I don't know.
3      Q. All right. If we could go to a call dated
4  June 30th, 2016. And it's call D4C184 to phone
5  number (240)217-8599. And do you recognize -- first
6  of all before we start the call, do you recognize
7  whose number that is?
8      A. 8599.
9      Q. Yes.
10      A. That's sounds like my mother's number.
11      MS. GOO: If we would start just the
12      introductory portion and then go to 15. Go
13      ahead.
14      AUDIO: Hello. You have a prepaid call.
15  You are not being charged for this call. This
16  call is from Melvin, an inmate at a Maryland
17  correctional facility. This call will be
18  recorded and monitored. If you wish to block
19  any future calls of this nature, dial seven
20  now. To accept this call, press -- Hello.
21  What's up. Nothing. How you doing. I'm good.

Page 278

1    MS. GOO: Can we stop there.
2    Q. Do you recognize the female voice?
3    A. It's my mom.
4    MS. GOO: Go to 15:40.
5    MR. GRUEN: 1530.
6    MS. GOO: Thank you.
7    AUDIO: What's going on. What's going on.
8    (inaudible). All right. Maybe you can tell
9    (inaudible) plan can't do it correctly then
10   (inaudible). Two more hundred dollars, give
11   him 500 (inaudible) go to court. Five and do a
12   affidavit for five and go to court.
13   MS. GOO: Stop there a second.
14   Q. So is it an accurate representation of the
15   recording that you said "all right, maybe you can
16   tell him the plan. If you can't do it correctly,
17   don't even try." Then she says "get two more
18   hundred dollars and $500 and he get the five when he
19   go to court. He get five when he do the affidavit,
20   five when he go to court." Is that an accurate
21   representation --

Page 279

1    A. That's what was said.
2    Q. -- of the recording. And this was a
3    discussion about who?
4    A. That was the discussion about Myron.
5    Q. Okay. Keep going further, please.
6    AUDIO: You got to realize, I mean I was
7    thinking about it like this, right. That
8    nigger said he wanted to be compensated. He
9    never really say what -- what, you know, the
10   (inaudible) would have been like that, do you
11   understand what I'm saying.
12   MS. GOO: Stop there for a second.
13   Q. So is it accurate that you said "you got
14   to realize I was thinking about it like this, that
15   nigger said that he wanted to be compensated. He
16   never really say what." Is that what was said?
17   A. That's what was said.
18   Q. If we go to 17:45, please.
19   MR. GRUEN: 1740.
20   AUDIO: Don't get (inaudible) until after
21   he do the affidavit and stuff, right. Listen,

Page 280

1    you ain't keep talking like that. All I'm
2    saying is -- all I'm saying is -- all I'm
3    saying is, yeah, he going to get that. I just
4    now told you. He ain't going to give nothing
5    without getting something. So, yeah, he going
6    to get the five, he going to get that. That's
7    the affidavit thing. He going to get that,
8    yeah.
9    MS. GOO: Stop there.
10   Q. So is it accurate that you said "listen,
11   am, you don't have to keep going to money and all
12   that, all I'm saying is, yeah, he going to get that, I
13   just done told you he ain't going to do nothing
14   without getting something, so, yeah. He going to
15   get the five, he going to get that, at the affidavit
16   thing yeah, he going to get that." Is that
17   accurate?
18   A. That's accurate.
19   Q. So you were saying Myron was going to get
20   paid after doing the affidavit at that point during
21   the phone call, right?

Page 281

1    A. That's what was said.
2    Q. So Mr. Brockington, was he ever paid?
3    A. No. No. Actually my understanding, my
4    understanding that the private investigator
5    convinced him otherwise and that was his money.
6    Q. So you said that the private investigator
7    convinced him otherwise.
8    A. That -- go ahead.
9    Q. Was Mr. Brockington ever told that he was
10   going to get paid?
11   A. He asked to be paid.
12   Q. He asked. And in response was he ever
13   told that he was going to get paid?
14   MR. BALLENGER: By who?
15   Q. By anybody on your behalf?
16   A. I don't recall.
17   Q. So it's possible that somebody said,
18   "yeah, you will get paid"?
19   A. What, it's possible that somebody may have
20   agreed to that?
21   Q. That somebody said to him that?

Page 282

1    A.  I don't know.

2    Q.  So is it possible that your mother said to

3    him, "yeah, you'll get payment"?

4    A.  There is a possibility that somebody

5    probably said that to him.

6    Q.  Is it possible that Wolfe said that to

7    him, that he would have gotten payment?

8    A.  I don't think it's possible that -- Wolfe

9    was always against it anyway.

10   Q.  Why was Wolfe against it?

11   A.  Because he said that -- he said that the

12   truth is the truth, you shouldn't be paying him to

13   tell what the truth is.

14   Q.  Okay.  Are you aware of any type of

15   compensation, anything that Mr. Brockington got in

16   exchange for the affidavit?

17   A.  No.

18       MS. GOO:  I think we're going to take a

19   five minute break now.

20       MR. BALLENGER:  Sure.

21       VIDEOGRAPHER:  We are going off the

Page 283

1    record.  The time is 4:06 p.m.

2       (Off the record colloquy.)

3       VIDEOGRAPHER:  We are back on the record.

4    The time is 4:22 p.m.  This is media number

5    six.

6    Q.  Thank you.  We're going to go to a call

7    dated May 19, 2016.  It is D4C147 to phone number

8    (410) 812-7500.  And Mr. Thomas, I believe you

9    already testified that that's a number for Dina

10   Thomas?

11   A.  7500?

12   Q.  Yes.

13   A.  No.  That's my mother's number.  Hold up.

14   7500.  What's the first four digits?

15   Q.  (410) 812-7500?

16   A.  Yeah, yeah, I believe that's Dina.

17   Q.  That's Dina.  Okay.  If we could play just

18   Dina's part of the call.

19       AUDIO:  This call will be recorded.  If

20   you wish to (inaudible) future calls of this

21   nature, dial.  Good morning.  Good morning.

Page 284

1    What's up.  Not much (inaudible).  Huh.

2       MS. GOO:  Stop there for a second.

3    Q.  Is that Dina on the phone?

4    A.  That's her.

5    Q.  And who is -- just for the record, who is

6    Dina in your life?

7    A.  I mean we don't talk any more.

8    Q.  Was she a girlfriend of yours at some

9    point?

10   A.  At some point.

11   Q.  Okay.  Go to 15:24.  And back in 2016 what

12   was your relationship with her?

13   A.  I just said it.

14   Q.  Were you in a relationship in 2016?

15   A.  I mean as much as a person in prison can

16   be in a relationship.

17   Q.  Was she somebody you considered to be

18   close to you?

19   A.  Yes.

20       MR. GRUEN:  15:23.

21       MS. GOO:  All right.

Page 285

1       AUDIO:  (inaudible) tell this shit, get

2    paid.  He basically want to charge me for the

3    truth.  (inaudible) agree to what (inaudible) I

4    don't know what the fuck is going on with that.

5       MS. GOO:  Stop there for a second.

6    Q.  So you said "him and Tyreke agreed to some

7    shit about because this nigger want to get paid.  He

8    basically want to charge me for the truth.  Yeah,

9    they agreed to some type of ransom or something."

10   Is that what was said?

11   A.  That's what was said, yes.

12       MS. GOO:  If you go to 16:07.

13       MR. GRUEN:  1601.

14       AUDIO:  That's where we at.  That's where

15   we at.  And I mean they do a video confirmation

16   (inaudible) after everything is handled.  I

17   don't know what's happening.  You're the first

18   person I called since I talked to Myron last

19   night.  I just had to give you this news.  I'm

20   coming home, yeah.  It's about to go down

21   (inaudible).

Page 286

1    MS. GOO: Pause for a second.

2    Q. Sorry, we're going to switch phone calls

3 now. So if we go to June 30th, 2016. And this is

4 call number D4C184. And this is to phone number

5 (240) 217-8599. And you testified previously that

6 this 8599 number is your mother's, correct?

7    A. That's right.

8    Q. If you could play the introduction part of

9 the call.

10    AUDIO: Hello. You have a prepaid call.

11 You will not be charged for this call. This

12 call is from Melvin, an inmate at a Maryland

13 correctional facility. This call will be

14 recorded and monitored. If you wish to block

15 any future calls of this nature, dial seven

16 now. To accept this call, press. Hello.

17 What's up. Nothing.

18    MS. GOO: Stop there.

19    Q. So this is a phone call with your mom?

20    A. Yes.

21    Q. If we can go to 17:50, please.

Page 287

1    MR. GRUEN: At 17:40.

2    AUDIO: Get no money -- he ain't get no

3 money until after he do the affidavit stuff,

4 right. Listen, ma, you ain't got to keep on

5 going about money and all that, talking like

6 that. All I'm saying -- all I'm saying is --

7 all I'm saying is, yeah, he going to get that.

8 I just (inaudible) told you he ain't going to

9 give nothing without getting something. So,

10 yeah, he going to get the five. He going to

11 get that. That's the affidavit thing. He

12 going to get that, yeah.

13    MS. GOO: Pause there.

14    Q. So is it -- did your mom say "he don't get

15 no money until he do the affidavit and stuff",

16 right?

17    A. That's what she said.

18    Q. And did you then say "listen, ma, you

19 don't have to keep going to money and all that. All

20 I'm saying is, all I'm saying is, yeah, going to get

21 that, that I just done told you he ain't going to do

Page 288

1 nothing without getting something so, yeah. He

2 going to get the five, he going to get that. At the

3 affidavit thing, yeah, he going to get that." Is

4 that what you said?

5    A. That's what I said.

6    Q. So you said that, and you were talking

7 about Myron Brockington, correct?

8    A. I was.

9    Q. And you were saying at that point, yeah,

10 he was going to get paid, right?

11    A. That's what he wanted to do, yeah.

12    Q. I'm sorry.

13    A. That's what he was asking.

14    Q. But you were telling your mother that he

15 was going to get paid in this phone call, correct?

16    A. That's what I said, yeah.

17    Q. Did you -- I know you mentioned previously

18 you had a difficult time getting in touch with Wolfe

19 at times when you were trying to contact him about

20 the case; is that right?

21    A. Yes.

Page 289

1    Q. But there were occasions in which you were

2 able to three-way call him so you could talk to him

3 and ask him questions about the case; is that right?

4    A. I'm sure.

5    MS. GOO: If we could go to July 15th,

6 2016. It's called D4C194 to phone number

7 (240)217-8599.

8    Q. And 8599 is your mother's number.

9    A. Yes.

10    Q. Okay. And if you could just play from,

11 let's go to minute marker 1:30.

12    MR. GRUEN: This is at 1:26.

13    AUDIO: Tell him all (inaudible) I got

14 five more minutes. I need two minutes of his

15 time. Two minutes. Hello. All right, I'm

16 dialing. Shit, man. Only need two minutes of

17 his time. (inaudible) Going to ask, I want to

18 know what the fuck is up with all the

19 questions, man.

20    MS. GOO: Pause there.

21    Q. So you were asking your mother to call

Page 290

1 Wolfe for you at this point because you had
2 questions for him?
3     A.   Yes.
4          MS. GOO:  And if we go to 3:43.
5          MR. GRUEN:  3:35.
6          AUDIO:  Hello.  Yeah, you still on the
7 phone.  Yeah, I'm right here.  What's going on.
8 Ain't nobody -- like I don't know why Darnel
9 and them ain't call you, but when she talked to
10 me the other day she want to tell me that the
11 shit you -- you can't see it really basically
12 on the video, it was very blurry, my mom
13 already told me (inaudible) about it,
14 (inaudible) cool.  But then she said she can
15 hear it and I know what you told me and I was
16 like, all right, man, thank you.  (inaudible)
17 talk on that day you said you did it, you told
18 me (inaudible) that you asked all of my
19 questions.  Yes.
20          MS. GOO:  Pause that for a second.
21     Q.   So you're on the call with Wolfe at this

Page 291

1 point, right?
2     A.   That's right.
3     Q.   And are the two of you discussing the
4 Myron Brockington video?
5     A.   Yeah.
6     Q.   Okay.  And they were having some
7 difficulty seeing the video?
8     A.   That's -- that's what I said.
9     Q.   Okay.  And that's what either Donna or
10 your mom told you about the video?
11     A.   That's what I said.
12     Q.   Why did you say that to him?
13     A.   I don't recall that.
14     Q.   But is it accurate that you said but
15 then -- I'm sorry, hold on.  Is it accurate you said
16 "I don't know why Donna and them ain't call you but
17 when she talked to me the other day she going to
18 tell me that you can't really see it basically the
19 video, it was very blurry.  My mom already told me
20 what you said about that, it's clear on your end.
21 Cool."  So did Donna tell you that she had issues

Page 292

1 with seeing the video?
2     A.   According to what I said.
3          MS. GOO:  Could you hit play.
4          AUDIO:  Say that every time (inaudible)
5 only three minutes.  I don't see how you asked
6 all those questions in three minutes and got
7 answers from him.  (inaudible) questions.
8 Unless they got a short version of what you
9 asked.  I know what you told me.  And ain't
10 nobody really can't give me no clear answers so
11 that's why I'm coming back to you.  I mean
12 (inaudible) about the video.  So you know.
13 Well, like I told your mother, (inaudible) and
14 get with Donna.  I'll get with Tyreke.  I got
15 all the videos on my phone.  It's like five
16 different videos, man.  Right.  So.  Why is it
17 five different ones, can you explain that to
18 me.  Because I had to use my phone and
19 (inaudible) phone it (inaudible) let's you
20 record or cut off and stop recording and that's
21 why.  And in that time, in that time we

Page 293

1 (inaudible) on it.  I heard about that, I heard
2 about that.  Well, he said he checked it before
3 he gave it to you it's fine, right.  I don't
4 know what happened, man.  That was crazy.  That
5 was unfortunate.  So you said that yours is
6 clear, and you said that you did get a chance
7 to ask all my questions.  Because that's what
8 you told me, right.  Yes, Melvin.  Yes, Melvin
9 Thomas, I asked all of your questions.  That's
10 why I said I'm trying to get you (inaudible)
11 see if I can get it on a flash drive or
12 something so I can get it to your people
13 because what I have is clear.
14          MS. GOO:  You can stop it.  Thank you.
15          AUDIO:  Here we go.
16     Q.   So Mr. Thomas, you were having an
17 extensive discussion with -- a discussion with
18 Mr. Wolfe about trying to get a copy of this video,
19 correct?
20     A.   That's what I said.
21     Q.   And you were -- I guess he said that he

1 was going to try to get it to you on a flash drive
2 so you can get it to your people; is that right?
3    A. That's what was said, yes.
4    Q. Why was it important for you to get a copy
5 of this video?
6    A. I don't know. I mean I guess I wanted to
7 hear what the video was about. I guess at that
8 time.
9    Q. I mean what Mr. Brockington said to Wolfe,
10 was that important to you?
11    A. It's my case.
12    Q. That is a yes or no question?
13    A. Everything is important to me about my
14 case.
15    Q. Okay. Did you ever get a transcript of
16 the interview that was done by Mr. Brockington by
17 Mr. Wolfe?
18    A. No.
19    Q. And did you get a report from Mr. Wolfe of
20 that video statement that he took?
21    A. No.

1    Q. Okay. And you did eventually obtain an
2 affidavit from Mr. -- sorry, Mr. Myron Brockington?
3    A. Yes.
4    Q. And that was in -- when was that?
5    A. I don't know.
6    Q. Was in December of 2018?
7    A. I don't know.
8    Q. Okay.
9    (Deposition Exhibit 14 marked.)
10    MS. GOO: Counsel.
11    Q. And is that the affidavit that Mr. Myron
12 Brockington did for you?
13    A. That's what it looks like. That's what it
14 looks like.
15    Q. Sorry. And have you seen this document
16 before?
17    A. Yes.
18    Q. Okay. And this was signed on December 4th
19 of 2018?
20    A. That's what it say.
21    Q. Do you know where it was signed?

1    A. I don't.
2    Q. Okay. And this was something that
3 Mr. Wolfe assisted you with?
4    A. Yes. It wasn't just him there though.
5    Q. It wasn't just --
6    A. Yes.
7    Q. So you said it wasn't just him there.
8 What do you mean by that?
9    A. I was speaking, sorry -- I answered your
10 question.
11    Q. I'm asking a follow-up question now. So
12 who was present when the affidavit was signed?
13    A. Law students.
14    Q. Law students?
15    A. And a notarizer, I believe. There was
16 three people there.
17    Q. So there was a notary there to sign off on
18 this?
19    A. Yeah.
20    Q. And you said law students?
21    A. Yeah, some people that he used to -- so

1 it's just not him -- when he answering questions,
2 it's not just him hearing the answers.
3    Q. So witnesses?
4    A. Yes.
5    Q. Okay.
6    A. Legal witnesses of some sort.
7    Q. And this was done with Mr. Wolfe?
8    A. Yes.
9    Q. Okay. Do you know if this was done in an
10 attorney's office or was this in Mr. Wolfe's office?
11    A. I don't know.
12    Q. Okay. Do you know if Mr. Bivricki was
13 present for this?
14    A. I don't think so. I don't know.
15    Q. Okay.
16    A. No, not for this.
17    Q. Okay. So there were two affidavits that
18 were completed by Mr. Brockington?
19    A. I don't think so, no. I don't recall.
20    Q. Okay. So if you could pull Exhibit 2 in
21 front of you. You have the stack there.

1     MR. BALLENGER: What's Exhibit 2?

2     MS. GOO: The answers to interrogatories.

3     MR. BALLENGER: Is this my copy?

4     MR. RIPKE: Can we take a break before you

5  pose the next question.

6     MS. GOO: Sure.

7     VIDEOGRAPHER: We're going off the record.

8  The time is 4:40 p.m.

9     (Off the record colloquy.)

10     VIDEOGRAPHER: We're back on the record.

11  The time is 4:47 p.m.

12     MR. BALLENGER: I just wanted to put on

13  the record I just cleared up with Mr. Booth

14  over here. This affidavit right here was

15  signed by Mr. Brockington with Mr. Booth.

16  Mr. Booth worked with Mr. Brockington to get

17  this particular affidavit. So I'm just putting

18  that on the record because it doesn't seem like

19  we should -- I mean you can keep asking more

20  questions but I just want to clear up this

21  affidavit.

1     MS. GOO: So for this purpose, so

2  interrogatory 19, your answer says that -- the

3  question to you was "identify each and every

4  person who was present at the signing of the

5  affidavit of Myron Brockington dated

6  December 4th, 2018", which is Exhibit 14. And

7  it says that -- there is some language at the

8  beginning that says "notwithstanding the

9  objection. Booth Ripke, an attorney for

10  plaintiff, was present when the affidavit was

11  signed." So is this that affidavit that was

12  signed on December 4th, 2018 with Mr. Ripke?

13     MR. NATHANS: He wasn't there --

14     MS. GOO: I understand.

15     MR. RIPKE: Okay. I was in the room. And

16  I worked with him to write the affidavit. So

17  he can -- he'll answer whatever you're going to

18  ask him, but he wasn't present.

19     MS. GOO: Okay.

20     Q. Are you aware -- so you described about --

21  you described an affidavit that was signed involving

1  Wolfe and a notary and some other witnesses. Do you

2  recall that?

3     A. I guess I was -- I was misthinking. I was

4  talking about the video. I was thinking about the

5  video.

6     Q. Okay.

7     A. Yeah.

8     Q. Was there another affidavit that you

9  obtained from Mr. Brockington through Wolfe before

10  the signed affidavit with Mr. Ripke?

11     A. No.

12     Q. So I just want to be clear about this.

13  There is -- okay. I just want to know what there

14  was from Mr. -- as to Mr. Wolfe, there were notes

15  that you have related to his conversations with

16  Mr. Brockington; is that right?

17     MR. BALLENGER: Whose notes?

18     MS. GOO: Sorry. So Mr. Wolfe's notes

19  that he took from a conversation that he had

20  with Mr. Brockington.

21     Q. Do you have those notes?

1     A. Do I have notes?

2     Q. Or his report.

3     A. I don't -- I can't recall that.

4     Q. Is there some type of written product that

5  you received from Mr. Wolfe documenting his

6  interviews with Mr. Brockington?

7     A. I never got the interview from

8  Mr. Brockington.

9     Q. Okay. As a part of his investigation,

10  Mr. Wolfe also spoke with the owner of Sally's, a

11  woman you say -- you know her as just Sally. Do you

12  recall that?

13     A. Yes.

14     Q. And you stated that there were, correct me

15  if I'm wrong, that you have a report from Mr. Wolfe

16  with information about that entity; is that correct?

17     A. I believe so, yes.

18     Q. Okay. And is there any reason why you

19  wouldn't be able to produce that to us?

20     A. Because I know I seen it but I have not

21  physically like seen it since I've been looking

1 through my papers. But I know it exists. I can do
2 another do-over or, you know.
3      Q.  So if we ask you to look for it, you
4 could -- through your attorneys obviously, that's
5 something that could be looked for?
6      A.  That's something that could be looked for.
7      Q.  Okay. I'm looking through my notes. And,
8 again, correct me if I'm wrong, but I believe you
9 testified that there was some type of report, this
10 is not a statement, but a report that was prepared
11 by Wolfe when he did some type of interview or
12 investigation with Myron Brockington in the
13 beginning stages of his investigation. And that's
14 something that you do have in your possession as
15 well; is that correct?
16      A.  A report?
17      Q.  A report or some type of memorandum
18 documenting his conversation with Myron Brockington?
19      A.  I don't recall.
20      Q.  Okay. Do you recall whether such a report
21 existed?

1      A.  I don't.
2      Q.  Okay. Other than the statement from
3 Sally, are there any other documents that were
4 prepared for you by Wolfe as a part of the
5 investigation that you still have in your
6 possession?
7      A.  No. Not that I recall.
8      Q.  So in the answers to interrogatories,
9 interrogatory number one says to "identify all
10 persons likely to have personal knowledge of any
11 fact alleged in the pleadings and state the subject
12 matter of the personal knowledge possessed by such
13 person." And that's on page two of the answers to
14 interrogatories in Exhibit 2. Now, you list a
15 number of names, Nina Wilson, Alease Turner, Dewey
16 Morgan, Donte Lyle and Myron Brockington. Is there
17 a reason why you did not mention Anthony Wilson, the
18 private investigator, Wolfe, as a person who had
19 knowledge about this matter.
20      A.  He didn't have knowledge about the matter.
21      Q.  Sorry.

1      A.  What you mean knowledge about the matter?
2      Q.  Because it says to identify "all persons
3 who are likely to have personal knowledge of any
4 fact alleged in the pleadings and state the subject
5 matter of the personal knowledge possessed by such
6 person." So my question is is there a reason why
7 you did not include Anthony Wilson in this?
8      A.  Because he wasn't part of the case. He
9 was a hired person. What I'm assuming. Maybe I
10 didn't understand the question.
11      MR. BALLENGER:  And I'll just interject.
12 To the extent that we didn't disclose it, that
13 would be on us. I mean I may have looked at
14 that and not known about it or overlooked it,
15 so...
16      MS. GOO:  I have no further questions.
17      MR. BALLENGER:  Just give me a couple
18 minutes with my co-counsel.
19      VIDEOGRAPHER:  We're going off the record.
20 The time is 4:54 p.m.
21      (Off the record.)

1      VIDEOGRAPHER:  We are back on the record.
2 The time is 4:56 p.m.
3      MR. BALLENGER:  I don't have anything
4 further and we will read and sign.
5      VIDEOGRAPHER:  This marks the end of the
6 deposition. We're going off the record. The
7 time is 4:56 p.m.
8      COURT REPORTER:  Matt, you want a copy of
9 the transcript?
10      MR. BALLENGER:  No.
11      (Deposition concluded at 4:56 p.m.)
12
13
14
15
16
17
18
19
20
21

1       Certificate of Deponent

2    I hereby certify that I have read and examined

3 the aforegoing transcript, and the same is a true

4 and accurate record of the testimony given by me.

5    Any additions or corrections that I feel are

6 necessary, I will attach on a separate sheet of

7 paper to the original transcript.

8

9 _____    _____

10 Melvin Thomas          DATE

11

12

13

14

15

16

17

18

19 (If needed, make additional copies of the Errata

20 Sheet on the next page or use a blank piece of

21 paper.)

1       ERRATA SHEET

2 Case:_____

3 Witness:_____    Date:_____

4 PAGE/LINE   SHOULD READ    REASON FOR CHANGE

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 7478075

1      STATE OF MARYLAND

2    I, David Corbin, a Notary Public in and

for the State of Maryland, do hereby certify

3 that the within named, MELVIN THOMAS,

personally appeared before me at the time and

4 place herein set according to law, was

interrogated by counsel.

5

6    I further certify that the examination was

recorded stenographically by me and then

7 transcribed from my stenographic notes to the

within printed matter by means of

8 computer-assisted transcription in a true and

accurate manner.

9    I further certify that the stipulations

contained herein were entered into by counsel

10 in my presence.

11    I further certify that I am not of counsel

to any of the parties, not an employee of

12 counsel, nor related to any of the parties, nor

in any way interested in the outcome of this

13 action.

14    AS WITNESS my hand and Notarial Seal this

25th day of August, 2025, at Centerville,

15 Maryland.

16

17

18           David C. Corbin

          Notary Public

19

20

21 My commission expires November 13, 2027

1 Matt Ballenger, Esq.

2 mballenger@br-lawyer.com

3  August 25, 2025

4 RE:   Melvin Thomas v. George Vigue, Et Al

5   8/11/2025, Melvin Thomas (#7478075)

6   The above-referenced transcript is available for

7 review.

8   Within the applicable timeframe, the witness should

9 read the testimony to verify its accuracy. If there are

10 any changes, the witness should note those with the

11 reason, on the attached Errata Sheet.

12   The witness should sign the Acknowledgment of

13 Deponent and Errata and return to the deposing attorney.

14 Copies should be sent to all counsel, and to Veritext at

15 cs-midatlantic@veritext.com.

16  Return completed errata within 30 days from

17 receipt of testimony.

18   If the witness fails to do so within the time

19 allotted, the transcript may be used as if signed.

20    Yours,

21  Veritext Legal Solutions

| & |
| --- |
| **&** 1:13 2:4,12 3:6 |

| 0 |
| --- |
| **03379** 1:6 6:10 |

| 1 |
| --- |
| **1** 4:8 12:5,6 |

**1's** 41:7
**1,000** 37:9 226:6,15 227:9
**10** 4:21 162:20 168:17,18 169:4,21
**10/22/19** 5:2
**100** 55:18 268:13,13
**1019** 41:13
**102** 162:13,21
**1099's** 41:7
**10:00** 35:21
**10th** 168:12
**11** 1:12 5:2 6:5 125:18 170:7,8 172:18
**11/9/11** 4:14
**110** 162:4
**119** 4:10
**11:04** 84:7
**11:18** 84:10
**11:57** 244:2
**11th** 173:1

**12** 4:8,9 5:3 172:7,8 243:21
**120** 2:13 162:10
**12:38** 159:21
**12:50** 160:3
**13** 5:5 176:8,9 308:21
**14** 5:6 295:9 299:6
**14th** 116:1
**15** 277:12
**1530** 278:5
**15:23** 284:20
**15:24** 216:3 284:11
**15:40** 278:4
**15th** 206:7 289:5
**16** 80:9
**1601** 285:13
**161** 4:11
**163** 4:13
**164** 4:14
**166** 4:15
**167** 4:17,19
**168** 4:21
**16:01** 216:21
**16:07** 216:20 285:12
**16:25** 274:3
**16:35** 245:13 274:2

**16:38** 245:11
**17** 26:5,8 78:18 80:9
**170** 5:2
**172** 5:3
**1740** 279:19
**176** 5:5
**17:40** 287:1
**17:45** 279:18
**17:50** 286:21
**17th** 12:19 27:3
**18** 13:4,6,7 15:17
**1800** 2:13
**18021** 308:17
**19** 147:8 214:16 215:5 234:1 283:7 299:2
**1980** 19:6
**1:11** 174:21
**1:23** 1:6 6:10
**1:26** 289:12
**1:30** 289:11
**1:54** 175:3

| 2 |
| --- |
| **2** 4:9 12:21 13:16 15:10 116:6 297:20 298:1 303:14 |

**20** 57:17 77:12 121:18,20,20 122:2,3 132:8

**139**:18 150:10 182:9,10 237:10
**200** 229:20 230:5
**2000's** 78:14
**2001** 16:4 24:21 25:3 26:12 30:21 43:3 46:11 50:9 59:10,14 60:18,20 62:1 62:4,6,9 72:1 73:5 75:3 82:11,20 83:17 85:19,21 86:5 86:8 93:14 195:18 272:15
**2002** 25:6,9 26:21 27:4 109:14
**2005** 134:20,21 135:10
**2005ish** 134:9
**2006** 134:21 135:10 161:6 161:18
**2008** 141:10,10
**2010** 66:8 80:21
**2011** 64:18 114:10 164:15 165:5

**2012** 115:4
166:6
**2013** 141:11
166:20 167:1,3
167:16
**2015** 115:16
196:5,11 206:5
206:8,9 231:4
**2016** 214:16
215:5 219:19
233:19 234:1
248:1,2,12
249:1 252:21
271:21,21
277:4 283:7
284:11,14
286:3 289:6
**2018** 168:12
170:1 295:6,19
299:6,12
**2019** 171:12,17
172:18 173:1
**2020** 43:4
47:19 80:2,21
116:1 126:21
127:1
**2021** 80:2
**2023** 80:3
**2025** 1:12 6:5
12:20 27:3
47:20 308:14
309:3
**2027** 308:21

**21** 26:3,4,6,8
27:8
**21201** 3:8
**21202** 1:15 2:6
2:14
**217-8599**
219:20 220:1,3
220:4 249:2
277:5 286:5
289:7
**21:36** 199:18
199:19
**22nd** 171:12,17
**2341** 1:14 2:5
**240** 196:6,9
206:6 219:20
220:1,2 231:5
231:8,9 249:2
277:5 286:5
289:7
**240-217-8599**
252:21
**24th** 196:4,11
**25** 117:18
309:3
**25:44** 231:15
**25:46** 207:3
231:16
**25th** 86:5 93:14
308:14
**26** 26:11 86:8
161:18 167:3
249:1 252:21

**26th** 166:21
167:10
**27** 206:8 231:4
**27:19** 232:15
**27:20** 232:14
**27:44** 210:15
**27th** 206:5
**295** 5:6
**29th** 166:21
167:14,16
**2:23** 221:3
**2:24** 221:2
**2:38** 214:21
**2:39** 215:3
**2:56** 230:19

### 3

**3** 4:10 119:17
119:18,20
**30** 132:8 248:8
309:16
**300** 223:13,17
229:21 230:6
**30th** 219:19
277:4 286:3
**312** 164:4
**3:01** 235:10
**3:03** 235:9
**3:07** 231:1
**3:35** 254:4
290:5
**3:37** 254:1,2
**3:43** 290:4

### 4

**4** 4:11 161:8
**40** 121:18
**400** 54:17
55:10 56:6,17
**401** 1:14 2:5
6:11
**402** 3:7
**406** 162:7
**410** 214:17
215:6 234:2
283:8,15
**43** 32:17
**44** 32:14
**4:00** 35:21
**4:06** 283:1
**4:22** 283:4
**4:40** 298:8
**4:47** 298:11
**4:54** 304:20
**4:56** 305:2,7,11
**4th** 166:5
295:18 299:6
299:12

### 5

**5** 4:13 163:18
163:19
**5/26/13** 4:18
**5/29/13** 4:20
**5/5/25** 4:10
**50** 39:8 57:17
57:18 58:1,3

**500** 58:16,17
278:11,18
**575** 3:7
**5:46** 234:4
255:4,5

**6**

**6** 4:14 25:2
164:19,20
**6/10/18** 5:1
**60** 145:20
164:12
**601** 260:12
**65** 211:15
**6:01** 225:21
**6:12** 260:11
**6:15** 225:17
**6:36** 227:13
**6:41** 227:21
**6:50** 227:20
228:5
**6:51** 228:11
**6:56** 238:17

**7**

**7** 4:15 166:4,11
166:12
**70** 35:6
**719** 31:3
**7478075**
307:21 309:5
**7500** 283:11,14
**7:01** 238:16

**8**

**8** 4:5,17 167:7
167:8
**8/11/2025**
309:5
**8/27/08** 4:13
**80** 19:5
**812-7500**
214:17 215:6
283:8,15
**823** 87:4
**8599** 249:5
277:8 286:6
289:8
**8:49** 229:16
**8:52** 229:15
**8th** 25:5,9

**9**

**9** 4:19 165:5
167:18
**9/26/06** 4:12
**9/4/12** 4:16
**90's** 19:8,10
22:7 27:14
57:15 74:5
**979-9009** 206:6
231:5,9
**979-9124** 196:6
196:9
**982-3324** 234:2
**9:30** 35:20
**9:55** 264:21

**9th** 164:15

**a**

**a.m.** 1:13 6:5
84:7,10
**abbreviation**
154:14
**ability** 9:10
100:5 112:3
**able** 9:2 124:16
150:13 178:18
194:7 221:15
258:13 263:15
289:2 301:19
**above** 13:9
55:11 88:12
169:14,16
173:8,19 174:6
309:6
**absolutely**
98:10,10 107:1
112:11 113:12
127:18 134:13
148:16 155:8,8
155:10 183:13
**abuse** 169:21
172:12
**accept** 169:19
171:8 197:4
220:14 234:7
253:9 277:20
286:16
**acceptable** 9:3

**accepted**
167:16,17
**account** 41:20
**accountant**
37:15,19
**accuracy** 309:9
**accurate**
120:20 174:6
200:21 202:4
207:16,19
209:19 210:9
210:20 212:16
212:19 213:3
216:11,16,18
217:13 218:3,5
218:17 219:8,9
222:12 223:13
224:7,14,15
225:4,11
226:14,20,21
227:9 229:3,12
230:3,9 236:16
242:9,17 245:2
245:8 252:13
254:10,15
255:13,18
256:9 261:17
265:6 266:16
267:12 270:8
270:12 278:14
278:20 279:13
280:10,17,18
291:14,15
306:4 308:8

**acknowledge**
174:4
**acknowledg...**
309:12
**act** 64:20 191:5
**action** 308:13
**activities** 76:6
**actual** 39:8
69:17 116:2
249:14 258:7
**actually** 12:3
14:9,19 21:12
41:5 57:7
64:14,20 70:15
72:13 105:3
107:12 108:21
124:16 125:15
129:21 133:11
138:19 141:14
163:17 183:8
183:21 184:3
189:3,7,17,18
190:21 191:3
191:14,16
196:4 205:12
215:5 225:19
234:10 238:15
252:8 281:3
**adapt** 150:3
**adaptive**
150:10
**add** 151:5,17
157:16

**additional**
168:6 306:19
**additions** 306:5
**address** 26:10
26:10 31:14,16
53:16 54:6,21
**adhd** 44:15
46:5,14 47:2,6
47:15 48:3,16
**admission**
162:13,19
163:17 169:4
169:20 172:12
**admit** 169:14
174:6
**admitted** 44:9
119:11 169:17
170:3 172:21
173:3 176:18
**adopt** 11:18
12:12 13:15
**advance** 36:3
199:16 207:1
225:17
**advice** 92:13
264:14
**advisements**
264:11
**affect** 9:10
149:21
**affected** 146:14
**affidavit** 5:6
172:12 173:11
255:10,17

259:21 260:1
260:14 261:4
261:10 262:10
262:14,18,19
263:2,6,9,9
264:6 265:20
266:18 278:12
278:19 279:21
280:7,15,20
282:16 287:3
287:11,15
288:3 295:2,11
296:12 298:14
298:17,21
299:5,10,11,16
299:21 300:8
300:10
**affidavits**
297:17
**affiliations**
6:16
**affirm** 13:10
**affirmed** 8:5
**affirming**
15:18
**aforegoing**
306:3
**afraid** 85:14,16
110:7,9,11
133:7 192:8
**afternoon**
175:6,7
**age** 53:8
184:10

**ages** 32:7
**aggressive**
95:20 96:7
148:2
**aggressively**
98:19
**ago** 34:20
44:20 80:1
239:14 240:6
255:17 274:6
**agree** 27:3 90:3
90:7,9 163:20
165:4,21
166:16 167:9
216:6,13,15
228:21 229:11
272:14 285:3
**agreed** 6:1
281:20 285:6,9
**agreeing**
173:12 214:12
**agreement** 5:4
105:10,19
170:11,14,19
171:8 189:15
190:9,13 275:1
**ahead** 12:16
38:16 112:4
186:18 228:16
229:6 237:11
277:13 281:8
**ailments** 49:8
49:10

ain't  27:12
  134:18 142:14
  145:8 148:19
  160:9 182:21
  199:20 211:7
  211:17 224:1
  224:10,12,17
  226:7,16
  237:16 239:7
  244:7,7 255:6
  255:14 256:4
  256:10,10
  259:18 260:5
  260:15,16
  261:7 268:5,5
  274:9 275:10
  280:1,4,13
  287:2,4,8,21
  290:8,9 291:16
  292:9
aip  120:7
al  1:7 6:8 309:4
alcohol  61:7
  168:13,15
alease  62:20
  63:1,4,7,9,10
  63:16 303:15
alike  245:7
alive  136:11
allegations
  11:17 12:10
alleged  63:14
  188:7 303:11
  304:4

allegedly  20:15
  67:6 185:17
  186:20 187:4,5
  187:5,7,7
alleging  111:17
alley  15:6
allotted  309:19
allow  46:20
  181:8 235:14
allowed  124:15
  179:10 235:13
alperstein
  66:16,19 67:19
  69:2
altercation
  124:11,19
altogether
  121:18
amount  75:17
  76:1 179:5
amplified
  274:5
andrew  115:3
andy  66:16
  67:18 68:2
  69:2
angela  81:10
  275:6
anger  212:17
  212:18
angle  212:6,6
animals  167:19
animated
  276:20

annex  117:2
  118:3 123:1,2
  123:3,10 131:1
  131:8 151:16
  158:16
answer  10:4,4
  10:17,19,21
  11:5 12:1
  13:18 14:2,18
  26:3,12 38:16
  93:10 95:15
  112:4 113:19
  116:5 149:12
  151:5,7,17
  267:17 276:19
  277:1 299:2,17
answered  92:4
  164:10,11
  247:6 261:14
  296:9
answering
  149:8 297:1
answers  4:9
  12:18 13:15,21
  15:10 93:18
  99:12 292:7,10
  297:2 298:2
  303:8,13
anthony  68:6
  68:13 303:17
  304:7
antmo  138:1,2
  138:4

anxious  10:17
anybody  65:21
  74:10 75:13
  128:3 146:6
  178:15,17
  180:14 195:4
  204:11 205:17
  213:10 263:19
  281:15
anyway  133:15
  212:1 266:6,7
  267:4,5,20
  282:9
apartments
  74:17
apologize
  197:20
apologized
  165:17,18
  197:6,16,18
appeal  109:10
  109:11,11
appeals  111:3
  111:7,9 188:17
appear  258:2
appearance  5:3
  170:10,14,19
  171:7
appearances
  6:16
appeared
  308:3
apple  188:19

**applicable**
  309:8
**apprehend**
  122:15
**approach**
  209:5
**approached**
  70:9
**appropriate**
  84:3 174:18
**approved**
  179:6
**approximately**
  44:20 59:1
  75:2 107:8
  123:4 130:12
  134:7,8 141:11
**april**  25:5,8
  27:4 109:14
  197:18
**area**  18:3,13
  27:14 55:17,20
  74:20 164:1,5
  167:4
**areas**  146:13
**arguing**  115:12
**argument**  15:2
**arian**  155:11
**armistead**
  140:13,17
  141:21
**arp**  154:8,11
  154:14,20,21

**arp's**  154:6
**array**  71:3
  242:19 243:5
  243:15,18
  246:2 268:17
**arrest**  86:17
  273:5
**arrested**  50:20
  51:6,9,18 52:3
  52:9 86:13,19
  86:21 87:6,13
  90:15
**asked**  90:18
  91:6,11 94:1
  101:2,11,15
  102:13,17
  106:20 113:10
  149:8,9 150:16
  173:18 190:15
  265:3,8 269:11
  273:6 275:11
  281:11,12
  290:18 292:5,9
  293:9
**asking**  10:20
  28:16 30:4
  38:3,10 42:9
  42:12 92:8
  94:10,12 113:8
  115:13 141:18
  170:16,21
  198:16,21
  223:18 238:5
  241:18 256:21

  259:6,11,12,17
  274:17 288:13
  289:21 296:11
  298:19
**asleep**  118:14
**assault**  163:21
  164:2
**assess**  42:9
**assigned**  166:8
**assisted**  296:3
  308:7
**associates**
  22:11,15 56:3
  82:18
**assume**  62:17
  62:17 88:15
  144:3 273:21
**assuming**
  143:15 195:14
  240:15 264:8
  271:10 304:9
**atkinson**
  163:15
**attach**  306:6
**attached**
  309:11
**attack**  123:18
  160:13
**attacked**
  126:14 160:12
**attempted**
  65:18 213:11
**attempts**
  219:15

**attention**  13:3
  13:6 26:18
  161:10,12
  164:21 173:5
  176:12
**attest**  189:9
**attorney**  7:20
  17:6 25:9 26:1
  28:16,17 103:6
  104:21 106:13
  114:4 184:7
  252:1,2 268:7
  299:9 309:13
**attorney's**
  297:10
**attorneys**  10:1
  10:2,6 107:11
  302:4
**audio**  196:19
  197:14 199:20
  201:1,4 202:5
  206:12 207:5
  207:15,20
  208:12 210:16
  210:21 211:11
  215:14 216:4
  216:12 217:2
  218:8 220:8
  221:4,10 222:5
  222:18 223:5
  223:17 224:17
  225:11,18
  226:1,13 227:3
  227:10,14

228:1,3,12
229:18 231:17
232:16 234:5
235:2,11 237:3
238:19 240:14
242:5 244:4
245:15 246:15
253:4 254:5
255:6 256:3
257:8 260:13
265:1,18 268:3
268:21 270:9
274:4 277:14
278:7 279:6,20
283:19 285:1
285:14 286:10
287:2 289:13
290:6 292:4
293:15
**august** 1:12 6:5
163:6 308:14
309:3
**aunt's** 192:15
**authority**
86:19 87:7,9
87:12
**authorization**
166:8,9,20
167:11 168:15
**automatically**
125:9
**available** 194:4
309:6

**avenue** 31:3
53:17,18 54:1
**avoid** 182:15
**aware** 108:12
203:12,15
243:4,18
282:14 299:20

**b**

**b** 4:7
**baby** 82:3
129:6,6 195:2
195:10,14
200:6,7,18,19
202:18 203:12
220:15 253:10
**back** 16:3
26:21 27:14
47:15 57:15
59:10,11 62:1
62:9 72:1 73:5
75:3 79:2 84:9
85:19,21 91:18
109:14 120:10
120:11 121:2
123:21 134:3
141:5 142:15
145:9 160:2
175:2 181:5,5
181:6,7,7,13
181:13 188:9
200:2,15
210:14 215:2
227:12 230:21

231:3 236:6,7
236:19 253:12
253:16 256:8
260:8,11 266:8
269:15 283:3
284:11 292:11
298:10 305:1
**bad** 125:19
142:17 151:1
**badge** 89:2
**bag** 131:15
153:14
**bah** 1:6 6:10
**bail** 184:5
**bailed** 200:3,16
201:4,6,16,19
202:15 203:4,7
**ball** 142:7
**ballenger** 1:13
2:3,4 6:17,18
11:20 12:7,16
13:17 14:1,11
14:15 28:13
29:1,6 37:21
38:3,9,14
43:13 47:11
48:6 51:3
59:13 61:20
79:7 84:5 93:9
95:12 112:2
118:20 122:4
149:7,15
159:11,15,19
161:11 162:21

164:10 168:2,8
174:19 196:7
196:10 198:15
199:9 205:2,7
206:7,9,18
227:18 230:16
249:10,13,18
250:1,3,8,14
250:17 251:4
251:11 252:4
252:16,19
261:12,14
262:17 263:1
264:2 276:18
281:14 282:20
298:1,3,12
300:17 304:11
304:17 305:3
305:10 309:1
**baltimore** 1:14
2:6,13,14 3:8
6:12 18:3
52:16,19 53:6
53:9,14,15
64:19 65:2
85:9 87:7,15
117:16
**banked** 218:12
219:2
**bar** 93:20
258:8,10,11
261:21 262:6
273:21

**barnes** 61:13
61:15,17 62:9
62:11
**base** 156:20
**based** 151:20
**basic** 9:19
**basically** 19:16
49:19 89:2
145:11 216:5
216:14 224:18
226:8,11,17,19
237:10,12,14
237:16,20
258:8 285:2,8
290:11 291:18
**basis** 38:18
40:14 41:17,18
43:12 60:9
77:16,18 79:19
81:16
**bathroom**
230:15
**bean** 153:14
**beat** 139:7
**beefing** 155:12
**began** 198:8
**beginning** 64:9
92:11 107:19
124:3,5,6
127:1 198:7
203:9 207:15
275:10 299:8
302:13

**behalf** 2:2,8 3:1
6:18,19,21 7:2
7:5,7,10,18
12:10 16:1
66:1 67:11
83:21 104:5
105:15 106:20
106:21 108:5
109:17 110:2
111:8 114:6,15
115:11,16,17
175:21 183:15
213:11 214:8
281:15
**belief** 13:12
**believe** 23:10
25:21 32:14
43:4 63:12,19
64:18 69:16,20
70:2,3 94:14
96:19 97:12
99:17 103:2,10
111:2 112:9
113:9 114:1
117:7 119:4
121:11 127:1,8
138:8 154:16
170:3 177:18
178:3 184:2,2
185:2 186:10
200:20 202:17
203:6 229:5
251:6 252:20
264:4 276:8

283:8,16
296:15 301:17
302:8
**believed** 177:6
**ben** 3:4 7:9
**benefit** 210:2,5
232:19 233:1,2
**benefited**
209:12
**benefits** 210:5
**best** 13:12
15:19 24:15
38:16,20 48:20
103:11 106:15
109:1 112:3
150:20 205:4
207:2
**bet** 219:3
**better** 229:1,11
244:17
**bgf** 155:12
**big** 18:3 118:7
125:10 133:11
139:3,4 143:20
143:21 147:13
156:11 182:4
242:5
**biggest** 158:1
**biographical**
92:8
**biscuit** 235:4,5
**bit** 29:10 38:15
38:16 91:18
95:17 107:15

108:2 176:4
197:13 211:9
218:7 225:20
227:2 231:14
235:8 238:16
242:3 256:2,8
271:10
**bites** 188:18
**bivricki** 297:12
**black** 155:14
159:5 266:13
267:11 268:4
268:10
**blade** 143:13
143:15
**blake** 32:9,12
72:4 73:13
74:8 94:20
175:11 197:20
199:10
**blame** 210:7
**blames** 209:14
210:17
**blank** 306:20
**blatant** 156:7
**blew** 124:13
**block** 18:4,8
52:6 54:15,17
55:18 56:6
58:16,17 71:15
72:2 197:2
215:15 220:13
234:5 253:8
277:18 286:14

**blood** 23:9
49:10,13,21
**bloody** 145:1
**blow** 242:7
**blue** 89:7
**blunt** 144:8
**blurry** 290:12
291:19
**bobby** 126:4,5
126:6
**bodily** 110:13
177:8
**body** 95:20
96:7 136:8
**boiling** 129:6
**book** 242:5
**booking** 103:2
**books** 38:21
40:16 41:4
42:3
**booth** 2:9 6:19
51:4 298:13,15
298:16 299:9
**boots** 156:8
**born** 19:4
52:16,20,21
62:2
**bottom** 120:6
169:10 173:6
**bought** 254:5
**boy** 14:14
135:4 142:14
226:6,15 255:2

**boys** 138:12
**bp** 89:7
**br** 2:7 309:2
**brach** 164:17
**brady** 115:12
115:14
**brain** 28:3
151:14 208:21
**branch** 117:3
123:12,13
125:5 126:9
127:9,10,11
136:4,6 138:20
139:5 141:21
142:3 152:1,2
152:11,21
153:4,7 156:7
157:9,10,13
159:2 160:16
167:1,4 168:8
168:9,10
**brand** 39:17
**bread** 235:3
**break** 11:4,6
84:4 159:12,17
174:18 201:10
202:1 230:16
230:17 251:16
282:19 298:4
**breaks** 11:2
**breathing**
140:1
**brian** 3:11 6:12

**briefly** 39:13
49:10 114:21
183:9
**bring** 177:7
199:20
**bringing** 169:1
**bripke** 2:15
**broad** 139:7
**broadness**
95:13
**brockington**
5:6 20:13 24:6
26:11 69:8,9
69:19 70:9,13
70:20 82:3,7
82:10,12,18
83:2,8,14,20
86:13 103:16
103:20 104:4
108:9 176:17
183:12,19
184:3 185:5
188:14 190:18
194:8,11 195:2
213:20 214:8
214:12 219:11
233:8,17 243:4
243:12,16,19
246:11 247:12
247:14 248:2,5
248:12 256:11
256:18 257:1
258:2,16
259:12 260:2

262:1,11,14
263:3,6,10,13
263:21 264:12
267:9,11,13
269:16 271:12
271:21 272:14
273:18 274:18
274:21 275:7
275:16,21
276:1,15 281:2
281:9 282:15
288:7 291:4
294:9,16 295:2
295:12 297:18
298:15,16
299:5 300:9,16
300:20 301:6,8
302:12,18
303:16
**brockington's**
16:3 22:5
175:16 204:12
205:1,19 213:6
254:18
**broke** 152:15
**brother** 72:3,6
72:15 73:14
74:8 94:13,20
175:11 199:13
242:16 244:6
**brought** 9:21
25:18 26:18
47:16,17 95:6
95:9 100:16

165:6 254:7,11
254:14
**bucks** 57:17,17
58:1,3
**buddies** 136:9
136:14 142:4
149:3,4
**buddy** 128:1,6
128:9 136:7,10
137:1,2 239:17
240:8
**building**
133:14 144:18
144:19
**buildings** 74:17
74:18 133:4
139:5
**bumped** 212:7
**bunch** 236:15
**buprenorphine**
165:9 172:3,19
173:1 174:13
**burner** 188:9
**business** 34:6
38:4,11,13,19
39:9 68:10
218:10 219:1
**businesses** 41:9
**busy** 236:6,20
**butter** 129:7
235:3,5
**buy** 34:19 35:4

**c**

**c** 1:15 2:1
308:18
**call** 23:17,20
24:2,5 29:12
30:21 58:10
60:15 68:14
77:12,15
112:20 127:4
128:19 153:5
177:12,15,17
178:11,14
179:4,5,10,15
179:19 180:5
181:5,5,7,9
182:14,19
183:1 196:3,18
196:19,20,21
197:1,9 198:7
198:8,8,13
199:6,11,17
200:10 201:15
203:21 204:6
206:12,13
209:18 211:5
211:10 214:16
215:4,7 217:14
218:4 219:18
219:20 220:7,8
220:9,10,11,14
220:17 227:1
231:4,4,6,8,8
232:2,13 233:8

233:12,21
234:1,3,7
246:12 247:5
247:11,12,13
247:20 248:1,2
248:6,8,11,16
248:21 249:1,2
249:9 252:21
253:2,5,5,6,9
253:14 264:20
271:20 272:4,8
277:3,4,6,14
277:15,16,17
277:20 280:21
283:6,18,19
286:4,9,10,11
286:12,13,16
286:19 288:15
289:2,21 290:9
290:21 291:16
**called** 16:17
20:11 21:9
94:14,18
152:18 154:13
156:11,17
181:4,13 189:6
196:5 206:4
214:16 217:6
217:17 222:7
233:12 285:18
289:6
**calling** 23:15
180:7 235:16

**calls** 62:16
95:13 178:21
180:19 181:3
182:18,20
183:4 197:3
198:19 215:16
220:13 233:13
236:2 247:15
249:17 253:8
276:10 277:19
283:20 286:2
286:15
**calm** 49:16
**camera** 265:2,7
**cameras**
258:10
**campbell** 81:10
275:6
**capacity** 8:19
9:2
**care** 41:11 49:4
**careful** 198:15
**carrollton** 31:3
**carry** 131:9
**case** 1:5 6:10
8:14 10:3
11:17 12:9,11
12:14 24:13
27:19 29:14,20
30:7,15,18
42:9 63:5,10
67:5 69:3 71:6
82:11 95:7,9
95:11 96:18

97:9 103:3
104:6,7,8,10
111:8 114:11
115:18,19
116:10 171:9
190:1 195:9
239:14 240:10
241:9 243:3
248:6 288:20
289:3 294:11
294:14 304:8
307:2
**cash** 59:9,10
**catch** 168:3
194:7 197:11
204:4 223:4
**caught** 132:12
132:12 208:17
**cause** 77:14
**caused** 124:9
**cds** 50:14,15
**ceiling** 143:12
**cell** 118:16,21
127:20 128:1,2
128:6,9 129:2
129:3 136:7,8
136:9,9,10,13
136:15,18
137:1,2 142:4
149:2,3,4
153:20 160:15
161:5 166:6,13
**cells** 130:3

**center** 119:5
**centerville**
308:14
**central** 103:2
**certain** 150:9
150:15 179:9
252:10
**certainly**
251:18
**certificate**
306:1
**certify** 306:2
308:2,5,9,11
**cgoo** 3:9
**chance** 15:9
250:20 293:6
**change** 307:4
**changes** 309:10
**changing** 150:8
150:14
**character**
141:4
**charge** 101:6,8
101:14 216:5
216:14 234:14
285:2,8
**charged** 160:14
196:20 220:9
253:4 277:15
286:11
**charges** 152:7
**charles** 3:7
17:5,10,11
26:15,17 27:8

27:10 84:15
110:12 176:18
**chart** 161:21
**check** 40:16
41:4 77:13
162:4 200:2,14
257:20
**checked** 224:20
224:20 225:8
293:2
**cheese** 156:21
**child** 32:20
200:19
**childhood** 53:2
53:10,12
**children** 32:18
**chinese** 89:16
**chinky** 245:8
**chip** 258:3
**choke** 153:20
**choose** 149:2
**chow** 140:6
**christine** 3:2
7:4 8:11
**chronological**
128:18
**circuit** 85:9
**city** 85:9
**claim** 16:2
115:11
**claimed** 112:21
**claims** 11:17
12:11,13 42:8
42:14 111:21

**clarification**
29:6 118:20
175:9 234:13
**class** 158:19
**clean** 209:11
**cleaning** 233:2
**clear** 9:1,13
10:20 83:7
94:17 183:10
192:20 213:16
238:20 291:20
292:10 293:6
293:13 298:20
300:12
**cleared** 298:13
**clearing** 210:5
**clearly** 139:21
**client** 28:16,18
106:16 108:6
252:13
**client's** 106:15
**close** 72:7
120:17 122:3
132:4 167:20
199:18 216:2
221:1 284:18
**clothes** 88:21
89:5,6
**clothing** 33:11
39:11,14,17
**clover** 55:18
**co1** 154:3
**co2** 165:5

coaching
   248:18
cocaine   59:21
   61:3
coincidence
   186:12
coincidentally
   135:15
coleman   165:6
collateral
   124:13
collect   219:16
   228:18 229:8
collected
   172:18
collecting
   30:19
collington   54:2
   54:3,6
colloquy   84:8
   160:1 175:1
   199:1,3 230:20
   283:2 298:9
colon   120:7
color   165:7
columbia   138:8
come   10:1
   40:10 44:3
   47:15,15 58:9
   70:20 99:5
   112:14,19
   129:5 131:5,10
   131:11 136:11
   143:9 145:7

150:11 157:3
192:12 204:8
212:4 226:3
247:5 266:8
269:9 274:21
comes   155:14
   155:16 266:1
   266:21
comfortable
   209:6,20
   232:16 275:11
coming   138:13
   142:15 167:20
   217:8,19
   285:20 292:11
commencing
   1:12
commissary
   143:11 160:17
commission
   308:21
committed
   137:13,15,17
committing
   163:21 164:2
communicate
   62:15 65:18
   78:19 81:3,6,8
   221:18,19
communicated
   67:8 68:3,4
   78:21 80:1,4
communicati...
   83:10

communicati...
   64:5
community
   137:1
companies
   40:1,6
company   33:11
   37:1,3,18 39:3
   39:7,11,15
   40:7,14,17
compensated
   279:8,15
compensation
   282:15
complain   155:7
complaint   4:8
   11:16,19 12:3
   12:9 16:1
   126:8
completed
   297:18 309:16
compound
   131:17 132:13
computer
   251:5 308:7
concealed
   143:19
concerned   29:8
concerns   133:2
conclude   102:5
   102:6
concluded
   305:11

conditions   49:8
conduct   19:14
conducted
   169:18 174:4
   208:15
confirm   174:1
confirmation
   169:18 174:3
   217:4,15 269:5
   269:17,20
   270:12,16,20
   270:21 271:8
   285:15
confirmed
   258:8
connect   189:18
connected
   133:13
connection
   262:1
conscious
   209:12 210:5
   233:2
consider   74:21
   75:1 160:13,13
considered
   225:16 284:17
consistently
   58:9
constant   80:19
   125:19 130:14
   130:17 148:2
   151:9

**constantly**
143:3 150:7,7
150:10
**constitutional**
156:14
**contact** 83:20
118:9 177:12
194:20 221:15
233:17 288:19
**contained**
65:10 308:9
**contend** 26:11
**content** 13:18
**contents**
173:10
**continue** 268:1
**contraband**
162:14,19
163:3,4
**conversation**
21:13,17,20
64:8 182:15,16
184:9,11
185:16,19
194:11 202:8
202:11 208:9
213:9 214:11
238:4 241:3
246:9 247:10
257:5 259:5,7
259:8,10 262:8
276:6 300:19
302:18

**conversations**
205:10 237:15
300:15
**converted**
144:20
**convey** 204:2
**convicted**
24:17 25:2
**conviction**
51:17 109:4,10
109:11 111:12
112:8 113:21
114:7
**convictions**
50:6,9,12 51:1
51:7
**convinced**
281:5,7
**cooking** 36:3
**cookout** 220:19
**cool** 237:20
290:14 291:21
**copeland** 8:13
89:14 95:7
96:2,20 99:1,3
99:6
**copied** 250:3
**copies** 306:19
309:14
**copy** 12:4
192:21 196:15
249:11,13
250:1,2,17
251:2 255:17

259:21 260:13
263:8 293:18
294:4 298:3
305:8
**corbin** 1:15,21
6:14 308:2,18
**cord** 143:16,17
144:5
**corner** 19:19
169:6
**corners** 75:16
75:19 76:1,2,8
**corpus** 109:12
**correct** 13:11
13:13 15:19
25:7,12 27:4,5
27:15 47:18
64:15,16 75:11
86:14,15
100:11 116:3
165:11 166:1
167:11 168:7
170:1 173:2
174:10 176:7
177:13,14
179:8 199:4,14
203:13 214:8
246:4 256:12
260:3,4 261:11
265:9 272:6
286:6 288:7,15
293:19 301:14
301:16 302:8
302:15

**corrected**
79:13
**correction**
14:17 169:20
**correctional**
117:3 123:12
123:14 125:9
155:7 157:9
197:1 220:11
253:6 277:17
286:13
**corrections**
43:11 49:5
116:21 117:2,8
118:3,4 122:21
129:13,17
130:17 306:5
**correctly** 137:5
278:9,16
**corresponden...**
204:10
**corroborate**
203:3
**cost** 35:5
**counsel** 6:15
7:17 12:5 13:1
111:14,16
119:18 196:14
218:21 295:10
304:18 308:4,9
308:11,12
309:14
**county** 138:9
138:14

**couple** 8:14
28:10 56:13
58:2 59:5,5
75:5,7,10
77:11 81:14
116:10 119:14
119:15 304:17
**course** 94:14
195:12
**courses** 158:12
**court** 1:1 6:9
6:14 9:3 10:12
10:13 64:19
65:16 66:6,7
69:14,15 83:15
85:9 87:3,4
96:16 110:18
111:3 112:19
115:20 176:6
184:4 188:10
192:13 195:13
195:15 202:12
266:6 267:4
278:11,12,19
278:20 305:8
**courtroom**
103:8 104:13
**courts** 60:4,5
**cousin** 23:18
23:20 39:16
41:10 76:20
77:3,4 186:2
**cousins** 22:16
22:18 23:8,16

23:17 76:16
186:1
**covered** 144:4
**covering** 144:5
**covid** 126:14
126:14,20
127:1 144:15
144:18 157:20
**crack** 152:2
**cracked** 142:15
**crazy** 124:14
129:8 155:21
189:17 191:12
235:14 246:21
293:4
**credits** 158:20
**criminal** 50:5
148:18 243:2,3
**cross** 53:21
**crowd** 219:13
**crushed** 106:9
106:9
**cs** 309:15
**cue** 206:4
**cuffs** 135:1,1
**current** 42:10
**currently** 31:2
33:7 50:2
73:17
**custody** 174:7
**cut** 146:10
292:20
**cv** 1:6 6:10

**d**

**d** 4:1 78:3
**d.c.** 138:12
**d3c218** 196:5
**d3c528** 206:4
231:4
**d4c147** 214:17
215:5 283:7
**d4c162** 219:18
**d4c181** 234:1
**d4c184** 277:4
286:4
**d4c194** 289:6
**d4c201** 249:1
252:21
**daily** 34:7,8
35:10 77:16,17
79:19 130:18
136:2
**dallas** 60:6,7
**damages** 38:7
116:9
**damn** 135:21
212:1
**damon** 163:15
163:16
**dana** 78:2
**danielczyk**
8:13 95:8 97:4
97:10 99:5
**dark** 273:7
**darnel** 114:18
222:6,7,7,7

290:8
**date** 4:12 41:3
80:10 161:17
163:10 170:5
171:11 172:18
196:10 306:10
307:3
**dated** 196:4
206:5 214:16
219:19 231:4
233:21 248:21
277:3 283:7
299:5
**dates** 29:16
202:12
**dating** 80:8
**daughter** 62:1
184:6 195:13
195:20,21
**daughter's**
61:16 184:9,12
**daughters**
184:10
**dave** 6:14
**david** 1:15,21
308:2,18
**day** 35:14
57:19,20,21
58:3,4,20
59:11 85:21
90:12,14
132:13 133:11
142:1,12
146:15 147:2

164:12 166:6
167:21 185:3
186:9 187:17
195:7 197:16
197:19 241:1
247:21 257:15
290:10,17
291:17 308:14
**daylight** 139:7
**days** 34:13,14
120:19 125:8
127:8,11,14,15
128:8 167:13
188:4 309:16
**daytime** 60:12
**dea** 241:6,20
**dead** 136:12
223:20 224:1,8
224:10
**deal** 37:13
104:3,4 105:7
106:18
**dealing** 19:18
191:16,17,19
**deals** 37:15
**dealt** 41:14
**death** 73:9
139:8 140:5,14
140:19 177:8
**debt** 218:13
**decade** 80:20
125:16
**decades** 187:21
188:2

**december**
24:21 25:2
50:9 116:1
195:17 295:6
295:18 299:6
299:12
**decent** 57:14
57:17
**decide** 134:16
188:13
**decided** 128:7
136:14
**decision** 4:13
**decline** 253:10
**deeper** 113:6
**deeply** 197:18
**defendant** 7:8
7:10,21 16:18
21:9 94:14,18
104:2,11
176:13,16,19
177:5
**defendant's**
112:15
**defendants** 1:8
3:1 7:5,19 8:12
**definitely** 22:3
88:11 101:12
112:18 130:20
**demeaning**
168:5
**demonstration**
266:3 267:1,16

**demonstrations**
107:13
**denied** 110:18
111:4 113:11
115:4,5,20
**denying** 100:4
**department**
43:10 49:4
64:19 65:2
87:7,16 186:16
**depending**
61:11 84:13
**depends** 41:19
74:21 77:12
80:15
**deployed**
145:17
**deploying**
145:21
**deponent** 306:1
309:13
**deposing**
309:13
**deposition** 1:11
6:2,6,10 8:20
9:16 12:6,21
27:18 28:2
29:11,21 64:9
119:17 161:8
163:19 164:20
166:4 167:8,15
167:18 168:17
168:20 170:8
172:8 176:9

214:12 251:17
295:9 305:6,11
**deranged**
149:4,18
**describe** 79:21
86:16 89:4
98:16 109:5
123:17 146:19
147:20 152:13
**described** 85:1
135:6 246:4
299:20,21
**describing** 96:6
202:7,10
**description**
120:20 165:1
171:16 226:21
273:6,7
**destination**
131:10
**detail** 139:21
241:11,12
242:12,13
**details** 38:4,10
38:10
**detective** 88:14
95:7,7,8,10,19
96:6,14,20
97:4,10,13
**detectives** 8:13
87:18,19 88:15
90:7 98:21
**deter** 219:6

**device** 174:6
**dewey** 14:7,8
  14:18 64:8,13
  65:3,15 69:7,9
  69:13 114:18
  115:9 190:17
  194:6 273:18
  274:6,8,8,18
  303:15
**diagnose** 47:19
**diagnosed**
  44:11 47:5,8
  47:14,21 48:1
  48:17 49:7
**diagnosis** 44:19
  45:1,4 46:6,10
  46:17 49:20
**dial** 177:20
  197:3 215:16
  220:13 234:6
  253:8 277:19
  283:21 286:15
**dialing** 289:16
**die** 126:15
  146:6
**died** 134:17
  135:3,21
  140:12 146:7,7
**difference**
  147:11,13
**different** 36:7,8
  52:4,5 60:4
  61:10 68:15
  70:10,14 97:16

99:4 101:3,7
  116:13 130:3
  133:4 147:7,9
  150:4 152:12
  154:1 182:1
  218:16 219:7
  242:14 273:8
  274:12,20
  292:16,17
**differently**
  10:9 30:6
  95:18 270:1
**difficult** 120:3
  133:14 288:18
**difficulty** 155:6
  291:7
**digital** 196:12
**digits** 283:14
**dina** 78:1,2,3
  80:7 113:15
  114:18,20
  115:1 214:11
  214:14 215:11
  216:1 263:19
  283:9,16,17
  284:3,6
**dina's** 283:18
**direct** 13:2,5
  26:2 161:9
  164:21 173:5
  176:11
**directed** 83:20
**directing**
  161:11

**direction** 88:9
  273:10
**directly** 41:20
  204:3,6
**disciplinary**
  156:10
**discipline**
  161:4 168:13
**disciplined**
  125:1
**disclose** 304:12
**disclosure**
  177:6
**discovery**
  63:19 65:8
  196:16 243:3
**discuss** 276:9
  276:11,12
**discussed**
  174:15 175:20
  248:3 267:13
  276:2
**discussing**
  246:2 256:14
  269:17,19
  291:3
**discussion**
  275:5,8,15
  279:3,4 293:17
  293:17
**disorder** 44:12
  48:18
**disperse**
  145:14

**distress** 116:8
  116:12 146:18
  146:20 147:1
  147:16 151:6
  151:18
**distressed**
  147:17
**distribute**
  50:18 174:12
**district** 1:1,2
  6:9,9 138:7
**divine** 40:18,19
**division** 1:3
  169:19
**doc** 43:3 45:2
  46:11 47:14
  49:1,9 62:12
  85:6 116:14
  154:5 160:7
**doctor** 47:9
**document**
  13:21 15:9
  26:4 28:7,7
  119:21 169:3
  176:11 295:15
**documented**
  134:2 140:11
  156:3
**documenting**
  301:5 302:18
**documents**
  27:18 28:21
  29:8 303:3

**doing** 19:12,17
  76:2,9,11 86:4
  86:8 88:6
  93:14 125:19
  125:21 154:13
  168:4 209:8
  232:19 237:7
  250:6 259:16
  277:21 280:20
**dollars** 35:13
  225:16 227:4,8
  227:14,15,16
  228:1,3,4,7,9
  228:13,14
  230:12 278:10
  278:18
**don** 89:17 97:6
  99:4
**donna** 78:1,4
  78:15 189:17
  200:14 202:19
  203:21,21
  211:8 212:14
  212:15,20
  213:16 231:12
  234:20 263:19
  291:9,16,21
  292:14
**donte** 21:11
  71:11,14 94:19
  108:13 303:16
**door** 15:4
  122:19

**doors** 167:20
**dorm** 118:21
  119:1,2 122:20
  130:3 144:17
  144:17 158:2
**dormitory**
  144:20,21
**dose** 121:11
**dots** 189:17
**double** 114:7
  172:11
**download**
  251:4
**dpscs** 174:7
**dress** 88:16
**dressed** 88:16
  88:18,20 89:10
**drinking** 61:7
**drive** 117:18
  293:11 294:1
**dropped** 132:5
**drove** 56:2
**drug** 51:7 52:9
**drugs** 19:18
  59:19,20 60:21
  72:17 160:17
  165:16
**dtx's** 165:9
**dude** 131:10
  142:6 207:11
  212:4 224:2,3
  224:11 226:4
  227:3,7,14
  228:13 241:6

  245:8 247:3
  269:4,16 270:5
  270:6,7,8,19
  272:2
**dudes** 241:15
  242:17
**duly** 8:5
**dundalk** 31:11
  31:12
**duration**
  248:15

## e

**e** 1:14 2:1,1,5
  2:13 4:1,7 8:8
  31:18,18 33:4
  33:4
**earl** 114:18
**earlier** 80:18
  127:1 175:10
  197:5
**earliest** 53:10
  53:11
**early** 24:20
  58:12,13,14
  78:14 129:10
  129:12
**earning** 38:7
**easier** 159:18
  274:4
**easiest** 10:7
**east** 6:11 18:3
  53:14,15,18,20

**easy** 190:3
**eat** 140:8
  142:12 143:6
**eating** 142:18
**education**
  158:21
**educational**
  158:12
**effect** 105:20
  146:14
**effects** 48:15
**efforts** 109:5
**eight** 35:17
  180:5,7
**eighty** 118:17
  118:18
**either** 45:5
  86:4 122:1
  194:21 227:19
  228:15 229:5
  268:12 275:16
  291:9
**electric** 153:13
**electrical**
  153:12
**ellis** 22:19,20
  23:2,6,7,17
  76:15
**else's** 178:15
  178:17,18
  179:2,4,12,18
  180:14 181:2
**embarrass**
  8:21 42:12

**embroider**
39:17
**embroidered**
40:11
**embroidering**
40:2
**embroidery**
39:18,19
**emotional**
116:8 146:18
146:19 147:16
151:6,17
157:17 212:17
**emotionally**
149:21
**employed** 33:7
33:9
**employee** 35:8
308:11
**employees** 34:1
34:2 36:7,10
36:11 37:14,19
**employs** 36:17
**encounter**
17:14
**encountered**
87:15,18
**encourage** 10:2
271:12 272:19
**ended** 140:4
**enforcement**
24:9 25:18
**engaging** 19:13

**english** 261:18
**entered** 308:9
**entering**
147:18 166:7
166:20 167:10
**entire** 42:16
116:19
**entitled** 173:20
**entity** 301:16
**environment**
136:1 148:2
**ephraim** 3:5
7:11,17
**errata** 306:19
307:1 309:11
309:13,16
**escorted**
125:11 126:3,7
**especially**
146:12
**esq** 309:1
**esquire** 2:3,9
2:10 3:2,3,4,5
**essentially**
166:12
**et** 1:7 6:8 309:4
**evaluations**
148:19
**event** 34:11,15
**events** 50:21
**eventually**
70:20 89:19
114:10 213:19
214:7 295:1

**everybody**
75:15,16 88:8
272:18
**evict** 57:2,6
**evictions** 58:6
**evidence** 193:9
193:11,12,14
258:18 259:14
**exact** 41:12
126:7
**exactly** 10:11
18:7 89:8
106:14 202:6
204:19
**examination**
4:4 308:5
**examined**
306:2
**except** 244:14
245:7
**exchange**
219:12 282:16
**excuse** 90:4
149:9
**exhibit** 4:8,9,10
4:11,13,14,15
4:17,19,21 5:2
5:3,5,6 12:5,6
12:21 13:16
15:10 116:6
119:17,18,20
161:8 163:18
163:19 164:19
164:20 166:4

166:11,12,17
167:7,8,18
168:17,18
169:4 170:7,8
172:7,8 176:8
176:9 295:9
297:20 298:1
299:6 303:14
**exist** 154:5
**existed** 258:7
302:21
**existence** 195:7
**existing** 30:9
**exists** 302:1
**exonerated**
189:4
**expect** 167:21
**experience**
125:20 130:3
149:19 150:18
151:8 152:3,12
211:11
**experienced**
146:20 147:18
152:4,4,11
156:7 157:8
**experiences**
149:10
**expires** 308:21
**explain** 292:17
**explained**
186:14 207:12
**explains** 259:8

extensive 293:17

extent 185:20 304:12

extreme 144:16

extremely 145:1

eye 142:7,11

eyewitness 113:1

**f**

f 7:18,18 120:19

fabian 45:10

fabius 45:19,20 47:10 48:21

face 118:8

faced 155:6

facial 120:15

facilities 128:17 158:8

facility 85:6 117:1,2 127:2 127:3 128:20 146:18 147:15 150:17 158:10 158:11,14,15 197:1 220:11 253:6 277:17 286:13

fact 28:16 175:9 192:8 228:21 303:11

304:4

facts 12:12 108:13 113:7

factual 12:10

failed 188:16

fails 309:18

fair 56:16 74:20 89:4 91:20 148:14 205:18

false 177:9,10

familiar 55:17 55:19 67:2 163:16 176:14 176:16

family 23:11 117:15 180:7 194:21 205:14 219:15 275:17

fan 142:6,8,10 142:16 143:9 143:12,13,20

fans 143:10

far 132:6 139:12,14,15 139:19,21 206:21 216:1 243:12,13,14 247:10

fashion 154:9

fast 132:1 167:20 230:15 236:1 253:21

faster 229:11

fayette 55:11

fear 110:13

fearful 85:15

february 26:11 59:10,14 60:18 60:20 62:6,9 85:19,21 86:4 86:5,8 93:14 197:17

fed 128:11

federal 109:11

fee 190:6

feed 152:16

feeding 156:9

feel 106:3,5,7 132:9 135:13 211:18 221:7 221:11 237:17 247:2 273:14 275:10 306:5

feet 132:8 139:16,18 239:7

fell 275:13

felony 50:15

felt 126:15 152:10 188:17 212:17,17

female 212:11 222:1 223:2,12 224:12 225:2 226:14 227:7 230:4 234:17

278:2

fence 131:21

fifth 171:15

fifty 253:3

fight 144:16 145:1,14 146:1 146:9 158:3 160:14 163:7 163:13

fights 130:15

figure 41:8 222:3 240:11

figured 238:6

file 41:11 109:9 111:11 113:20

filed 11:16 12:9 12:19 16:1 25:9 109:17 110:1 111:8 112:8 114:5 115:16 175:21 176:5

files 30:7,9,15 30:17

filings 27:19

finally 90:5 117:4 136:14 139:11 147:8 188:20 189:20

find 20:8,12 66:17 69:7,8 69:13,18 129:5 150:4 157:3 189:2,2 190:9

190:13,16
201:8,21
218:14 219:5
**fine** 199:19
230:17 293:3
**finish** 10:19,20
208:7,9 240:12
257:2
**firm** 189:6
**first** 8:18 9:5
11:6 13:2,5
31:9 42:14
43:2 44:3,9,21
45:11 51:10
52:18 53:4,9
53:15 54:10,12
56:9,9,12
61:12 65:17
87:14,19 92:7
101:4,10,15
105:9 113:21
116:12 117:7
124:7 128:19
129:1 131:6,19
141:7,8,9
146:18 150:17
151:6 158:13
158:15 161:10
161:12 162:2
165:1 173:4
178:2 188:3
193:7 196:17
198:8,18
200:10 203:4

203:11 206:10
215:13 217:6
217:17 220:6,7
223:7,7 234:3
247:13 261:9
261:15 270:8
274:11 277:5
283:14 285:17
**five** 84:3
120:19 127:13
127:14,15
128:8 141:8
142:17 146:5
182:2 231:2
253:3 278:11
278:12,18,19
278:20 280:6
280:15 282:19
287:10 288:2
289:14 292:15
292:17
**fix** 266:13
267:10
**flash** 293:11
294:1
**flea** 185:9,12
187:13 246:11
246:18 247:18
248:3 269:4,16
270:19 271:9
272:6
**fledged** 148:7
**flee** 270:8

**flip** 131:12,14
**floyd** 17:5,10
17:11 26:15,17
27:8,11 84:15
84:16,18 85:6
110:12 176:18
176:18
**floyd's** 177:5
**focus** 48:7
151:10
**focused** 48:8
**folding** 135:8
**folks** 20:10
137:11
**follow** 84:13
127:6 147:10
149:14,19
231:6 250:5
260:5 296:11
**followed** 96:2
122:5
**following** 88:8
**follows** 8:7
**food** 33:10,12
33:14 34:3,5
34:16,19 35:3
35:5,6 37:5
38:19 143:5,7
143:8 156:10
156:11,12,13
156:16 157:4,7
**foot** 218:11
219:2

**footage** 190:21
191:2
**force** 144:8
**forced** 149:4
**foregoing**
13:11 173:10
**forever** 144:17
145:2 146:4
**forget** 160:18
**forgot** 81:7
127:6 154:15
160:18 196:1
203:19
**form** 4:14
92:14,21
102:19 177:8
251:8
**formal** 167:15
**format** 196:12
**forms** 41:14
**forth** 185:15
256:8 269:15
**forward** 177:4
254:1
**found** 106:3
109:18 163:4,5
163:20 164:2,3
165:17 185:1
187:19 190:20
190:21 191:1,3
191:4,14,15
192:13 218:11
219:2

founded 39:16
four 31:5 123:4
  123:20 139:4,5
  139:6,7 141:7
  142:16 146:3,5
  150:18,20
  172:10 175:4
  229:21 241:14
  242:16 273:8
  283:14
fourth 230:6,8
frame 19:3
  97:16 143:14
  188:3
franchise 39:6
freak 186:12
free 184:4
  185:2
frequent 77:10
  80:18
frequented
  258:11
friday 59:3
friend 78:8
friendly 72:8
  72:11
friends 22:10
  22:14 56:3
  59:15 72:7,17
  82:17 124:21
  180:8
frightened
  133:20,21
  192:12

front 26:4
  205:14,14
  297:21
fuck 212:18
  218:15 219:6
  245:20 285:4
  289:18
fucker 207:5,8
  207:18 231:17
  231:20 232:4
  246:20
fucking 212:7
  246:21
full 11:9 14:8
  15:6 65:7
  130:15 148:7
  168:3 249:16
  250:12,19
funds 210:6
  233:3
further 121:3
  158:18 197:13
  218:7 227:2
  242:4 256:2
  279:5 304:16
  305:4 308:5,9
  308:11
furthering
  158:21
future 197:3
  215:15 220:13
  253:8 277:19
  283:20 286:15

g

gallaham 81:18
  81:20
gang 144:16
gangs 144:21
gaping 118:8,8
gather 228:19
  229:9
gcms 169:17
ged 158:15
generally
  203:12
generated
  174:5
george 1:7 6:8
  152:5 241:8,19
  309:4
george's 138:9
  138:14
getting 36:5
  38:15 80:21
  89:20 130:1
  150:12 190:4
  207:10 208:17
  213:20 222:13
  223:19 228:16
  239:14 240:5
  280:5,14 287:9
  288:1,18
girl 200:2,3,15
  200:15
girlfriend
  62:10 82:2

  192:5 195:2,11
  200:6,18 284:8
girlfriends
  77:19,20
  194:21
give 29:9 37:8
  57:21 58:3
  65:6,7 87:10
  90:7,9 123:19
  134:15 152:7
  155:2 174:3
  188:20 217:8
  217:18 218:15
  219:6 229:18
  229:19,20,20
  230:4,5,5,6,7
  240:3 241:10
  241:12 244:17
  264:11,14
  278:10 280:4
  285:19 287:9
  292:10 304:17
given 219:14
  273:8 306:4
giving 28:18
  88:9 149:11
  156:9 238:11
go 8:14 9:19
  11:14 12:16
  23:1 28:7
  31:21 35:20
  38:14,16 41:19
  43:5 57:10
  58:19 61:9

68:10 91:7,8
92:10,13 97:15
100:10 101:1,4
101:12,16
102:9,16 103:1
105:3 108:2
112:4 113:6
116:20 121:2
123:10,19
128:18 131:10
131:10 134:1,3
134:11,16
135:16 136:1
138:12 140:8
155:4,15 156:1
157:1 158:10
159:9,12,13
179:20 184:15
186:18 188:8
188:13 189:16
205:19 214:7
214:18 217:19
219:18 227:12
227:20 228:10
228:16,17
229:6,7,14
231:3,14 235:8
235:15 238:16
243:21 245:11
248:21 252:8
255:3 260:11
264:19 265:17
271:13 272:20
274:2 277:3,12

277:12 278:4
278:11,12,19
278:20 279:18
281:8 283:6
284:11 285:12
285:20 286:3
286:21 289:5
289:11 290:4
293:15
**god** 160:18
221:13
**goes** 84:18
167:6 239:9
257:17
**going** 6:4 8:14
11:20 13:2
15:2 26:2 28:7
28:13 31:5
32:14,17 37:21
38:14 42:6
46:11 51:4
56:11 61:9,10
62:17 69:16
70:10 84:6,12
85:19 91:3,5,7
91:16,16 95:12
97:15,17,18,21
98:1 100:10,19
101:1,4,6,8,11
101:14,16,20
102:8,9,16,18
102:20 106:11
111:20 112:2
116:10 120:4

126:15 128:18
128:19 141:5
146:1,16
148:20 150:8
153:3 154:11
159:12,20
168:4 169:2
174:20 176:11
176:19 177:4
185:17 186:19
196:3 201:3,8
201:8,20,21
205:2 212:2,16
213:7 214:18
214:20 215:6
215:12 218:6,8
218:9,19,20
219:5 221:7,9
221:10,17
222:10,17
223:6,16
225:21 226:5,8
226:9,10,17,18
226:18 227:8
228:17 229:8
230:18 231:3
236:5,19 237:2
237:7,21
239:13 240:4,4
240:13 242:3
242:13 246:14
251:15,16,17
252:4,7,9,12
260:21 266:9

267:7 268:9,20
278:7,7 279:5
280:3,4,5,6,7
280:11,12,13
280:14,15,16
280:19 281:10
281:13 282:18
282:21 283:6
285:4 286:2
287:5,7,8,10
287:10,12,19
287:20,21
288:2,2,3,10
288:15 289:17
290:7 291:17
294:1 298:7
299:17 304:19
305:6
**goo** 3:2 4:5 7:4
7:4 8:9,11
28:20 38:5,12
51:5 84:2
149:13 159:9
159:13,17
160:5 174:17
175:5 196:9,11
199:2,19 201:3
206:8,10 207:4
207:14 209:17
211:9 212:10
214:18 217:1
217:11 220:6
221:9,21
222:11,17

223:1 224:16
225:19 226:12
227:6,12
228:10 229:2
229:17 230:2
230:17 233:7
234:16 236:10
237:2 238:10
238:18 239:18
240:13 241:16
242:8 244:3,16
245:14 247:8
249:12,15,20
250:2,7,10,16
251:1,6 252:6
252:18,20
253:13 254:3,9
255:3,12 256:2
256:6 257:7
258:1 260:11
261:2 262:20
264:19 265:5
265:17 266:14
268:1,15
269:14 274:2
277:11 278:1,4
278:6,13
279:12 280:9
282:18 284:2
284:21 285:5
285:12 286:1
286:18 287:13
289:5,20 290:4
290:20 292:3

293:14 295:10
298:2,6 299:1
299:14,19
300:18 304:16
**good** 6:17 7:6
8:10 66:16
109:3 119:10
145:19 146:3,5
175:6,7 185:15
197:17,17
208:19 212:3
217:1 277:21
283:21,21
**google** 141:20
**gotten** 143:5
282:7
**grade** 55:7,8
**graduate** 55:3
**grand** 35:6
**grandchildren**
33:5
**great** 189:6
229:17
**green** 239:6
**greens** 156:20
**grenade** 153:14
**grew** 17:16
**grill** 99:6
**grilling** 98:19
**grossed** 40:21
**ground** 8:15
9:19
**groups** 130:16
130:16

**gruen** 3:4 7:9,9
196:16 199:18
201:14 207:3
210:14 216:21
221:3 225:21
227:13,21
228:2,5,11
229:16 231:16
232:15 234:4
235:10 238:17
244:2 245:13
251:8,20 253:3
254:2,4 255:5
260:12 264:21
274:3 278:5
279:19 284:20
285:13 287:1
289:12 290:5
**guard** 145:8
154:17
**guards** 145:3,5
145:7
**guess** 21:6
37:17 47:9
70:19 114:9
141:20 147:17
183:5 187:10
192:4 213:14
236:6,20
241:13 242:14
267:8 270:17
271:6 273:20
293:21 294:6,7
300:3

**guilty** 105:4
106:4,6 108:13
147:2,3 162:1
162:1,5,8,10
163:4,5,21
164:2,3 171:9
171:20 172:2,4
187:19
**guns** 100:16
218:11 219:1
**guy** 16:19 57:2
88:4,5,6,7
89:16 112:21
124:10,20
129:3 131:20
131:20 132:3,4
132:11 134:1,3
134:17,21
135:1,2 136:12
136:13 137:8
137:12 142:8
153:3 155:11
155:14,14,16
160:12 185:9
185:17 186:6
192:10 197:5
204:3 271:9
272:1
**guy's** 142:11
**guys** 98:18
135:15,17
136:19 141:6
148:4 185:13
185:15 237:21

259:5

**gym** 144:20

**h**

**h** 4:7 33:4

**habeas** 109:11

**halal** 33:15,16

**half** 99:14,20
125:18 141:9
153:19 159:9

**halfway** 81:2

**hall** 140:9
142:20

**hand** 143:17
144:6 169:6
308:14

**handcuffs**
131:11 155:15
155:16

**handle** 165:8

**handled** 217:5
217:16 285:16

**hands** 15:6

**hang** 75:15

**hanging** 18:10
18:11 19:12
22:16,16 59:15
75:19 76:1,7
89:3

**hangings** 158:5

**happen** 134:7
148:3 155:13
155:17,21
181:11 218:9

218:20 226:9,9
226:17,18

**happened**
98:12 104:10
107:14 124:8
128:5 130:2
132:10 134:8
134:19 135:3
137:6,7,11
146:2 156:4
168:19 184:13
186:4,12
187:11 208:14
210:16 236:9
257:10 260:20
293:4

**happening**
132:7 134:18
139:13 148:6
148:17 156:6
208:17 217:6
217:17 285:17

**happens** 155:5
177:17 200:1

**hard** 140:1
146:12 151:10
160:10 204:3
207:6 222:13
228:15 229:5
231:18

**harm** 110:14
177:8

**haul** 167:21

**he'll** 217:14
226:15 299:17

**head** 52:15
135:20 142:7
142:15 194:19
231:10

**headed** 9:13

**heal** 124:15

**health** 42:7,10
42:15 49:1
148:14,21
149:21

**hear** 7:15
11:13 21:1
23:14 24:2
129:15 185:11
185:21 197:6
199:11 208:8
224:12 227:11
227:17 228:6
239:21 257:2,5
259:7 261:18
290:15 294:7

**heard** 15:3
20:10 21:3,5
23:17,20 63:1
70:15,17,18
82:6,14 84:21
129:2,16,18,20
129:21 130:1
166:3 183:20
185:4,16
187:14 191:6
224:4,13 228:9

235:2 265:11
293:1,1

**hearing** 4:11
4:13 5:2
114:11 115:2
128:13 171:8
195:15 297:2

**heavy** 143:16

**heightened**
148:1

**helicopters**
131:5

**hell** 153:21

**hello** 196:19
220:8,10,15
221:16,16,16
234:7 235:11
256:3 260:15
277:14,20
286:10,16
289:15 290:6

**help** 57:5,7
91:17 190:11
190:13 219:12
238:11

**helped** 58:7
69:2 189:7

**helpful** 70:1
112:19 210:13

**herald** 270:16

**heron** 60:6,7

**hesitant** 145:9

**hey** 197:4,4,4
220:15 253:10

hide 182:19,21
high 49:10,13
54:10,12 55:3
56:9,11,21
highest 136:6
hillman 87:3,4
hindered 104:5
hire 68:19 69:5
189:14 204:17
204:20
hired 68:17,18
69:7 188:7
190:4 204:20
304:9
hisself 90:21
hit 142:6,8
157:20 292:3
hold 168:13
257:12,13
261:1,8,8
262:9 283:13
291:15
home 30:12
42:21 43:1,2
44:21 53:2
87:1 134:2
135:16 136:1
150:11 154:8
158:4 189:7
217:8,19 226:3
253:12 264:9
274:6 285:20
homemade
165:6

homes 27:14
homicide 241:7
241:7
hooked 143:14
hospital 119:11
hot 129:6,6
hour 35:17,18
99:14,16,21,21
159:10
hours 34:10
35:14 99:18
119:9,14,16
house 15:2
57:10,19
116:21 117:1,8
118:3,3 122:21
129:13,16
130:17 205:11
205:12,20
212:8 213:12
253:17
housed 116:13
houses 58:2
housing 86:19
87:6,9,12
133:4
huh 29:1,5
68:12 91:6
101:5 161:19
207:6,19
231:18,21
232:5 243:17
245:5 253:11
260:17 269:2,5

270:4 284:1
humiliating
168:5
hundred 75:5,7
75:10 278:10
278:18
hung 72:2
273:21
hurry 228:20
229:10
hurt 150:13

**i**

i.d. 177:19
178:1,4,5,6,10
178:15,16
179:4,12,18
180:14,19
181:2,14
206:20
ibuprofen
121:12
idea 35:19 40:1
40:21 109:20
identification
242:20 268:18
identify 243:7
299:3 303:9
304:2
identifying
16:13
identity 17:2
20:9

illegal 19:14
immediately
145:6
important
10:13,15 69:12
69:18 104:3
112:20 149:5
183:18 294:4
294:10,13
imposed
169:19
impossible
201:5,6,17,18
imprisoned
116:9
inaudible
197:5,14,15,16
197:17,19,19
197:21 199:20
200:1,1,5,7,8
201:4,7,9,11
206:13,13
207:6,7,11,12
208:12,13,14
208:16,17,18
208:19,21,21
209:1,2,4,5,8,9
209:11,13
210:16 211:11
211:12,13,14
211:16,17,18
211:21 212:2,3
212:5,6,7,8
215:14,16

216:4,6 217:4
217:9 218:10
218:14,15,16
220:16 221:4,5
221:8,11,13,14
221:18,20,20
222:5,8,19,20
223:8,19,20
224:3,18,20
225:1,18 226:1
226:2,2,5,7
227:3,4,5,15
227:16 228:3
228:12,15,21
229:21 230:1,1
232:17 234:5,6
234:8,9,10,13
234:15,15
235:12,13,13
235:14,18,20
235:21 236:1,2
236:3,5,7
237:3,5,6,7,8,9
237:11,13,18
237:19 238:1,2
238:6,8,20,21
239:5,8,17
240:4,14,15,21
241:10,13,14
242:5,6 244:6
244:9,9,11,12
244:13,14,15
245:15,16,19
245:20 246:16

246:17,18,21
247:7 253:11
253:11 254:5,6
254:6,7 255:6
255:9 256:5
257:8,9,11,11
257:12,13,14
257:16,18,20
260:13,14,17
260:18,19,20
260:21 261:1
265:2,19
266:12 268:7
268:10,13,21
269:1,2,2,3,5,6
269:7,8,9,12
274:8,9,10,11
274:13 278:8,9
278:10,11
279:10,20
283:20 284:1
285:1,3,3,16
285:21 287:8
289:13,17
290:13,14,16
290:18 292:4,7
292:12,13,19
292:19 293:1
293:10
**incarcerated**
74:4 85:12
107:7 147:9
175:12 184:4
189:4

**incarceration**
30:20 117:5
160:9 175:13
**incidences**
122:8
**incident** 118:5
155:18 156:5
165:1 188:7
**incidents** 156:3
156:4
**include** 304:7
**incomplete**
14:16
**increase** 228:2
**indifferent**
106:6
**individual** 26:9
133:13 176:17
189:5
**individuals**
84:21 148:13
**induced** 49:14
**ineffective**
111:18 112:1
112:10,13
113:3,9,18
218:21
**informal** 166:6
166:14 167:17
168:19
**information**
4:14 13:12
16:12,13,14,15
20:18 21:8

24:8,10,13,14
25:18 26:13
27:7 63:15,16
64:12,20,21
65:1,3,6,10
92:9 106:1
110:13 112:18
134:15 176:21
177:6 178:19
179:21 180:11
191:5 204:9
271:13 273:1
301:16
**informed**
107:11 171:6
**infraction**
128:9,12
160:15 161:5
164:16
**infractions**
127:16 160:6,9
160:20 168:6
**initial** 92:14
147:15,17
174:5
**initially** 49:18
275:9,15 276:5
**injuries** 94:2
125:4
**injury** 124:9
125:4
**injustice** 189:6
**inmate** 4:11,15
4:17,19,21 5:2

5:3 154:17
169:7 170:10
170:13,18
171:3,6 196:21
206:14 220:10
253:5 277:16
286:12
**inmate's**
169:11
**innocence**
69:17 116:2
**innocent**
205:15
**insane** 129:9
136:1,1 153:21
**inside** 122:2
**insisted** 276:17
**instance**
130:10
**instances** 130:2
**instant** 165:9
166:1
**institution**
117:3 123:12
123:14 136:3
148:7
**institutions**
148:5 150:19
150:20
**instructed** 10:3
83:20
**intent** 50:18
**interacted**
88:14

**interaction**
95:18 96:10
133:6 185:8
**interactions**
96:14 97:9
**interest** 106:16
**interested**
77:16 308:12
**interfering**
163:21 164:5
**interject**
304:11
**interrogated**
308:4
**interrogatories**
4:9 12:19
13:16 15:11
116:6 298:2
303:8,14
**interrogatory**
14:18 26:3,5,8
27:8 299:2
303:9
**interrupt**
147:14 149:13
**interview** 95:1
190:19 191:8
192:21 193:3,6
193:8,9 205:10
262:14 263:6
294:16 301:7
302:11
**interviewed**
205:12

**interviews**
301:6
**intimate** 192:1
**intimidate** 96:2
**introduce** 7:16
**introduction**
129:12 286:8
**introductory**
206:11 234:3
249:8 253:1
277:12
**investigating**
189:5,10
202:14
**investigation**
17:3 24:16
25:13 109:21
125:10 191:15
202:13 203:10
241:5,20 301:9
302:12,13
303:5
**investigations**
192:14
**investigator**
66:18 67:15,16
67:17 68:9
69:2 83:19
183:15 188:8
202:14 230:13
230:14 232:10
236:5,19 241:7
248:19 254:20
255:1,9,16

259:20 261:7
264:13 274:13
275:14 276:8
281:4,6 303:18
**investigators**
66:2,3,13
**investor** 36:13
**invited** 10:5
**involve** 203:21
240:21
**involved**
145:12 163:7
240:9
**involvement**
39:14
**involving**
243:15 258:17
299:21
**isolated** 127:3
**issues** 25:10
150:6 291:21

**j**

**j** 33:4,4
**jail** 20:2 22:2
29:9 30:14
31:10 70:13
72:20 73:11
78:9 79:8,11
79:12,14 80:5
83:2,8 125:18
131:5 156:5
172:3 174:13
175:16 177:11

177:13 183:12
233:13 235:21
**jake** 165:6
**jargon** 120:18
**jaw** 122:2
**jefferson** 55:16
**jessup** 117:12
117:13,20,21
118:1 121:16
128:19 129:11
130:5,8 146:19
151:6 157:8,11
158:14
**job** 35:18,18
**jog** 203:18
**jogging** 203:15
**joint** 116:1
**jones** 17:7,8
24:18 25:17
26:19 103:7
109:17 111:18
175:21
**judge** 65:7
105:4 115:4
**july** 249:1
252:21 271:21
289:5
**june** 12:19 27:2
168:12 169:21
233:19 234:1
248:1,2,12
277:4 286:3
**junior** 11:10

**junky** 71:20
201:10 202:2
239:6
**justice** 188:21

**k**

**k** 31:18 41:7
**kamionski** 3:6
7:5,7,10,12,18
**kara** 253:19
**kara's** 253:16
**keep** 30:11,15
48:7 52:1
106:11 150:8
150:14 154:11
156:2 168:4
176:3 201:3
208:10 209:9
210:3 218:6
221:9 222:17
223:16 224:16
232:21,21
237:2 240:13
242:3 246:14
251:17 257:7
264:9 268:20
279:5 280:1,11
287:4,19
298:19
**keeping** 30:17
172:11
**kelmore** 31:15
31:17

**kept** 30:6 91:4
99:11
**kerry** 2:11 7:2
**key** 103:18
**kids** 57:5
**kill** 135:3
152:20 211:15
**killed** 134:4,21
135:2 136:13
137:1,3,3
142:5 150:12
**killing** 211:14
**kind** 33:14
58:10 59:20
63:18 94:9
**kitchen** 142:7,9
142:10
**knee** 123:21
124:13,15
**knew** 17:12
27:13 74:11,12
82:18 91:13
110:12 136:19
165:15 184:16
186:10 189:19
190:3 195:7
197:14 202:11
239:8 240:9
245:17 247:4
266:5 267:19
267:19 274:1
**knife** 130:15
131:11,12,15
135:7,8 144:16

145:1 155:17
158:3 170:15
**knocked**
117:12 140:5
142:7
**know** 10:6 16:9
16:10 17:2,11
17:17 18:7
19:15,17,18,20
21:21 22:11
23:7 24:12
25:17,19 26:5
26:14,16,17
27:9,10,12
31:15 35:16
38:21 39:1
41:12,13,19,20
42:1 44:3,4,6
45:10 48:1
53:1,6 61:12
61:13,15 62:20
63:4,6,9,10,11
66:15,21 67:4
68:6 69:1 70:5
71:11,14 72:6
73:18 74:2,3,9
74:14,16 75:4
75:14 76:5,6
76:12,13 77:13
81:18,20 82:2
82:4,5,7,10,12
82:14,17 84:14
84:15,16,18,20
90:16 91:8,13

91:14,17 94:12
94:13,15 95:21
96:3 97:7 98:3
99:1,4,19,19
100:7,9 101:3
101:20 102:19
104:16,17
106:12 107:21
108:15 110:8
110:10,20
111:6 113:19
115:5,12,13,13
118:15 122:6
124:20 125:1
128:5,14
136:12 137:19
137:19 138:4
139:5,16,17,18
140:3,11,12
141:1,2,9,16
141:18 143:1
144:3 148:9
152:7 154:14
155:1 156:19
158:20 160:8
160:16 161:3
162:21 164:7,8
164:8,9 165:13
167:6 168:16
179:13 182:11
183:2 184:6,7
184:10 186:8
187:17 188:6
190:17 192:19

192:19 194:20
195:6,10,19
200:3,3,8,9
201:5,6,6,11
201:15,16,17
201:18,18
202:1,2 204:20
205:15 208:4,4
210:1 212:7,9
212:19 216:7
217:5,16,21
221:19 223:6,7
223:8 224:3,13
229:8,19,19
230:5 232:11
235:7,12
236:14 237:3,6
237:8,9,10,12
237:12,12,13
237:14 238:2,3
238:6 239:3,3
239:3,4,5,5,6,7
239:8,19 241:1
241:17,18
242:5,6,13,15
243:12,13,14
243:15,20
244:13 245:4,6
246:16,16,21
247:3,7,16
248:10 249:3
256:15,16,17
257:16 258:5
260:21 261:13

262:2 263:17
263:18,20
264:2,5 265:20
265:21 266:3
266:12,19,19
267:2,3,10
269:10,10
270:13,13,21
271:2 274:5,12
274:14,15
276:21 277:1,2
279:9 282:1
285:4,17
288:17 289:18
290:8,15
291:16 292:9
292:12 293:4
294:6 295:5,7
295:21 297:9
297:11,12,14
300:13 301:11
301:20 302:1,2

**knowing** 72:14
177:5 179:21
238:12

**knowledge**
13:12 15:19
48:20 146:6
173:10 272:17
303:10,12,19
303:20 304:1,3
304:5

**known** 26:10
136:21 304:14

**knows** 200:16
228:18

**l**

**l** 31:18 33:4,4
**label** 148:18
**laboratory**
174:1
**laceration**
120:15 121:3
**lady** 112:20
**lakewood**
54:14 55:10
56:7,18 58:18
71:15
**landslide** 152:3
**language** 95:21
96:7 97:20
122:1 299:7
**large** 74:21
75:1
**larnell** 22:19
22:20 23:2,6
24:3
**larry** 2:10 6:21
**lasted** 144:16
248:8
**lastly** 229:14
**lasts** 145:2
**lateral** 124:12
**launcher**
153:14
**laundry** 140:3
140:15,20

141:12

**law** 24:9 25:18
151:11 296:13
296:14,20
308:4

**lawsuit** 9:21
95:6

**lawyer** 17:4
24:16 26:18
99:10 104:15
105:17,18
106:20 112:4,5
112:8

**lawyer.com** 2:7
309:2

**lawyers** 28:11
28:15 106:2

**lay** 112:3

**lcl** 123:19

**leading** 28:1
80:20

**leagues** 147:9

**learn** 20:10,17
24:14 25:14
63:15 64:17
70:12 73:9
104:7 105:6,16
136:20 151:11

**learned** 105:8,9
105:10 148:17
189:11 219:11

**learning**
211:11

**leave** 55:5,8
56:10 79:8

**leaving** 49:1,9
120:21 166:8

**led** 50:21 125:9
125:10

**lee** 89:17 97:6
99:5

**leeway** 28:18

**left** 10:14 45:2
49:4 55:6,7
56:20 169:6
188:19

**leg** 124:17

**legal** 11:21
13:18 95:13
157:3 297:6
309:21

**legs** 109:20

**lengthy** 99:20

**letter** 4:10

**letters** 62:16
81:5

**letting** 10:18
25:19 237:10
237:11,14

**level** 54:8

**lie** 165:12,13
165:15

**lied** 160:16
221:12

**lieutenant**
154:4 165:6

**life** 42:16 98:5
98:7 136:7
152:4 284:6

**ligament**
124:13

**likely** 101:13
255:1 272:18
303:10 304:3

**limit** 180:5

**limited** 249:15
251:2

**line** 86:1 100:9
143:2,7 209:10
213:1 222:2
232:21 275:13
307:4

**lingo** 202:21

**link** 201:13
202:3,21

**lisa** 81:18,20
82:2

**list** 61:9 73:13
77:15 84:12
105:3 177:21
179:1,1,6,14
179:16 180:1,3
180:7 181:10
233:12 303:14

**listen** 149:5
185:19 204:4
221:12 259:8,9
279:21 280:10
287:4,18

**listened** 130:1

**listening**
184:11 198:19
238:14 239:20

**lists** 178:20

**literally** 91:2
271:4

**little** 29:7,9
38:15,15 91:18
95:17 105:11
108:2 120:3
145:20 147:3
176:4 197:13
211:9 218:7
225:20 227:2
231:14 232:14
235:8 238:16
242:3 256:2,8
271:10

**live** 31:2 54:5
54:13,21 92:9

**lived** 17:17
18:7,9 53:5
56:4,13 58:16
71:15 72:2
75:3,11 117:15

**living** 31:4
52:10,12 54:9
56:6,17 75:8
87:2

**llc** 1:13 2:4
40:18,19

**llp** 2:12 3:6

**loaf** 156:17
**located** 117:10
**location** 117:11
164:1,6 166:7
166:8 167:10
**locations**
166:20
**lock** 85:8 135:1
137:2 155:13
155:14,18,21
168:20
**locked** 79:9
80:12 138:8,13
157:20 201:7
**log** 193:10,11
193:12,14
**logistically**
177:16
**logistics** 118:15
**lollipop** 160:17
164:16 165:7
165:10,16
**long** 30:17 31:4
31:19 48:13,14
54:5,18,21
74:6 78:17
80:10 99:8,8
99:12 107:10
119:7 123:2
124:16 133:12
139:10 142:13
145:1,3,16
146:1 157:19
187:20 188:6

255:16 259:20
274:6
**longer** 38:15
99:20 104:17
145:20 159:12
**look** 13:5 14:5
38:21 42:3
91:16 119:19
120:2 134:11
134:16 153:14
169:13 170:2
172:9 176:10
183:3 188:14
209:3 245:7,20
246:3 254:11
302:3
**looked** 15:4
29:3 98:16
132:2 144:2
201:20 205:15
246:19 302:5,6
304:13
**looking** 89:16
183:3 184:13
238:3 250:10
301:21 302:7
**looks** 120:7
295:13,14
**lose** 205:16
**lot** 11:21 24:12
53:8 58:8
73:18 74:17,17
74:19 81:2
95:13 108:21

109:4 146:14
148:4 156:4
191:15 192:13
198:19 236:17
247:9 274:4
**love** 197:4
**loved** 177:7,12
**lucky** 274:12
**lunch** 174:18
**lying** 108:10
**lyle** 17:7,8
21:11 24:18
25:17 26:19
71:11,14,21
72:6,16,20
73:2,7 94:19
103:7 104:6
105:2 107:16
109:17 111:17
175:21 303:16
**lyle's** 104:8,10
105:6 108:13

**m**

**m** 8:8 31:18
33:4,4
**ma** 287:4,18
**ma'am** 9:4
13:14 19:7
**mac** 156:21
**mace** 145:13,14
145:16,21
153:18

**mackey** 3:11
6:12
**mad** 140:4
**made** 12:13
40:8 42:1,8
65:7 70:13
101:18 115:7
115:11 124:12
133:14 140:4
146:11 150:2
154:7 184:7,19
266:11,12
267:8 275:21
276:1
**make** 8:18 9:1
17:1 56:8 60:9
131:14 137:4
150:3 153:21
154:21 156:11
168:14 177:17
178:11,13,21
179:3,14,18
180:19 181:3
183:10 196:4
207:7,17 210:1
211:20 231:19
232:2,18
234:11 237:20
244:10 306:19
**makes** 221:10
239:1
**making** 29:7
117:4 134:5,6
203:16 209:6

209:20 232:16
244:10,10
252:9
**male** 197:8
198:5,17 199:6
200:11 234:21
236:11,21
240:8 242:10
255:20
**man** 136:6
140:20 141:13
207:9 208:13
236:3,17
245:20 289:16
289:19 290:16
292:16 293:4
**manage** 37:5
**manipulative**
96:1,8,9 97:13
97:14 98:3
**manner** 308:8
**marijuana**
61:5
**marked** 12:6
12:21 119:17
161:8 163:19
164:20 166:4
167:8,18
168:17 170:8
172:8 176:9
295:9
**marker** 216:3
216:19 232:13
243:21 245:11

255:3 289:11
**market** 185:10
185:12 187:13
246:11,18
247:18 248:3
269:4,16 270:8
270:19 271:9
272:7
**marks** 305:5
**marriage** 76:19
76:20
**married** 77:1
**maryland** 1:2
1:15 2:6,14 3:8
6:9,12 64:19
116:21 117:1,8
118:2,3 119:4
119:5 122:21
129:13,16
130:17 138:13
191:4 196:21
220:11 253:6
277:16 286:12
308:1,2,15
**mate** 127:20
**math** 158:18
**matt** 2:3 6:17
305:8 309:1
**matter** 6:7
154:20 209:3
303:12,19,20
304:1,5 308:7
**max** 147:11

**maximum**
117:1,2,3
147:6
**mballenger** 2:7
309:2
**mcij** 117:5
126:10,13,14
144:13 157:15
157:19 159:6
**meal** 140:9
**mean** 14:3
16:14,17 17:5
17:15 19:15
20:9,15 21:6
23:15 27:12,21
33:4 35:17,18
40:3,5 41:19
45:17,18 46:2
47:7 52:20
55:19 58:11
65:16 66:10
69:20 70:5
74:19 76:4
77:12 80:11
88:5 109:7
111:20 112:5,8
112:14 113:5
113:19 118:3
121:21 129:1
133:21 139:16
142:11 147:14
151:7 159:17
178:17 180:2
183:6 191:19

195:12 200:6
200:18 202:1
208:13 212:8
212:19 213:14
216:17 217:3
217:14 221:6
223:8,17,18
235:6 237:16
238:2,3 239:16
240:7 241:7
242:7,13 244:4
247:1,1,2
251:14,15
256:20 257:14
269:9 270:13
271:20 273:12
273:16,20
279:6 284:7,15
285:15 292:11
294:6,9 296:8
298:19 304:1
304:13
**meaning** 154:2
178:20 179:16
235:19
**means** 14:6
270:14 273:13
308:7
**meant** 8:21
46:2 203:3
271:2
**meat** 156:21
**media** 6:6
84:10 160:3

175:3 231:1
283:4
**medical** 4:10
118:10 119:3,5
120:18 121:3
123:19 124:14
**medication**
45:15,18 46:1
46:3,16,17,19
46:21 47:1
48:3,9 49:17
49:19
**medications**
9:6,8 45:17
121:5,6
**medium** 117:5
147:7,11
150:21
**meet** 78:6,13
189:1 191:13
**meeting** 99:10
241:19
**melajah** 33:2,3
**melvin** 1:4,11
4:3 6:6,7 8:4
11:10 105:14
161:14 169:7
171:3 172:16
196:21 198:9
198:20,21
199:2,4 206:14
206:16 220:10
253:5 277:16
286:12 293:8,8

306:10 308:3
309:4,5
**member**
275:17
**members** 180:8
194:21
**memorandum**
302:17
**memory** 53:12
93:3 109:3
203:15,18
**men** 140:3,15
**mental** 42:7,10
42:15 49:1
116:8 136:2
146:13,17,20
147:1,16 148:5
148:6,14,19,21
149:21 151:5
151:12,18
157:17
**mentally** 123:7
146:12 148:11
**mention** 94:2
115:7 157:12
247:11 303:17
**mentioned**
11:3 39:10
45:21 90:1
93:20 94:13
97:12 113:3
127:5,7 128:16
134:11 138:15
157:18 163:7

175:11 177:11
185:4 193:5
288:17
**mentioning**
85:3
**messed** 148:11
197:15
**messes** 135:20
**met** 17:10 78:9
78:11 79:10,16
87:20 88:2
255:8,15
**metal** 144:4
**methodologies**
150:4
**mexican** 139:8
141:6
**mexicans** 139:3
139:7
**mhc** 121:14
**michael** 140:13
140:17 141:20
**midatlantic**
309:15
**middle** 11:11
54:10 113:11
113:14 124:4
207:6 231:18
244:14 245:5,6
**mildred** 32:9
32:15
**mind** 95:14
108:9 113:6
134:6 172:11

236:17 238:20
271:16,18
274:15
**minded** 9:1
**mindful** 10:18
**minds** 40:18,19
**mine** 216:1
**minute** 84:4
117:18 145:20
196:17 208:11
214:19 216:3
216:19 232:13
243:21 245:11
255:3 262:17
282:19 289:11
**minutes** 146:3
146:5 159:14
159:16 237:11
244:1 248:9
264:20 289:14
289:14,15,16
292:5,6 304:18
**miranda** 87:10
89:19,20
**missing** 261:21
**misspoke** 218:1
**misthinking**
300:3
**mistreatment**
154:19
**mode** 96:1
150:11 151:15
**mom** 217:7,10
254:11 263:19

278:3 286:19
287:14 290:12
291:10,19
**moment** 14:5
119:19 120:2
176:11
**moments** 150:7
**momma** 82:3
195:2,10
**mommy** 222:13
**monday** 1:12
59:3
**monetary**
210:6 233:3
**money** 38:18
41:19 42:1
59:18 207:9,19
219:12,14,16
226:2 231:21
232:5,9,11
280:11 281:5
287:2,3,5,15
287:19
**monitored**
197:2 215:15
220:12 253:7
277:18 286:14
**month** 29:13
77:8,11,11
152:17
**monthly** 38:18
40:13 41:17,21
130:18

**months** 59:6
195:20,21
**morgan** 14:7,9
14:18 64:8,9
64:13 65:4,15
69:7,9,13
114:18 115:9
190:17 194:6
273:18 274:8
274:18 303:16
**morning** 6:17
7:6 8:10,20 9:6
9:9,11,14
26:14 58:12,13
58:14 283:21
283:21
**mother** 46:20
53:7 61:16
77:3 81:11,15
184:9,12
186:16 195:14
198:3,4 200:6
200:7,18,19,20
202:8,10,18
203:13 204:12
205:1 207:5,8
207:18 212:8
213:2,6,8
220:4,18
231:17,20
232:3 246:20
253:15 275:6
282:2 288:14
289:21 292:13

**mother's**
205:19 213:12
249:7 277:10
283:13 286:6
289:8
**motion** 5:5
25:8,10,20
66:8,9,11 71:3
109:13,16
110:1,11,17
111:9 114:11
175:20 176:5
188:16
**motions** 109:8
**motor** 142:6,8
142:10,16
143:16,20
**mountain**
221:6
**mouth** 99:7
**move** 130:9
156:4 157:13
216:2,19 221:1
221:6
**moved** 53:8
56:12 109:17
122:16,17,18
**movement**
157:21
**moving** 143:3
145:8
**mpia** 65:11
115:7 193:1,6

**mullin** 2:11 7:2
7:2
**multiple**
129:15
**murder** 74:1
131:6,8 132:15
132:21 135:5
138:5,6
**murdered**
135:4
**murders** 130:4
131:18 134:10
136:7,8,10,17
136:20 137:5
137:11,13,15
137:17 138:20
142:2 144:10
**myron** 15:5
16:3 20:13
26:11 69:8,9
69:19 82:3,7
82:12 83:7
86:13 103:20
104:4 108:9
175:15 183:11
183:19 184:2
185:5,14 186:6
186:9,10,14
187:10 190:18
191:14,18
192:2,9 194:8
194:11,18
195:2,6 203:6
203:7 204:12

205:1,12,19
213:5 214:11
217:18,21
233:8,17
241:21 242:1
242:11 243:12
243:16,19
245:1,2,3,5
246:2,6 254:18
256:1,18 262:1
262:11,14
263:2,6,10,13
263:21 265:11
270:2,4,6,11
270:19,20
271:21 272:14
273:18 279:4
280:19 285:18
288:7 291:4
295:2,11 299:5
302:12,18
303:16

**myron's**
254:11,12

**n**

**n** 2:1 4:1 8:8,8
78:3
**nah** 213:15
**name** 4:2 6:12
7:6,17,19 8:11
11:9,11 17:4
21:7 23:1,4
26:9,12,15

27:10 33:1
39:3,17 40:17
45:10,11 63:1
66:15 68:16
73:13 81:20
84:14,16,20
85:1 89:16
92:9 99:4
137:18,19,20
137:21 140:12
140:13 141:1,2
161:14 163:14
165:20 169:7
176:17 182:15
182:17,20
192:15,18,18
195:7 218:1
**named** 16:19
108:18 308:3
**names** 11:14
22:18 32:7
40:8 61:17
68:10,11 71:17
78:15 84:13,19
85:3 89:12
94:12 303:15
**namey** 16:19
16:20 17:12
20:9,12 21:12
21:14 22:12,15
23:7,14,17,20
24:6,10 25:10
26:13,17 27:9
74:9,13,14

75:10,14,18
84:16 110:7
187:4,5,5,7,8
**namey's** 17:2
**nasty** 142:17
**nathan** 3:6 7:4
7:7,9,12,18
**nathans** 2:10
2:12 6:21,21
154:16 271:18
299:13
**nathanslaw.c...**
2:15
**nation** 155:11
**nature** 148:2
177:5 197:3
215:16 220:13
234:6 253:8
277:19 283:21
286:15
**near** 56:4
**necessary**
306:6
**necks** 156:8
**need** 10:19
28:14 40:10
49:19 66:10
133:3 207:12
222:21 223:12
223:17 234:14
254:7,14 260:9
289:14,16
**needed** 40:7
44:2 58:10

100:5 148:14
149:20 177:17
190:12 306:19
**needs** 36:3
148:21
**neighborhood**
17:16,19 84:17
**nervous** 237:17
**never** 18:9
33:19,21 67:10
68:3,5 79:9,14
82:6 85:7
87:12 88:19
108:16 112:16
112:17 125:3
132:12 142:14
147:5 151:9
152:4,21 153:6
153:8,16 154:6
155:5,5 157:11
174:15 184:14
184:14 185:1
191:6,6 194:4
195:6,7 196:1
203:17,17
208:14 213:8
214:6 217:21
218:1 219:14
224:4,13
258:13 279:9
279:16 301:7
**new** 5:5 25:8
25:21 66:8,9
66:11 109:6,8

109:13,16
110:11,17,21
111:10 114:11
130:21 175:20
188:16
**news** 217:8,19
285:19
**nice** 118:2
**nick** 11:14
26:12 61:17
68:10,16 71:16
78:15 84:15,19
85:1,3 137:20
141:2
**niece** 191:11,11
**nigger** 152:18
207:11 211:19
212:3 216:4,13
218:12,15
219:2,5 246:17
279:8,15 285:7
**night** 60:11
63:14,14 67:7
93:21 94:16
190:21 191:2
217:7,18 236:2
272:15 285:19
**nina** 66:21 67:2
67:4 191:11,11
191:18 192:2,7
192:15 193:3
194:2 243:10
262:2 303:15

**nine** 118:17,18
**ninth** 55:9,9
**nklawllp.com**
3:9
**normal** 59:11
77:15 85:20
124:17
**north** 31:3
53:17,18 54:1
54:5,19,20
55:10,18 56:7
56:18 117:3
123:12,13
127:10,11
136:6 139:5
141:21 152:11
152:21 153:4,7
156:7 157:9,10
160:16 167:1
168:8,9,10
**northern** 1:3
125:5 126:9
127:8 136:4
138:20 142:2
152:1,2 157:13
159:2 164:16
167:3
**notarial** 308:14
**notarizer**
296:15
**notary** 1:16
296:17 300:1
308:2,18

**note** 309:10
**noted** 29:11
**notes** 300:14
300:17,18,21
301:1 302:7
308:6
**notice** 1:10
4:15,17,19,21
128:13 132:1
171:16
**noticed** 147:7
**notwithstand...**
299:8
**november**
164:15 165:5
172:18 173:1
308:21
**number** 6:10
9:20 11:17
12:10 14:18
20:1,3 26:3,4
27:8 84:10
85:20 90:2
92:10 148:13
160:3 175:3
177:19,20
178:1,4,5,6,10
178:13,15
179:4,5,9,13
179:18 181:3,6
181:8,14 182:4
182:5,6 183:3
183:7 189:20
190:1,3 196:6

196:7 197:21
206:5,21
214:17 215:6,8
215:10 219:20
219:21 224:18
231:1,4,5,9,12
234:1 249:1,3
249:4,7 254:11
254:12,19
277:5,7,10
283:4,7,9,13
286:4,4,6
289:6,8 303:9
303:15
**numbers**
161:21 178:16
180:1,2,5,7,14
180:19 181:16
181:19 182:2
**numerous**
130:14,14
131:5 142:5
**nutritious**
157:2

**o**

**o** 8:8 31:18
**object** 11:20
28:13 37:21
43:13 95:12
112:2 144:8
149:7 205:2
276:18

**objection** 10:5
12:16 13:17
14:1 29:7 93:9
299:9
**objections** 10:1
**observe** 117:21
128:20,21
130:4 131:2
136:5 139:2
144:13
**observed** 14:19
64:13,14
128:17 139:3
144:11
**obtain** 263:15
295:1
**obtained** 193:1
193:6 194:17
300:9
**obtaining**
115:8 258:3
**obvious** 267:18
**obviously** 9:20
118:9 122:7
132:17 138:15
196:14 251:17
302:4
**occasion** 18:16
18:17
**occasions**
181:12,15
289:1
**occur** 43:12
141:13

**occurred** 24:20
96:10 171:17
**occurring**
86:17
**octavia** 61:13
61:21
**october** 161:6
170:4 171:12
171:17 196:4
196:11
**offender** 173:5
**offense** 171:21
**offenses** 50:21
52:9
**offer** 275:21
276:1
**office** 297:10
297:10
**officer** 7:19
8:12 88:13
165:5,15,16
171:8
**officers** 7:8,10
7:21 12:11
88:10 125:9
155:7,9
**offices** 1:13
**official** 128:13
**oh** 22:3 101:16
115:1 160:16
160:18 218:18
238:7 239:1
241:6 253:11
260:21 264:16

265:18 269:6
269:13 270:7
**oil** 129:6,6
**okay** 8:1,16,17
9:3,8,13 10:21
11:1,7,8 12:7
12:18 13:1,9
13:15,20 14:15
14:21 15:16,21
16:8,15 17:10
17:17 19:21
20:21 22:7,14
25:2,13 26:8
27:2,6 29:16
29:19 30:2,5
30:11,14 32:2
32:5,12 36:5
36:14,17 37:8
37:17 39:3,10
40:17 43:10,16
45:4 46:10
48:2 50:12,17
51:5 52:6,16
53:15 54:12,15
54:18 55:3,10
55:17 56:16
61:3,5,9 62:8
62:14 63:6
64:5,17 65:21
66:5 67:8,16
67:18 68:8,19
69:12 70:19
71:11,14 75:2
75:7,18 77:1,5

77:17 78:13
79:18 80:4,13
82:10 83:10
84:2,5 86:12
86:16,21 91:18
92:1 93:3,16
95:6 97:12
98:20 100:4,20
102:19 103:18
106:3 108:2,11
109:1 110:6,17
111:17 112:12
113:4 114:3
115:11 116:5
117:18 120:17
121:2,13,16
122:14 123:10
124:3,8 125:7
126:9 127:5
128:16 130:9
132:17 138:19
139:12,20
140:9 142:2
144:10,13
146:16 150:16
151:1,4 152:13
159:8,9 161:14
163:9 166:11
166:16 170:20
171:2,3,11,13
171:14,20
172:14,15
173:19 174:12
175:15,19

177:4 178:4
179:2,9 180:18
183:9,14 186:8
193:13,16,19
193:21 194:2
194:20 196:2
198:7 199:6,9
200:10 201:3
203:7,20
204:17 207:1
208:6 210:20
212:15 214:7
214:10,15
216:2,8,11,19
219:18 220:5
220:19 221:8
222:16 223:12
223:16 226:6
226:13,15
229:18 230:4
231:11,14
232:7 233:11
233:16 234:17
235:2,8 237:21
237:21 238:10
238:15 239:19
240:13 241:6
241:17 242:9
242:19 243:9
243:11,21
245:2 246:10
246:14 247:6,9
247:17 248:15
248:18,21

249:8 252:19
253:16,21
260:5,11 263:8
265:11 269:6,6
269:8,8,8
270:11,18
271:3 272:13
274:9,20 275:5
275:19 277:1
279:5 282:14
283:17 284:11
289:10 291:6,9
294:15 295:1,8
295:18 296:2
297:5,9,12,15
297:17,20
299:15,19
300:6,13 301:9
301:18 302:7
302:20 303:2
**old** 32:12,15,20
**once** 44:7 77:8
77:8,9,11
129:16 146:10
147:21 148:18
196:13
**ones** 95:9
138:17 142:4
177:8,12
292:17
**onsite** 174:5
**open** 119:1,2
146:13 149:11
149:12

**opened** 133:17
**opening** 99:7
**operate** 33:18
33:19,21 34:14
**opiates** 121:9
**opinion** 103:18
**opportunity**
15:13 34:21
35:4 184:1
**options** 188:18
**order** 49:11,12
128:18 154:7
**original** 306:7
**orleans** 55:13
55:15,16
**outcome**
308:12
**outline** 249:12
249:21
**outright**
152:10 156:7
**outside** 75:15
133:5 166:12
167:4
**overload**
151:12
**overlooked**
304:14
**overtime** 150:2
**overwhelmin...**
133:7
**owe** 256:18,20
**own** 30:6 34:16
39:6,8 49:21

109:20 112:12
178:5 189:5
211:14 276:5
**owner** 36:13
190:19 192:16
301:10
**owns** 35:2

**p**

**p** 2:1,1
**p.m.** 159:21
160:3 174:21
175:3 214:21
215:3 230:19
231:1 283:1,4
298:8,11
304:20 305:2,7
305:11
**package**
223:19,21,21
224:8,9,10
226:2
**packet** 65:8
**page** 4:4 13:2,3
13:4,4,6,7
14:11,13 15:17
26:5,8 120:4,9
120:10 161:10
161:12 162:2
165:1 169:3
170:9,13,16,17
170:18,21
171:1,15,15
172:9,10,10,13

176:12 303:13
306:20 307:4
**pages** 120:12
**paid** 35:6,9,11
35:12 36:5,7
40:13 41:8,17
59:8 209:15
210:9,10,18
216:5,14 218:8
218:13,19
219:4,13 233:6
276:4 280:20
281:2,10,11,13
281:18 285:2,7
288:10,15
**pain** 121:5,6
**paper** 162:15
162:17 306:7
306:21
**papers** 302:1
**paperwork**
108:16 191:9
264:8,9
**paragraph**
120:7,14
169:14 173:19
176:12,13
**paralegal**
189:6
**paranoid**
142:12
**part** 36:6 39:7
95:14 104:16
104:17 116:5

198:18 200:10
220:6 226:13
228:6 236:14
243:2 256:4,10
259:9,18 260:6
260:16 261:5
261:11 265:2,7
265:12 268:5
269:12 270:9
283:18 286:8
301:9 303:4
304:8
**partaking** 76:7
**partially**
239:12 240:2,2
**particular** 18:4
29:16 70:8
298:17
**parties** 308:11
308:12
**partner** 35:2
41:10
**pass** 24:8
**passed** 73:7
**passing** 244:5
**past** 129:3
**patsy** 212:2
**patuxent** 73:20
**pause** 10:3
197:7 198:1
201:14 206:15
207:14 209:17
212:10 215:18
217:11 221:21

222:11 223:1
225:2 226:12
236:10 242:8
246:1 253:13
255:12 256:6
265:5 286:1
287:13 289:20
290:20
**pausing** 197:8
**pay** 35:8 37:5
57:12 188:10
190:6 219:16
230:13,14
275:13
**paying** 36:21
37:2 275:6
282:12
**payment** 275:1
275:8,12,16
276:12,13
282:3,7
**payments**
275:9
**payroll** 37:13
37:16
**peaceful**
185:16
**peel** 129:5
**peeled** 129:7
**penalties** 13:10
15:18 173:9
**penalty** 128:7
164:12

**pending** 11:5
104:7
**people** 19:12
21:2,3,6 36:17
40:10 41:15,15
57:2,6 60:14
61:10 69:6
74:17,19 75:2
75:7,11,13,17
75:18 76:1
77:13,15
118:17,18
129:15 131:5
136:9 142:12
142:20 146:4
147:6 148:9,21
150:9,15 152:6
152:20 153:8
153:15 156:5
179:1,5,10
185:8,9 189:7
189:8,12
190:10,14,15
222:9,13 223:7
225:1,10
228:16,18,19
229:6,8,9
233:11,12
240:16 263:19
270:3 273:8
293:12 294:2
296:16,21
**people's** 180:19

peopling   143:2
percent   39:8
  268:13,14
perfect   184:1
period   18:18
  19:4 22:8 47:4
  47:20 52:8
  60:21 80:2,21
  127:17 135:10
  190:11
perjury   13:11
  15:18 173:9
perkins   17:20
  17:21,21 18:2
  18:2,5,16,19
  19:9 27:14
  51:13,15,21
  52:2,4 60:2
  74:16 75:1,3,8
  75:11
perpetrator
  16:3
perry   3:3 7:7
  7:19
person   16:13
  16:16,18 20:13
  21:7 25:19
  26:15 48:21
  61:12,12,13
  62:20 67:6,21
  68:6 70:16
  71:12 81:10,18
  82:5,8 84:14
  85:12 97:20

112:3 128:1
132:20 164:1,5
181:9,9 183:21
186:20 217:6
217:17 238:12
241:17 242:21
268:12,17
273:7 284:15
285:18 299:4
303:13,18
304:6,9
person's   26:10
  26:15 177:20
personal
  143:13 173:9
  191:21 303:10
  303:12 304:3,5
personally
  128:21 130:4,6
  308:3
persons   89:13
  149:20 181:14
  303:10 304:2
petition   69:17
  111:11 113:20
  114:8 116:2
phone   62:16
  81:5 92:9
  161:5 177:17
  177:18,21
  178:14,20,21
  179:14,18
  180:19 181:3,7
  182:14,18,19

183:1 190:2
196:3,17
198:19 199:6
199:17 206:5
209:18 211:4
214:2,16,17
215:6,8 219:19
219:21 231:3,4
231:8,12 234:1
234:21 240:10
244:19 246:11
247:4,11,13,15
247:20,21
248:1,6,8,11
248:16 249:1,3
249:4,17
253:14 254:19
255:6 271:20
272:4 276:10
277:4 280:21
283:7 284:3
286:2,4,19
288:15 289:6
290:7 292:15
292:18,19
photo   243:15
  243:18 246:2
photograph
  239:13 240:3
photographic
  71:3 242:19,20
  243:5 268:17
physical   42:7
  42:10 49:7,10

100:19 116:7
116:11 125:4
126:12 146:8
physically
  100:13 117:10
  123:7,8,14
  147:21 194:13
  301:21
pick   191:13
  267:20
picking   152:9
picture   191:13
  240:20,20,20
  240:21 241:14
  242:15 268:5
  268:11
pictures   240:16
  243:6 266:13
  267:12
piece   271:10
  306:20
pieces   155:15
piss   150:4
place   6:11 52:3
  52:4,5,15
  186:13 190:19
  258:10 308:4
placed   129:7
places   52:14
  116:13
plain   89:5,6
plaintiff   1:5
  2:2,8 6:18,20
  7:1,3 26:13

299:10
**plaintiff's** 12:5
  196:14
**plan** 278:9,16
**plastic** 119:9
  165:8
**platter** 165:5
**play** 196:3,17
  197:13 206:10
  211:9 215:7,12
  219:20 220:6
  222:4 227:2
  231:5,7 232:13
  233:4 234:2
  249:2,8 253:1
  256:2 260:8
  283:17 286:8
  289:10 292:3
**played** 153:5
  201:1,15 202:5
  202:6 207:21
  225:11 227:10
  236:15 272:9
**playing** 208:7
  224:16 232:1
  240:12 257:2,7
  268:1
**plea** 5:4 104:12
  104:14,16
  105:9 106:8
  108:13,16,19
  162:1 170:11
  170:14,19
  171:8

**pleading** 105:4
  106:6 171:9
**pleadings**
  303:11 304:4
**please** 6:15 8:2
  10:20 11:8
  12:4 199:17
  201:3 207:2
  209:17 215:13
  216:20 225:2
  229:15 231:15
  233:7 240:13
  246:14 254:3
  256:6 260:11
  265:17 268:2
  274:2 279:5,18
  286:21
**pled** 106:4
  171:20 172:2,4
**plenty** 264:7
**point** 25:9,11
  38:7 50:10,11
  51:1 56:20
  62:2,3,5 66:14
  70:19 79:8
  81:2 84:2
  86:12 94:3
  102:6 111:4,12
  125:21 133:16
  137:9 142:21
  157:4 175:17
  175:18,19
  184:15 196:2
  214:1 243:20

247:1 252:15
  266:2,21
  269:18 271:20
  273:9 280:20
  284:9,10 288:9
  290:1 291:1
**police** 12:11
  29:19 30:1
  51:6 63:20,21
  64:19 65:2
  86:20 87:7,15
  88:13,17,18
  90:3,5,14
  91:19 95:1
  98:12,14 135:4
  139:10 152:20
  186:16 191:2,9
  191:13 205:11
  207:10 209:14
  210:7,17
  211:13,13
  212:1 233:4
  258:9,12
  259:14 271:13
  272:20 273:1
**popping** 156:3
**portion** 201:15
  206:11 207:15
  207:20 208:8
  209:18 216:8
  234:3 249:9
  250:18 253:1
  256:7 277:12

**portions**
  249:15 250:13
  250:14
**pose** 298:5
**posed** 92:1
**positive** 165:10
  169:16 172:21
  174:2,4
**possessed**
  303:12 304:5
**possessing**
  168:13 170:3
**possession**
  50:17 161:5
  162:14 163:3,4
  163:5 168:15
  171:21 194:14
  194:15 302:14
  303:6
**possibility** 94:1
  204:13,16
  205:3 273:20
  282:4
**possible** 92:21
  93:7 114:5,9
  134:15 179:20
  180:10,12
  181:11 216:3
  221:2 281:17
  281:19 282:2,6
  282:8
**possibly** 22:7
  177:7 188:11

post 109:4,10
109:10 111:11
112:8 113:20
114:7
potato 156:20
pounds 142:17
pratt 1:14 2:5
6:11
pre 179:6
prefer 159:19
preliminary
8:15
prep 36:3
prepaid 196:19
206:12 220:8
277:14 286:10
preparation
27:17
prepare 28:4
prepared
113:12 260:2
302:10 303:4
preparing
29:20 196:3
prerecorded
206:19,20
prescribe 48:3
prescribed
45:18 46:16
47:2 121:10,11
presence 174:1
308:10
present 34:21
97:5 103:8,15

104:13,15,19
105:2 186:4,21
296:12 297:13
299:4,10,18
presentation
268:16
presented
243:5
press 220:14
234:7 253:9
277:20 286:16
pressure 49:11
49:13 50:1
186:15
presumably
36:2
pretty 18:3
62:19 66:16
79:20 97:7,19
102:8 104:18
109:3 119:10
124:5 157:20
259:8
previously
15:14 189:3
196:15 231:5
286:5 288:17
primary 49:3
prince 138:9,14
printed 308:7
prior 27:19
43:3,5,7 82:11
82:11 112:21
175:12 176:5

176:18 247:12
247:18,19,20
258:4 259:17
prison 42:20
43:7 77:6
109:19 122:11
131:14 135:21
137:7 147:4,5
147:6 148:5,7
148:12,20
151:15 153:16
156:14 157:5
158:17 284:15
private 68:9
69:2 83:18
183:14 188:7
189:5 202:14
232:9 236:19
248:19 255:8
255:16 259:20
261:7 264:13
274:13 275:14
276:8 281:4,6
303:18
privilege 28:16
probably 10:13
18:20 28:17
58:5 159:11,15
182:12 214:14
254:20 282:5
probation
60:19
problem
124:20

proceedings
109:4
process 104:17
155:2,4
produce
196:12 251:3
252:5,14,17
301:19
produced
196:16 251:9
product 250:13
251:10,12
252:2 301:4
professional
1:16 49:1
237:8
professionali...
189:10
program 159:1
159:5
programming
159:4
programs
159:3
projects 17:20
18:2,3,5,16,19
19:9 51:13,21
52:2,4 60:2
74:11,16 75:3
75:8,11 240:17
244:6
proof 134:2
prosecutor
209:14 210:8

210:18 233:5
**proud** 211:18
**prove** 134:6
**provide** 27:7
  158:17 196:14
**provided** 13:16
  13:21
**provider** 49:4
**proximity**
  132:4
**psychiatric**
  42:17 43:6,17
  43:19 44:12
  48:18
**psychiatrist**
  45:6,9,13 47:9
  150:6
**psychological**
  42:17 43:6
  44:12 48:17
  148:19 149:9
  149:10
**psychologica...**
  150:1
**psychologist**
  45:6,8,12,14
  47:12,13
**psychology**
  158:19,20
**psychos** 148:8
**ptsd** 44:15,18
  45:18 46:4
  47:8 48:1,16

**public** 1:17
  64:20 191:4
  308:2,18
**pull** 297:20
**punch** 124:11
  124:19 177:19
**punishment**
  156:12,13
  157:5,7
**punk** 207:13
**purpose** 42:11
  66:5,6 205:20
  299:1
**purposes** 69:14
**purpura** 105:1
  106:12 107:2,4
  107:6 108:3
**pursuant** 1:10
**push** 218:20
**put** 15:5,8 57:9
  100:16 112:5
  126:8 136:15
  148:5 156:20
  178:1,5,10,14
  188:9 190:1
  240:21 273:5
  298:12
**putting** 149:1
  156:8 298:17

---

**q**

**quarantine**
  144:19

**quarantined**
  127:4
**quarterly**
  41:18
**question** 9:5
  10:4,6,8,10,11
  10:18 11:5,5
  12:12 18:1
  30:6 38:20
  39:5 70:11
  81:7 83:7 92:5
  95:15,16,17
  98:9 102:10,12
  102:13,14,17
  104:9 107:18
  127:6 134:14
  137:14 147:10
  149:6,11,18,19
  150:16 154:10
  158:11 162:20
  176:20 178:7,9
  179:17 180:9
  193:4 198:20
  203:4,14,19
  232:7 241:2
  259:11 261:12
  262:20 266:2
  266:10,11
  267:1,7,8,16
  267:18 268:8
  269:21 270:1
  272:21 273:5,6
  274:21 294:12
  296:10,11

298:5 299:3
  304:6,10
**questioned**
  273:4
**questioning**
  88:6 91:2
  100:7,9 205:16
**questions** 8:15
  8:20 9:20 10:7
  10:21 42:6,9
  42:12,14 61:11
  84:13 85:20
  86:1 88:7 90:2
  91:10,19 92:1
  92:10 93:13,17
  94:8,9 98:9,11
  99:11 100:10
  105:3 116:7,11
  131:1 146:17
  149:14 231:7
  234:15 238:19
  254:8,15
  259:17 262:18
  265:4,8 269:11
  289:3,19 290:2
  290:19 292:6,7
  293:7,9 297:1
  298:20 304:16
**quick** 51:3
  119:19 154:10
**quicker** 229:1
**quiet** 141:3
**quite** 189:7
  236:3,18 237:6

**r**

**r** 2:1 31:18
**racism** 152:5
  152:10 156:7
  159:4
**raise** 49:21
  239:13
**raised** 25:10
**ran** 124:10,19
  132:3,4 135:4
**rank** 154:2
**ransom** 216:7
  216:15 285:9
**raped** 129:17
  129:18 130:2
**rat** 239:16
  240:7
**rate** 136:7
**reach** 66:1
  67:11,21
  183:11,11,15
  189:21 195:1
  204:11
**read** 14:4
  92:15,21 110:1
  110:15,15
  120:3 255:10
  255:17 259:21
  260:14 265:19
  305:4 306:2
  307:4 309:9
**reading** 6:2
  249:11,19

250:15 251:13
260:3
**reads** 165:11
  165:21
**real** 16:8 51:3
  131:11,14
  133:6 137:19
  155:18 156:3
  184:13 186:20
  192:10 230:15
**realize** 148:16
  279:6,14
**realized** 132:9
  148:6
**really** 10:15
  28:3,8,9
  145:10 192:12
  222:18 279:9
  279:16 290:11
  291:18 292:10
**reason** 27:6
  69:20 70:7,8
  103:13 133:6
  148:3 208:21
  209:7,21
  232:18 239:10
  239:11,12
  240:1,2 265:18
  266:17 267:20
  301:18 303:17
  304:6 307:4
  309:11
**reasons** 126:6
  126:7

**rec** 139:6
**recall** 20:1 21:4
  21:5,7 29:18
  30:3 31:14,15
  43:9,21 44:1
  44:18 45:11,12
  46:3,18,18
  47:21 48:5
  50:20 51:2,6,9
  51:18 52:6,15
  53:5,7,8,21
  54:8,15 55:2,6
  55:6 56:6
  57:13 58:6,8
  60:10 63:12
  64:10 68:20,21
  71:2,8 73:10
  86:1,17 87:19
  89:1,12,17,20
  90:12 91:10
  92:6,8,12,18
  92:19 93:2,4
  93:19 100:3,4
  100:6 101:13
  105:5 109:13
  109:16 110:18
  111:9,21
  114:14,19
  115:9 116:16
  118:6,7 121:8
  121:9 125:14
  133:19 144:12
  161:4 162:18
  163:15 166:5

166:10,12,15
168:12 172:6
176:1,2 180:20
181:16 182:1
187:11,17
194:18 204:19
213:7,8,10,21
214:10 231:11
231:13 233:16
246:10 247:13
247:15,17
248:1,4,13,15
264:1,14,18
272:7,10,12
273:17 276:14
276:16 281:16
291:13 297:19
300:2 301:3,12
302:19,20
303:7
**receipt** 309:17
**receive** 43:11
  43:20 45:5,15
  46:5,13 48:2
  89:19 118:10
  120:21 121:2
  121:17 126:12
  126:16 127:14
  128:9 160:7
**received** 43:17
  43:18 44:6,19
  45:1 46:7,11
  90:2 119:8
  127:16 164:12

166:19 192:21
243:3 301:5
**receiving** 161:4
166:6,14
168:12
**recently** 201:7
201:19
**recognize**
197:9 198:1,5
198:17 200:11
212:11 215:8
215:18 219:21
220:17 223:2,9
231:8 234:17
236:11 277:5,6
278:2
**recollection**
24:15 25:20
86:3,7 94:6
103:12 109:2
112:7 114:2
121:19 161:2
244:18 262:7
**recommended**
46:3,19
**record** 4:11 5:2
6:4,16 10:20
11:3,9 84:7,8,9
86:10 94:17
122:4 159:20
160:1,2 165:4
174:21 175:1,2
175:10 214:18
214:20 215:1,2

215:4 230:19
230:20,21
252:8,9 283:1
283:2,3 284:5
292:20 298:7,9
298:10,13,18
304:19,21
305:1,6 306:4
**recorded**
182:14,16,19
182:21 197:2
206:18 215:14
220:12 253:7
277:18 283:19
286:14 308:6
**recording**
198:18 207:16
207:20 209:19
210:21 215:13
218:3,5,18
219:8,10
223:14 224:7
225:4 226:14
226:20 229:4
229:12 230:9
236:14 242:10
245:3,9 254:16
255:14 256:9
263:20 270:15
278:15 279:2
292:20
**recordings**
251:14 252:11

**records** 4:10
134:3,14 203:8
**red** 139:9
165:7
**redirect** 250:4
**refer** 68:13
**reference** 19:3
199:10
**referenced**
309:6
**referencing**
261:20
**referring** 18:5
213:5
**reflected**
169:16
**reflection**
225:11
**reflects** 225:5
**reframe** 104:9
**refused** 45:17
45:21
**refusing**
252:16
**regardless**
148:20 182:20
**registered** 1:16
**regular** 62:19
81:16 88:21
131:4 136:12
152:19
**regularly** 62:18
80:17 157:5

**rehabilitate**
148:10
**rehabilitated**
148:11
**reisterstown**
154:6
**related** 9:21
25:10 30:7,15
30:18 39:5
42:7 48:3
76:18 77:2
127:6 150:17
231:7 300:15
308:12
**relates** 67:5
**relating** 116:11
**relation** 96:17
**relationship**
22:12 42:4
62:8 71:21
72:14,16 190:5
191:21 192:1,2
284:12,14,16
**relatives** 19:13
23:9
**released** 117:6
126:21
**relevance** 38:1
**relevant** 42:13
**reliability**
189:9
**relief** 111:12
113:21

| | | | |
|---|---|---|---|
| **remain** 93:5 | **replaying** | 230:9 236:16 | 101:18 281:12 |
| **remember** 20:6 | 271:10 | 242:9,17 245:3 | **responsible** |
| 51:14 52:11,12 | **replied** 245:5 | 245:9 254:10 | 36:21 37:1,3 |
| 53:2,16 57:13 | **report** 4:14 | 254:15 255:13 | 138:16 |
| 66:15 71:6,16 | 41:6 63:17,18 | 256:9 265:6 | **rest** 100:1,5 |
| 88:1,4 90:18 | 63:19,20,21 | 266:16 267:12 | **restaurants** |
| 90:19 93:8,11 | 154:12 165:11 | 270:9 278:14 | 35:3 |
| 93:16 94:9,9 | 165:21 166:2 | 278:21 | **restricted** |
| 94:11 107:8 | 167:9,12 | **represented** | 157:21 |
| 111:7 114:20 | 171:12 193:19 | 111:14 115:2 | **restriction** |
| 124:1 126:2 | 194:10 294:19 | **representing** | 166:7 |
| 160:10,19 | 301:2,15 302:9 | 7:20 | **result** 45:4,16 |
| 163:10,12,14 | 302:10,16,17 | **request** 44:5 | 46:17 65:11 |
| 170:5 174:8 | 302:20 | 65:13 115:8 | 125:2 128:10 |
| 181:19 200:5 | **reported** 1:21 | 134:14 193:1,6 | 169:20 172:21 |
| 200:17 203:2 | **reporter** 1:16 | **requested** | 174:5 |
| 213:1 232:1 | 6:14 8:2 10:12 | 60:15 | **results** 131:9 |
| 248:18 266:18 | 10:14 305:8 | **required** | 172:19 |
| 270:2,3,4 | **reporting** 41:6 | 178:21 | **retainer** 190:6 |
| 272:8,10 | 41:7 154:17 | **reside** 31:9 | **retribution** |
| **remembered** | **reports** 29:20 | 32:1,2 | 177:7 |
| 104:18 | 30:1,3 | **resided** 31:6 | **retrieve** 258:13 |
| **removal** | **represent** 8:12 | **residence** | **return** 35:21 |
| 120:19 121:4 | **representation** | 52:18 53:4 | 309:13,16 |
| **removed** 129:8 | 200:21 202:5 | **resolution** | **review** 4:13 |
| **repeat** 72:10 | 207:16,20 | 166:6,14 | 15:10,13 27:18 |
| 91:7 95:16 | 209:19 210:20 | 167:17 | 28:4 29:19 |
| 101:2,11,15 | 212:20 213:3 | **respond** 204:9 | 108:11 309:7 |
| 102:18 193:4 | 216:12 217:13 | 270:7 | **reviewed** 28:10 |
| 196:7 | 218:18 219:8,9 | **responded** | 28:21 29:13,17 |
| **repeated** 97:18 | 222:12 223:13 | 254:12,13 | 111:3 176:5 |
| **rephrase** 10:10 | 224:7 225:4 | 256:11 267:9 | **reviewing** 29:8 |
| **replay** 210:12 | 226:20 227:9 | **response** 27:7 | **right** 8:10 |
| | 229:3,12 230:3 | 91:8 101:1,9 | 10:14 16:4 |

17:2 24:21
25:1,6,11,16
26:4 27:11,17
28:20 36:16,20
37:7 38:2
40:11 42:11
47:3 53:20
55:15 56:15
70:21 75:9,15
82:7 86:12
89:8 93:5 95:4
95:9 100:8
103:4 110:7
111:1,5 113:16
114:12 118:2
120:13 123:21
126:10,21
135:9 140:5,10
144:7,9 147:19
149:1 153:3
156:14 162:14
163:6 164:4,15
166:3 168:14
170:5,6 174:3
175:13,14
176:6 178:12
179:7 183:3,7
183:16 186:17
188:5 197:5,15
197:20 198:10
199:7 205:13
207:7,9,17,18
209:8,14,15
210:2,7,8,17

210:18 214:3
215:12 221:1
221:12,14
226:10,19
227:20 228:10
229:14 230:1,7
231:19,20
232:3,4,12,19
233:4,5,9
235:3,18,18,18
235:19 236:4,6
236:7,9,12,15
236:18,20,20
237:20 238:1,8
238:9,9,20
239:1,6,7,9,10
240:8 241:1,2
242:7 246:5,20
247:6 248:6
249:12,20
250:3,10 251:3
253:21 254:14
257:17,17,17
257:21 259:18
262:6 265:19
266:1,17,21
267:1 268:3,3
268:8,10 269:9
269:9 270:12
272:2,15
273:15 274:5
275:17 277:3
278:8,15 279:7
279:21 280:21

284:21 286:7
287:4,16
288:10,20
289:3,15 290:7
290:16 291:1,2
292:16 293:3,8
294:2 298:14
300:16
**rights** 92:14
  156:9
**ripke** 2:9,12
  6:19,19 298:4
  299:9,12,15
  300:10
**road** 31:15
**robinson** 115:3
**roche** 1:13 2:4
**role** 241:8
**rolled** 131:21
**rolling** 208:10
**room** 98:16,18
  98:21 99:9
  100:1,5,14
  167:21 299:15
**roommates**
  149:18
**rotates** 36:12
**round** 225:10
**routine** 43:12
**rpr** 1:21
**rule** 4:15,17,19
  4:21 152:15
  161:21 162:4
  162:13,20,21

164:4,7 171:16
**rules** 8:15 9:20
**rumor** 20:18
  24:9
**run** 15:6 35:9
  38:11,13 39:11
  153:10
**running** 36:15
  37:18 129:3
  132:2 148:12
**rushing** 124:12

**s**

**s** 2:1 3:7 4:7
  7:18
**safety** 133:2
**sag** 156:11,16
  156:17
**salary** 35:10,11
**sally** 191:7
  192:6,7,17,18
  193:1,16
  194:18 258:9
  301:11 303:3
**sally's** 93:20
  190:19 192:16
  258:10,14,17
  258:20 261:21
  262:6 301:10
**sample** 173:21
**sanction**
  169:19
**sat** 143:6 184:5

**saturday** 34:8
34:9,10
**savagely**
148:12
**save** 250:4
**saw** 18:13,15
18:19 19:9,11
83:13 96:17
131:18 132:15
132:17 133:17
141:5,10
155:19,20
183:21 263:20
272:9
**saying** 10:16
14:8 18:15
42:11 90:21
91:4,15 93:5
97:20 98:2
149:16 182:8
187:8,9 199:21
200:4,17
201:12,13
202:2,4 206:15
207:11 208:13
208:16,20
209:11 210:4
210:19 211:7
211:16,17,20
211:21 212:4
225:1,9 226:6
228:14 229:4
232:8 233:1
234:9 237:9,15

240:18 241:11
242:12 244:13
259:3,9 261:17
262:5,8 266:1
266:8,20 267:6
268:7 269:7
270:15 272:7
272:10 274:16
279:11 280:2,2
280:3,12,19
287:6,6,7,20
287:20 288:9
**says** 13:9 14:9
23:11 26:9,12
110:11 120:7
120:15,17,18
161:14,17,21
162:10 165:1,4
166:2,17,18
167:9,12 169:7
169:11,14
170:18 171:3,6
172:15 173:4,8
173:19,20
176:13,16
177:4 200:14
200:20 216:12
224:12 225:3
228:6 236:21
240:8 270:2,4
270:6,11,15,15
270:19,20
272:19 278:17
299:2,7,8

303:9 304:2
**scar** 118:2,8
**scared** 132:20
192:7
**scary** 136:2
**scattered**
145:10
**school** 54:8,11
54:13 55:3
56:9,11,21
**screaming**
129:2
**screening**
172:19
**seal** 308:14
**search** 164:1,5
164:8
**seated** 10:14
**second** 13:3
51:17 101:18
174:1 176:12
197:7,8 198:1
207:14 215:5
215:18 217:12
221:21 222:11
223:1,9 224:6
226:12 227:6
234:16 236:10
238:10,15
239:18 241:16
244:16 246:1
247:8 253:13
254:9 255:12
256:6 265:5

266:15 268:15
269:14 278:13
279:12 284:2
285:5 286:1
290:20
**seconds** 145:20
210:14 215:13
220:7 222:4
253:3
**secretary** 250:8
**section** 161:20
**security** 117:1
117:2,4 147:6
147:12 150:21
**see** 13:6 15:8
19:15 72:11
81:15 102:20
105:19 112:16
118:12 120:8
120:14 129:9
130:13 131:8
133:14 134:5
139:17,21
140:1,2 141:4
142:4 143:18
159:14 161:15
161:16 162:1,3
162:4,6,9,11
165:2 169:6,7
169:9 170:13
170:20 171:4,9
171:12,13,16
171:18,19
172:15,20

173:11,14,16
176:14 181:11
184:20,20
188:14,20
189:21 190:2
190:10 200:1,2
200:15 201:9
201:21 202:15
207:11 208:18
212:4 239:10
240:1 250:7
255:2 266:5
268:11 269:8
274:7,7,9
290:11 291:18
292:5 293:11
**seeing** 131:4
135:6 147:4,5
205:20 247:3
291:7 292:1
**seeking** 116:9
**seem** 14:8 88:9
109:3 222:8,8
298:18
**seemed** 88:7,11
96:1 105:9
144:16 146:3
216:1 246:8
267:18
**seeming** 219:3
**seemingly**
145:2 148:8
**seems** 148:4
153:17 184:1

218:13
**seen** 15:5,6
19:16 22:16
48:21 64:3
65:17 70:16
82:14 85:11
108:16 112:16
112:17 113:2
119:20 125:3
129:3 130:11
130:15 131:6,9
131:9,9 132:12
133:4 136:7
142:5,15 153:6
153:7,8,14,15
153:15,16,16
157:11 158:1
184:14,14
185:1 186:11
191:6 244:4,7
244:8 263:18
271:9 295:15
301:20,21
**segregation**
168:21
**selected** 103:3
**self** 49:14,21
**sell** 60:1,11,15
143:10
**selling** 59:20
174:15
**send** 154:8
250:19

**sense** 211:20
239:2 244:11
**sent** 173:21
234:14 257:19
309:14
**sentence**
120:18 177:9
**sentenced** 25:5
**sentencing**
109:14
**separate** 92:5
306:6
**separately**
262:21
**september**
114:10 161:18
166:5
**sergeant** 154:3
**series** 61:11
243:6 265:3,8
269:10
**serious** 177:8
268:8
**serve** 72:17
**served** 22:4
**set** 12:18 30:9
42:6,14 60:14
96:2 131:1
146:17 179:5
308:4
**seven** 197:3
220:14 234:6
253:9 277:19
286:15

**seventeen** 26:7
**shared** 21:8
**shareef's** 39:4
39:7,7
**sheet** 131:17
234:14 306:6
306:20 307:1
309:11
**sheridan** 126:4
126:5,6
**shield** 153:7,9
153:10,13
**shields** 153:6
**shiny** 144:4
**shirts** 40:8
**shit** 216:4,13
224:10 285:1,7
289:16 290:11
**shock** 153:6,6,9
153:12,13
**shocked** 153:11
**shocking**
139:17 141:4
**shoes** 139:9
140:1
**shoot** 14:13
**shooter** 15:5
16:8 63:13,14
67:7 108:19
110:12 176:19
185:1 186:21
187:8,9 272:18
272:18,19
273:3

shooting   14:10
  14:19 15:3,5
  16:3 20:13,15
  22:5 24:11
  64:14 86:13
  112:21 113:2
  175:16 243:4
shop   60:14
short   61:21
  93:18 273:7
  292:8
shortly   187:16
  187:18
shot   24:6 26:11
  70:6,6,16
  176:17 183:21
  185:9,17 272:2
  272:14
shots   15:3
  205:15
show   13:2
  134:3 203:9
showed   116:6
  193:13,14,15
  241:13 242:15
shower   155:16
  167:21
showers   152:17
showing   12:4
  13:1 119:18
  163:18 164:19
  166:11 167:7
  168:18 170:7
  172:7 176:8

242:6
shown   242:20
  243:7,9,19
shut   102:7
  133:11
siblings   32:5,8
  32:10
sid   20:1,3
  181:16 183:2
side   23:10
  48:14 53:18,19
  53:20 139:4,7
sided   120:12
  172:11
siff   3:5 7:12,17
sign   155:3,4
  173:17,18
  296:17 305:4
  309:12
signature   13:7
  13:9 169:10,11
  169:12 173:5,6
  173:7 174:9
  308:17
signed   15:16
  27:2 169:21
  263:9 295:18
  295:21 296:12
  298:15 299:11
  299:12,21
  300:10 309:19
significance
  195:8

significant
  195:8
signing   6:2
  173:12 299:4
silent   93:5
simple   105:9
  112:15 266:10
  267:8
sir   52:1 252:3
sister   253:20
sit   142:12
  143:4
sitting   73:3
  113:17 143:3
  184:3,8 195:12
  195:14
situation   89:3
  134:1 185:11
  186:19 192:8
  209:2 237:18
  239:11 240:2
  241:9 242:14
  247:18 266:4
  267:2,18
  273:13
six   34:14 54:7
  239:7 283:5
sixish   134:9
skills   150:3
skin   129:4,4
skinned   273:7
sleep   118:4
  146:11

sleeping   118:7
slept   133:3
  144:19
slightly   150:21
slop   157:1
small   74:19
  75:17,21 98:18
  98:18 148:3
  182:4,6 250:13
smooth   132:14
sneakingly
  142:13
sock   143:19
  144:1
socket   142:11
sold   59:19
  160:17 257:10
solemnly   173:8
solutions
  309:21
somebody
  21:12 72:2
  81:6 87:15
  118:9 129:17
  129:18 130:1
  150:5,13
  178:18 179:2,4
  179:12,18
  181:4,13
  182:16 187:15
  197:14 202:9
  202:15 205:19
  214:7 222:19
  222:20 232:8

234:13 239:16
240:7,9 273:9
281:17,19,21
282:4 284:17
**soon** 153:11
**sooner** 236:4,7
236:18
**sorry** 7:14
11:11,13 13:3
33:20 36:9
47:13 48:6
54:18 56:7
59:13 62:4
86:4 120:10
124:8 127:6,21
147:14 155:9
157:10 162:16
168:13 173:15
178:8 192:20
203:20 204:17
213:19 215:5
235:5 254:21
257:4 264:17
271:7 286:2
288:12 291:15
295:2,15 296:9
300:18 303:21
**sort** 297:6
**sound** 24:21
25:1
**sounded** 201:2
211:7 220:20
228:8 242:18
245:10 254:17

255:19 256:1
256:13 265:10
265:13 267:14
268:19
**sounds** 25:7,12
106:10 163:16
198:3 202:9
204:15 220:18
235:4 241:21
242:1 277:10
**source** 219:13
**south** 53:6,9
54:19
**space** 57:3,4
**span** 182:9,10
**speak** 16:6
62:11,18 72:19
77:6 80:16
86:10 90:3
107:2,6 193:16
194:2
**speaking**
198:13 199:7,7
238:12 240:10
241:18 255:21
296:9
**special** 111:3
**specific** 60:16
67:5 82:11
93:17 94:5,11
95:8 97:8,8
106:7 111:21
125:21 141:18
142:1 180:4

187:17 190:10
190:13,15
259:13
**specifically**
22:19 51:14
86:18 136:13
144:15 179:14
**specifics** 28:17
105:10,12,13
106:13
**speculation**
95:14 276:19
**speed** 251:15
251:19
**spell** 31:17
61:20
**spending** 37:18
38:19
**spin** 99:11
**spoke** 28:14
73:1 194:6
214:2,4,6
264:12 301:10
**spoken** 64:1
65:15 83:2
**spoon** 165:8
**spray** 153:19
**spraying**
145:13
**sprint** 168:2,3
168:3
**stab** 246:20
**stabbed** 272:9

**stabbing** 132:2
132:6 146:4
**stabbings**
129:15 130:11
130:12 131:4
142:5
**stabs** 155:17
**stack** 224:21
225:9,13,14
297:21
**stages** 302:13
**stand** 184:15
**standing**
131:21
**stare** 99:5
**start** 10:21
78:4 80:7
116:20 117:20
145:13,21
207:4 219:13
225:19,21
277:6,11
**started** 8:16
40:7 49:16
124:10 149:17
189:5
**starting** 128:18
199:16 227:13
234:4
**starts** 176:13
**starved** 125:8
127:7,19
**starving** 128:8

**state** 6:15 11:9
26:9 148:20
303:11 304:4
308:1,2
**state's** 184:7
**stated** 8:11
12:13 76:15
84:15 245:5
301:14
**statement** 14:7
15:7,16 90:7,9
96:11,13 97:1
97:5 101:19
102:6,11,21
108:12 112:16
206:19 210:12
239:14 263:12
265:14 276:4
294:20 302:10
303:2
**statements**
115:8 194:16
240:5 275:3
**states** 1:1 6:8
25:21 268:7
**station** 87:17
90:6 91:19
92:7 98:12
**stations** 86:20
98:14
**stay** 31:19
**staying** 49:16
**stenographic**
308:6

**stenographic...**
308:6
**step** 51:4
**stephen** 45:19
45:20 48:21
**steroids** 153:18
**stipulated** 6:1
**stipulations**
308:9
**stitch** 122:2
**stitched** 119:10
**stitches** 121:16
**stitching** 122:5
**stock** 225:16
**stolen** 155:2
**stomped** 139:8
140:5,13
**stood** 60:17
91:1,12 139:17
**stop** 139:11
145:11,12,12
145:12,12,14
145:19,20,21
145:21 156:6
176:20 184:8
213:11 218:17
219:5 223:9
224:6 227:6
229:2 230:2
232:1 233:7
234:16 238:10
239:18 241:16
244:16 247:8
254:9 258:1

261:2 266:14
268:15 269:14
274:17 278:1
278:13 279:12
280:9 284:2
285:5 286:18
292:20 293:14
**stopped** 140:19
236:15
**stories** 156:2
**storm** 208:21
**story** 156:1,1
185:5,20
186:17
**strange** 97:20
184:16,17
239:4
**street** 1:14 2:5
2:13 3:7 6:11
18:4 20:20,21
22:1,3 53:7,21
55:11,18 56:7
175:17,18,19
**streets** 131:13
**stress** 147:20
157:17
**stressing** 49:16
**stretch** 151:14
**strike** 21:13
41:5
**strip** 165:10
**strolling**
131:16

**struggling**
222:9
**stuck** 100:20
218:10 219:1
**students**
296:13,14,20
**stuff** 11:21
57:9,10,11
94:4 130:11
134:6 146:11
168:21 188:10
192:6 236:1
244:10 255:10
255:18 260:1
269:3 270:6
279:21 287:3
287:15
**stupid** 207:8,18
231:20 232:3
**subdural** 122:5
**subject** 171:6
303:11 304:4
**submitted**
173:21
**suboxone**
165:9,11
174:13
**subpar** 124:14
**subpoena**
107:12 113:10
113:13
**subsequent**
115:8 199:1,3

**subsequently**
47:5,7 117:6
**substance**
169:4,15,17,21
172:12 174:2,7
**successful**
213:12,20
**suffer** 151:13
**sufficient** 15:9
**suite** 1:14 2:5
2:13 3:7
**sunday** 34:8,9
34:10,12
**sundays** 34:13
**supplemental**
114:8
**supporting**
108:13
**supposed**
166:13 167:5
178:14 251:13
256:11 259:15
273:14
**supposedly**
20:19 48:7
70:16 186:17
**suppress** 71:3
**sure** 8:19 9:1
10:9 17:1
43:13 56:1,8
70:12 74:10
76:9 83:6
92:12 93:15
94:4 115:5,15

115:19 119:20
137:4 154:21
167:2 168:11
168:14 174:19
179:3 180:6
182:8 183:10
187:16 190:17
196:4 198:20
206:21 208:10
212:1 229:19
229:19 230:5,7
234:12 236:4
236:18 237:6
238:7 250:5,16
252:9 268:13
268:14 269:7
271:9 272:16
282:20 289:4
298:6
**surgeon** 119:9
**surprise**
108:18,20,21
110:10
**surprised**
110:15
**survival** 150:3
150:11 151:14
**survive** 150:6
150:10
**suture** 120:19
121:4
**swear** 8:3
13:10,20
221:13 247:15

**swearing** 15:17
**swings** 153:20
**switch** 286:2
**sworn** 8:5
**sync** 204:9
**system** 120:21
152:6,9 177:12
177:16
**systemic** 152:5
152:8

**t**

**t** 4:7 8:8 61:21
**table** 73:4
98:18 100:17
106:19
**tabron** 78:4,5,6
78:7 79:1 81:8
213:17,18,19
231:12
**tactics** 189:10
**take** 8:19 9:9,9
11:4,6 13:5
14:5 41:11,20
46:17,20 47:1
48:13 49:17
51:4 57:10,11
84:3 91:3,6
100:18 101:6,8
101:14 102:18
103:3 113:12
118:10 119:19
120:2 121:7
145:3,16 152:6

155:4 158:12
158:13 159:11
159:17 176:10
190:1 226:6,15
227:3,4,8,14
227:15 228:13
230:16,17
250:20 282:18
298:4
**taken** 1:11 9:5
9:16 48:11
86:20 119:2
**talk** 10:17
39:13 69:6,7
73:16 77:17
80:14 81:13
83:7 92:17
104:6 112:21
136:4 139:1
149:3 177:15
188:8 202:19
202:20 204:3
214:8 217:10
222:6,6 226:7
226:16 233:17
238:2 271:1
284:7 289:2
290:17
**talked** 63:13
67:7 79:18
108:3 147:17
183:9 186:14
191:1 192:6
202:19 203:17

| | | | |
|---|---|---|---|
| 217:7,18,21 | **tape** 95:2 | 291:21 | **testifying** |
| 218:2 238:1 | 199:21 240:5 | **telling** 186:17 | 114:20 115:9 |
| 248:5 270:2,3 | 257:21 259:13 | 258:9,19 272:1 | 173:12 |
| 285:18 290:9 | 262:13 271:11 | 288:14 | **testimonies** |
| 291:17 | **taped** 112:15 | **ten** 64:18 | 29:17 |
| **talking** 25:14 | **tapes** 191:5,6 | 112:17 153:19 | **testimony** |
| 41:13 53:20 | 191:10 193:7 | 156:8 159:14 | 26:14 27:20 |
| 75:21 77:16 | 193:13,15 | 159:16 166:6 | 66:12 100:8 |
| 81:1 90:17 | 258:12,12,14 | 182:7,8,12 | 103:9,13,15 |
| 130:19 147:10 | 258:17 261:20 | 187:21 188:3 | 206:2 306:4 |
| 149:17 152:10 | **taxes** 41:6,11 | 210:14 215:13 | 309:9,17 |
| 154:16 193:7 | 41:15 189:18 | 220:7 264:19 | **testing** 42:17 |
| 197:5 198:17 | **tay** 61:18,19,21 | **tennis** 140:1 | 43:6,11,17,19 |
| 198:21 199:1 | **teen** 56:17 | **term** 43:14 | 173:21 174:5 |
| 199:13 202:9 | **teenage** 18:20 | **terms** 11:2 19:4 | **thank** 176:4 |
| 202:20 208:2,2 | 19:1 | 28:20 29:10 | 199:19 201:14 |
| 208:5 211:4,6 | **telephone** | 43:16 95:10 | 229:17 238:18 |
| 213:13 221:17 | 196:5 | 106:8 149:18 | 244:3 245:14 |
| 221:20 232:8,9 | **tell** 8:5 28:14 | 157:16 238:11 | 278:6 283:6 |
| 232:12 238:7 | 63:6 88:13 | **test** 165:10,18 | 290:16 293:14 |
| 239:19 242:21 | 90:11,13,14 | 166:1 169:18 | **thereabouts** |
| 244:18 246:6 | 95:10 97:15 | 172:19 174:1,4 | 167:17 245:12 |
| 246:10 247:17 | 100:21 112:12 | **tested** 165:8,10 | **thew** 262:19 |
| 257:14,16 | 116:16 118:5 | 169:15 174:2 | **thing** 8:18 |
| 258:3,5,6 | 125:7 141:21 | **testified** 70:21 | 10:13 13:17 |
| 259:4 261:3,6 | 185:3 186:18 | 71:4 114:15 | 44:2 49:8 91:1 |
| 261:10 262:3,4 | 204:8 211:6 | 283:9 286:5 | 97:19 101:3 |
| 265:15 268:16 | 218:16 219:7 | 302:9 | 109:6 153:19 |
| 269:1,1,4 | 221:7 239:15 | **testifies** 8:6 | 156:10,11 |
| 270:5,7,19 | 240:6,7 264:15 | **testify** 9:2,10 | 158:1 167:13 |
| 271:1 272:21 | 267:15 278:8 | 71:9 104:4 | 187:13 191:4 |
| 280:1 287:5 | 278:16 282:13 | 105:14 106:20 | 192:5 207:8,9 |
| 288:6 300:4 | 285:1 289:13 | 106:21 107:12 | 207:17,18 |
| | 290:10 291:18 | 107:16 | 209:8 210:2 |

224:8 226:4,11
226:19 228:16
228:20 229:6
229:10 231:19
231:20 232:3,4
232:19 236:3
237:13 238:4
239:1,4 241:9
245:17 246:15
267:16 268:11
268:12 273:15
273:15 274:12
280:7,16
287:11 288:3
**things** 28:10,11
36:8 40:11
75:16 92:8
94:11 101:13
112:15 124:17
125:18 140:10
140:12 148:10
151:13 152:16
155:10 158:1
203:11 236:17
251:15,19
252:10 259:15
**think** 35:6
38:20 47:11
63:12 64:13
70:14 75:3
84:2 89:16
93:11 103:14
113:16 138:16
149:7 150:14

151:19 156:2
161:1 174:17
175:10 180:4
183:14 184:18
184:19 187:14
189:4 203:16
203:17 218:6
221:4,5,10
223:21 224:9
228:9 251:11
252:11 264:4
272:13 282:8
282:18 297:14
297:19
**thinking** 9:1,13
52:14 184:17
279:7,14 300:4
**third** 170:9,18
171:1
**thomas** 1:4,11
4:3 6:7,7 8:4
8:10 11:10,14
12:8 14:17
15:8,21 19:21
26:2 27:17
31:2 32:9 33:2
33:3 50:5 72:4
73:13 74:8
80:7 84:12
94:20 114:20
115:1 119:18
149:5,17 160:6
161:15 169:2,7
171:4 172:16

175:6,8,11
197:9 214:11
215:7,11
219:21 231:8
243:2 249:3
261:3 283:8,10
293:9,16
306:10 308:3
309:4,5
**thomas's**
105:14
**thought** 70:9
79:10 91:3
108:9 112:13
188:11 198:16
205:3 218:9,19
223:6 261:19
**thoughts**
205:10
**thousand** 35:13
225:16 227:3,4
227:8,14,15,16
228:1,3,4,7,9
228:13,14
230:11
**threat** 98:5,6
100:19
**threaten**
100:13
**threatening**
100:8,11
**three** 14:12,13
32:21 34:20
35:18 44:20

98:18,20
136:13,15
137:5 138:16
138:18 139:4,6
139:6 155:15
160:4,9 161:2
161:3 167:13
169:3 230:8
233:13 235:15
261:14 273:8
289:2 292:5,6
296:16
**threw** 128:6
129:5 262:18
**throw** 153:21
205:15
**tier** 128:7
137:8,10,12,15
137:16 140:3
**time** 11:4 18:18
19:4 22:4,8
38:1,8 43:3
44:4 47:4,20
50:8 51:1 52:8
52:13 56:20
59:13 60:11
61:1 65:17
73:1,11 74:7
75:8 78:21
80:2,11,21
83:13 84:7,10
87:1,2,14
91:15 96:17
98:2 99:12

101:4,18
104:21 112:19
114:4 116:18
116:19 117:15
124:4,16
126:19 127:17
129:4 130:15
131:6 133:4,12
133:16 135:11
137:8,9 139:6
142:6,13,18
144:21 145:18
150:15 155:11
159:21 160:3
160:12 168:20
174:18,21
175:3,15
184:13 186:13
187:20 188:6
190:11 193:7
195:21 196:2
201:19 208:19
214:21 215:3
222:13 224:19
224:20 225:8
230:19 231:1
236:2 238:1,5
247:4 250:4
258:11 268:10
274:11 275:10
283:1,4 288:18
289:15,17
292:4,21,21
294:8 298:8,11

304:20 305:2,7
308:3 309:18
**timeframe**
29:10 134:4
141:15,17
204:20 309:8
**timely** 154:9
**times** 59:1
60:16 77:10,11
81:14 99:3,4
120:3 152:17
152:18,19
261:15 288:19
**tired** 139:9
**titled** 169:3
170:10 172:11
**today** 6:14
10:12,16 27:18
27:20,21 28:2
28:5 29:12,21
100:8 151:13
197:21
**together** 78:17
85:9 112:6
133:9,10 157:1
192:3
**told** 46:16 96:4
106:12,14,16
108:14 109:19
187:15 189:21
202:17,18
222:19,20
228:19 229:9
237:4 241:3

254:11 260:20
280:4,13 281:9
281:13 287:8
287:21 290:13
290:15,17
291:10,19
292:9,13 293:8
**tone** 95:20 96:7
**toned** 150:21
**took** 25:21
64:18 87:17
97:1 98:4
104:12 109:5
123:20 124:16
136:15 139:10
142:11 143:14
143:15 152:17
158:20 165:19
191:3,10
250:19 258:12
294:20 300:19
**top** 52:15 113:6
129:2 161:14
171:4 172:15
178:19 194:18
231:10 255:9
**tore** 123:18
124:12
**totality** 151:8
**totally** 192:11
**touch** 153:11
183:19 205:1
213:20 273:19
288:18

**touched** 129:4
129:7
**towards** 132:3
**toys** 153:4,5
**transcribed**
308:6
**transcribing**
252:2
**transcript**
249:11,16
252:6,14
261:17,18
294:15 305:9
306:3,7 309:6
309:19
**transcription**
308:7
**transcripts**
27:19 29:2,4
29:14 108:12
249:14,16,18
250:12 251:12
251:14,20
**transition**
190:3
**trash** 128:7
**treat** 49:15
**treated** 45:9
50:2 119:12,13
119:15 127:2
**treatment** 45:5
45:16 46:13
118:10 119:3,8
119:12 120:20

121:3 123:20
124:15 127:4
148:14 149:1
149:21
**trial** 5:5 17:4
24:13,20 25:8
25:15,21 29:2
29:4,13 50:8
66:8,10,11
71:8 73:4 83:1
103:4,6,9,19
109:6,8,13,16
110:11,17,21
111:1,10
112:14 113:3
113:11,12,14
114:11 175:20
176:18 188:16
195:16,17,19
**trick** 207:10
**tricky** 203:14
272:21 273:2
273:11,12,13
273:16
**tried** 91:21
106:19 113:10
123:18 191:13
197:20 211:14
218:9,20
239:15,15
240:6,6
**truck** 33:10,12
33:18 34:5,17
34:19 35:5,7,9

36:15,18,19
37:6 38:19
39:9
**trucks** 34:3
35:3
**true** 13:11
15:19 17:2
75:12 173:11
176:21 177:1,2
177:9 183:21
306:3 308:7
**trust** 239:8
273:9
**truth** 8:5,6,6
13:20 185:3
188:15 216:6
216:15 258:9
274:4 275:12
276:5 282:12
282:12,13
285:3,8
**truthful** 169:20
173:13
**try** 10:10 66:1
69:8 102:5
109:5 113:13
153:1 167:20
182:15 188:19
188:19,20
192:10 209:3
219:13,15
278:17 294:1
**trying** 38:5,6
38:12 39:21

41:8 95:21
96:2,3,11
99:11 124:10
148:10 149:14
155:6 185:2
192:9 197:11
222:3 223:4
224:20 225:8
236:12 240:11
246:8 255:7,15
257:2,5 259:4
259:19 266:19
267:15,17
273:17,19
288:19 293:10
293:18
**tuned** 236:12
**turn** 120:4,11
144:18 169:2
170:9,21
171:14 172:10
**turned** 65:10
189:8
**turner** 62:20
63:4,7,9,10,16
64:1 303:15
**turner's** 63:1
**twenty** 32:21
121:18
**twice** 70:21
71:1
**two** 21:19
23:13 32:10
41:9 50:8 52:9

52:14 58:5
62:14,18 72:16
73:16 76:18
77:1 78:17,19
79:18 80:7,10
80:13 81:1,3,5
81:8,12 84:11
85:8 86:4 98:9
99:18 101:7,13
120:11 130:6
131:7,7 133:3
133:8,17 136:9
139:3,6,7
140:3 141:6
142:3 144:21
147:8 165:14
166:19 182:2
195:20,21
230:7 235:21
256:14 259:3
259:12 262:18
270:18 278:10
278:17 289:14
289:15,16
291:3 297:17
303:13
**type** 19:13 36:2
42:16 43:5,11
44:11 45:15,21
48:17 49:8
74:13 76:6
88:21 89:2,3
91:17 121:6
150:5 155:12

156:19,21
157:1 158:19
186:11,19
192:6 209:9,12
210:3,6 216:7
216:15 232:20
233:3 235:21
241:4 242:20
252:14 256:18
282:14 285:9
301:4 302:9,11
302:17
**typed** 252:10
**types** 109:6
**typical** 122:5
**typically** 9:9
**tyreke** 23:5,6,6
23:20 24:3,4,5
76:15 77:6
186:3,4,8
216:13 221:15
225:8 228:17
229:7 285:6
292:14

**u**

**u** 120:19
**uh** 29:1,5
161:19
**ultimately**
100:20 110:18
125:10
**ultra** 117:3

**unclear** 10:6
**under** 13:10
15:17,18 173:9
174:7 182:14
182:16
**underlying**
210:3
**understand**
10:7,8,9,11
14:8 18:1
20:17 38:6,6,9
38:12 56:8
70:11 122:1
137:4 154:21
169:16 173:20
178:7,9 179:3
180:8 199:21
200:4,17
201:13 202:4
208:12,16,20
209:10 210:4
210:19 211:15
211:16,19,21
222:18 224:21
225:9 227:18
227:19 232:21
234:12 240:18
240:19 244:8,9
244:11,12
261:15 265:21
266:7,20 267:5
268:4,4 269:21
274:16 279:11
299:14 304:10

**understanding**
185:18 186:15
246:9 281:3,4
**understood**
11:8 98:6
102:8 257:7
**unfortunate**
293:5
**unfortunately**
250:11
**uniform** 88:18
89:1
**uniforms** 88:17
**unit** 6:6 133:5
**united** 1:1 6:8
**university**
119:4,5
**unpredictable**
136:2
**update** 204:5,6
**upper** 169:6
**uptown** 131:13
**use** 69:16 100:1
100:5 153:8,15
153:15,17
156:13 157:4
168:15 169:4
178:5,13,15,17
178:18 179:2,4
179:18 180:13
180:18 181:2,6
181:17 182:20
204:8 226:1
230:15 292:18

306:20
**used** 19:15
23:19 43:14
49:21 57:1,1,2
57:2,5 72:8,11
78:15 156:11
156:12 167:19
169:15 174:6
177:11 179:12
180:21 182:2
203:17 296:21
309:19
**using** 60:21
61:3 144:7
156:9 165:9
169:17 172:2
181:13 183:7
251:1 273:11
**usually** 138:13
235:16

**v**

**v** 309:4
**vaccine** 126:16
126:18
**vain** 242:16
**varied** 60:13
**vary** 60:12
**veins** 71:20
**verify** 309:9
**veritext** 6:13
6:15 309:14,21
**veritext.com.**
309:15

**version** 292:8
**versus** 6:7
  130:16 268:17
**victim** 94:3
  118:1 122:7,9
  123:5,15
  131:16 132:17
  140:17,18
  146:8
**victimize** 152:7
**victims** 135:18
  135:19
**video** 214:12
  217:3,14 256:4
  256:10,14,16
  256:19,20,21
  257:1 258:4,7
  259:1,4,6,13
  259:18 260:6
  260:16 261:5,9
  261:11 262:4,6
  262:13,19
  263:12,21
  264:2 265:1,7
  265:14 285:15
  290:12 291:4,7
  291:10,19
  292:1,12
  293:18 294:5,7
  294:20 300:4,5
**videographer**
  3:11 6:4,13 8:2
  84:6,9 159:20
  160:2 174:20

175:2 214:20
  215:2 230:18
  230:21 282:21
  283:3 298:7,10
  304:19 305:1,5
**videos** 261:20
  261:21 292:15
  292:16
**videotaped**
  1:10 263:5
**vigue** 1:7 6:8
  8:13 87:21
  88:1,2,18 90:2
  90:6,21 91:11
  91:19 92:2
  95:7,10,19
  96:6,14 97:13
  99:3,6,7 152:5
  241:8,19 309:4
**violation** 4:11
  4:15,17,19,21
  115:12,14
  156:13 161:17
  171:17
**violence** 117:21
  118:1 122:8,9
  123:5,15
  126:12 128:17
  128:20 130:16
  131:2 136:5
  144:14 154:17
**violent** 177:5
**visit** 73:18

**visited** 47:9
**visiting** 19:13
**visits** 81:6
**vocational**
  158:12
**voice** 52:1
  176:3 197:8,10
  197:12 198:2,5
  198:17 199:7
  200:11,12
  211:10 212:11
  216:8,10 222:1
  223:2,3,10,12
  224:12 225:2
  226:14 227:7
  230:4 234:17
  236:11,12,21
  240:8 242:10
  255:20 278:2
**voices** 215:19
  215:21 220:17
**volume** 228:2
**vs** 1:6
**vyvanse** 48:4,7

**w**

**wait** 10:20
  262:17
**waited** 145:7
**waive** 171:7
  174:3
**waived** 6:3
**waiver** 5:3
  170:10,13,18

**waking** 118:7
**walk** 177:16
  185:18
**walked** 55:21
  56:1 135:2
**walking** 131:15
  131:16 147:4
  148:8,9
**walkway** 140:6
**want** 8:18
  10:16 14:3,5
  56:8 92:17
  100:18 127:4
  137:4 150:12
  151:5,17
  154:12,20
  157:12,16
  170:20 172:9
  179:3 181:5
  183:10 192:12
  203:18 208:8
  208:10 216:5,5
  216:13,14
  217:15 222:5
  224:19 225:3,3
  234:9 238:7
  250:17 252:8
  252:14 257:10
  257:11 260:19
  285:2,7,8
  289:17 290:10
  298:20 300:12
  300:13 305:8

wanted   17:1
  70:8 96:4
  150:11 175:8
  181:9 188:13
  219:4 224:5,14
  231:6 236:8
  240:14 241:10
  241:12 275:11
  276:4 279:8,15
  288:11 294:6
  298:12
wants   224:3,11
war   156:6
warden   125:11
  126:2
warnings   87:10
  89:19,21
warrant   273:5
wasserman   3:3
  7:6,7,11,14,16
  7:20 252:1
waste   275:13
watched   14:13
  15:1 152:19
  153:3
watching   146:4
way   8:21 10:10
  38:20 42:13
  74:13 83:11
  85:14 89:1
  91:17 97:14,16
  101:3 102:14
  102:14 106:5
  138:11 150:8,9

  150:14,14
  153:17 154:4
  155:13 178:18
  181:10 182:21
  186:11 209:9
  209:13 210:3,6
  211:17 226:7
  226:16 232:20
  233:3,13
  235:15,17,17
  289:2 308:12
ways   81:5
  101:7
we've   252:10
weak   201:11
  202:2
weaker   201:12
  202:3
weakest   201:13
  202:3,21
weapon   153:8
  153:16 160:14
  170:4 171:21
wearing   89:5
weeds   38:16
week   34:14
  35:13 37:9,18
  37:20 81:14
  130:21
weekends   59:4
weekly   41:17
  60:9 130:18,20
weeks   28:1
  59:5

weigh   142:16
weight   106:11
weird   91:3
  124:15
went   28:11
  58:12 71:16
  74:2 78:9
  116:21 126:10
  137:1 153:7
  154:3,4 158:4
  168:21 185:13
  186:6,8 204:10
  205:13,13
  213:2 265:1
west   53:19
whatsoever
  64:6
white   139:8
  144:3 155:16
  165:7 266:13
  267:11 268:5
wide   118:8
  149:11,11
william   11:10
  11:12,13 105:1
willing   185:3
  188:20 190:1
  203:2
wilson   66:21
  67:2,4,9,12
  68:1,4,6,14,14
  69:5 83:18
  113:15 114:18
  191:11,11

  194:3 243:10
  262:2 303:15
  303:17 304:7
wilson's   192:15
window   15:4
wish   197:2
  215:15 220:12
  253:7 277:18
  283:20 286:14
wished   171:7
withheld
  110:13
witness   4:2
  7:13,15 8:1,3
  15:4 103:12,19
  104:2 112:20
  113:11,13
  129:19 136:17
  138:19 158:5,7
  194:16 243:7
  251:13 307:3
  308:14 309:8
  309:10,12,18
witness's   29:17
witnessed
  14:10 152:21
  153:1 205:21
witnesses
  114:14,19
  243:6 297:3,6
  300:1
witnessing
  135:13

**wolfe** 68:16
189:1 193:16
194:17 202:20
204:3,18 260:2
262:10 263:3,9
269:11 282:6,8
282:10 288:18
290:1,21
293:18 294:9
294:17,19
296:3 297:7
300:1,9,14
301:5,10,15
302:11 303:4
303:18
**wolfe's** 297:10
300:18
**woman** 203:7,8
301:11
**word** 20:20,21
152:19 273:11
**words** 112:13
205:7
**work** 35:15
36:18,19 40:1
40:4,5 56:21
57:2,21 58:20
59:2 150:2
209:6,21
232:17 235:17
250:13 251:10
251:11 252:2
258:20

**worked** 235:17
298:16 299:16
**working** 59:16
140:15 190:5
207:6 231:18
256:12 260:17
**works** 177:16
237:13
**worrying**
188:12
**worst** 152:3
**wow** 132:11
**wrapped**
143:17 144:5
**writ** 116:2
**write** 154:7,12
193:19 194:10
299:16
**written** 11:18
105:19 263:10
264:6 301:4
**wrong** 25:19
95:10 205:13
205:13 211:19
212:18 238:4
245:18 273:15
301:15 302:8
**wrongdoing**
95:11
**wrote** 111:15

**x**

**x** 4:1,7 8:8
40:11

**y**

**y** 40:11 61:21
**yard** 131:7,20
132:3 133:8,10
133:11,17
134:4,18 139:3
139:4,11 141:6
**yards** 133:13
**yeah** 18:12
19:2,10 21:17
22:21 26:16
28:11 33:17
34:15 35:11
37:1 43:2
44:21 53:12
57:5,11,20,21
58:13,21 67:20
70:18 74:10
75:6 77:3,14
80:6 88:8,11
89:6 92:3,6,6
102:1,7 106:2
107:17 108:10
108:16,20
109:21 111:1
115:21 117:19
119:1,15 120:5
124:7 125:3
128:11 129:8
129:15 130:16
131:19 132:16
132:19 133:10
133:11 135:9

137:7 138:3,7
140:2,16,18
141:9 142:10
144:6,9,15
145:13 147:13
151:3 153:13
155:1,1,20
158:4 159:15
161:13 162:9
162:15 163:5
164:3,14 165:3
165:20 181:15
182:8,11 185:6
189:17 193:12
194:9,15
197:20 200:5
200:13,18
203:10 205:5,6
206:1,20 208:1
208:12 209:1
211:1 212:12
212:21 216:15
217:8,19 220:4
222:6 224:17
226:8,9,11,17
226:18,19
228:9 230:16
234:8,8 235:11
235:11,18,19
236:2,17,21
237:1,5 238:5
238:5,8,8,8,21
238:21,21,21
239:4,5,7

241:5,5,7
242:2 243:1,8
243:20 244:4
245:4,16,16,16
248:7 254:13
256:3 257:9,15
257:17,17
258:8 260:15
260:18 262:7
263:11 264:15
265:4,11,18
268:3 269:3,3
269:4 270:7,11
270:16,17
271:19 274:9
280:3,5,8,12
280:14,16
281:18 282:3
283:16,16
285:8,20 287:7
287:10,12,20
288:1,3,9,11
288:16 290:6,7
291:5 296:19
296:21 300:7
**year** 19:4 31:20
32:13,16 41:1
41:3 42:2
44:18 54:10,12
55:5,6 56:9
59:7 74:2 77:8
77:9 115:6
116:4 117:4
124:1,7 125:14

125:14,21
126:20 134:18
141:19 204:19
**years** 18:20,21
19:1 31:5
34:20 44:20
54:7 55:2
56:14,17 69:21
77:12 78:18
79:2 80:1,15
80:16,18,19
112:17 123:4
123:20 125:18
141:7,8 147:8
150:10 160:19
165:14,19
182:9,10
187:21 203:1
211:15 218:14
219:4 239:14
240:6
**yelled** 145:11
145:19
**yo** 270:3
**young** 46:7,8
**younger** 32:13
32:16
**youngest** 53:7
**yup** 135:12,12
135:12 230:15

|   z   |
| :---: |

**z** 40:11

**zero** 220:14
234:7 253:9
**zoom** 3:5 7:17

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.